UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANU MILLARD<br>1400 Michigan Ave NE<br>Washington, DC 20017<br><br>and<br><br>TONY KEY<br>1112 Thompson Ave<br>Severn, MD 21144,<br><br>and<br><br>KEONTAE STEPTOE<br>5002 70th Ave.<br>Hyattsville, MD 20784.<br><br>On behalf of themselves and all others<br>similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOVERNMENT OF THE DISTRICT OF<br>COLUMBIA,<br><br>Defendant. | Civil Action No.: |

CLASS ACTION
COMPLAINT AND JURY DEMAND
(§ 1983 Civil Rights Claims)

**INTRODUCTION**

1.      This is a class action against the Government of the District of Columbia (the "District"

or the "District of Columbia") under 42 U.S.C.A. § 1983 brought by Sanu Millard, Tony Key,

and Keontae Steptoe (sometimes the "Named Plaintiffs" or "Plaintiffs") for injuries they and the

other class members suffered during the Class Period because the District, by enforcing its

unconstitutional handgun registration and licensing statute and regulations against them, caused

them and the other members of the Classes defined below in violation of their Second and Fifth Amendment rights.

2.     Sanu Millard, Tony Key, and Keontae Steptoe and the other members of the Second Amendment License Class and the Fifth Amendment Propensity Class (both defined below) are persons who applied for licenses to carry a pistol in public in the District but who were denied a license or whose licenses were revoked or not renewed on the basis of a regulation promulgated by the Chief of Police ("Chief") which provides licenses may only be held by a person who: "[h]as not exhibited a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another." DCMR 24-2335(d).

3.     Keontae Steptoe and Tony Key and the other members of the Second Amendment Registration Class and the Fifth Amendment "History of Violent Behavior" Class (both defined below) are persons who applied to register a handgun in the District but whose registration certificates denied or were revoked or not renewed on the basis of a statute enacted by the D.C. Council which provides licenses may only be held by a person who: "[w]ithin the 5 years immediately preceding the application, has [] had a history of violent behavior," D.C. Code § 7-2502.03(a)(6A), and a regulation promulgated by the Chief implementing the statutory provision, DCMR § 24-2309(f).

4.     Keontae Steptoe and Tony Key and the other members of the Fifth Amendment Procedural Due Process Class (defined below) are persons who applied for registration certificates or concealed carry licenses or whose registration certificates or CPLs were revoked or not reviewed and were denied a meaningful hearing.

5.     The statutory provision and the regulations are not consistent with this Nation's historical tradition of firearm regulation or any relevantly similar historical analogue.

6.     There were no founding era laws or any relevantly similar historical analogue preventing felons from owning or possessing handguns nor were there any laws generally directed at persons deemed "violent" by a law enforcement official such as a sheriff or a constable.

7.     Nor were there founding era laws or any relevantly similar historical analogue requiring registration of guns or licensing of persons carrying handguns outside the home.

8.     The statutory provision and the regulations are not consistent with the District's historical tradition of firearm regulation.

9.     Nor are the statutory provision and the regulations supported by any relevantly similar historical analogue.

10.    After the reprehensible slavery provisions were removed from the District's laws there were no laws restricting ownership and carriage of handguns.

11.    No permitting or licensing laws applicable to handguns existed in District law until 1892 when Congress imposed a licensing requirement on the concealed carry of handguns which concealed carry was otherwise outlawed by the 1892 law.

12.    It remained legal to carry a pistol openly in the District until 1943.

13.    The District had no laws governing the registration of handguns until 1976 (Firearms Control Regulations Act of 1975).

14.    The statutory provision and the regulations require the "appraisal of facts, the exercise of judgment, and the formation of an opinion," rather than providing "narrow, objective, and definite standards" to guide the Chief and his delegates in registration and licensing decisions.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the Named Plaintiffs' § 1983 claims under 28 U.S.C.A. §1331 and 28 U.S.C.A. §1343(3)-(4).

16.     Venue is proper in this jurisdiction pursuant to 28 U.S.CA. §1391(b) because the events

or omissions underlying the claims occurred in this judicial district.

## PARTIES

17.      Named Plaintiffs are adults and citizens of the United States and are part of "the

People" protected by the Second Amendment.

18.     Defendant District of Columbia is a municipal corporation capable of being sued under

D.C. Code § 1-102.

## FACTUAL ALLEGATIONS

### The District's policies governing registration and licensing statutes and regulations

19.     For years the District has maintained the most restrictive gun laws in the nation in

violation of the Second Amendment.

20.     From at least the 1970s the District maintained a total ban on ownership of guns and

public carriage of guns until 2017.

21.     Even after being forced by the Supreme Court in 2008 to allow ownership of guns in the

home, and after being forced by this Court in 2014 and the D.C. Circuit in 2017 to issue

licenses for concealed carry of handguns in public, the Mayor and Chief of Police have voiced

strong opposition to guns in general and public carriage of guns in particular.

22.     For example, the Honorable Muriel Bowser, Mayor of the District of Columbia during

the class period, stated at a public event: "You have a mayor who hates guns," she said. "If it

was up to me, we wouldn't have any handguns in the District of Columbia. I swear to protect

the Constitution and what the courts say, but I will do it in the most restrictive way as possible."

Class Action Complaint • Millard v. Gov't of D.C.

23.     Muriel Bowser: 'You have a mayor who hates guns', Washington Post, January 9, 2015.

https://www.washingtonpost.com/blogs/mike-debonis/wp/2015/01/09/muriel-bowser-you-

have-a-mayor-who-hates-guns/

24.     After the unconstitutional statutory regimes enacted by the D.C. Council were struck

down in 2014 and 2017, the Chief of police tightened the criteria for qualifying for registration

certificates and concealed carry licenses to exclude persons he believed in his subjective opinion

would be a threat to public safety as he defined that concept without any regard for the Second

Amendment right to self-defense.

25.     The Chief's policy and practice is to scour the histories of gun applicants for any events

in an applicant's life – regardless of remoteness in time – and use encounters with the police that

do not result in arrests or prosecutions as what the Chief considers indicators of "propensity for

violence or instability" or a "history of violent behavior" requiring the "appraisal of facts, the

exercise of judgment, and the formation of an opinion" to evaluate suitability for registration

certificates and concealed carry licenses, even when the applicant satisfies the "narrow,

objective, and definite standards" guiding licensing officials.

26.     The Chief uses the statutory provision and the regulations to do an end run around the

"narrow, objective, and definite standards" supporting the constitutional categorical bans on

gun possession and ownership and carriage remaining in the District's gun control laws after the

subjective "good cause" component of the District's licensing regime was enjoined by the D.C.

Circuit.

27.     The Chief makes registration and licensing decisions on the basis of materials in the

Chief's possession as interpreted by the Chief on the basis of facts as determined by the Chief

without any regard for the Second Amendment right to self-defense.

28.     For example, the Chief used Mr. Key's perfectly lawful use of a handgun to defend his daughter, himself, and his home from an unruly crowd threatening them as evidence of "a history of violent behavior" to deny his application to register a handgun and to obtain a concealed carry permit in the District.

29.     The appeals process from denials and revocations of registration certificates and concealed carry licenses is a sham kangaroo court designed and operated to rubber stamp the chief's decisions because the standard of review is a "rational basis" standard which defers to the chief's factual findings and legal conclusions and because the Chief manipulates it.

