## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SANU MILLARD,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-CV-02672-RCL** |
| **GOVERNMENT OF THE DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

## DEFENDANT'S MOTION TO STAY THE CASE
## OR, ALTERNATIVELY, DISMISS PLAINTIFFS' COMPLAINT

Defendant District of Columbia (District) moves to stay the case or, alternatively, under

Federal Rule of Civil Procedure 12(b)(6) to dismiss the Complaint [1] of Plaintiffs Sanu Millard,

Tony Key, and Keontae Steptoe.  A memorandum of points and authorities as well as a proposed

order are attached.  Because this Motion is dispositive, the District has not sought Plaintiffs'

consent.  *See* LCvR 7(m).

Date: February 27, 2023.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

STEPHANIE E. LITOS
Interim Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Adam J. Tuetken*

ANDREW J. SAINDON [456987]
Senior Assistant Attorney General
ADAM J. TUETKEN [242215]
Assistant Attorney General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendant*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SANU MILLARD**, *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-CV-02672-RCL** |
| **GOVERNMENT OF THE DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO STAY THE CASE OR, ALTERNATIVELY, DISMISS PLAINTIFFS' COMPLAINT</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

    I.    Regulation of Gun Possession and Carrying in the District ................................. 2

        A.    Firearm Registration ................................................................................ 2

        B.    Licensing for Concealed Carry ................................................................ 4

    II.    Plaintiffs' Cases ................................................................................................. 6

        A.    Millard ..................................................................................................... 6

        B.    Key .......................................................................................................... 7

        C.    Steptoe ................................................................................................... 7

    III.    Procedural History ............................................................................................ 8

LEGAL STANDARD ............................................................................................................ 9

ARGUMENT ...................................................................................................................... 10

    I.    The Court Should Abstain From Deciding This Case Until The District-Law Issues Can Be Decided By District Adjudicators. ........................................ 10

    II.    Plaintiffs' Second Amendment Claims Fail. ........................................................ 12

        A.    The Second Amendment Covers Only Law-Abiding, Responsible Individuals, Not Dangerous Individuals. ................................................ 14

        B.    Alternatively, the District's Dangerousness Standards Are Consistent with the Nation's Historical Tradition of Firearm Regulation. ............................................................................................. 19

            1.    The Historical Record Shows that Governments Could Disarm Dangerous Individuals. ................................................... 19

            2.    The District's Dangerousness Standards Are Relevantly Similar to Historical Laws. .......................................................... 26

        C.    Plaintiffs' Arguments to the Contrary Are Meritless ............................... 29

III.    Plaintiffs' Vagueness Claims Fail..............................................................34

    A.    The "History of Violent Behavior" Standard Is Not Vague. ....................35

    B.    The "Propensity for Violence or Instability" Standard Is Not
        Vague. ...................................................................................................37

IV.    Plaintiffs' Procedural Due Process Claims Fail........................................39

    A.    Plaintiffs Failed to Pursue All Available Process. ....................................40

    B.    Plaintiffs Fail to Identify Any Constitutionally Deficient
        Procedures...............................................................................................41

        1.    The Chief Provides Adequate Notice. ..........................................41

        2.    The System Affords Prompt Post-Deprivation Hearings..............43

        3.    The Board's Standards Are Constitutional. ..................................44

CONCLUSION................................................................................................................46

## INTRODUCTION

As then-Judge and now-Justice Barrett explained, "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting). The District prohibits dangerous people from possessing guns by authorizing the Metropolitan Police Department (MPD) to deny firearm registration and concealed carry licenses to individuals who are likely to be dangerous if allowed to possess a firearm or carry a pistol in public. In doing so, the District provides a process—culminating in judicial review—for individuals who have been denied registration or licenses to challenge those decisions and receive final determinations about whether they qualify as dangerous under District law.

Plaintiffs are three individuals who were denied registration or licenses but declined to complete the review processes available under District law. They now claim that the District's firearms registration and licensing system violates the Second Amendment, is void for vagueness, and deprived them of procedural due process. Although Plaintiffs attempt to cloak their claims in constitutional garb, most of them reduce to a simple contention: that District agencies misapplied District law. Yet, no local court has weighed in on the District-law issues underlying Plaintiffs' claims. Because resolution of those issues by a local court could obviate the need to decide Plaintiffs' constitutional claims, the Court should abstain.

Even if the Court does not abstain, it should dismiss the Complaint [1]. First, Plaintiffs' Second Amendment claims fail because, in accord with the original meaning of the Second Amendment and a long history of regulation, the District's system constitutionally prohibits dangerous persons from accessing guns. Second, Plaintiffs' vagueness claims fail because the dangerousness standards MPD uses to deny registration or licenses identify readily discernible courses of conduct. Third, Plaintiffs' procedural due process claims fail because the District's

system affords a bevy of procedural protections—many of which Plaintiffs did not pursue.  The Court should thus conclude that Plaintiffs fail to state a claim.

## BACKGROUND

### I.     Regulation of Gun Possession and Carrying in the District

People who want to keep a gun at home or at a place of business in the District must obtain a registration certificate for that weapon, which requires them to satisfy certain standards, including, but not limited to, that they have no recent history of violent behavior that would indicate a likelihood of unlawful firearm use.  People who want to carry a concealed pistol in the District must first obtain a registration certificate for that pistol and then a concealed carry license, which requires them to satisfy additional standards, including, but not limited to, that they do not have a propensity for violence or instability that would render their public carrying of a concealed pistol a danger to themselves or others.

#### A.     Firearm Registration

Any person in the District who "possess[es] or control[s]" a firearm must register it, subject to several exceptions not relevant here.  D.C. Code § 7-2502.01(a).  A person seeking a concealed carry license also must register the pistol he intends to carry in the District, even if it is being kept elsewhere.  *Id.* § 7-2509.02(a)(2).  Applicants often apply for a registration certificate and a concealed carry license at the same time.  *See* MPD, *Concealed Carry Pistol License Application* 2, https://tinyurl.com/5n953d76; MPD, *Instructions for Submitting an Application for a Concealed Carry Pistol License* 1, https://tinyurl.com/mr3fudd9.

The Chief of MPD issues registration certificates when certain requirements are met, including, for example, that the applicant "[h]as not been convicted of a weapons offense" "or a felony" and has not recently been "[c]ommitted to a mental institution."  D.C. Code § 7-2502.03(a)(2), (6)(A)(5).  This case involves only one of the several qualifications to receive

a registration certificate: that the applicant, "[w]ithin the 5 years immediately preceding the application, has not had a history of violent behavior," *id.* § 7-2502.03(a)(6A), which may be demonstrated by "[a]rrest records," 24 DCMR § 2309.01(f).  This includes but is not limited to: arrests for threats to do bodily harm under D.C. Code § 22-407; assaults or threatened assaults in a menacing manner under D.C. Code § 22-404; any "crime of violence" under D.C. Code § 23-1331(4)[1]; or "any similar provision of the law of any other jurisdiction so as to indicate a likelihood to make unlawful use of a firearm."  24 DCMR § 2309.1(f).

To begin the registration process, the applicant must provide certain information to the Chief, including any past revocations of a firearm license, D.C. Code § 7-2502.03(b)(6), and fingerprints, *id.* § 7-2502.04(a).  The Chief then uses that information to perform a background check, which may include "[i]nquiry and investigation of the applicant's criminal history," "[r]ecord checks," "[s]ubmission of fingerprints to the F.B.I.," and "interviews or other investigative techniques."  24 DCMR § 2314.2.

If the Chief determines there is no history of violence and the other eligibility factors are met, he approves the application and issues a registration certificate.  *Id.* § 2314.4.  If the Chief denies the application, he must notify the applicant of the proposed denial or revocation and explain his reasons.  D.C. Code § 7-2502.10(a).  If the applicant does not respond, the proposed denial or revocation becomes final.  *Id.*  If the applicant chooses to "submit further evidence in support of the application or qualifications, the Chief must respond with a final decision.  *Id.* § 7-2502.10(b).  If the Chief has "not expressly approved or denied" a registration application

---

[1]     D.C. Code § 23-1331(4) identifies several "crime[s] of violence" for purposes of the District's pre-trial detention statute, including, for example, "armed carjacking," "kidnapping," and "cruelty to children."

within 60 days, the application is "deemed to be denied for the purpose of appealing." 24 DCMR § 2315.7.

The applicant may appeal the Chief's final denial or revocation decision to the Office of Administrative Hearings (OAH), which must provide a de novo evidentiary hearing to resolve any disputed facts. *See* D.C. Code §§ 7-2502.10(b), 2-1831.03(b-2); 1 DCMR §§ 2821, 2822. If the OAH denies his claim, he may petition the D.C. Court of Appeals for review. D.C. Code § 2-1831.16(e).

### B.    <u>Licensing for Concealed Carry</u>

District law allows the carrying of a concealed pistol with a license issued by the Chief. *See* D.C. Code §§ 22-4504(a), 22-4506. To qualify, the applicant must meet several requirements, including, for example, registering the pistol he intends to carry and completing a firearms training course. *Id.* § 7-2509.02(a)(2), (4). This case involves only one of those requirements: that the applicant be "a suitable person to be so licensed," *id.* § 22-4506(a), meaning that he "[h]as not exhibited a propensity for violence or instability that may reasonably render [his] possession of a concealed pistol a danger to [himself] or another," 24 DCMR § 2335.1(d). To enable the Chief to make this determination, the applicant provides certain information, *id.* § 2337(d), (e), which the Chief then uses to conduct an investigation, which may entail interviewing references and reviewing criminal records, *id.* §§ 2338.1, 2338.2(e)–(g).

If the Chief approves the application, a concealed carry license is issued to the applicant. *Id.* § 2340.1. If he denies the application, he must provide written notice to the applicant providing the reasons for the denial. *Id.* § 2340.3.

A concealed carry license is valid for two years. D.C. Code § 7-2509.03(a), (b)(1). During that time, the Chief may revoke the license if he finds that the licensee failed to comply with his duties for responsible carrying, 24 DCMR § 2341.1(2), or no longer meets licensing

requirements, D.C. Code § 7-2509.05(a)(1).  To do so, the Chief must serve a "notice of intent"

explaining the reasons for revocation and informing the applicant that the revocation will take

effect unless he files a timely appeal.  *Id.* § 7-2509.05(a)(4); 24 DCMR § 2341.3.

A person who has had a license denied or revoked may appeal to the Concealed Pistol

Licensing Review Board (the Board).  D.C. Code §§ 7-2509.02(g), 7-2509.03(c),

7-2509.05(a)(4).  The Board consists of 11 members (drawn from law enforcement, mental

health professions, and members of the public with relevant experience) and typically hears

appeals sitting in three-member panels.  *See id.* § 7-2509.08; 1 DCMR § 1202.  The Board may

resolve the appeal through summary disposition if it "determines that the resolution of the appeal

does not include a dispute concerning a material fact."  1 DCMR § 1210.1.  When, however, the

appeal requires the Board to resolve disputed material facts, the appeal proceeds to a de novo

evidentiary hearing.  *Id.* §§ 1208.1, 1218.2.  At the hearing, the appellant must "prove disputed

material facts by a preponderance of the evidence," *id.* § 1218.2, but the Board defers to the

Chief's exercise of discretion in applying the statutory and regulatory standards for licensure, *id.*

§ 1218.3.[2]

A party aggrieved by the Board's decision may petition the D.C. Court of Appeals for

review.  *See* D.C. Code § 7-2509.08(f).