30.     For example, the Chief decided that Mr. Millard's rifle case – designed to look like a guitar case – was in fact a guitar case. The Chief then drew from his factual finding that Mr. Millard stored his rifles in a gun case the conclusion that he was unstable.

31.     On appeal, Mr. Millard tried to explain that his rifle case was designed to look like a guitar case but the District of Columbia Concealed Pistol Licensing Review Board (sometimes the "Board") rejected his explanation and the appeal because of the overly deferential standard of review.

32.     In another case the Chief denied the renewal application of an applicant, Allen Whitaker, on the basis of the same "propensity for violence or instability" regulation.

33.     When Mr. Whitaker finally got his appeal of the Chief's denial of the renewal application to the District of Columbia Court of Appeals, the Chief reversed course and granted the renewal application in a successful attempt to moot Mr. Whitaker's appeal to avoid judicial review of the original denial. Petition For Writ Of Certiorari, *Allen Whitaker v. District of Columbia Concealed Pistol Licensing Review Board*, No. 21-1545, filed Jun 29, 2022, distributed for Conference of 9/28/2022. Mr. Whitaker's petition states only a claim under the Due Process Clause, not the Second Amendment.

34.     The statutory provisions and the regulations and the Chief's implementation of them restore to the Chief the open-ended discretion previously conferred by the "good cause" licensing regime on licensing officials and condemned by the D.C. Circuit in *Wrenn*.

### The District maintains a dual system of registration of guns and licensing of persons carrying the guns outside the home

35.     Currently the District maintains a dual system of registration of handguns and licensing of persons carrying handguns outside the home to enforce its anti-gun policies.

36.     Registration requirements require registration of individual guns and do not meaningfully serve the purpose of ensuring that owners know how to operate guns safely in the way certain licensing requirements can. Registration requirements are often seen as half-a-loaf measures aimed at deterring gun ownership.

37.     In contrast, licensing requirements govern gun owners themselves.

38.     The District delegated registration and licensing of handguns to the Chief and their delegates. Applications in the first instanced are evaluated by the Firearms Registration Branch/ Gun Control Section.

39.     In order to obtain a Concealed Carry License (sometimes "CPL" from "CPWL," D.C. Code § 22-4504, carrying a pistol without a license) an applicant must: (1) meet all of the requirements for a person registering a firearm; and (2) have obtained a registration certificate for the pistol that the person is applying to carry concealed. D.C. Code § 7-2509.02(a)(2).

40.     Thus, the registration and licensing requirements and processes are separate, but a CPL depends on an applicant's being able to register the pistol the applicant wants a license for.

### D.C.'s gun registration regime

41.     The District requires each handgun lawfully possessed in the District to be separately registered. D.C. Code § 7-2502.01.

42.     Gun owners must also effectively register ammunition because possession of ammunition in the District is limited to holders of valid registration certificates for firearms. D.C. Code § 7-2506.01(a)(3).

43.     The remaining parts of the law on registration contain certain categorical bans on the registration of firearms by persons who fall into certain categories such as persons with convictions of felonies and violent misdemeanors and drug law and weapons offenses, and persons adjudicated mental incompetents. D.C. Code § 7-2502.03

44.     Subsection (6A) of the provision excludes from registering a firearm in the District persons who "[w]ithin the 5 years immediately preceding the application, [have] had a history of violent behavior." D.C. Code § 7-2502.03(a)(6A).

45.     The Chief issued a DCMR regulation (DCMR § 24-2309(f)) establishing that the term "history of violent behavior" in D.C. Code § 7-2502.03(a)(6A) is satisfied by, among other things, "[a]rrest records within the five (5) years immediately preceding the application" for offenses including but not limited to threats, assault, and any crime of violence as defined in D.C. Official Code § 23-1331(4), or any similar offense in any other jurisdiction, regardless of whether a conviction resulted from the arrest.

46.     The Chief's regulation also provides that "[a]rrest records within the five (5) years immediately preceding the application, showing that the applicant has had a history of violent behavior" and "[f]or purposes of this subsection, "history of violent behavior" includes, but is not limited to, arrests for assaults and threats, any crime of violence as defined in D.C. Official Code § 23-1331(4)."

**License to Conceal Carry Pistols**

47.     Pursuant to statutes enacted by the D.C. Council, in addition to registering their handguns, a person may concealed carry a handgun outside the home only if they also obtain a license from the Chief of Police. D.C. Code § 7-2509.02 *et seq*.

48.     Licenses are granted for concealed carry of pistols/ handguns only. The District does not issue "open carry" licenses for handguns or any kind of carry license for "long guns" such as rifles or shotguns.

49.     A CPL remains valid only for 2 years after the date of issuance when it must be renewed.

50.     The Chief has promulgated a regulation limiting issuance of CPLs to, among other things, persons who have not "exhibited a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another." DCMR § 24-2335(d) (Suitability to Obtain a Concealed Carry License).

51.     The Chief has not issued any regulations establishing the types of records that shall be used to determine whether there is *prima facie* evidence of a disqualification for issuance of a license to carry outside the home under the "propensity for violence or instability" regulation as he has for the "history of violent behavior" ban on registration in D.C. Code § 7-2502.03(a)(5). See DCMR § 24-2309(f).

52.     However, the Chief has stated that they employ the following standard in applying the "propensity for violence or instability" regulation:

> When determining whether a person meets this standard of suitability, MPD assesses all available evidence that may reflect a propensity for violence or a propensity for instability, unpredictability, or low self-control. This decision may be based on police or court records that have been sealed from the public; arrest records that may not have resulted in charges or convictions; and even records from incidents that may not have resulted in an arrest.
>
> Behavior that is violent or criminal demonstrating instability, unpredictability, or low self-control may be grounds for denial under the standard of suitability. This

determination takes into account risk factors, such as any acts of violence, history of domestic or intimate partner violence or abuse, threatened or actual use of weapons, drug or alcohol abuse, and reckless or repetitious illegal behavior.

MPD conducts an individualized assessment to determine whether an applicant has shown a propensity for violence or instability that my reasonably present a danger to the public.

If you are being denied a renewal license application, please note that all licensees are being held to the new standard of suitability described above. This may explain a denial decision without any change in circumstance that would affect your eligibility. **As noted above, MPD's standard of suitability is primarily based on reducing risk to public safety in the District of Columbia**. (emphasis added)

53.     The standard lacks any regard for the Second Amendment right to self-defense.

54.     The Chief gives applicants summaries of the Chief's analysis of the source materials he considers rather than granting them access to all of documents the Chief relies on in making registration and licensing decisions.

55.     When the Chief denies an application or revokes a license, the District of Columbia Concealed Pistol Licensing Review Board generally rubber stamps the Chief's action.

56.     Judicial review is limited.

57.     The rule leaves applicants little recourse if the Chief denies or revokes a CPL.

58.     The fact that the "history of violent behavior" statutory provision and the Chief's regulation implementing it and the Chief's "propensity for violence or instability" regulation fail to expressly contain the qualifying phrase "other than in self-defense", the fact that, like the "proper cause" standard that was rejected by the Supreme Court in NYSRPA, the statutory provision and the two regulations and the "suitability" standard impermissibly grants licensing officers the discretion to deny registration certificates and CPLs based on a perceived lack or presence of a characteristic that is vague and subjective.