---

[2]     Prior to June 2021, the Board's regulations did not require de novo review of disputed
facts.  *See* 1 DCMR § 1218.1 (2020) ("[T]he appellant has the burden of persuading the Board
that the Chief's final action should be reversed or modified based on substantial evidence.").
The Board amended the regulations in June 2021 to clarify that the Board conducts a de novo
hearing and resolves disputed facts under a preponderance of the evidence standard.  Notice of
Emergency and Propose Rulemaking, 68 D.C. Reg. 7,779, 7,779–81 (Aug. 6, 2021).  Millard's
appeal was denied by the Board under the prior regulations, but he does not contend that the
differences between the two versions are relevant to his claims.

## II.   Plaintiffs' Cases

Plaintiffs are three individuals (Sanu Millard, Tony Key, and Keontae Steptoe) who were denied or revoked concealed carry licenses or firearm registration certificates due to MPD's determination that they satisfied one of the District's dangerousness standards.

### A.   Millard

The Chief denied Millard a concealed carry license in December 2019 because Millard "exhibited a propensity for violence or instability that may reasonably render [his] possession of a concealed pistol a danger to [himself] or another" under 24 DCMR § 2335.1(d).  Compl. ¶¶ 79–80; Def.'s Ex. A, Final Order & Decision Den. Appeal of Sanu Millard (Millard Order) 1– 2.[3]  The notice of denial and an attached memorandum explained the Chief's reasoning in detail. Compl. ¶¶ 81–85; Millard Order 1–2.

Millard appealed to the Board and argued that he did not have a propensity for violence or instability.  Compl. ¶ 103; Millard Order 3.  After a preliminary review, the Board notified the parties that the appeal did not appear to present any factual disputes, so summary disposition may be appropriate.  Millard Order 4.  Each party then presented their arguments in writing to the Board.  *Id.* at 5–19.

The Board affirmed the Chief's denial of a concealed carry license in July 2020.  *Id.* at 19–22.  Millard did not petition the D.C. Court of Appeals for review.  *See* Compl. ¶ 108.

---

[3]     The Court may consider, on a motion to dismiss, public records and filings before an administrative agency.  *Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017).  The Court may also consider "[p]ublic records . . . when referred to in the complaint and integral to the plaintiff's claim."  *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 273 (D.C. Cir. 2018).  The Complaint refers to and quotes filings in each Plaintiff's case, and the claims depend on the Chief's and Board's decisions.  *E.g.*, Compl. ¶¶ 81, 114, 160.  To the extent any of Plaintiffs' allegations contradict the administrative record, the record controls.  *Owens*, 897 F.3d at 272–73.

**B.**     **Key**

The Chief denied Key a concealed carry license in June 2021 because eligibility for a registration certificate is a prerequisite for licensing, D.C. Code § 7-2509.02(a)(2), and Key was ineligible for the prerequisite registration certificate because he had a "history of violent behavior" "within the 5 years immediately preceding the application," D.C. Code § 7-2502.03(a)(6A).  Compl. ¶ 113; Def.'s Ex. B, Key Notice of Denial (Key Notice).  The notice of denial explained the Chief's reasoning.  Compl. ¶¶ 114–15; Key Notice 1–2.

Key appealed the denial to the Board.  Compl. ¶ 144.  The Board dismissed the appeal without prejudice because Key lacked the prerequisite registration certificate.  Def.'s Ex. C, Key Order to Dismiss Without Prejudice (Key Order) 1.  The Board advised Key that he could appeal the Chief's effective denial of a registration certificate to OAH.  *Id.*  If Key obtained a registration certificate, he could then resubmit his concealed carry license application to the Chief and, if denied, appeal to the Board.  *Id.*  Key took no further action.

**C.**     **Steptoe**

The Chief revoked Steptoe's concealed carry license in December 2021 because Steptoe violated his duty as a licensee to carry his pistol in a holster on his person under 24 DCMR § 2344.2.  Compl. ¶ 150; Def.'s Ex. D, Steptoe Dec. 22, 2021 Notice of Revocation (Steptoe 2021 Notice) 1.  The notice of revocation explained the Chief's reasoning.  Compl. ¶¶ 150–51; Steptoe 2021 Notice 1–2.

Steptoe appealed the revocation to the Board.  Compl. ¶ 153.  He argued that a different regulation applied because he had been in his vehicle.  *Id.* ¶¶ 153–56; Def.'s Ex. E, Steptoe Order to Stay 1.  The Board stayed the case and remanded the issue to the Chief to show cause why Steptoe's argument was incorrect.  Compl. ¶ 158; Steptoe Order to Stay 2.

7

On remand, the Chief determined that Steptoe was ineligible for a registration certificate because he had a history of violent behavior within the previous five years under D.C. Code § 7-2502.03(a)(6A) and revoked his registration certificate.  Compl. ¶ 159; Def.'s Ex. F, Steptoe Apr. 5, 2022 Notice of Revocation (Steptoe 2022 Notice) 1.  Because Steptoe lacked the prerequisite registration certificate, the Board dismissed his appeal without prejudice, advising him that he could pursue an appeal through MPD and OAH.  Compl. ¶ 161; Def.'s Ex. G, Steptoe Dismissal Without Prejudice (Steptoe Order) 1–2.  If Steptoe obtained a registration certificate, he could then reapply to the Chief for a concealed carry license and, if denied, appeal to the Board.  *Id.*  Steptoe appealed the revocation of his registration certificate to MPD in April 2022.  Def.'s Ex. H, Apr. 19, 2022 Appeal of Notice of Revocation of Firearms Registration. MPD has not changed its original decision, meaning that his appeal has been constructively denied.  *See* Compl. ¶¶ 178–82; 24 DCMR § 2315.7.  Steptoe has not appealed to OAH.

## III.   **Procedural History**

Plaintiffs, on behalf of themselves and three putative classes, sued the District to challenge their denials or revocation of concealed carry licenses or registration certificates.  *See* Compl.  They allege five claims: (1) the regulation providing that licenses may be denied if a person has "exhibited a propensity for violence or instability that may reasonably render [his] possession of a concealed pistol a danger," 24 DCMR § 2335.1(d), violates the Second Amendment on its face and as applied to Plaintiffs; (2) the statute and regulation providing that registration may be denied if a person has a "history of violent behavior," D.C. Code § 7-2502.03(a)(6A); 24 DCMR § 2309.01(f), violate the Second Amendment on their face and as applied to Plaintiffs; (3) the "history of violent behavior" statute and regulation are void for vagueness in violation of the Fifth Amendment; (4) the "propensity for violence or instability" regulation is void for vagueness; and (5) the procedures for appealing denials and revocations of

licenses and registrations violate procedural due process under the Fifth Amendment.  Compl.

¶¶ 193–247.  Plaintiffs seek a declaration that the challenged provisions are unconstitutional, an

injunction enjoining their enforcement, and compensatory and nominal damages.  *Id.* ¶ 267.

## LEGAL STANDARD

A complaint must be dismissed for "failure to state a claim upon which relief can be

granted."  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, the "complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)).  Courts need not accept as true conclusory "assertions devoid of further

factual enhancement," *Iqbal*, 556 U.S. at 679 (internal quotation marks and citation omitted), or

"legal conclusions," *Pueschel v. Chao*, 955 F.3d 163, 166 (D.C. Cir. 2020).  Courts may consider

abstention arguments with a Rule 12(b) motion and review whether the complaint presents issues

that warrant abstention.  *E.g.*, *Trump for President, Inc. v. Boockvar*, 481 F. Supp. 3d 476, 487

(W.D. Pa. 2020).

A plaintiff bears a "heavy burden" in bringing a facial challenge.  *United States v.

Salerno*, 481 U.S. 739, 745 (1987).  He cannot merely suggest that constitutional problems may

arise when the law is applied to some "conceivable set of circumstances."  *Id.*  Rather, the

complaint must affirmatively "establish that no set of circumstances exists under which the Act

would be valid."  *Id*.  Where a statute has a "plainly legitimate sweep," a facial challenge must

fail.  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (internal

quotation marks and citation omitted).

## ARGUMENT

### I.    The Court Should Abstain From Deciding This Case Until The District-Law Issues Can Be Decided By District Adjudicators.

The Court should abstain from deciding this case or otherwise exercise its equitable discretion to stay this case because it is predicated on unresolved issues of District law. Under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), a federal court may abstain from deciding cases where resolution of state-law issues will obviate the need to rule on a federal constitutional question. *Quackenbush v. Allstate Ins.*, 517 U.S. 706, 716–17 (1996). More generally, a federal court enjoys the "inherent" power to stay proceedings due to "economy of time and effort for itself, for counsel, and for litigants." *Bledsoe v. Crowley*, 849 F.2d 639, 645 (D.C. Cir. 1988) (internal quotation marks omitted) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)).

Here, Plaintiffs allege that they should not be disqualified under the District's history of violence and suitability standards and that District agencies misapplied District law. *E.g.*, Compl. ¶¶ 93, 126–27, 172. In other words, Plaintiffs contend that they are not, in fact, violent or unstable. No local court, however, has determined the scope of the terms "history of violent behavior" and "propensity for violence and instability"—let alone whether, on the facts, the District may bar Plaintiffs from obtaining a registration or a license under these standards. Those questions, which are demonstrably questions of District law, warrant abstention. They make clear that this case "concern[s] the applicability of [a] challenged statute to a certain person or a defined course of conduct, whose resolution in a particular manner would eliminate the constitutional issue and terminate the litigation." *Baggett v. Bullitt*, 377 U.S. 360, 376–77 (1964). Indeed, the federalism concerns undergirding *Pullman* abstention squarely apply here, where receiving clarity on the meaning of registration and licensure requirements and whether

10

they apply to a plaintiff on the facts should precede deciding the constitutionality of the licensing scheme.  *See Osterweil v. Bartlett*, 706 F.3d 139, 145 (2d Cir. 2013) (O'Connor, J., sitting by designation) (applying *Pullman* abstention in face of request to overturn handgun licensing law, and reiterating that the Supreme Court "has [w]arn[ed] against premature adjudication of constitutional questions . . . when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court"); *see also Davis v. Grimes*, 9 F. Supp. 3d 12, 33 (D. Mass. 2014) (declining to resolve Second Amendment challenge to police's application of licensing law because the scope of the law was best left to state courts); *Doe No. 1 v. Putnam County*, No. 16-cv-8191, 2020 WL 7027596, at *7–8 (S.D.N.Y. Nov. 30, 2020) (similar).