### NAMED PLAINTIFFS' CASES

Class Action Complaint • Millard v. Gov't of D.C.

**Named Plaintiffs' cases illustrate how the Chief interprets and enforces the "history of violent behavior statutory provision and regulation and the "propensity for violence or instability" regulation to deny registration certificates and CPLs to law-abiding applicants**

59.     Named Plaintiffs' cases illustrate how the Chief interprets and enforces the "history of violent behavior" statutory provision and regulation and the "propensity for violence or instability" regulation to deny registration certificates and CPLs to law-abiding applicants.

60.     Each of the Named Plaintiffs is African American. The burden of the District's and the Chief's policies fall more heavily on African Americans than any other segment of applicants.

## SANU MILLARD

61.     Sanu Millard is a 23-year-old African American lifetime resident of the District.

62.     He graduated from Woodrow Wilson Senior High School.

63.     He has no criminal convictions, and, in fact, he has never been arrested let alone charged with an offense.

64.     Mr. Millard's parents divorced when he was about 15 but they continued to live near each other in the District and during the few years before he applied for and was denied a license to carry a handgun, he split his time at his mother and father's homes.

65.     At the time of his application or thereafter he possessed special police officer licenses issued by the District of Columbia, the State of Maryland, and the Commonwealth of Virginia and he worked as a special police officer in those jurisdictions.

66.     In addition, he holds a nonresident concealed carry permit issued by the Commonwealth of Virginia, and the State of Maryland.

67.     At the time of his application, he held registration certificates issued by the District of Columbia for two rifles and at least one pistol.

68.     At the time of his application, he held registration certificates or licenses issued by the District of Columbia, the State of Maryland, the Commonwealth of Virginia, and the State of Utah.

69.     Mr. Millard has met all the extensive qualifications to lawfully purchase and register firearms in the District of Columbia — a jurisdiction with notoriously difficult gun laws.

70.     Thus, the District and several State agencies have vetted Mr. Millard's background and found him fit to (1) serve as a security guard; (2) act as a Special Police Officer with arrest powers (D.C. Code § 23–582); and (3) lawfully carry a concealed handgun.

71.     And, most importantly, the MPD has specifically found him fit to register three separate firearms - two rifles and a handgun.

### Mr. Millard's application for a Concealed Carry License

72.     On September 13, 2019, Mr. Millard applied for a CPL pursuant to DCMR § 24-2332.

73.     Mr. Millard meets all the objective requirements set forth for eligibility.

74.     He has never been convicted under any of the disqualifying offenses in the registration or licensing statutes.

75.     In fact, he has never even been arrested.

76.     Nor has he ever fallen into any of the statutory "statuses" such as mental incompetence or drug addiction. *See* D.C. Code § 7-2502.03(a)(3)(mental illness or condition); see D.C. Code § 22-4503 (unlawful possession of firearms).

77.     One of the criteria for registration of a firearm in the District is that "[w]ithin the 5 years immediately preceding the application, has not had a history of violent behavior." D.C. Code § 7-2502.03(a)(6A).

78.     Although the Chief denied Mr. Millard's application for a CPL the Chief has never revoked the registration certificates for his rifles and handgun.

79.     Nonetheless, on December 21, 2019, the Metropolitan Police Department – Gun Control Section issued a Notice of Denial in response to Mr. Millard's application for a CPL on the basis of the Chief's "propensity for violence or instability" regulation.

80.     The Notice of Denial cited D.C.M.R. 2335.1(d) as a basis for disqualifying Mr. Millard from obtaining a CPL citing Mr. Millard's "propensity for violence or instability that may reasonably render" his "possession of his concealed pistol a danger" to himself or another.

81.     Specifically, the Notice of Denial erroneously stated that Mr. Millard has "[e]xtensive criminal history" that is reflected in "serious criminal charges."

82.     In support of this erroneous conclusion, the Notice of Denial references two incidents involving the MPD and which the Notice of Denial mischaracterizes as "Extensive Criminal History."

83.     The Notice of Denial states: "(Extensive Criminal History)—Specifically your criminal history reflected the following serious criminal charges; Family Report 11/24/18 (DC) (No Arrest), Family Report 2/8/19 (DC) (No Arrest). Although all of these charges may not have resulted in convictions, the totality of charged offenses may be used when determining suitability to be licensed to carry a pistol."

84.     An attachment to the denial contained an MPD memo listing these two incidents and an additional incident where the police were called to the mother's home because of problems with the boyfriend.

85.     The attachment also outlining the process by which the MPD arrived at the decision to deny Mr. Millard's application for a CPL:

> The factors that were weighed during the consideration of this application were that he had been involved in three family domestic events in which police were needed to resolve the disturbance, it was alleged that he has mental health issue that could be a liability if he were to be issued a CCPL. Lastly, as documented he violated the firearm registration duties by not notifying the MPD that he had

changed locations of his firearms, which directly demonstrates that he may not abide by the regulations governing CCPL.

86.     But, in an Orwellian inversion of logic, the "[e]xtensive criminal history" that is reflected in "serious criminal charges" the Chief referenced in the Notice of Denial and attachment refers to two interactions Mr. Millard had with police in which he was not arrested or charged with a crime but was rather the victim of domestic violence by his divorced mother's boyfriend.

87.     Mr. Millard disputed all of the facts the Chief relied on in his appeal of the Chief's denial of his CPL application.

88.     The background to the events the Chief relied on stem from the fact that in 2014, when Mr. Millard was a teenager, his parents divorced. Although his parents divorced, they continued to live near each other in Northwest Washington, D.C.

89.     First he lived with his father and then when he was 18 he began splitting his time between his mother and his father.

90.     After the divorce, Mr. Millard's mother began a relationship with a man who ultimately became her boyfriend.

91.     The relationship was stormy and the boyfriend's behavior frequently led to the police being called to the mother's home to calm the mother and especially the boyfriend.

92.     In the first incident referenced by the Chief, police were called to the mother's home because the boyfriend pushed Mr. Millard and bloodied his lip after the mother had asked the boyfriend to leave her home.

93.     In the second incident, the boyfriend arranged for a false tip to the MPD that someone was storing illegal firearms in the mother's basement in preparation for a "beef."

94.     The reality is that Mr. Millard was legally storing two long guns lawfully registered to him in a locked gun storage case disguised for safety's sake to look like a guitar case in the locked storage area in the basement of the mother's apartment building.

95.     Mr. Millard was not "beefing" with anyone.

96.     In the third incident, on the same date as the second incident, the boyfriend grabbed Mr. Millard's mother's computer keyboard from Mr. Millard when Mr. Millard was attempting to retrieve Mr. Millard's mother's keyboard and computer at her request after she had asked the boyfriend to leave her home.

97.     Another factor the Chief relied on for the denial is that during the third incident where police came to the home the boyfriend told police that Mr. Millard had mental health issues and as a result MPD called a "Crisis Intervention Officer" to the scene. The "Crisis Intervention Officer" found that Mr. Millard was not in crisis.

98.     Although it was the obviously biased spurned boyfriend who told MPD that Mr. Millard had mental health issues, and the MPD's own "Crisis Intervention Officer" found that Mr. Millard was not in crisis, the Chief nonetheless held that the fact that a "Crisis Intervention Officer" had been called to the scene at all was evidence of Mr. Millard's "instability."