The fact that there is no litigation currently pending in local court is no bar to *Pullman* abstention.  *See, e.g.*, *Pullman*, 312 U.S. at 501 (holding that abstention was appropriate even though state agency decision had not been appealed); *San Remo Hotel v. City & County of San Francisco*, 145 F.3d 1095, 1104 (9th Cir. 1998) ("Once *Pullman* abstention is invoked by the federal court, the federal plaintiff must then seek a definitive ruling in the state courts on the state law questions before returning to the federal forum.").  In fact, the D.C. Circuit has held that a case fell "squarely within the scope of the *Pullman* abstention doctrine" where appellants had "been before the Superior Courts . . . for a number of years, [but had] not pursued an appeal to the District of Columbia Court of Appeals, which thus never had an opportunity to rule on [their] claims."  *Justice v. Superior Ct., D.C.*, 732 F.2d 949, 950 (D.C. Cir. 1984).

Abstention aside, resolution of plaintiffs' claims is premature due to ripeness and other prudential considerations.  In evaluating ripeness, a court examines the "fitness of the issues for judicial decision," *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), including "whether the

agency action is final; whether the issue presented for decision is one of law which requires no additional factual development; and whether further administrative action is needed to clarify the agency's position," *Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 854 (D.C. Cir. 2006) (internal quotation marks and citation omitted).  As discussed above, the gist of Plaintiffs' claims is that they are not, in fact, violent, and that the Chief's conclusions require additional factual development and should be determined through additional administrative process.  At a minimum, it makes little sense for this Court to serve as referee on factual disputes when Plaintiffs should have availed themselves of the opportunity to present those issues in the proper forum before the appropriate adjudicators.  *See White v. Ill. State Police*, 15 F.4th 801, 810 (7th Cir. 2021) ("[R]espect for the review mechanism[s] that [the government] has established, along with broader concerns of comity and federalism, counsel against a searching federal review.").

## II.  <u>Plaintiffs' Second Amendment Claims Fail.</u>

If the Court reaches the merits, Plaintiffs' Second Amendment claims nonetheless fail because the District may prevent individuals who pose a risk of danger from possessing or carrying guns.  A Second Amendment challenge requires a challenger to show that the law infringes on activity protected by "the Second Amendment's plain text," as originally understood.  *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129–30 (2022).  If the challenger can show that his conduct is covered by the Second Amendment, the law is only "presumptively" unlawful.  *Id.* at 2130; *see also Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (instructing that "a plaintiff bears certain burdens to demonstrate an infringement of his rights" and that "[i]f the plaintiff carries these burdens, the focus then shifts to the defendant to show that its actions were nonetheless justified.").  Ultimately, the law must be upheld if the government can demonstrate that it "is consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130.

Here, Plaintiffs challenge the constitutionality of only one aspect of the District's registration and licensing schemes: its dangerousness standards. Specifically, Plaintiffs challenge (1) the prohibition on issuing registration certificates for people who, in the previous five years, have demonstrated a "history of violent behavior," Compl. ¶ 205 (internal quotation marks omitted) (quoting D.C. Code § 7-2502.03(a)(6A)); and (2) the prohibition on issuing concealed carry licenses to people whose conduct demonstrates a "propensity for violence or instability," *id.* ¶ 194 (internal quotation marks omitted) (quoting 24 DCMR § 2335.1(d)).[4]

Neither challenge states a claim on which relief can be granted. Dangerous individuals fall outside the scope of the Second Amendment, which addresses only the right of only law-abiding, responsible citizens to possess or carry guns. Alternatively, Plaintiffs' challenges should be dismissed because governments have long been empowered to prohibit dangerous people from possessing or carrying guns and public, and the District's laws follow in that historical tradition. *See Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019) (affirming dismissal of challenge to federal felon-in-possession ban because the meaning and history of the Second Amendment supported disarming felons).

---

[4] To be clear, each Plaintiff only has standing to challenge the licensing or registration laws that barred him from owning or carrying a gun. *See California v. Texas*, 141 S. Ct. 2104, 2114 (2021) ("[O]ur cases have consistently spoken of the need to assert an injury that is the result of a statute's actual or threatened *enforcement* . . . ."); *Hightower v. City of Boston*, 693 F.3d 61, 70 (1st Cir. 2012) (plaintiff lacked standing to challenge aspects of concealed carry licensing regime that were not applied to her). So Millard lacks standing to challenge the registration provisions because he never had a registration certificate denied or revoked. Key and Steptoe lack standing to challenge the licensing provisions because they were not eligible for a license due to their lack of a registration certificate. Key Order 1; Steptoe Order 1. Nonetheless, because at least one plaintiff has standing to challenge either the licensing or registration provisions, this motion addresses all the challenged provisions on the merits.

**A.** **The Second Amendment Covers Only Law-Abiding, Responsible Individuals, Not Dangerous Individuals.**

Plaintiffs' claims fail at the threshold because the Second Amendment does not encompass a right of dangerous individuals to possess guns or carry them in public.  The Second Amendment protects "the right of the people to keep and bear arms."  U.S. Const. am. II.  In *Bruen*, the Supreme Court held that the conduct of those challengers was covered by this plain text because it was undisputed that they were "ordinary, law-abiding, adult citizens" and thus "part of 'the people' whom the Second Amendment protects."  142 S. Ct. at 2134 (citing *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008)).  The Court has thus broadly instructed that "nothing in [*Heller*] should be taken to cast doubt on longstanding," "presumptively lawful" prohibitions on possession by individuals who cannot be trusted to responsibly use firearms for self-defense, *e.g.*, restrictions on "felons and the mentally ill."  *Id.* at 626–27 & n.26; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1255 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that the presumptively lawful prohibitions identified in *Heller* "were within the historical understanding of the scope of the right").

In examining historical sources "to determine the public understanding of" the Second Amendment, *Heller*, 554 U.S. at 605, proposals from the Pennsylvania, Massachusetts, and New Hampshire ratifying conventions reveal how the Founders conceived of the right, *e.g.*, *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).[5]  The "highly influential" Pennsylvania proposal,

---

[5]    If the Court does not agree that *Bruen* instructs that courts consider the scope of the Second Amendment before assessing, if at all, the historical pedigree of a particular regulation, *see* p. 12, *supra*, the Court may nonetheless consider the above arguments and sources when deciding whether the regulation is "consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130; *see Kanter*, 919 F.3d at 452 (Barrett, J., dissenting) ("These approaches will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away.").

14

*Heller*, 554 U.S. at 604, guaranteed the right to arms "unless for crimes committed, or real danger of public injury from individuals," *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (internal quotation marks and citation omitted).  Likewise, the Massachusetts proposal—drafted by Samuel Adams—"would have limited the right to 'peaceable citizens.'"  *Id.* at 455 (citation omitted).  "At the time, 'peaceable' was defined as '[f]ree from war; free from tumult'; '[q]uiet; undisturbed'; '[n]ot violent; not bloody'; '[n]ot quarrelsome; not turbulent.'"  *Id.* (quoting 1 Samuel Johnson, *A Dictionary of the English Language* (5th ed. 1773)).  Finally, the New Hampshire proposal provided that Congress could disarm a citizen if he was "in actual rebellion."  *Id.* at 454 (emphasis, internal quotation marks, and citation omitted).  Because "[r]ebels posed a risk of insurrection and so were dangerous," this proposal too "focus[ed] on dangerousness."  *Folajtar v. Att'y Gen.*, 980 F.3d 897, 915 (3d Cir. 2020) (Bibas, J., dissenting).  "[T]aken together," each of these precursors to the Second Amendment reflect the Founders' understanding that individuals who "threatened violence" or posed a "risk of public injury" could be categorically excluded from keeping arms.  *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

Based on this historic conception of the right, the D.C. Circuit, courts, and scholars have concluded that dangerous individuals can be ineligible for gun ownership.  *E.g.*, *Medina*, 913 F.3d at 159 (collecting cases); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 713 (2009).  *Bruen* did not cast doubt on the principle that certain individuals can be disqualified from accessing guns.  *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm . . . ."); *id.* at 2162 (Kavanaugh, J., concurring) (emphasizing that the *Bruen* decision does not disturb *Heller*'s discussion of "presumptively lawful" prohibitions on possession by certain classes of

individuals).  Thus, both history and precedent instruct that the Second Amendment does not preserve a right of dangerous individuals to keep or bear arms.

The District's dangerousness standards are reasonably crafted to prohibit only violent and other dangerous people from possessing firearms and carrying them in public.  *See Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017) (explaining that "traditional limits" on the Second Amendment right "include, for instance, licensing requirements"); *id.* at 659 ("[L]egal regulations of possession or carrying that are 'longstanding' . . . reflect limits to the preexisting right protected by the Amendment." (quoting *Heller*, 554 U.S. at 626)); *Heller II*, 670 F.3d at 1255 (stating that the background check requirement for firearm registration is "akin to licensing the gun owner"); *Berron v. Ill. Concealed Carry Licensing Rev. Bd.*, 825 F.3d 843, 847 (7th Cir. 2016) (explaining that "[l]icensure is how states determine whether" someone is a law-abiding, responsible citizen with a right to bear arms).  Indeed, the *Bruen* Court took care to note that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of "licensing regimes," which are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"  142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635).  The Court further noted that these regimes "often require applicants to undergo a background check."  *Id.*  And Justice Kavanaugh, joined by the Chief Justice, separately stressed that "the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun."  *Id.* at 2161 (Kavanaugh, J., concurring); *see also Abed v. United States*, 278 A.3d 114, 129 n.27 (D.C. 2022) (affirming a conviction for unlicensed carry and explaining that *Bruen* "'does not prohibit States from imposing licensing requirements' for concealed-carry of a handgun (quoting *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring))).