99.     D.C. Code § 16-1031 requires mandatory arrest for intrafamily offenses when probable cause is present, but MPD never arrested Mr. Millard in connection with any of these incidents.

100.    The Chief contended that the Mr. Millard's being a victim of mother's boyfriend's domestic violence renders his living situation unstable and dangerous and is a risk factor weighing against his suitability for a CPL.

101.    This denial sets a dangerous precedent of preventing victims of domestic violence from obtaining a Concealed Carry Pistol License and discouraging victims of domestic violence from calling the police for protection from violence.

102.    Finally, Mr. Millard did register a change of address with the MPD when he changed the storage location of his firearms

### Mr. Millard submitted a timely appeal

103.    On January 20, 2020, Mr. Millard timely filed an appeal from the denial of the CPL to the Concealed Pistol Licensing Review Board.

104.    In his response to Mr. Millard's appeal the Chief introduced additional incidents which were not listed as the basis of the denial of the application in the Notice of Denial which he claimed established a violation of the "propensity for violence or instability" regulation.

105.    Mr. Millard explained how each of the allegations was factually incorrect.

106.    The Concealed Pistol Licensing Review Board summarily denied Mr. Millard's appeal on April 23, 2020.

107.    Rather than granting Mr. Millard a CPL for self-defense it relied on evidence of the boyfriend's aggressive and assaultive conduct as a reason to deny the CPL, stating: "the Panel is deeply concerned about the introduction of a CPL into a home with such a recent and troubling pattern of domestic violence."

108.    Mr. Millard still does not have a CPL issued by the Chief.

### TONY KEY

109.    Mr. Key is an upstanding member of the community, a Maryland resident for the last fifteen years, a business owner, a homeowner and licensed firearms instructor.

### Tony Key's application for a Concealed Carry License

110.    In 2021, Tony Key, age 45, of 5409 Chillum Place NE, Washington, DC, initiated the two-step process for a applying for a Concealed Carry Pistol License with the MPD Firearms Registration Branch: step one: apply to register a handgun; upon approval of the registration, apply for a CPL.

111.    At the time of his application, he was a firearms instructor, and he has a license to carry firearms in several states including Maryland, Virginia, and Utah.

112.    He still retains those licenses in good standing.

## The Chief denied Mr. Key's application for a CPL

113.    But, on June 24, 2021, the Chief denied Mr. Key's application for a CPL because, the Chief averred, Mr. Key was not "a suitable person to be so licensed" under 24 DCMR § 332.l(h) and because pursuant to D.C. Code§ 7-2502.03(a)(6A) "within the 5 years immediately preceding the application, [he has had] a history of violent behavior".

114.    The Denial stated that:

> When determining whether a person meets this standard of eligibility, MPD assesses all available evidence that may reveal your criminal history. This decision may be based on police or court records that have been sealed from the public; arrest records that may not have resulted in charges or convictions; and even records from incidents that may not have resulted in an arrest. Behavior that is violent or criminal demonstrating instability, unpredictability, or low self-control may be grounds for denial under the standard of eligibility. This determination takes into account risk factors, such as any acts of violence, history of domestic or intimate partner violence or abuse, threatened or actual use of weapons, drug or alcohol abuse, and reckless or repetitious illegal behavior. MPD conducts an individualized assessment to determine whether an applicant's history has shown instability, low self control, that may reasonably present a danger to the public.

115.    The Chief relied on two incidents: an alleged "unlawful discharge at crowd" charge in Maryland in 2019, and an alleged ADW/ CPWL charge by the MPD on September 5, 2020.

116.    The alleged "unlawful discharge at crowd" charge and arrest (referred to as a "disorderly conduct" by the Maryland authorities, was, based on the Maryland police reports, a constitutional exercise by Mr. Key of his Second Amendment right to self-defense and protection of his daughter using a lawful handgun Mr. Key was licensed to carry.

117.    The following account tracks the version of events the Chief relied on in making his revocation decision.

118.    Mr. Key and his daughter were being menaced by a crowd in front of his Maryland home, one of whom had yelled, ""I'm going to shoot the house up."

119.    Mr. Key fired a shot from a lawful handgun into the ground in front of the crowd to disperse the crowd and it worked – the crowd menacing Mr. Key ran to their cars and left peacefully.

120.    The prosecutor accepted Mr. Key's explanation that he acted in self-defense and the prosecutor declined to prosecute the charge ("no papered" the case in Superior Court parlance) the arrest charge.

121.    The arrest was expunged.

122.    Implicit in the Second Amendment right to carry a handgun outside the home for self-defense is the right to fire the handgun.

123.    The Chief's reliance on this incident as evidence of "a history of violent behavior" effectively excludes from carriage of handguns in public for self-defense people who have actually exercised the Second Amendment right to use a handgun for self-defense.

124.    The second incident was an arrest by the MPD for ADW (assault with a deadly weapon) and CPWL (carrying a pistol without a license) in the District on September 5, 2020.

125.    The arrest report on which the Chief based his version of the incident begins with the report-writing officer's disclaimer, "[t]his statement off acts is based on my best recollection without having the legal authorization to review any associated body worn camera footage to assist in writing this statement."

126.    The MPD's ADW narrative is based on third-party hearsay.

127.    According to the MPD ADW narrative, officers were flagged down by two people who falsely alleged that Mr. Key, also on the scene, and whom they knew, had pointed a gun at them.

128.    The sworn *Gerstein* affidavit states that in response to a call MPD officers approached Mr.

Key in his truck and asked him to identify himself and whether there was a firearm in the truck

without any mention of an ADW.

129.    Mr. Key truthfully identified himself to the officers and truthfully reported that there was

a pistol in his glovebox and that he had permits to conceal carry from outside the District but

not a District-issued CPL.

130.    As to the alleged ADW the *Gerstein* states merely that, ""[o]fficers were investigating an

*allegation* of an assault with a deadly weapon." (emphasis added).

131.    On the basis of third-party hearsay – the two people who flagged down the MPD - MPD

also arrested and charged Mr. Key with ADW (DV)/ CPWL (D.C. Code § 22-4504, carrying a

pistol without a license) and referred the prosecution to the US Attorney.

132.    Mr. Key did not assault anyone in connection with the incident.

133.    Mr. Key was licensed to carry the handgun in three other states.

134.    The U.S. attorney initiated a prosecution for CPWL in Superior Court but not for the

MPD ADW arrest charge.

**The Chief erroneously allegedly Mr. Key "had been convicted by guilty plea to**

**"attempted carrying a pistol without a license" growing out of the arrest for**

**CPWL**

135.    In the Notice of Revocation the Chief erroneously allegedly that Mr. Key "had been

***convicted*** by guilty plea to "attempted carrying a pistol without a license" growing out of the

arrest for CPWL. (emphasis added).

136.    Admittedly, "conviction of a weapons offense (but not an infraction or misdemeanor

violation under § 7- 2502.08, § 7-2507.02, § 7-2507.06, or § 7-2508.07) or a felony in [the

District] or any other jurisdiction" is a disqualifying conviction under D.C. Code § 7-2502.03(a)(2).

137.    But, as the Chief knows, and as the docket of the Superior Court proves, Mr. Key has never been ***convicted*** of a weapons offense under Section 7-2502.03(a)(2). Docket entry, *U.S. v. Key*, 2020 CF2 006853 (November 20 and 23, 2020).