What is more, the *Bruen* Court favorably passed on several states' licensing statutes with dangerousness or suitability standards like the District's.  *See* 142 S. Ct. at 2123 n.1 (majority op.) (listing 43 states' licensing systems), 2138 n.9.  For example, the Court characterized Connecticut's scheme as permissible because its "suitable person standard precludes permits only to those individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon." *Id.* at 2123 n.1 (internal quotation marks and citations omitted).  Besides Connecticut, the Court cited more than a dozen states with licensing laws—compiled in the following Table 1—that allow the licensing authority to deny a concealed carry license if the authority determines that the applicant poses a danger or otherwise is unsuitable.  *Id.*

| Statute | Dangerousness or Suitability Standard |
|---|---|
| Ala. Code § 13A-11-75(c)(11) | Licensing authority shall deny the application if the applicant "[c]aused or causes justifiable concern for public safety" |
| Colo. Rev. Stat. § 18-12-203(2) | "[I]f the sheriff has a reasonable belief that documented previous behavior by the applicant makes it likely the applicant will present a danger to self or others if the applicant receives a permit to carry a concealed handgun, the sheriff may deny the permit." |
| Del. Code tit. 11, § 1441(a)(2) | Licensing authority requires a certificate from five citizens stating that the applicant "bears a good reputation for peace and good order in the community" |
| Ill. Comp. Stat., ch. 430, § 66/10(a)(4) | "The Illinois State Police shall issue a license to carry a concealed firearm . . . to an applicant who . . . does not pose a danger to himself, herself, or others, or a threat to public safety as determined by the Concealed Carry Licensing Review Board." |
| Iowa Code § 724.8(3) | Licensing authority shall deny license if "[p]robable cause exists to believe . . . that the person is likely to use a weapon unlawfully or in such other manner as would endanger the person's self or others" |
| Me. Rev. Stat. § 2003(1), (4)(C) | Licensing authority shall grant license if the applicant has "demonstrated good moral character," which requires considering whether "the applicant has engaged in reckless or negligent conduct" |
| Mo. Rev. Stat. § 571.101(c)(7) | Licensing authority may deny a license if the applicant has "engaged in a pattern of behavior . . . that causes the sheriff to have a reasonable belief that the applicant presents a danger to himself or others" |

17

| Minn. Stat. § 624.714(6)(a)(3) | Licensing authority may "deny the application on the grounds that there exists a substantial likelihood that the applicant is a danger to self or the public" |
|---|---|
| Mont. Code Ann. § 45-8-321(2) | "The sheriff may deny an applicant a permit to carry a concealed weapon if the sheriff has reasonable cause to believe that the applicant . . . may be a threat to the peace and good order of the community . . . ." |
| N.D. Cent. Code § 62.1-04-03(1)(e) | "The bureau may deny approval for a license if the bureau has reasonable cause to believe that the applicant or licenseholder has been or is a danger to self or others . . . ." |
| 18 Pa. Cons. Stat. § 6109(e)(1)(i) | "A license shall not be issued to . . . [a]n individual whose character and reputation is such that the individual would be likely to act in a manner dangerous to public safety." |
| R.I. Gen. Laws § 11-47-11(a) | License shall be granted "if it appears that . . . [the applicant] is a suitable person to be so licensed" |
| S.D. Codified Laws § 23-7-7.1(4), (5) | License shall be granted if the applicant "[h]as no history of violence" and "[h]as not been found in the previous ten years to be a danger" |
| Utah Code § 53-5-704(3)(a)(ii) | Licensing authority may deny or revoke license "if it has reasonable cause to believe that the applicant or permit holder has been or is a danger to self or others" |
| Va. Code Ann. § 18.2-308.09(13) | Licensing authority may deny license to "[a]n individual who the court finds . . . is likely to use a weapon unlawfully or negligently to endanger others" |

These standards are similar—and in some cases near-identical—to the District's "propensity for violence or instability" and "history of violent behavior" standards. 24 DCMR § 2335.1(d); D.C. Code § 7-2502.03(a)(6A).

What *Bruen* specifically condemned were licensing laws requiring ordinary, law-abiding applicants to show a special need for a gun. *Id.* at 2138, 2156. That was because the Second Amendment codifies the right of *all* ordinary, law-abiding citizens to carry a gun for self-defense, so governments cannot require those citizens "to demonstrate a special need for self-protection distinguishable from that of the general community." *Id.* at 2156 (internal quotation marks and citation omitted). But, the Court clarified, demonstrating a special need is different

from demonstrating that one is an ordinary, law-abiding citizen. *Id.* at 2138 & n.9. The latter is constitutional.[6]

### B. Alternatively, the District's Dangerousness Standards Are Consistent with the Nation's Historical Tradition of Firearm Regulation.

Because the District's dangerousness standards do not run afoul of the original understanding of the Second Amendment, the District need not proffer extensive historical evidence to support them. *See Oakland Tactical Supply, LLC v. Howell Township*, No. 18-cv-13443, 2023 WL 2074298, at *4 (E.D. Mich. Feb. 17, 2023) (dismissing complaint at *Bruen* step one). Even if such a showing were required, the historical record confirms that a "legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety," *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting), whether the person "belongs to a dangerous category or bears individual markers of risk," *id.* at 451. The District's dangerousness standards follow in this "comparable tradition of regulation" and are thus constitutional. *Bruen*, 142 S. Ct. at 2132.

#### 1. The Historical Record Shows that Governments Could Disarm Dangerous Individuals.

Historical sources—from proposals for the Second Amendment to English law, laws disarming "dangerous" classes, prohibitions on using guns dangerously, 19th century licensing laws, and Reconstruction Era discourse—show that the government has always been able to

---

[6] Although the Court noted that the District had a requirement of proper cause, that provision "has been permanently enjoined since 2017" in *Wrenn*, 864 F.3d at 668, and is not at issue here. *Bruen*, 142 S. Ct. at 2124. Because the District had a proper cause requirement, like New York's, the Court did not focus on other aspects of the District's law, like its dangerousness standards. And those standards are similar or nearly identical to other states' standards approved by the Court.

disarm those it considers dangerous, as most courts and jurists pre- and post-*Bruen* have concluded.[7]

Since the earliest English recognition of the right to bear arms, the government has possessed the authority to preclude dangerous individuals from possessing and carrying firearms. *See Heller*, 554 U.S. at 599 (relying on English law because the Second Amendment "codified a right 'inherited from our English ancestors'" (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897))). "In England, officers of the Crown had the power to disarm anyone they judged to be 'dangerous to the Peace of the Kingdom.'" *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (quoting Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662)). And this power was exercised "on a massive scale" in the years *following* the adoption of the English Bill of Rights codifying a right to bear arms. Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in McDonald v. City of Chicago*, 57 Clev. St. L. Rev. 351, 382 (2009). Accordingly, English law shows that, even with a codified right to bear arms, the government had the power and discretion to determine who was sufficiently safe and law-abiding to exercise that right.

The "same concern" in English law over dangerous persons' access to guns "animated" "early American restrictions on arms possession," like the proposals for the Second Amendment

---

[7]     *E.g.*, *United States v. Harper*, No. 21-cr-4085, 2022 WL 4595060, at *2, *4 (N.D. Iowa Sept. 30, 2022) (collecting post-*Bruen* cases that "recognized the historical conclusion that dangerous or unvirtuous citizens could be barred from owning guns" (internal quotation marks and citations omitted)); *United States v. Williams*, 24 F.4th 1209, 1212 (8th Cir. 2022) (Stras, J., concurring in part and concurring in the judgment); *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting); *State v. Weber*, 168 N.E.3d 468, 490 (Ohio 2020) (DeWine, J., concurring in the judgment only); *Binderup v. Att'y Gen.*, 836 F.3d 336, 367 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments).

discussed earlier and other American laws.  *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

American governments in the Revolutionary and Founding Eras imposed such prohibitions on

large classes of people the state found dangerous.  *See id.* at 458.  For example, "several

jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an

oath of allegiance to the state or to the nation."  *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of*

*Alcohol, Tobacco, Firearms & Explosives* (*NRA*), 700 F.3d 185, 200 (5th Cir. 2012); *see, e.g.*,

1777 N.J. Laws 90, ch. 40 § 20 (empowering the government "to deprive and take from such

Persons as they shall judge disaffected and dangerous to the present Government, all the Arms,

Accoutrements, and Ammunition").  "American legislators had determined that permitting these

persons to keep and bear arms posed a potential danger."  *NRA*, 700 F.3d at 200; *see also id.*

(noting that the Founders "'were perfectly willing to confiscate weapons from anyone deemed

untrustworthy,' a group that included law-abiding slaves, free blacks, and Loyalists" (quoting

Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America* 116 (2011))).  Of

course, some of these status-based prohibitions would be unconstitutional today under other

constitutional provisions.  *See Kanter*, 919 F.3d at 458 n.7 (Barrett, J., dissenting).  But these

laws nonetheless show that "founding-era legislatures categorically disarmed groups whom they

judged to be a threat to the public safety."  *Id.* at 458.

Early American governments also barred possession by individuals who had previously

used guns in a dangerous manner.  Statutes from the colonial era through the early 19th century

allowed government officials to disarm individuals who bore arms "in a way that spreads 'fear'

or 'terror' among the people."  *Bruen*, 142 S. Ct. at 2145.  For example, "Colonial Massachusetts

and New Hampshire both authorized justices of the peace to arrest 'all Affrayers, Rioters,

Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively . . . by Night

or by Day, in Fear or Affray of Their Majesties Liege People.'" *Id.* at 2142–43 (quoting 1692 Mass. Acts and Laws no. 6, at 11-12).[8]  Breaches of the peace often entailed a threat or use of force.  *Kanter*, 919 F.3d at 455–56 (Barrett, J., dissenting).  These laws indicate that "colonial-era legislatures still placed restrictions on uses of weapons that posed a present danger to others." *State v. Weber*, 168 N.E.3d 468, 491 (Ohio 2020) (DeWine, J., concurring in judgment).

One specific type of restriction was a surety law, which allowed ordinary citizens to ask a court to take action against individuals who posed a risk of harm.  These laws originated at English common law, 5 William Blackstone, *Commentaries* 251 (St. George Tucker ed. 1803) (1767), but carried over to the early United States, as nine states—plus the District—codified the surety process in the early and mid-19th century, *Bruen*, 142 S. Ct. at 2148.  Under these laws, any citizen could complain to a justice of the peace that she had "reasonable cause to fear an injury" from another person, and the justice could require that person to "find sureties for keeping the peace."  *Bruen*, 142 S. Ct. at 2148 (internal quotation marks omitted) (quoting Mass. Rev. Stat., ch. 134, § 16 (1836)).  The surety's terms were at "the discretion of such justice," but would usually require the accused to find a community member to post bond on his behalf, and if he committed an act of violence or breached the peace, the bond would be forfeited and he would be imprisoned.  Marshall, *supra*, at 718 (internal quotation marks omitted) (quoting William Hawkins, 1 *A Treatise of the Pleas of the Crown: Or, a System of the Principal Matters Relating to that Subject, Digested Under Their Proper Heads* ch. 60 § 15 (Leach ed. 1788) (1716)).

---

[8]     In *Bruen*, the Court reasoned that this law, the Statute of Northampton and its successors, did not provide historical support for New York's broad prohibition on public carry because the law was focused on dangerous uses.  142 S. Ct. at 2142.  The law nonetheless supports the different notion that the government can prohibit uses of weapons by dangerous people, as then-Judge Barrett (who joined *Bruen*) explained.  *Kanter*, 919 F.3d at 456–57 (Barrett, J., dissenting).

Surety laws limited gun possession because some sureties could be forfeited if an accused person possessed weapons while under bond, and a person acting as a surety could require that the subject, in exchange, forfeit his guns or pledge not to use them.  Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245, 295–96 (2021).  Surety laws thus served as "preventive justice," Blackstone, *supra*, at 251, by "depriv[ing]" a risky person "of any power to do future mischief," *id.* at 255.[9]

Similar concerns played a role in Founding Era statutes governing the militia, which prohibited possession by those who demonstrated unfitness to bear arms.  Mustering laws authorized officers to determine who in their militia could bear arms.  *See, e.g.*, An Act for Regulating the Militia of the State of New York, 1779 N.Y. Laws, ch. 55 (1780) ("That if any dispute shall arise with respect to the age or ability to bear arms of any person, it shall be determined by the colonel or commanding officer of the regiment whose determination in the case shall be final.").  Laws likewise provided that if a militia member appeared drunk, used abusive language, quarreled, or instigated argument, "he shall be disarmed . . . until the company is dismissed."  Act for Establishing and Conducting the Military Force of New Jersey, 1806 N.J.