138.    Mr. Key was arrested and prosecuted for carrying a pistol without a license in the District on September 5, 2020.

139.    But, about a month after the prosecution began, Mr. Key accepted responsibility and entered a guilty plea in a Deferred Sentencing Agreement to a charge of *Attempted* Carrying a Pistol without a License.

140.    The Deferred Sentencing Agreement provided that, upon successful completion of community service and the other terms of the agreement, the U.S. Attorney would not oppose withdrawal of the plea, and the U.S. Attorney would *nolle* the case. Docket entry, *U.S. v. Key*, 2020 CF2 006853 (October 20, 2020).

141.    Judge Erik Christian approved the Deferred Sentencing Agreement, and he accepted the plea.

142.    Mr. Key successfully completed the terms of the Deferred Sentencing Agreement and on November 20, 2020, two months after the arrest, Mr. Key withdrew the guilty plea and the U.S. Attorney *nolle*'d the prosecution. Docket entry, *U.S. v. Key*, 2020 CF2 006853 (November 20 and 23, 2020).

143.    Therefore, Mr. Key was never convicted of *Attempted* Carrying a Pistol without a License because he withdrew the plea before the Judge entered sentence, and the U.S. Attorney *nolle*'d the charge.

144.    Mr. Key appealed the denial of the CPL to the Concealed Pistol Licensing Review

Board:

145.    The Board dismissed the appeal rather than remanding for supplementing the record

because it assumed that the Chief had refused to issue the registration certificate for a valid

reason:

> The record in this case does not reflect that the issuing authority, the Chief of the
> Metropolitan Police Department ("Chief"), has granted Anthony Key
> ("appellant") a registration certificate, **likely due to a finding of appellant's
> ineligibility pursuant to D.C. Official Code § 7-2502.03(a) (setting
> forth provision disqualifying persons from firearms registration
> certificates)**. In any event, because District law is clear that the Chief must issue
> a registration certificate as a prerequisite to considering a CPL application, this
> appeal hereby is DISMISSED WITHOUT PREJUDICE. (emphasis added)

146.    The Chief's refusal to actually issue a denial of a registration certificate denies Mr. Key

the statutory right under D.C. Code § 7-2502.10(a) to submit further evidence in support of the

qualifications to hold a registration certificate to the Chief as the statute provides, and to ask the

Chief to reconsider the denial.

147.    The Chief's refusal to actually issue a denial of a registration certificate also denies Mr.

Key the right to appeal any denial or refusal to reconsider

### KEONTE STEPTOE

148.    Mr. Steptoe is a resident of the District who applied for and received a registration for a

handgun in the District and a CPL May 3, 2021.

### Keonte Steptoe's Concealed Carry License revoked by the Chief

149.    On December 13, 2021, the Chief's designee issued a Notice of Revocation of Mr.

Steptoe's CPL.

### Notice of Revocation of CPL

150.    The Notice revoked Mr. Steptoe's CPL pursuant to D.C. Code Sec. 7-2509.05(a)(1) and

24 D.C.M.R. § 2341.1 (no longer satisfies one or more of the concealed carry license

qualifications or failed to comply with one or more requirements or duties imposed upon the

licensee) and 24 D.C.M.R. § 2344.2(d)(a licensee shall carry any pistol in a manner that it is

entirely hidden from view of the public when carried on or about a person, or when in a vehicle

in such a way as it is entirely hidden from view of the public.

151.    The Notice cited to the following violation as the basis to revoke:

> "Fail to carry a pistol in a holster on your person in a firmly secure manner that is
> reasonably designed to prevent loss, theft, or accidental discharge." During an
> investigative stop it was found that the pistol you were carrying was not secured
> on your person. The pistol was found inside your vehicle's glove box, loaded."

152.    The Chief did not indicate that Mr. Steptoe failed to meet any of the other registration

or licensing requirements and Mr. Steptoe in fact met and continues to meet all these

requirements.

153.    On January 28, 2022, Mr. Steptoe, through counsel, timely filed an appeal with the

Concealed Pistol Licensing Review Board because, since Mr. Steptoe was in a vehicle at the

time of the stop, the applicable regulations permitted him to carry the handgun in the glovebox

of his vehicle.

154.    In his appeal, Mr. Steptoe, through counsel, pointed out that 24 D.C.M.R. Sec. 2344

states that "A licensee shall carry any pistol in a manner that it is entirely hidden from view of

the public when carried on or about a person, or when in a vehicle, in such a way as it is entirely

hidden from view of the public."

155.    The Code itself mandates against a Licensee carrying a pistol on one's person when it

should in fact be entirely hidden from view of the public. Mr. Steptoe's firearm was found inside

his locked glove box, in such a way as it was *entirely hidden from view of the public*. (Emphasis added.)

156.     Therefore, Mr. Steptoe did not violate D.C.M.R. 2344.2 because his conduct was not governed by that section of the Municipal Regulations as he was in a vehicle.

157.     Thus, the Board recognized that the Chief erred by applying D.C.M.R. 2344.2.

158.     On March 10, 2022, the Concealed Pistol Licensing Review Board issued an order staying the appeal and instructing the Chief to explain why explain why the Chief's reliance on 24 DCMR § 2344.2 as the basis for the revocation decision was not a legal error.

## The Chief revoked Mr. Steptoe's registration certificate instead of responding to the Board's Order

159.     But, rather than respond to the Board's order to justify his application of D.C.M.R. 2344.2 to revoke Mr. Steptoe's **CPL**, the Chief on April 5, 2022 issued a proposal to revoke Mr. Steptoe's **registration certificate** – a predicate of Mr. Steptoe's holding a CPL – on the theory that "MPD has determined that Mr. Steptoe does not meet the criteria for firearm registration based on the finding that Mr. Steptoe has a disqualifying "history of violent behavior" within the past five years. D.C. Code §§ 7-2502.03(a)(6A), 7- 2502.09(a)(1).

160.     On April 5, 2022, the same day as the proposed notice of revocation of the registration, the Chief filed a response asking the Board to uphold the revocation of the CPL but on a different basis – "Mr. Beale (sic) does not meet the requirements for a person registering a firearm."

161.     On April 7, the Board dismissed the appeal of the revocation of the CPL for lack of a registration certificate.

## Notice of Revocation of Registration Certificate

162.     The Chief proposed revoking Mr. Steptoe's registration based on the D.C. Code § 7-2502.03(a)(6A) which prohibits firearm registration for individuals who have had a history of violent behavior within the past five years.

Class Action Complaint • Millard v. Gov't of D.C.

163.    The statute, as enacted by the D.C. Council, does not provide "objective, and definite standards" guiding licensing officials in evaluating applications for and revocations of registration certificates.

164.    Therefore, the provision invites the Chief to engage in the "appraisal of facts, the exercise of judgment, and the formation of an opinion" in deciding when the provision applies.

165.    The Chief issued a DCMR regulation establishing that the term "history of violent behavior" in D.C. Code § 7-2502.03(a)(6A) is satisfied by, among other things, "[a]rrest records within the five (5) years immediately preceding the application" for offenses including but not limited to threats, assault, and any crime of violence as defined in D.C. Official Code § 23-1331(4), or any similar offense in any other jurisdiction, regardless of whether a conviction resulted from the arrest. *See also* DCMR § 24-2309(f).