---

[9]     The *Bruen* Court found that surety laws did not provide historical support for New York's requirement that individuals establish a special need to carry firearms for self-defense because surety laws did not amount to a "ban on public carry" for all individuals absent a good reason.  142 S. Ct. at 2148 (emphasis omitted).  That determination is inapposite to the separate and distinct question of whether surety laws provide historical support for restrictions on dangerous individuals possessing or carrying firearms.  In fact, in distinguishing New York's law from surety laws, the *Bruen* Court pointed to ways in which surety laws mirror the dangerousness standards challenged here: "they typically targeted only those threatening to do harm," *id.*, the "right to public carry . . . could be burdened only if another person could make out a specific showing of 'reasonable cause to fear an injury,'" *id.* (quoting Mass. Rev. Stat., ch. 134, § 16), and surety laws were used "for prevention," *id.* at 2149 (quoting Blackstone, *supra*, at 249).

Laws 536, 563; *see also* An Act for Regulation of the Militia of this Commonwealth, 1822 Penn. Laws 316, 340.  Again, the historical record shows legislatures authorizing government officials to use their discretion to prohibit dangerous individuals from possessing or using arms.

The government's power to prohibit possession by dangerous individuals continued and strengthened in the Fourteenth Amendment period and shortly after, as Congress and states implemented licensing regimes that required determinations of whether an individual was dangerous.  *See Bruen*, 142 S. Ct. at 2150 (describing "a short review of the public discourse surrounding Reconstruction" as "useful"); *Heller*, 554 U.S. at 614 (calling Reconstruction sources "instructive").  Nationally, more than two dozen cities passed ordinances between the mid-19th century and early 20th century requiring a permit to carry firearms subject to a suitability determination by a government official.  Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 156 & n.219 (2018).  And, in the late 19th century, Congress required people to obtain a permit to carry a pistol in the District. An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes, Pub. L. No. 52-159, § 2, 27 Stat. 116, 116–17 (1892).

Further, national discourse in this era showed that the American public thought of licensing schemes with suitability standards as the preferred way to protect the right of law-abiding, responsible citizens to bear arms.  Charles, *Armed*, *supra* at 156–63.  For example, a few years after the Fourteenth Amendment was adopted, *The New York Times* opined that, to ensure that guns "fall as nearly as possible only into proper hands," gun purchasers must receive "a permit from the police authorities."  *The Sale of Deadly Weapons*, N.Y. Times, May 19, 1873, at 4.  Likewise, in a seminal 1875 book defending the use of the pistol for self-defense, the author "urge[d] that no man has a right to carry such a terribly efficient instrument of destruction unless

he is perfectly assured of his power of self control, and of his ability to use the weapon without incurring the danger of injuring friends and innocent persons." Charles, *Armed*, *supra*, at 162 (internal quotation marks omitted) (quoting *The Pistol as a Weapon of Defence: In the House and on the Road* 9 (1875)). These are just two examples of the "[b]road public support for armed carriage laws" that included licensing laws with suitability standards. *Id.* And these laws were just the latest iteration of governments exercising their well-established power to disarm individuals who they found to be unfit to bear arms.

Broader discussions during the Reconstruction Era about the right to bear arms further confirm that the right did not encompass dangerous or irresponsible individuals. Much of this discussion concerned whether newly freed Black people could exercise the right to keep and bear arms. *Heller*, 554 U.S. at 614–15. A joint congressional report explained that the right should extend to freedmen because they "have shown by their peaceful and orderly conduct that they can safely be trusted with fire-arms." *Heller*, 554 U.S. at 615 (quoting Joint Comm. On Reconstruction, H.R. Rep. No. 30, 39th Cong., 1st Sess., pt. 2, p. 229 (1866) (Proposed Circular of Brigadier General R. Saxton)). Similarly conditioned, an 1866 decree by a Union general preempting South Carolina's prohibition on gun possession by Black people declared: "The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed . . . . And no disorderly person, vagrant, or disturber of the peace shall be allowed to bear arms." *Bruen*, 142 S. Ct. at 2152 (internal quotation marks omitted) (quoting Cong. Globe, 39th Cong., 1st Sess., at 908–09). Still further, circulars and newspapers advised freedmen who sought to exercise their Second Amendment right that "[a]ny person, white or black, may be disarmed if convicted of making an improper or dangerous use of weapons." *Id.* (quoting *The Loyal Georgian*, Feb. 3, 1866, p. 3, col. 4). Thus, in the era when the Second Amendment was

extended to a new segment of the American population, most people at the time understood that the right did not extend to dangerous persons as determined by government officials.

###    2.    The District's Dangerousness Standards Are Relevantly Similar to Historical Laws.

The historical laws described above are "relevantly similar" to the District's dangerousness standards challenged by Plaintiffs.  *Bruen*, 142 S. Ct. at 2132 (internal quotation marks omitted) (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).  The *Bruen* Court explained that two "metrics" for similarity are "why" and "how" "the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.*  The historical sources and the District's laws share the same "why" and "how."

On the "why," all the laws and sources discussed above were aimed at disarming individuals who posed a potential danger to others.  *See Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) ("The concern common to all three [proposals for the Second Amendment] . . . is about threatened violence and the risk of public injury . . . . This is the same concern that animated English and early American restrictions on arms possession.").  And that is precisely what the District's "history of violent behavior" and "propensity for violence or instability" provisions aim to do.

On the "how," the historical laws relied on the legislature's or government officials' assessment of a person's previous conduct to determine who was dangerous.  The District's laws are at least comparable to, if not less burdensome than, those historical laws.  *See Bruen*, 142 S. Ct. at 2133 (describing as a "central" consideration "whether modern and historical regulations impose a comparable burden").  Many of the historical sources did not define their conception of dangerousness (*e.g.*, Pennsylvania and Massachusetts proposals) or used inexact proxies for dangerousness (*e.g.*, status-based disarmament laws).  Unlike these amorphous, categorical

approaches, the District's scheme uses textually cabined standards for dangerousness along with careful procedures to make individualized, evidence-based determinations. *See White*, 15 F.4th at 813 (concluding that Illinois's similar "individualized approach to concealed carry licenses reflects better, not worse, tailoring than the blanket prohibitions we have previously upheld"). All said, if the government historically could preclude possession by dangerous individuals based on status-based judgments, the District should be able to preclude possession after making an individualized judgment of dangerousness.

Plaintiffs nonetheless allege that the challenged laws lack a historical analogue because no licensing laws existed in the District until the 19th century. Compl. ¶¶ 9–13. Plaintiffs misunderstand the inquiry. The *Bruen* Court emphasized that current laws only need a "historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133. Even "a distinctly modern firearm regulation" "unimaginable at the founding" could be constitutional if it is "relevantly similar" to historical laws. *Id.* at 2132 (internal quotation marks and citation omitted). As then-Judge Barrett explained, contemporary restrictions on the use of guns by dangerous individuals, like a ban on gun possession by those convicted of dangerous crimes, "are 'lineal descendants' of historical laws banning dangerous people from possessing guns." *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting) (quoting Tr. of Oral Arg. 77, *Heller*, 554 U.S. 570 (No. 07290)). As such, they "need not mirror limits that were on the books in 1791." *Id.* (internal quotation marks omitted) (quoting *United States v. Skoien*, 614 F.3d 638, 634 (7th Cir. 2010) (en banc)).

Thus, Plaintiffs' attempt to require the District to produce a mirror statute from the Founding applies the wrong test. Instead, if history established that the government could categorically disarm a class of people, any modern prohibition on gun ownership by members of that class should be constitutional, even if the formulation of such a law is new. In other words,

"[t]he relevant inquiry is whether a particular *type* of regulation has been a 'longstanding' exception to the right to bear arms," not whether the particular regulation itself is longstanding. *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019).  For example, prohibitions on gun possession by persons subject to a restraining order became prevalent in the 20th century. Carolyn B. Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257, 1301–02 (2017). Nonetheless, courts have reasoned that, because the government could historically disarm dangerous individuals, and persons subject to a restraining order have been adjudicated as dangerous, the government can enact a modern prohibition on gun possession by those subject to a restraining order.  *See United States v. Boyd*, 999 F.3d 171, 186 (3d Cir.), *cert denied*, 142 S. Ct. 511 (2021); *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011).

Similarly, because the District's dangerousness standards follow closely in a long tradition of laws authorizing government officials to keep guns away from those they find dangerous, the District satisfies *Bruen*'s historical inquiry.  Moreover, licensing laws prohibiting possession or carrying by dangerous people are more than 150 years old and date to the period around the adoption of the Fourteenth Amendment.  *See Heller*, 554 U.S. at 614–19 (considering post-Civil War legislation and sources).  Licensing laws are also a direct continuation of the government's power to disarm dangerous individuals established in the Founding Era and before. Because they gained a foothold in the mid-19th century, they are closer "lineal descendants of historical laws banning dangerous people from possessing guns" than 20th century laws like the federal felon-in-possession ban, which then-Judge Barrett explained has sufficient historical support at least with respect to dangerous felons.  *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting) (internal quotation marks and citation omitted).  Thus, licensing laws' age combined with their consistency with earlier history provides strong historical support.  *Cf. Bruen*, 142 S. Ct. at 2154

(discounting late 19th century evidence "when it contradicts earlier evidence").  The Court

should dismiss Plaintiffs' Second Amendment claims.  *See, e.g.*, *Campiti v. Garland*, No. 22-cv-

177, 2023 WL 143173, at *3 (D. Conn. Jan. 10, 2023) (dismissing, on a Fed. R. Civ. P. 12(b)(6)

motion, challenge to federal felon-in-possession ban because the historical record showed that

the government can disarm individuals who pose a danger).[10]

### C.     Plaintiffs' Arguments to the Contrary Are Meritless.

Based on both the text and history of the Second Amendment, Plaintiffs' marquee claim

(that the Second Amendment broadly prohibits the District's dangerousness standards, Compl.

¶¶ 5–13) fails.  And Plaintiffs' attempts to allege various, specific flaws in the District's laws all

lack merit.