166.    Therefore, the Chief's regulations invite the Chief's delegates in the Firearms Registration Branch to engage in the "appraisal of facts, the exercise of judgment, and the formation of an opinion" in deciding when the provision applies.

167.    In Mr. Steptoe's case the Chief relied on the following incidents to revoke the registration:

168.    • On April 5, 2017, Mr. Steptoe threatened to shoot someone before fleeing the scene in a vehicle. (CCN: 17-055-197)

169.    • On April 29, 2020 there was a Sound of Gunshots call in the 1300 block of Fairmont Street, NW. Officers were dispatched and, upon arrival, they located multiple spent shell casings and a crime scene. Shortly thereafter, Mr. Steptoe delivered the shooting victim to an area hospital. (CCN: 20-065-194)

170.    • On November 28, 2021 in the 1300 block of Fairmont Street, NW you attempted to interfere with a. police investigation by assaulting a police officer and resisting arrest. You were

additionally found to be in possession of a quantity of marijuana, the amount of which was more consistent with the intent to distribute the drug.

171.    • On December 13, 2021 [Mr. Steptoe was] arrested for Possession with Intent to Distribute Marijuana while Armed. The officers recovered various forms of leafy green substance that tested positive for Marijuana, and located [Mr. Steptoe's] registered firearm loaded and improperly stored in the glove box of your vehicle.

172.    But, the **Chief's version of the facts was wrong.**

173.    In the April 5, 2017, incident, Mr. Steptoe never threatened to shoot someone and he never fled the scene in a vehicle. (CCN: 17-055-197). Mr. Steptoe was not arrested in this incident. The stepfather was arrested; Mr. Steptoe was a witness.

174.    In the April 29, 2020 incident, Mr. Steptoe acted as a Good Samaritan and carried a wounded person to the hospital. Mr. Steptoe was not arrested in this incident.

175.    In the November 28, 2021 incident, Mr. Steptoe did not assault or interfere with a police officer. The encounter resulted in an arrest but the U.S. Attorney no-papered the MPD arrest charges.

176.    In the December 13, 2021 incident, Mr. Steptoe was arrested but the prosecutor no papered the arrest and personal use marijuana is legal in the District and carrying a gun in the glovebox of the vehicle is the correct mode of transporting a handgun in a vehicle. 24 D.C.M.R. Sec. 2344.

177.    Mr. Steptoe has never been charged with a crime by a prosecutor.

**Mr. Steptoe "appealed" the revocation of his registration certificate by asking the Chief to reconsider the revocation in light of facts presented by Mr. Steptoe but the Chief refused to do so**

178.    On April 19, 2022 Mr. Steptoe through counsel timely submitted further evidence in support of the qualifications to continue to hold a registration certificate to the Chief as the statute provides. D.C. Code § 7-2502.10(a).

179.    The statute requires the Chief or their designee to respond to the submission within 10 days of the date of receipt with a final decision on the proposed registration revocation.

180.    The Chief has never provided a decision.

181.    Counsel for Mr. Steptoe has emailed (the usual method of communication) the designees numerous times about the decision but Counsel has never received a response from the designees.

182.    Once in a phone call on an unrelated related matter with the Chief's designee Counsel raised the Steptoe "appeal" on the call. The Chief's designee said he would "get back to me" but he never did.

183.    Mr. Steptoe applied for a registration certificate in September of 2020. At the time of his application, the Chief had available Mr. Steptoe's existing law enforcement contacts, which included the 2017 and 2020 incidents now cited as reasons for revoking his firearm registration certificate. In other words, at the time of the application, the Chief considered Mr. Steptoe's criminal history in the preceding five years and approved the application and issued a firearm registration certificate on January 7, 2021. This sequence of events supports the argument that the Notice to revoke Mr. Steptoe's registration is pretextual – not in fact based on Mr. Steptoe's conduct or history.

**The examples of Named Plaintiffs show how the Chief's registration and licensing regulations and his enforcement of the District's and his own regulations deprives applicants and holders of their Second Amendment and Fifth Amendment rights**

184.    These examples of Named Plaintiffs show how the Chief's registration and licensing regulations and his enforcement of the District's and his own regulations deprives applicants and holders of their Second Amendment and Fifth Amendment rights.

185.    The District's policymakers enacted an overly restrictive registration and licensing regime as a matter of policy.

186.    The D.C. Council delegated the Chief enforcement and rulemaking authority.

187.    The Chief uses the state procedures to enact regulations that allow him to establish subjective criteria which the Chief interprets requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion" to do an end run around the objective components of the District's gun registration and licensing regime.

188.    Like the "proper cause" standard that was rejected by the Supreme Court in *Bruen*, and the D.C. Circuit in Wrenn, the "good moral character" standard impermissibly grants the Chief and his delegates the discretion to deny registration certificates and CPLs based on a perceived traits which as set forth in the statutory provision and the Chief's regulations are overbroad and vague and subjective terms in violation of the under the Second Amendment and the Fifth Amendment.

189.    The Chief relies on MPD generated arrest reports and other documents containing third party narratives the Chief and his delegates shape to deny or revoke handgun registration certificates and CPLs without regard to the Second Amendment right to self-defense.

190.    The Concealed Pistol Licensing Review Board employs an overly deferential standard of review that rubber stamps the Chief's version of the facts and in most cases the Chief's legal decisions applying the statutes and regulations.

191.    The Concealed Pistol Licensing Review Board affirms the Chief's denial, revocation, and refusals to renew registration certificates and CPLs pursuant to "established state procedures."

192.    On information and belief the Chief blocks review of his denial or revocation of registration certificates by refusing to reconsider the revocation in light of facts presented by applicants and by refusing to correct the MPD's erroneous factual findings using the discretion granted him by the Mayor's and his own regulations.

## Substantive Allegations for Claims

### Claim 1

### Second Amendment CPL Claim

193.    The preceding paragraphs are incorporated as though fully stated herein.

194.    The Chief routinely relies on D.C.M.R. 2335.1(d), the "propensity for violence or instability" regulation, as a basis for denying or revoking CPLs from law-abiding applicants or licensees whom the Chief classifies as having a "propensity for violence or instability that may reasonably render" their "possession of his concealed pistol a danger" to himself or another.

195.    The regulation is overbroad on its face and as applied.

196.    The regulation is not consistent with this Nation's historical tradition of firearm regulation.

197.    The regulation does not make any exceptions for the Second Amendment right to self-defense.

198.    The propensity for violence/ instability regulation allows the Chief to evade the "narrow, objective, and definite standards" components of the District's CPL system and to indulge in the "appraisal of facts, the exercise of judgment, and the formation of an opinion" in

making CPL decisions instead of being guided by "narrow, objective, and definite standards" in licensing decisions.

199.    This system allows the Chief practically unfettered and unreviewable discretion to deny a CPL to an applicant or revoke the CPL of a licensee who satisfies all of the objective criteria in the regulatory framework including an applicant or licensee who has not been convicted of any of the disqualifying offenses or status enumerated in the statutes enacted by the D.C. Council.

200.    The regulation as promulgated and as applied by the Chief impermissibly shifts the Chief's burden of establishing that an applicant for or a license is not qualified as a basis for denial or revocation to the applicant or licensee to show that they are qualified for a CPL in addition to meeting the objective criteria.