First, Plaintiffs allege that, to comport with the Second Amendment, the District's

dangerousness standards must make exceptions for self-defense.  Compl. ¶¶ 197, 211.  This

misunderstands the point of the Supreme Court's "self-defense" analysis.  Self-defense was at

---

[10]     A Fifth Circuit panel recently departed from this well-accepted approach to analyzing historical analogues and struck down the longstanding federal law prohibiting the possession of firearms by someone subject to a domestic violence restraining order (18 U.S.C. § 922(g)(8)). *United States v. Rahimi*, No. 21-11001, 2023 WL 1459240 (5th Cir. Feb. 2, 2023).  The panel reasoned that historical laws disarming dangerous individuals were too dissimilar from the federal law because the former operated broadly against classes, as opposed to neutralizing specific dangerous individuals.  *Id.* at *8.  That reasoning makes no sense because it faults the federal law for being *less* burdensome on Second Amendment rights than historical laws. Further, the panel's discussion of historical sources is against the weight of other courts of appeals' and Justice Barrett's views, which hold that § 922(g)(8) and similar modern laws, like the federal felon-in-possession ban, are supported by the historical record.  *Compare id.* at *7– 10, *with Boyd*, 999 F.3d at 186, *and Bena*, 664 F.3d at 1184, *and Kanter*, 919 F.3d at 465 (Barrett, J., dissenting).  Unsurprisingly, then, the panel's decision will not be the last word, as the United States has already announced it will seek further review.  U.S. Dep't of Just., Off. of Pub. Affairs, *Statement from Attorney General Merrick B. Garland Regarding United States v. Rahimi* (Feb. 2, 2023), https://tinyurl.com/4hbmx73v.  Accordingly, the Court should keep with the more defensible view that the government could historically disarm dangerous individuals, and the licensing and registration laws challenged here are relevantly similar to that historical practice.

the heart of the analysis in *Heller* because the Court recognized, for the first time, that the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation."  554 U.S. at 592; *see id.* at 599 (explaining that the prefatory clause "announces the purpose for which the right was codified," but that "self-defense had little to do with the right's *codification*; it was the *central component* of the right itself").  *Heller* did not, however, suggest that the Second Amendment covers every individual with self-defense needs.  On the contrary, *Heller* plainly envisioned that some categories of dangerous people (such as felons and the mentally ill) could be prohibited altogether from possessing firearms regardless of an individualized right to self-defense.  *Id.* at 626; *see id.* at 635 ("Assuming that Heller is not *disqualified from the exercise of Second Amendment rights*, the District must permit him to register his handgun and must issue him a license to carry it in the home." (emphasis added)).  The Court thus recognized that, although the Second Amendment protects the right to bear arms for self-defense, that right is held only by "ordinary, law-abiding, adult citizens."  *Bruen*, 142 S. Ct. at 2134.  Because dangerous individuals fall outside of that category, they cannot assert a right to arm themselves for self-defense.  *See id.* at 2134–35 (explaining that, because the petitioners were "two ordinary, law-abiding, adult citizens," they could assert the Second Amendment right to keep arms for self-defense).

Second, Plaintiffs allege that the District's dangerousness standards permit too much subjectivity and discretion.  Compl. ¶¶ 198, 212.  *Bruen*, however, described license schemes that include dangerousness or suitability determinations as providing "narrow, objective, and definite" standards.  142 S. Ct. at 2138 n.9 (internal quotation marks omitted) (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)); *see* Table 1, *supra*.  Because the District's system mirrors those schemes, the District's dangerousness standards are not too

subjective or discretionary.  Adopting similar reasoning, several other courts have applied *Bruen*'s teachings on licensing standards to uphold similar suitability standards.[11]

The *Bruen* Court also drew from the First Amendment context, and the District's dangerousness standards are similar to permitting standards held to comply with the First Amendment.  For example, the Supreme Court has held that regulations allowing park officials to deny park permits if they determine that "the intended use would present an unreasonable danger to the health or safety of park users" set "narrowly drawn, reasonable and definite standards to guide the licensor's determination."  *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 324 (2002) (internal quotation marks and citations omitted).  Similarly, the D.C. Circuit has upheld a "danger" standard in this context, while explaining that "some measure of discretion" is "not fatal" and a licensing official can "make a predictive judgment based on the facts as she knows them and her expertise in the field."  *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 517 (D.C. Cir. 2010).  Plaintiff's attempt to cast the District's dangerousness standards as too subjective cannot be squared with this line of cases either.[12]

---

[11]     *E.g.*, *People v. Velez*, 302 Cal. Rptr. 3d 88, 104–05 (Cal. Ct. App. 2022); *Or. Firearms Fed'n, Inc. v. Brown*, No. 22-cv-1815, 2022 WL 17454829, at \*15 n.23 (D. Or. Dec. 6, 2022); *Dykes v. Broomfield*, No. 11-cv-4454, 2022 WL 4227241, at \*4 (N.D. Cal. Sept. 13, 2022); *People v. Williams*, 175 N.Y.S.3d 673, 675–76 (N.Y. Sup. Ct. 2022).  Notably, the only court that has preliminarily enjoined a licensing scheme post-*Bruen* had that decision quickly stayed by the Second Circuit, and the Supreme Court denied a request to lift the stay.  *Antonyuk v. Hochul*, No. 22-cv-986, 2022 WL 16744700, at \*42 (N.D.N.Y. Nov. 7, 2022), *stay granted*, No. 22-2908, 2022 WL 18228317 (2d Cir. Dec. 7, 2022), *application to vacate stay denied sub nom. Antonyuk v. Nigrelli*, No. 22A557, 2023 WL 150425 (U.S. Jan. 11, 2023).

[12]     To be sure, the District does not agree that this line of cases should be imported into the Second Amendment context.  *See, e.g.*, *Hightower*, 693 F.3d at 80 (explaining that these First Amendment cases are a "poor analogy" for Second Amendment challenges to licensing laws).  The point articulated here is that, even under those cases, the standards Plaintiffs challenge in this case are constitutional.

Third, Plaintiffs allege that the registration and licensing systems unconstitutionally shift the burden of establishing suitability to the individual.  Compl. ¶¶ 200, 214.  Plaintiffs are wrong both factually and legally.  As a factual matter, under both schemes, the Chief bears the initial burden of identifying and explaining reasons for denial or revocation.  D.C. Code §§ 7-2502.10(a), 7-2509.05(a)(4); 24 DCMR §§ 2341.3, 2340.1, 2340.3.  As a legal matter, "[o]utside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment."  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 58 (2005) (internal quotation marks omitted) (quoting *Lavine v. Milne*, 424 U.S. 577, 585 (1976)).  So "a state may assign applicants that burden [of demonstrating suitability] without transgressing the Constitution."  *Berron*, 825 F.3d at 848.  Indeed, in noting with approval states' licensing laws that employ dangerousness standards, the *Bruen* Court made no remark about those schemes' locus of the burden.  142 S. Ct. at 2138 n.9.

Fourth, Plaintiffs allege that the District's dangerousness standards are overbroad. Compl. ¶¶ 195, 208.  But the Supreme Court has "discouraged" courts from recognizing overbreadth claims outside "relatively few settings"—and the Second Amendment is not one of them.  *Sabri v. United States*, 541 U.S. 600, 609 (2004).  So courts, both before and after *Bruen*, have rejected Second Amendment overbreadth claims.  *E.g.*, *Hightower v. City of Boston*, 693 F.3d 61, 82 (1st Cir. 2012) (collecting cases); *Cal. Rifle & Pistol Ass'n, Inc. v. City of Glendale*, No. 22-cv-7346, 2022 WL 18142541, at *7 (C.D. Cal. Dec. 5, 2022).  For good reason: such claims would "invite judgments on fact-poor records" and "allow a determination that the law would be unconstitutionally applied to different parties and different circumstances from those at hand."  *Sabri*, 541 U.S. at 609.  That is especially true when it comes to challenges to licensing

laws, which would require courts to imagine hypothetical applicants.  To avoid "a further departure from the norms of adjudication," the Court should reject any overbreadth claim.  *Id.*

Fifth, each Plaintiff alleges that the District applied its dangerousness standards to him in a manner that violates Second Amendment rights.  *E.g.*, Compl. ¶¶ 87, 117, 172, 189.  Plaintiffs' disagreements with the decisionmakers' rationales do not rise to a Second Amendment violation.  At the outset, "respect for the review mechanism[s] that [the District] has established, along with broader concerns of comity and federalism, counsel against a searching federal review" of the Chief's and Board's decisions.  *White*, 15 F.4th at 810; *see also id.* at 813–14 (deferring to state licensing authority's individualized determination of dangerousness); *Kuck v. Danaher*, 600 F.3d 159, 165 (2d Cir. 2010) (explaining that it is "not [the federal court's] province" to resolve whether the licensing authority correctly denied an application under state law).  In each case, the Chief and/or the Board relied on a history of arrests or incidents to reach their conclusions.  Although these are not convictions, the Second Amendment allows states to consider arrests "in assessing dangerousness."  *White*, 15 F.4th at 813.  While Plaintiffs may disagree with the conclusions drawn from their records, the Second Amendment allows the determination of dangerousness to be left to licensing authorities.  Argument § II.B, *supra*.

As a final note, Plaintiffs lack standing to seek compensatory damages for their Second Amendment claims.  A plaintiff "must establish standing 'for each claim [it] seeks to press and for each form of relief that is sought.'"  *Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 136 (D.C. Cir. 2022) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)).  The Complaint does not allege facts that plausibly show Plaintiffs suffered harms from going without a license or registration that can be remedied by compensatory damages.  For example, they do not allege that safety or security was compromised in an identified and compensable way.

Instead, they include boilerplate, implausible conclusions that they suffered "emotional distress," "physical harm," and "loss of earnings," among other things.  Compl. ¶¶ 203, 217.  To pursue compensatory damages, however, the Complaint must do more.  *See Foodbuy, LLC v. Gregory Packaging, Inc.*, 987 F.3d 102, 116 (4th Cir. 2021) (holding that a plaintiff lacked standing when his theory of monetary injury was not supported by factual allegations in the complaint); *Sanchez-Mariani v. Ellingwood*, 691 F.2d 592, 596 (1st Cir. 1982) (Breyer, J.) (rejecting argument that "boiler-plate request" for damages for constitutional violation prevented case from being moot).