201.    The "propensity for violence or instability" regulation as promulgated and as applied by the Chief violated Named Plaintiffs' Second Amendment rights.

202.    The moving force of the constitutional violations was the Chief's promulgation and enforcement of the "propensity for violence or instability" regulation.

203.    The Second Amendment License Class Named Plaintiffs and the other members of the Second Amendment License Class suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses and loss of the constitutional right to carry handguns in self-defense outside the home that resulted from denial of their CPLs because of the District's enactment and enforcement of its "propensity for violence or instability" to deny or revoke or refuse to renew their CPLs.

204.    The Second Amendment Named Plaintiffs and the other class members are therefore entitled to monetary compensation and the other relief described herein.

## Claim 2

## Second Amendment Registration Certificate Claim

Class Action Complaint • Millard v. Gov't of D.C.

205.    The Chief has issued a regulation establishing that the term "history of violent behavior" in D.C. Code § 7-2502.03(a)(6A) is satisfied by, among other things, "[a]rrest records within the five (5) years immediately preceding the application" for offenses including but not limited to threats, assault, and any crime of violence as defined in D.C. Official Code § 23-1331(4), or any similar offense in any other jurisdiction, regardless of whether a conviction resulted from the arrest. See also DCMR § 24-2309(f).

206.    The preceding paragraphs are incorporated as though fully stated herein.

207.    The Chief routinely relies on D.C. Code § 7-2502.03(a)(6A) ("history of violent behavior" provision) and his regulation implementing it, DCMR § 24-2309(f) ("history of violent behavior" regulation), as a basis for denying registration certificates from law-abiding applicants or holders of registration certificates whom the Chief classifies as having a "history of violent behavior."

208.    The "history of violent behavior" provision and regulation are overbroad on their faces and as applied.

209.    The "history of violent behavior" provision and regulation is not consistent with this Nation's historical tradition of firearm regulation.

210.    In fact, requiring registration of all handguns is not consistent with this Nation's historical tradition of firearm regulation.

211.    The regulation does not make any exceptions for the Second Amendment right to self-defense.

212.    The "history of violent behavior" provision and regulation allows the Chief to evade the "narrow, objective, and definite standards" components of the District's registration system and to indulge in the "appraisal of facts, the exercise of judgment, and the formation of an opinion"

in making registration decisions instead of being guided by "narrow, objective, and definite standards" in registration decisions.

213.    This system allows the Chief practically unfettered and unreviewable discretion to deny a registration certificate to an applicant or revoke the registration certificate of a licensee who satisfies all of the objective criteria in the regulatory framework including an applicant or licensee who has not been convicted of any of the disqualifying offenses or status enumerated in the statutes enacted by the D.C. Council.

214.    The "history of violent behavior" provision and the regulation as promulgated and as applied by the Chief impermissibly shifts the Chief's burden of establishing that an applicant for or registration certificate is not qualified as a basis for denial or revocation to the applicant or registration certificate holder to show that they are qualified for a registration certificate in addition to meeting the objective criteria.

215.    The "history of violent behavior" provision and the regulation as promulgated and as applied by the Chief violated Named Plaintiffs' Second Amendment rights.

216.    The moving force of the constitutional violations was the enactment of the "history of violent behavior" provision and the Chief's enforcement of the provision and the Chief's promulgation and enforcement of the regulation.

217.    The Second Amendment Registration Class Named Plaintiffs and the other members of the Second Amendment Registration Class suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses and loss of the constitutional right to own handguns including the right to own handguns and to carry handguns in self-defense outside the home that resulted from denial or revocation of their registration certificates.

218.    The Second Amendment Registration Class Named Plaintiffs and the other class members are therefore entitled to monetary compensation and the other relief described herein.

**Claim 3**

**Fifth Amendment Registration "History Of Violent Behavior" Vagueness Claim**

219.    The preceding paragraphs are incorporated as though fully stated herein.

220.    The D.C. Council enacted a registration regime which requires gun owners in the District to register every gun they own and have in the District.

221.    The D.C. Council enacted the "history of violent behavior" provision in D.C. Code § 7-2502.03(a)(6A) which prohibits persons with a "history of violent behavior" from registering handguns, and thus obtaining CPLs.

222.    The Chief issued a regulation establishing that the term "history of violent behavior" in D.C. Code § 7-2502.03(a)(6A) is satisfied by, among other things, "[a]rrest records within the five (5) years immediately preceding the application" for offenses including but not limited to threats, assault, and any crime of violence as defined in D.C. Official Code § 23-1331(4), or any similar offense in any other jurisdiction, regardless of whether a conviction resulted from the arrest. See also DCMR § 24-2309(f).

223.    Neither the statutory provision nor the Chief's regulation implementing the provision make any exceptions for the Second Amendment right to self-defense.

224.    Both the statutory provision and the Chief's regulation implementing the provision are "void for vagueness" under the second prong of the Fifth Amendment vagueness doctrine, the arbitrary and discriminatory enforcement prong.

225.    The "history of violent behavior" provision and the regulation as promulgated and as applied by the Chief violated Named Plaintiffs' Fifth Amendment rights.

226.    The moving force of the constitutional violations was the enactment of the "history of violent behavior" provision and the Chief's enforcement of the provision and the Chief's promulgation and enforcement of the regulation.

227.    The Fifth Amendment Registration Class Named Plaintiffs and the other members of the Fifth Amendment Registration Class suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses and loss of the constitutional right to own handguns including the right to carry handguns in self-defense outside the home that resulted from denial of their registration certificates.

228.    The Fifth Amendment Registration Class Named Plaintiffs and the other class members are therefore entitled to monetary compensation and the other relief described herein.

**Claim 4**

**Fifth Amendment CPL "Propensity for Violence or Instability" Regulation**

**Vagueness Claim**

229.    The preceding paragraphs are incorporated as though fully stated herein.

230.    The D.C. Council enacted a licensing regime which requires gun owners in the District to obtain and maintain a CPL to carry a handgun for self-defense in public.

231.    The D.C. Council delegated the Chief the authority to promulgate regulations on the subject.

232.    The Chief issued a regulation prohibiting persons whom the Chief decides have a "propensity for violence or instability" from obtaining or maintaining CPLs.

233.    The regulation does not provide any exception for the Second Amendment right to self-defense.

234.    The "propensity for violence or instability" regulation is "void for vagueness" under the second prong of the Fifth Amendment vagueness doctrine, the arbitrary and discriminatory enforcement prong.

235.    The "propensity for violence or instability" regulation as promulgated and as applied by the Chief violated Named Plaintiffs' Fifth Amendment rights.

236.   The moving force of the constitutional violations was the Chief's promulgation and enforcement of the "propensity for violence or instability" regulation.

237.   The Fifth Amendment Propensity Class Named Plaintiffs and the other members of the Fifth Amendment Propensity Class suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses and loss of the constitutional right to own handguns including the right to carry handguns in self-defense outside the home that resulted from denial of their registration certificates.

238.   The Fifth Amendment Propensity Class Named Plaintiffs and the other class members are therefore entitled to monetary compensation and the other relief described herein.

## Claim 5

### Fifth Amendment Procedural Due Process Claim

239.   The preceding paragraphs are incorporated as though fully stated herein.

240.   The District's procedures for appealing denial and revocation decisions of registration and licensing of persons for carrying handguns are part of an established District procedure.