## III.    **Plaintiffs' Vagueness Claims Fail.**

If the Court reaches the merits, Plaintiffs' contention that the District's dangerousness standards are unconstitutionally vague because they invite "arbitrary and discriminatory enforcement" fails to state a claim.  Compl. ¶¶ 224, 234.  A law is unconstitutionally vague because it "invites arbitrary and discriminatory enforcement when 'there are no standards governing the exercise of the discretion' it grants."  *Agnew v. District of Columbia*, 920 F.3d 49, 55 (D.C. Cir. 2019) (quoting *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972)).  "A law may, however, require law enforcement officers to use their discretion without being unconstitutionally vague."  *Id.* (internal quotation marks omitted) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)).  Here, both the "history of violent behavior" standard and the "propensity for violence or instability" standard sufficiently guide the Chief's exercise of discretion when issuing registration certificates or licenses.[13]

---

[13]    The Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe," but even assuming a "more stringent vagueness test should apply," it is met here. *Village of Hoffman Estates v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489, 498–99 (1982); *see id.* (applying

A.    **The "History of Violent Behavior" Standard Is Not Vague.**

The "history of violent behavior" standard used to deny registration certificates, D.C. Code § 7-2502.03(a)(6A), is not vague because, especially when read in conjunction with clarifying regulations, it specifies a comprehensible, core standard of conduct.  *See Smith v. Goguen*, 415 U.S. 566, 578 (1974) (criminal provision was vague when "no standard of conduct is specified at all" and it "has no core" (internal quotation marks and citation omitted)). Violence has a defined core: the use, or attempt or threat to use, force.  *E.g.*, *Violence*, Merriam-Webster Dictionary, https://tinyurl.com/2p8p298j; 18 U.S.C. § 924(c)(3)(A) (defining "crime of violence").  The term "history" is also sufficiently objective.  "History" is "a chronological record of significant events" or, more simply, "an established record," as in "a prisoner with a history of violence."  *History*, Merriam-Webster Dictionary, https://tinyurl.com/4uak868d.  As a result, "history of violence" is readily understood to mean that a person has one or more incidents in their past involving the use or threatened use of physical force.

Moreover, clarifying regulations further rebut Plaintiffs' vagueness challenge.  *See Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1214 (D.C. Cir. 2021) ("[V]agueness concerns are mitigated when regulated entities 'have the ability to clarify the meaning of the regulation' . . . ." (quoting *Village of Hoffman Estates*, 455 U.S. at 498).  Those regulations instruct MPD to consider arrest records within five years for threats to do bodily harm, assaults and threats, any "crime of violence," and any similar crimes from other jurisdictions that "indicate a likelihood to make unlawful use of a firearm."  24 DCMR § 2309.1(f).  The cross-reference to the statutory definition of "crime of violence" provides further clarity by listing dozens of specific crimes, like "armed carjacking" and "kidnapping."  D.C. Code § 23-1331(4);

---

"more stringent vagueness test" to "constitutionally protected rights"); Argument § II.A, *infra* (explaining why Plaintiffs lack Second Amendment rights).

*see United States v. Williams*, 553 U.S. 285, 306 (2008) (identifying as relevant considerations "statutory definitions" and "narrowing context").

The phrase "history of violence," then, plainly "give[s] a person of ordinary intelligence fair notice" of the type of conduct that could disqualify him from firearm registration. *Papachristou*, 405 U.S. at 162.  Indeed, because MPD considers arrest records, the conduct must at least suggest probable cause that the person has committed an arrestable offense.  *See* 24 DCMR § 2309.1(f).  And the detailed list of offenses that could qualify as "violen[t]" precludes "arbitrary and discriminatory enforcement."  *Agnew*, 920 F.3d at 55 (quoting *Papachristou*, 405 U.S. at 170).  This dangerousness standard simply is not "dependent on the subjective reaction of others"—instead, "there are specific fact-based ways to determine whether" a defendant's behavior is violent.  *United States v. Nordean*, 579 F. Supp. 3d 28, 57 (D.D.C. 2021) (internal quotation marks omitted).  The standard thus prescribes "'core' behavior" to guide the Chief's application.  *Agnew*, 920 F.3d at 57 (quoting *United States v. Bronstein*, 849 F.3d 1101, 1108 (D.C. Cir. 2017)).  Even if "history of violence" requires some "interpretation" by the Chief, the provision is not thereby rendered vague.  *Agnew*, 920 F.3d at 57.

Courts, lawyers, and law enforcement officers use similar standards every day, further indicating that the District's standard is discernible.  *See Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 773 (D.C. Cir. 2022) ("The key question, then, is whether the law or regulation 'provides a discernable standard when legally construed.'" (quoting *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017))).  For example, to determine whether criminal pretrial detention is appropriate, courts examine "the history and characteristics of the person" charged to determine the "threat a defendant poses to others and the community."  *United States v. Fairlamb*, 535 F. Supp. 3d 30, 39 (D.D.C. 2021) (internal quotation marks omitted) (quoting

18 U.S.C. § 3142(g)).  "[A] defendant's *history of violence* offers some of the strongest evidence

of his future dangerousness." *Id*. at 40 (emphasis added).  Accordingly, courts have rejected

vagueness challenges to suitability requirements because they "provide[d] adequate guidance to

persons of common intelligence that conduct which is criminal and violent, regardless whether it

has resulted in a criminal conviction, is grounds for" revocation.  *Chief of Police v. Holden*,

26 N.E.3d 715, 725 & n.8 (Mass. 2015).  This Court should too.

### B.     <u>The "Propensity for Violence or Instability" Standard Is Not Vague.</u>

For similar reasons, this Court should dismiss Plaintiffs' vagueness claim arising out of

the prohibition on public carrying by people with a "propensity for violence or instability that

may reasonably render the person's possession of a concealed pistol a danger to the person or

another."  24 DCMR § 2335.1(d).  Each clause in this regulation provides sufficient clarity to

"give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by

the statute," *Papachristou*, 405 U.S. at 162, and provide standards that "'govern[] the exercise of

the discretion' it grants," *Agnew*, 920 F.3d at 55 (quoting *Papachristou*, 405 U.S. at 170).

The "propensity for violence" clause refers to an individual's "natural tendency" to

engage in the "use of physical force," especially "physical force unlawfully exercised with the

intent to harm."  Propensity, *Black's Law Dictionary* (11th ed. 2019); Violence, *Black's Law

Dictionary* (11th ed. 2019).  And "propensity for instability" refers to an individual's "lack of

emotional or mental stability."  *Instability*, Merriam-Webster Dictionary,

https://tinyurl.com/yh5vau4a; *Unstable*, Merriam-Webster Dictionary,

https://tinyurl.com/2uzvupw3.  In other words, an individual's tendency toward behavior that is

violent, dangerous, or demonstrates low self-control, and which "reasonably render[s] [his]

possession of a concealed pistol a danger to the person or another," is disqualifying.  24 DCMR

§ 2335.1(d).  Thus, "[t]he readily discernible meaning of the words is apparent in the way that

they 'converge upon [certain] behavior.'" *Agnew*, 920 F.3d at 57 (quoting *Bronstein*, 849 F.3d at 1108).

Although "propensity" is not quantifiable to "meticulous specificity," "a regulation is not impermissibly vague because it is marked by flexibility and reasonable breadth." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 737 (D.C. Cir. 2016) (internal quotation marks and citation omitted). As the Supreme Court has held, there is nothing inherently vague about "laws that call for the application of a qualitative standard," including whether an individual has demonstrated a tendency to engage in certain conduct or behavior. *Johnson v. United States*, 576 U.S. 591, 604 (2015). Rather, "the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree." *Id.* Indeed, several states use standards in licensing schemes that require an assessment of an individual's risk of danger. *See* Table 1, *supra*. Courts have upheld those similar, if not broader, standards. *See Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 126 (2d Cir. 2020) (holding that "good moral character" is "easily understandable"); *Kuck v. Danaher*, 822 F. Supp. 2d 109, 132 (D. Conn. 2011) ("There are innumerable factual circumstances in which invocation of the suitability standard to revoke a person's pistol permit on the basis that he poses a danger to the public would be constitutionally valid."). The District's "propensity for violence or instability" standard is equally valid.

Moreover, this standard is limited by an additional qualifier—the person's "propensity for violence or instability" must "reasonably render that person's possession of a concealed pistol a danger to the person or another." 24 DCMR § 2335.1(d). Many jurisdictions, including the District, apply a similar "dangerousness" standard to determine whether a mentally ill person may be subject to short-term involuntary hospitalization or long-term civil commitment. *See* D.C. Code §§ 21-521 (authorizing emergency hospitalization if a mentally ill person "is likely to

injure himself or others if he is not immediately detained"), 21-545(b)(2) (authorizing a one-year period of hospitalization if the person is "likely to injure himself or others if not committed"). These provisions authorize deprivation of individual liberty far greater than the right to carry a pistol in public.  *See Jones v. United States*, 463 U.S. 354, 361 (1983) ("[C]ommitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."). Despite the decades-old, widespread application of this dangerousness standard, *see Addington v. Texas*, 441 U.S. 418, 431–32 nn.6–8 (1979) (citing state statutes), it has repeatedly survived constitutional scrutiny, *see, e.g.*, *Schall v. Martin*, 467 U.S. 253, 278–79 (1984) ("[T]he state . . . has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill.").  Similarly, some states require juries considering the death sentence to determine "whether there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  *Jurek v. Texas*, 428 U.S. 262, 272 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).  The Supreme Court has upheld these standards, explaining that "there is nothing inherently unattainable about a prediction of future criminal conduct," and "specifically reject[ing] the contention . . . 'that it is impossible to predict future behavior and that the question is so vague as to be meaningless.'"  *Id.* at 274.

## IV.     **Plaintiffs' Procedural Due Process Claims Fail.**

If the Court reaches the merits, Plaintiffs' procedural due process claims suffer from several deficiencies.  For one, Plaintiffs have not pursued all process available to them, which forecloses their claim.  For another, to state a claim, Plaintiffs must allege that the District's registration and licensing system deprives people seeking registration or licenses of "appropriate procedural protections."  *Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017) (internal quotation marks omitted) (quoting *Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 689 (D.C.

Cir. 2009)).  Yet each of the supposed procedural infirmities alleged in the Complaint are without merit.

### A.   Plaintiffs Failed to Pursue All Available Process.

To state a claim for violation of procedural due process, a plaintiff must first avail himself of all available process.  *E.g.*, *Williams v. District of Columbia*, No. 20-7037, 2020 WL 6038667, *1 (D.C. Cir. Sept. 1, 2020) (per curiam); *Long v. District of Columbia*, 194 F.3d 174 (Table) (D.C. Cir. 1999) (per curiam); *see Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 485 (1982) ("The fact that [plaintiff] failed to avail himself of the full procedures provided by state law does not constitute a sign of their inadequacy.").  Plaintiffs have not satisfied this standard.

Millard could have petitioned the D.C. Court of Appeals for review of adverse decisions by the Board.  D.C. Code § 7-2509.08(f).  He did not.  Had he done so, he could have raised all the claims he asserts here and, if successful, obtained a remedy.  *See id.* § 2-510(a)(3)(A)–(C) (empowering the D.C. Court of Appeals to set aside agency actions for legal errors).  Likewise, Key and Steptoe could have appealed the Board's decisions to the D.C. Court of Appeals or appealed the denials of their registration certificates to OAH after 60 days.  24 DCMR § 2315.7. Neither did.

Plaintiffs should not be allowed to collaterally attack District processes when District lawmakers have endeavored to provide review mechanisms to remedy errors by MPD, OAH, or the Board.  Thus, Plaintiffs' failures require dismissal.  *See, e.g.*, *Young v. Hawaii*, 992 F.3d 765, 828 (9th Cir. 2021) (en banc) (rejecting due process challenge to firearm licensing scheme because plaintiffs had not pursued scheme's contested case procedures), *vacated and remanded on other grounds*, 142 S. Ct. 2895 (2022); *Trello v. McKeighan*, No. 21-cv-987, 2022 WL 3577113, at *5 (N.D.N.Y. Aug. 19, 2022) (similar).