241.   The proceedings are constitutionally deficient. The Chief and his delegates do not give adequate reasons for denying registration certificates and CPLs, the Chief relies on secret information, and the standard of review on its face and as applied unconstitutionally limits applicants'/ revokees' rebuttal of the Chief's findings.

242.   The District deprived people of their protected interests in obtaining and retaining gun registration certificates and Concealed Carry Licenses or CPLs by denying applications or by revoking registration certificates and CPLs without providing prompt post deprivation hearings at which people could challenge the Chief's registration and CPL decisions in prompt hearings conducted by a neutral arbiter according to fair procedural and evidentiary rules.

243. The District should have provided prompt post deprivation hearings at which people could have challenge the Chief's registration and CPL decisions in prompt hearings conducted by a neutral arbiter according to fair procedural and evidentiary rules.

244. The lack of such prompt post deprivation hearings violated Named Plaintiffs' Fifth Amendment rights.

245. The moving force of the constitutional violations was the lack of such prompt post deprivation hearings.

246. The Fifth Amendment Due Process Class Named Plaintiffs and the other members of the Fifth Amendment Due Process Class suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses and loss of the constitutional right to own handguns including the right to carry handguns in self-defense outside the home that resulted from denial of their registration certificates.

247. The Fifth Amendment Due Process Class Named Plaintiffs and the other class members are therefore entitled to monetary compensation and the other relief described herein.

## RULE 23 ALLEGATIONS

248. Named Plaintiffs on behalf of themselves and the classes defined below bring this action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following three classes consisting of each person who:

249. **Second Amendment License Class/ Fifth Amendment Propensity Class**: (i) in the period beginning three years before the date of filing of the original complaint in this case and going forward up to the case is terminated; (ii) was denied or lost to revocation a CPL; (iii) by the Chief; (iv) because of the Chief's "propensity for violence or instability" regulation.

250. **Second Amendment Registration Class/ Fifth Amendment "History of Violent Behavior" Class**: (i) in the period beginning three years before the date of filing of

the original complaint in this case and going forward up to the case is terminated; (ii) was denied

or lost to revocation a CPL; (iii) by the Chief; (iv) because of the "history of violent behavior"

statutory provision and the Chief's regulation.

251.    **Fifth Amendment Due Process Class**: (i) in the period beginning three years before

the date of filing of the original complaint in this case and going forward up to the case is

terminated; (ii) was denied or lost to revocation a CPL; (iii) by the Chief; (iv) because of the lack

of prompt post deprivation hearings.

252.    Certification of these classes under Federal Rule of Civil Procedure 23(b)(2) is

appropriate, because the District of Columbia has a policy, pattern, and practice for each claim

that has uniformly affected all members the class, and injunctive relief and declaratory judgment

and a judgment against the District will benefit each and every named plaintiff and class

member.

253.    The classes are entitled to injunctive relief including issuance of or restoration of

registration certificates and CPLs.

254.    Certification of the classes under Federal Rule of Civil Procedure 23(b)(3) is also

appropriate, in that common questions of law and fact predominate over any individual

questions, and class action treatment is superior for the fair and efficient adjudication of these

class claims as detailed below.

255.    The classes are entitled to monetary relief.

256.    Regarding Named Plaintiffs and the other members of the classes defined above, there

are no individual questions on the issue of liability, because all members of each of the classes

were injured by the same policy and practices.

257.    Among the questions of law and fact common to the classes are:

258.    whether the Chief's "propensity for violence or instability" regulation or any part of it during the Class Period violated the Second Amendment facially or as applied;

259.    whether the District's "history of violent behavior" regulation or any part of it or the Chief's implementing regulation or any part of it during the Class Period violated the Second Amendment facially or as applied;

260.    whether during the Class Period requiring separate registration of all handguns violated the Second Amendment;

261.    whether Named Plaintiffs and the members of the classes are entitled to equitable relief, and, if so, what is the nature of that relief; and

262.    whether a jury can determine the general damages for an entire class using a damages matrix on the basis of a trial using a sample of the class members.

263.    Each of the classes is both so numerous that joinder of all members is impracticable. The exact number of the classes members is unknown to plaintiffs at this time, but discussions with lawyers, instructors, and applicants/ holders indicates that each class numbers in the hundreds.

264.    Sanu Millard, Tony Key, and Keontae Steptoe's claims are typical of the claims of the other members of the they are members of and the classes were injured by exactly the same means, that is, by District's Chief's unconstitutional policies and enforcement of their unconstitutional policies.

265.    Sanu Millard, Tony Key, and Keontae Steptoe on behalf of themselves and the classes will fairly and adequately protect the interests of the members of the classes and have retained counsel who are competent and experienced in complex federal civil rights class action litigation and criminal defense law including the District's unconstitutional gun control regime.

266.    Sanu Millard, Tony Key, and Keontae Steptoe on behalf of themselves and each of the classes of which they are members have no interests that are contrary to or in conflict with those of the members of each of the classes of which they are members.

## CLASS RELIEF DEMANDS

267.    Sanu Millard, Tony Key, and Keontae Steptoe as Named Plaintiffs on behalf of themselves and all other members of the classes of which they are members respectfully request that this Court grant the following relief:

**A.**    Enter judgment in their favor on all of their claims;

**B.**    Grant a jury trial on all claims so triable;

**C.**    Declare that the Chief's "propensity for violence or instability" regulation on its face or as applied to them and other class members violates the Second Amendment and grant them nominal damages;

**D.**    Declare that the District's "history of violent behavior" statutory provision and the Chief's implementing regulation on their face or as applied to them and other class members violates the Second Amendment and grant them nominal damages.

**E.**    Declare that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) and certifying the classes defined above, and designating Sanu Millard, Tony Key, and Keontae Steptoe as the proper representative of each of the classes of which they are a member and appointing William Claiborne as class counsel.

**F.**    Award Sanu Millard, Tony Key, and Keontae Steptoe and all other members of the classes defined above injunctive relief in the form of enjoining application of the "propensity for violence or instability" regulation ordering the Chief to process their

applications for CPL on the basis of the objective criteria in the CPL statutes and regulations;

**G.**   Award Sanu Millard, Tony Key, and Keontae Steptoe and all other members of the classes defined above injunctive relief in the form of enjoining enforcement of the statutes and regulations requiring separate registration of all handguns.

**H.**   Award all Named Plaintiffs and class members compensatory and consequential damages in an amount to be determined at trial;

**I.**   Award Plaintiffs attorney's fees and costs incurred in bringing this action under 42 U.S.C. § 1988 or as determined under the "common fund" rule; and

**J.**   Grant such other relief as this Court deems just and proper.

| | |
|---|---|
| Respectfully submitted,<br><br>/s/ William Claiborne<br>WILLIAM CLAIBORNE<br>D.C. Bar # 446579<br><br>Counsel for Sanu Millard, Tony Key, and Keontae Steptoe on behalf of themselves and the putative class members<br><br>717 D Street, N.W<br>Suite 300<br>Washington, DC 20006<br>Phone 202/824-0700<br>Email claibornelaw@gmail.com | |

## JURY DEMAND

Plaintiffs demand a jury of six as to all claims so triable.

/s/William Claiborne
WILLIAM CLAIBORNE

D.C. Bar # 446579
Counsel for Plaintiffs and the classes