**B.      Plaintiffs Fail to Identify Any Constitutionally Deficient Procedures.**

Although the Complaint accuses the District's licensing and registration system of a handful of procedural infirmities, *see* Compl. ¶¶ 241–45, Plaintiffs fail to allege that the system has any unconstitutional procedures, either on its face or as applied.  "[D]ue process is flexible," requiring only "the opportunity to be heard at a meaningful time and in a meaningful manner." *Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.*, 980 F.3d 109, 118 (D.C. Cir. 2020) (internal quotation marks and citations omitted).  The processes challenged here afford individuals meaningful notice of the reasons for denial or revocation, an opportunity to be heard on those reasons (including, when appropriate, de novo review of disputed facts), and the opportunity for judicial review in the D.C. Court of Appeals.

Registration and licensing decisions are based on evidence submitted by the applicant, explained in writing, can be reconsidered by the Chief, and are reviewable by both an administrative body and a court.  *See* Background § I, *supra*.  When reviewing similar processes, courts have rejected due process challenges.  *See, e.g.*, *Statewide Bonding*, 980 F.3d at 118–19 (similar administrative appeal process); *Berron*, 825 F.3d at 847–49 (similar licensing process); *Hightower*, 693 F.3d at 83–87 (similar licensing process).  Plaintiffs thus face an uphill battle in identifying flaws in a process that is broadly consistent with procedural due process.  Yet, Plaintiffs have not even met their burden to allege "what plausible alternative safeguards would be constitutionally adequate." *Statewide Bonding*, 980 F.3d at 120.  And their attacks on certain aspects of the District's procedures fail.

**1.      The Chief Provides Adequate Notice.**

Plaintiffs allege that the Chief does not give "adequate reasons" for his decisions and "relies on secret information."  Compl. ¶ 241.  To the contrary, applicants receive "fair notice of the arguments and evidence against them," *Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 226–27

41

(D.C. Cir. 2017), "to ensure that the opportunity for a hearing is meaningful," *City of W. Covina v. Perkins*, 525 U.S. 234, 240 (1999).  The statute and regulations specify the type of evidence that the Chief may rely on, 24 DCMR §§ 2314.2, 2337, and require him to provide notice of his reasons, *id.* §§ 2340.3, 2341.3(a); D.C. Code § 7-2502.10(a).  Any facial challenge thus fails.

In each case here, the Chief carefully explained his reasons and disclosed the evidence he relied on.  Millard Order 1–2; Key Notice 1–2; Steptoe 2021 Notice 1.  Moreover, Plaintiffs then were able to effectively present their case before the Board, engaging in the Chief's analysis and disputing his evidence—and, in one case, get a remand.  *E.g.*, Steptoe Order to Stay 1; Millard Order 3–4, 6–7.  Any as-applied challenge also fails.

Next, Plaintiffs allege in only a conclusory way that the Chief relies on "secret information."  Compl. ¶ 241.  Reading the Complaint most generously, Steptoe may take issue with the Chief's reconsideration of Steptoe's file following a remand.  Compl. ¶ 241; *see* Steptoe 2022 Notice 1.  Or Millard may take issue with the Chief's citation of evidence in response to Millard's introduction of new evidence on appeal.  *See* Millard Order 11–12.  Neither action by the Chief, however, ran afoul of due process.

In Steptoe's case, it cannot be a due process violation for an adjudicator to reconsider his decision and review *more* evidence in response to a remand.  *See Withrow v. Larkin*, 421 U.S. 35, 57 (1975) ("[I]t is not contrary to due process to allow judges and administrators who have had their initial decisions reversed on appeal to confront and decide the same questions a second time around.").  Here, the Chief bolstered his reasoning and evidentiary support following remand, just as trial courts and agencies do every day.  *See id.*

In Millard's case, the Chief explained that the evidence relied on and disclosed in his notice was "sufficient" for the Board to affirm his decision.  Millard Order 11; *see also id.* at 13.

The Chief only discussed two additional incidents to refute "new allegations" made by Millard for the first time before the Board. *Id.* at 14. Moreover, neither party's additional evidence was dispositive, as the Board's decision found the Chief's reason for denying the license persuasive. *Id.* at 21. Thus, even if the Chief erred, Millard cannot show prejudice. *See Throckmorton v. Nat'l Transp. Safety Bd.*, 963 F.2d 441, 446 (D.C. Cir. 1992) (finding no due process violation where plaintiff failed to show prejudice); *Caba v. Weaknecht*, 64 A.3d 39, 64 (Pa. Commw. 2013) (rejecting due process claim, even when notice of a revocation of concealed carry license was deficient, because the licensee was still able to present his case at a post-deprivation hearing).

## 2.     The System Affords Prompt Post-Deprivation Hearings.

Plaintiffs allege—again in only a conclusory way—that the District's licensing scheme fails to provide "prompt post deprivation hearings" to challenge the Chief's decisions. Compl. ¶ 244. Not so. As explained, the system offers several layers of review of the Chief's decisions. Such multi-layer post-deprivation review, with an opportunity to prove disputed facts in an evidentiary hearing, more than satisfies the District's responsibility to provide adequate post-deprivation opportunities to be heard. *See Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 302 (1981) (upholding system that allowed summary, discretionary decisions followed by "post-deprivation administrative hearings and an opportunity for judicial review"); *Hightower*, 693 F.3d at 86–87 (upholding similar licensing scheme). Even if, in individual situations, the District failed to properly follow these processes, they do not allege that the statutory or regulatory scheme is insufficient to protect their Second Amendment rights, if indeed they so qualify.

To the extent Key and Steptoe allege that the process prevented them from appealing the Chief's constructive denial of a registration certificate, Compl. ¶¶ 146–47, 180–82, they

misunderstand the regulatory scheme.  As clearly provided in the regulations, if the Chief has

"not expressly approved or denied" a registration application within 60 days, the application

"shall be deemed to be denied for the purpose of appealing."  24 DCMR § 2315.7.  Accordingly,

although the Chief did not disturb his decision in Key's and Steptoe's cases, he constructively

denied their applications, and they could have pursued an appeal.  *See id.*  They did not, so they

cannot complain that they failed to receive a post-deprivation hearing when the appeal process

was in fact available to them.

### 3.       The Board's Standards Are Constitutional.

Plaintiffs allege that the Board's standard of review and burden of proof are too

deferential to the Chief.  Compl. ¶¶ 29–31, 190, 241.  Plaintiffs are wrong.  To start, the Board

uses common, long-accepted standards of review for agency actions.  The Board upholds the

Chief's decision only if "it is rationally supportable and could have been arrived at reasonably."

1 DCMR § 1218.3.  That standard mirrors the federal APA's "arbitrary-and-capricious

standard," which requires courts to affirm agency action if it is "reasonable and reasonably

explained."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  That standard is

applied every day to review alleged agency deprivations of liberty or property interests.  And that

standard has long been upheld as a constitutionally sufficient post-deprivation procedure—

including in the context of concealed carry licenses.  *E.g.*, *Unification Church v. Att'y Gen.*, 581

F.2d 870, 878 (D.C. Cir. 1978); *Gen. Elec. Co. v. Johnson*, 362 F. Supp. 2d 327, 341–42 (D.D.C.

2005), *aff'd*, 610 F.3d 110 (D.C. Cir. 2010); *Hightower*, 693 F.3d at 87.  The Board's analogous

standard is thus constitutional.  Plus, the Board's decisions are subject to judicial review.  D.C.

Code § 7-2509.08(f).  That additional layer of procedural protection further rebuffs Plaintiffs'

procedural due process claim.  *See Hodel*, 452 U.S. at 302.

Plaintiffs are also incorrect when they allege that the Board "rubber stamps the Chief's version of the facts." Compl. ¶ 190. To the contrary, an appellant is given the opportunity to identify disputed facts and make his case for an evidentiary hearing. 1 DCMR § 1210. If there are indeed disputed facts, the appellant receives a full evidentiary hearing and a de novo determination of factual disputes. *Id.* §§ 1210.4, 1218.2.[14] In no way, then, does the Board "rubber stamp" the facts as found by the Chief. Such procedures are more than adequate. *See, e.g.*, *Hightower*, 693 F.3d at 87 (rejecting due process challenge to concealed carry licensing scheme when aggrieved individuals could "introduce evidence to demonstrate that the licensing decision was erroneous"); *Sibley v. Watches*, 460 F. Supp. 3d 302, 320 (W.D.N.Y. 2020) (collecting cases holding that similar New York procedure provided all the necessary post-deprivation process).

Plaintiffs are also mistaken in alleging that the Board "limits applicants'/revokees' rebuttal of the Chief's findings." Compl. ¶ 241. As is "the norm," *Berron*, 825 F.3d at 848, "[a]n appellant shall prove disputed material facts by a preponderance of the evidence," 1 DCMR § 1218.2. That burden of proof accords with how administrative and civil proceedings usually operate, where "the proponent of a position bears the burden of showing entitlement by a preponderance of the evidence." *Berron*, 825 F.3d at 847–48. There is no reason "why the Second Amendment would alter that standard, which applies to disputes about other kinds of property such as zoning and home ownership, occupational licenses such as law licenses, and

---

[14] At the time of Millard's appeal, the Board's regulations did not provide for a de novo evidentiary hearing on disputed facts. *See* footnote 2, *supra*. Nonetheless, the Board concluded that Millard did not show the existence of a material factual dispute, Millard Order 20, which is a prerequisite to obtaining a hearing under the current regulation (and which decision he did not appeal), so the differences in how the Board handled factual disputes pre- and post-June 2021 is not at issue in this case. Nor does he take issue with the difference in the regulations.

other valuable licenses of all kinds." *Id.* at 848; *see also Hightower*, 693 F.3d at 87.  So the placement of the burden here is not a constitutional issue.  *Schaffer*, 546 U.S. at 58.  Thus, Plaintiffs have not identified any constitutional deficiency with the standards currently employed by the Board.

## CONCLUSION

The Court should stay the case or dismiss the Complaint with prejudice.

Date: February 27, 2023.                    Respectfully submitted,

                                            BRIAN L. SCHWALB
                                            Attorney General for the District of Columbia

                                            STEPHANIE E. LITOS
                                            Interim Deputy Attorney General
                                            Civil Litigation Division

                                            */s/ Matthew R. Blecher*
                                            MATTHEW R. BLECHER [1012957]
                                            Chief, Civil Litigation Division, Equity Section

                                            */s/ Adam J. Tuetken*
                                            ANDREW J. SAINDON [456987]
                                            Senior Assistant Attorney General
                                            ADAM J. TUETKEN [242215]
                                            Assistant Attorney General
                                            Civil Litigation Division
                                            400 6th Street, NW
                                            Washington, D.C. 20001
                                            Phone: (202) 735-7474
                                            Email: adam.tuetken@dc.gov

                                            *Counsel for Defendant*