# EXHIBIT A

# Millard Final Order

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**CONCEALED PISTOL LICENSING REVIEW BOARD**



**Case Number:  2020-034**

**FINAL ORDER AND DECISION DENYING APPEAL OF**
**SANU MILLARD**

On June 11, 2020, the appeal of Sanu Millard ("appellant") came before a Panel of the Concealed Pistol Licensing Review Board ("Panel") to review the denial by the Chief of the Metropolitan Police Department ("Chief") of appellant's application for a concealed pistol license (CPL), based upon the "suitability" standards promulgated pursuant to D.C. Official Code § 7-2509.11(1)(C).  The Panel consisted of Ms. Debra Long-Doyle, Presiding Member, along with and Dr. Edwin Powell and Mr. Alfredo Phoenix.

The Panel met to review the materials submitted by appellant at the time of his appeal; the materials submitted by the Chief in support of the denial of appellant's application; and, the materials submitted by appellant and the Chief in response to the Panel's Notice of Summary Disposition.

**During the meeting, the Panel found the following facts were not in dispute:**

1. **By application dated September 13, 2019, appellant applied to the Chief for a CPL.**

2. **On December 21, 2019, the Chief issued a Notice of Denial stating that appellant's application had been denied for the following reasons:**

    "Specifically, the applicant did not meet the minimum requirement of showing: Suitability to obtain a concealed carry license due to the fact his criminal history record reflects several violent criminal charges. As stated in D.C. Municipal Regulations section 2335.1, a person may be considered to be suitable to obtain a concealed carry license if (d) has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another." (Extensive criminal history)- Specifically your criminal history reflected the following serious criminal charges: Family Report 11/24/18 (DC) (No Arrest), Family Report 2/8/19 (DC) (No Arrest).

    Although all of these charges may not have resulted in convictions, the totality of charged offenses may be used when determining suitability to be licensed to carry a pistol..."

    **Notice of Denial, dated December 21, 2019 (emphasis omitted).**

3. **On December 19, 2019, Lt. Colin Hall issued a Memorandum on behalf of the Chief in support of the denial, which included the following:**

"The applicant does have a criminal record and history of incidents MPD used to weigh in making a final decision, which provide substantial evidence to demonstrate the applicant does do not meet the criteria under DCMR 2335.1 (d). These items are as follows:

> [Three Cobalt records of "Family Reports" resulting in no arrests in DC on 11/24/18, 2/8/19, and 2/8/19]…

…The applicant's history record includes [] three domestic family incidents. In each case MPD Officers were summoned to intervene and the officers documented the events that took place with an incident report. During these incidents the applicant was involved in a dispute with his mother's boyfriend, during one event he struggled over a computer keyboard with the boyfriend, it was also alleged that the applicant has mental health issues. The last family related event revealed that the applicant was storing his registered firearms in a guitar case in a storage facility. He had not notified MPD of this arrangement or that he had moved the firearms from the address he had registered them to as required under the duties of a registrant.

The factors that were weighed during the consideration of this application were that he had been involved in three family domestic events in which police were needed to resolve the disturbance, it was alleged that he has mental health issue that could be a liability if he were to be issued a CCPL. Lastly, as documented he violated the firearm registration duties by not notifying the MPD that he had changed locations of his firearms, which directly demonstrates that he may not abide by the regulations governing CCPL.

MPD weighed the factors as previously mentioned and determined that in totality there is enough evidence to demonstrate that the applicant has exhibited a propensity to violent/unstable behavior that would cause a reasonable person to believe that the applicant could present a danger to the public should the applicant be approved to carry a concealed firearm in the District of Columbia.

These facts must be considered when determining the applicant's eligibility to be licensed to carry a pistol based on his suitability and criminal history as required by DC Municipal Regulation 2332.1(h) and 2335.1(d).

Applicable Law/Regulations

DCMR 2332.1 (h) A person is eligible for issuance of a license to carry a concealed pistol only if the person is suitable to be so licensed.

DCMR 2335.1(d) A person is suitable to obtain a concealed carry license if he or she: has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another.

RECOMMENDATION

2

Based upon the aforementioned facts and circumstances, it is recommended that the applicant's request for approval of a license to carry a concealed pistol in the District of Columbia be denied citing DCMR 2335.1(d) "a propensity to violence or instability".

**Chief's Memorandum, dated December 19, 2019 (emphasis omitted).**

**4.  On January 23, 2020, the Panel received appellant's completed request for appeal, which stated as follows:**

"My name is Sanu Millard. On January 7th, 2020 I received a Notice of Denial for my Concealed Carry Pistol License Application. The Notice of Denial stated that I have an "Extensive criminal history" and listed two Family Reports as "serious criminal charges." The first charge listed, Family Report 11/24/18 (DC) (No Arrest), was an instance where I contacted law enforcement after I had been punched in the mouth by my mother's romantic partner after I refused to speak to him. Officers from the Metropolitan Police Department responded and made a report. No charges were filed. The second charge that's listed is Family Report 2/8/19 (DC) (No Arrest). That call was the second of two incidents within a twenty-four-hour period. The call from the night previous is important, as it provides context for the call on the day of. On 2/7 /19, at approximately 11:00pm, an officer from the Metropolitan Police Department contacted me through my mother's cell phone and informed me that there was an incident that involved me at my mother's apartment. The officer requested my presence at my mother's apartment. I ran from my father's house, whom I was visiting, three blocks away to my mother's apartment. Upon my arrival approximately five minutes later, there were several officers from the Metropolitan Police Department in the hallway leading to my mother's apartment that began to interview me and challenge me for my Firearms Registration Certificates. The officers asked questions related to the condition and storage regarding both of my registered rifles. The officers then asked for my consent to search my room for any illegal firearms or ammunition. I gave my consent. The officers then proceeded to search my room and made no seizures. The officers informed me that they had used a canine to locate the storage locker, inside of the storage room of the apartment building (6101 16th Street NW) where my rifles were kept at the time.

The storage locker is where I mentioned my firearms will generally be kept on my registration application. My mother insisted that I put my rifles there before we hosted guests two weeks prior. The only people who knew the location of my rifles were myself, my mother, and her romantic partner when he saw me take the gun case to the storage locker.

The officers then proceeded to cut the lock off the storage locker and forcibly open the locked hard side gun case. The officers then brought the firearms to the hallway near the apartment where they were interviewing me to compare my credentials to the rifles themselves. After the officers confirmed that the certificates match the rifles they recommended that I spend the night at another location. I heeded to the officers' advice. An officer escorted me to my room inside of my mother's apartment to grab clothes, hygiene gear, etc. The officers then helped me case my rifles and drove me to my brother's

3

house a few miles away. The following morning on 2/8/19 my mother asked me to stop by the apartment to help her grab some things. Among them being a computer with personal information in the hard drives. Her romantic partner was in the same room as the computer. When I went to retrieve the computer, the man shoved me. My mother began to dial 911 and tried to lodge herself between the man and me. I was then cornered. When I attempted to escape toward the front the door the man punched me in the mouth. My mother and I began to push the man until I could find cover in my room, as the man was still blocking the only exit. When I found the chance to escape, I ran downstairs and waited for law enforcement to arrive. Officers from the Metropolitan Police Department interviewed my mother and I, then proceeded to escort the man off the property. They advised him not to return without a police escort.

These incidents, listed on my Notice of Denial letter as charges, represent the first calls that were made after enduring years of abuse. I was never charged with or convicted of a crime during or any time after these incidents. If this denial is not overturned, it would set a dangerous precedent of preventing victims of domestic violence from obtaining a Concealed Carry Pistol License. Seven months after the incident on 2/8/19 I purchased a handgun, began the registration process, and applied for my Concealed Carry Pistol license. A sergeant with the Gun Control Section delayed my registration and began an investigation into the same incidents listed as charges on my Notice of Denial. After two weeks, the registration for my handgun was approved.

If the Metropolitan Police truly believed that I am a danger to myself or others, my rifles would've been seized during or any time after these incidents. This is possible under the provisions of DC Code§ 7-2510.02.

Also, the Notice of Denial contains language about the need to "Demonstrate a good reason to fear injury to person or property, or other proper reason for a concealed carry license." A permanent injunction was placed on this provision of the District of Columbia Municipal Regulations after Wrenn v. District of Columbia was decided by the United States Court of Appeals for the District of Columbia Circuit. Requiring a "good reason" to obtain a Concealed Carry Pistol License would be a direct violation of a federal court order."[1]

**Appellant's undated appeal letter, received January 23, 2020.**

5. **On February 4, 2020, the Panel issued to appellant and the Chief Notices of Receipt of Appeal.**

6. **On April 2, 2020, the Panel conducted an initial hearing and voted to issue a Notice of Summary Disposition ("Notice"). On April 4, 2020, the Panel issued to the Chief and appellant the Notice, along with the Chief's file supporting the denial.**

---

[1] The Panel notes that the Notice of Denial clearly indicates that the basis of denial is a finding of a failure to meet the suitability standards, and does not indicate failure to establish "good cause" as a basis.

**7.  By letter dated May 4, 2020, the Panel received from appellant's attorney the following:**

"On September 13, 2019, Appellant Sanu Millard [hereinafter "Mr. Millard"], applied for
a Concealed Carry Permit [hereinafter "CCP"] pursuant to D.C. Code Sec. 24-2332. Mr. Millard
meets all the requirements set forth for eligibility. On December 21, 2019, the Metropolitan
Police Department – Gun Control Section issued a Notice of Denial. The Notice of Denial cited
D.C.M.R. 2335.1(d) as a basis for disqualifying Mr. Millard from obtaining his CCP citing Mr.
Millard's "propensity for violence or instability that may reasonably render" his "possession of
his concealed pistol a danger" to himself or another. Specifically, the Notice of Denial
erroneously stated that Mr. Millard has "[e]xtensive criminal history" that is reflected in "serious
criminal charges." The Notice of Denial further cites two interactions Mr. Millard had with
police in which he was not arrested or charged with a crime.

On January 20, 2020, Mr. Millard submitted a timely appeal, which was summarily denied on
April 23, 2020. [2] Mr. Millard was served on that Notice of Summary Disposition on April 24,
2020 via email. The Notice of Summary Disposition states that his appeal did not include "a
dispute concerning a material fact" and therefore was "suitable for resolution through a summary
disposition process." D.C.M.R. 1210.1. Mr. Millard now timely files, through undersigned
counsel, written argument to the Concealed Pistol Licensing Review Board pursuant
to DCMR 1210.2.

**Standard of Review**

The burden of persuasion rests on the appellant. DCMR 1218. Further, the appellant has
the burden of producing evidence that (1) the appellant met all the non-discretionary
requirements of the Act, and (2) having met all the non-discretionary requirements, the Chief's
exercise of discretion was not supported by reliable, probative, and substantial evidence. DCMR
1218.2. A decision shall be supported by substantial evidence on the record. Pursuant to the
substantial evidence rule, courts shall uphold an administrative determination of fact if on the
entire record the determination is rationally supportable and could have been arrived at
reasonably. DCMR 1221.4.

[Recitation of "substantial evidence rule" interpretation by the D.C. Courts].  In DC, "substantial
evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion."  This wording comes from a 1938 Supreme
Court case: Consolidated Edison v. N.L.R.B., 305 U.S. 197, 229 (1938).  This standard was
imputed to DC through Washington Post Co. v. District Unemployment Compensation Board,
377 A.2d 436, 439 (D.C. 1977).  "Mere uncorroborated hearsay or rumor does not constitute
"substantial evidence." Consolidated Edison, 305 U.S. 197, 230.

Argument

---

[2]The Panel notes that appellant is incorrect: the appeal was not denied at the time, but rather,
appellant was served with a Notice of Summary Disposition, to which appellant's response is
recited herein.

The decision to deny Mr. Millard's CCP is a violation of his Second Amendment Rights. Mr. Millard has met all non-discretionary requirements of the Act.  This fact is not in dispute as the Notice of Denial only cites to a single discretionary requirement as the basis to deny Mr. Millard a CCP.  In addition, the Notice of Summary Disposition affirms that Mr. Millard meets all non-discretionary requirements of the Act.  However, the Notice of Summary Disposition errors by concluding that no dispute concerning a material fact exist in this appeal.  This finding is not supported by "reliable, probative, and substantial evidence."  DCMR 1218.2.  Mr. Millard has not exhibited a propensity for violence or instability.  Mr. Millard's possession of a CCP would not create a danger to himself or others.  Finally, material facts in dispute include whether Mr. Millard improperly stored his lawfully registered firearms in a storage locker and whether Mr. Millard has mental health issues.

I. Whether Mr. Millard has a propensity for violence is a material fact in dispute.

Appellant Mr. Millard has not exhibited a propensity for violence or instability.  In support of this erroneous conclusion, the Notice of Denial states:

> (Extensive Criminal History)—Specifically your criminal history reflected the following serious criminal charges; Family Report 11/24/18 (DC) (No Arrest), Family Report 2/8/19 (DC) (No Arrest).  Although all of these charges may not have resulted in convictions, the totality of charged offenses may be used when determining suitability to be licensed to carry a pistol.

The facts used to support this conclusion are material and very much in dispute.  First, the Notice of Denial refers to "charges" while simultaneously admitting that Mr. Millard was never even arrested—let alone charged with a crime in either incident.  Second, the Notice of Denial notes that the "charges" (factually incorrect) "may not have resulted in convictions" but may still be "used when determining suitability to be licensed to carry a pistol."  Subsequent to this unsupported conclusion, the Notice of Denial references three separate "family reports" that did not lead to an arrest of Mr. Millard.  The "Summary" portion refers to the following facts: (1) Mr. Millard's history includes three domestic family incidents; (2) Officers intervened to resolve a dispute with his mother's boyfriend (3) During one event Mr. Millard "struggled over a keyboard with the boyfriend"; (4) It was also alleged that Mr. Millard has mental health issues.  All these facts are in dispute and the evidence used to support the conclusions in the Notice of Denial are not reliable, probative, or substantial.  DCMR 1218.2.

D.C. law requires that police "shall arrest a person" if the officer has probable cause that the person "committed an intrafamily offense that caused or was intended to cause reasonable fear of imminent serious physical injury or death."  D.C. Code 816-1031.  "Incidents" are not arrests, charges, or convictions.  Because no arrest was made in any of these incidents, the police lacked probable cause to arrest Mr. Millard for an intrafamily offense.  In fact, Mr. Millard did not engage in force, violence, or unlawful behavior.  In the three instances, he was in fact the complainant.  These facts are in dispute even as evidenced by the record relied upon by MPD as well as Mr. Millard's written appeal.  See Exhibit 1.

A. CCN 19022600

On February 8, 2019, Mr. Desmar Becton (at the time, Mr. Millard's mother's boyfriend) falsely claimed that he had spoken with a female who stated her boyfriend had beef with a person and had guns stored in a guitar case.  It was determined by members of the Metropolitan Police Department that these guns located in a storage unit were lawfully registered to Mr. Millard.

B. CCN 19022819:

This report also lists Mr. Millard as having his lower lip bleeding as part of its Medical Addendum.  Mr. Millard's lower lip was bleeding because Mr. Millard was the victim of domestic violence perpetrated by his mother's boyfriend Desmar Becton—not the assailant.  See Exhibit 2.  Police did not make an arrest in relation to this incident.  The conclusion to use an incident in which Mr. Millard was the victim of domestic violence and had properly registered his firearms as evidence of "charges," "criminal history," or "serious criminal charges" showing him to have a "propensity for violence or instability" does not rationally flow from the factual findings and record evidence and is a material fact in dispute.

In addition, the Internal Narrative supports the conclusion that Mr. Becton was in fact the aggressor and perpetrator of domestic violence against Mr. Millard.  "RP-1 stated that she had asked Sub-1 (Mr. Becton) to leave earlier in the day due to him and her son (Mr. Millard)… and that she just wanted Sub-1 out of the residence…"  Finally, RP-1 stated that there was "no assault."  In addition, and consistent with the officers' decision not to arrest Mr. Millard, "it was determined that no assault occurred."  Therefore, using this incident as evidence to support Mr. Millard has a propensity for violence is erroneous, unsupported by the record, and does not rationally flow to the conclusions in the Notice of Denial.  Finally, denial of a CCP on this basis violates Mr. Millard's Second Amendment rights under the Constitution.

C. CCN 18199823

This incident describes a verbal argument over the television between Mr. Millard and Mr. Becton on November 24, 2018.  The report specifically states that "[n]o offense occurred no probable cause exists for an arrest."  This incident report also states without any support that Mr. Becton alleged that Mr. Millard "has mental health issues."  Given that no crime occurred here other than an argument between a son and his mother's boyfriend about television, referring to it as a "charge," "serious criminal charge," or basis to conclude Mr. Millard has a propensity for violence is completely unsupported by the record and does not rationally flow to the conclusions reached in the Notice of Denial and is a material fact in dispute.  Finally, a denial of a CCP on this basis violates Mr. Millard's Second Amendment rights under the Constitution.

II. Whether Mr. Millard has a propensity for instability is a material fact in dispute.

The Notice of Denial uses three separate police contacts on three different days as evidence that Mr. Millard has a propensity for violence and instability.  DCMR 2335.1(d) prohibits issuing a CCP to an applicant who has a propensity for violence or instability.  The factual findings and

7

legal conclusions do not specify whether it bases its denial on a claim that Mr. Millard has a propensity for violence or Mr. Millard has a propensity for instability (or both).

A. Mr. Millard's background does not reflect a propensity for instability.

As stated supra I.A, nothing in the record reflects a single allegation that Mr. Millard has engaged any form of threats or violence ever. Accordingly, assuming the Notice of Denial bases its denial of Mr. Millard's CCP because of a propensity for instability, this fact is both material and in dispute. Mr. Millard is a 21-year-old African American male with ADHD. He graduated from Woodrow Wilson Senior High School. It is undisputed that he has no criminal record and has never been arrested. Currently, he possesses a Security Guard license issued by the State of Maryland. See Exhibit 3. In addition, he holds a nonresident concealed carry permit issued by the Commonwealth of Virginia (Exhibit 4) and the State of Maryland (Exhibit 5). Finally, he is a licensed Special Police Officer in the District of Columbia. See Exhibit 6.

He has divorced parents who live near each other and he splits time at his Mother and Father's house. Mr. Millard has met all the extensive qualifications to lawfully purchase and register firearms in the District of Columbia—a jurisdiction with notoriously difficult gun laws. Several District and State agencies have vetted Mr. Millard's background and found him fit to (1) serve as a security guard; (2) act as a Special Police Officer with arrest powers (D.C. Code § 23–582); and (3) lawfully carry a concealed weapon. And, most importantly, this agency has specifically found him fit to register three separate firearms.

B.      Whether Mr. Millard has mental health issues is a material fact in dispute.

The Notice of Denial further states that "it was alleged that he [Mr. Millard] has mental health issue that could be a liability if he were to be issued a CCPL." This assertion is unsupported by the record. This triple hearsay allegation was made by Mr. Becton who has abused Mr. Millard repeatedly. Moreover, the record does not specify any particular mental health issue. Most importantly, the record evidence in this case contradicts that assertion. Under the Criminal and Mental Health History section of the Notice of Denial, the record states:

> Records checks were conducted in WALES, JUSTIS, Courtview, Cobalt, Linx, PRISM and NICS. Fingerprints were captured, and sent to the FBI for analysis. Additionally, a check was conducted of the Firearms Registration Mental Health Database, and applicant was found to have no mental health record.

A material fact in dispute exists within the existing record. On the one hand, Mr. Millard's domestic abuser apparently made an unspecified allegation that Mr. Millard had mental health issues. On the other hand, no record of any law enforcement database supports this unspecified allegation. Therefore, whether Mr. Millard has mental health issues is a material fact in dispute and DCMR 1210.3 compels a hearing on that basis alone.

C. Whether Mr. Millard improperly stored his firearm in a locker is a material fact in dispute.

8

Mr. Millard did not violate firearm registration duties.  On July 19, 2018, Mr. Millard applied to register a firearm with the Metropolitan Police Department.  In that application, the following question was asked: GIVE A BRIEF STATEMENT OF GENERALLY WHERE THE FIREARM WILL BE KEPT.  Mr. Millard answered "Gun range locker."  See Exhibit 7.  The incident report cited in the record for CCN 19022600 specifically states Mr. Millard's lawfully registered firearms were located "in storage unit 22."  The report concludes that "Sub-3 [Mr. Millard] provided the Officers on scene with DC Firearms registration for each weapon.  As stated in Mr. Millard's written appeal and attached Declaration, Mr. Millard moved the firearms at the request of Metropolitan Police Department officers in full cooperation with their lawful authority.  In so doing, Mr. Millard clearly notified MPD of the movement of the firearms because he did so at their request and command.  See Exhibits 1, 9.  Accordingly, whether Mr. Millard violated his firearm registration duties is a material fact in dispute.

Finally, it appears the Notice of Denial relies on the fact that a young man did not get along with his mother's boyfriend for a period of time and despite the confrontations never escalated to an arrestable offense or probable cause for an arrest.  In addition, Mr. Millard himself was a victim of domestic violence in these incidents.  See Exhibit 1, 9.  Such a conclusion—that Mr. Millard has a propensity for instability—does not rationally flow from the factual record and the Notice of Denial basis these conclusions on two material facts clearly in dispute.  Therefore, Mr. Millard is entitled to a hearing and to have his CCP application granted.

III. Whether Mr. Millard's possession of a CCP would create danger to himself or others is a dispute of material fact.

[Recitation of deference to agency rulings.]   Nothing in the factual record demonstrates that Mr. Millard would be a danger to himself or others if MPD grants him a CCP.  This finding is clearly arbitrary, capricious, a total abuse of discretion, and not supported by substantial evidence in the record.  Again, the only evidence presented in the record are unsworn police report documents repeating hearsay testimony.  In addition, even assuming arguendo everything in these police reports are true and carry substantial evidentiary weight, nothing in the supported documentation leads to the conclusion Mr. Millard is a danger to himself or others should he be granted a CCP.

The clearly arbitrary decision in the Notice of Denial and subsequent Notice of Summary Disposition acknowledge that Mr. Millard has lawfully registered several firearms.  D.C. Code 7-2502.03 outline the various administrative requirements an individual must demonstrate to lawfully register a firearm in the District of Columbia.  Specifically, subsection (6A) requires lawful issuance of firearm registration to individual who "[w]ithin the 5 years immediately preceding the application, has not had a history of violent behavior."

The "incidents" cited in Notice of Denial and Notice of Summary Disposition occurred on November 24, 2018, February 8, 2019 (twice).  Mr. Millard has lawfully registered three firearms in the District of Columbia.  The Metropolitan Police Department has issued three firearms registration certificates to him—on July 20, 2018, December 31, 2018, and October 1, 2019.  See Exhibits 8.  The final registration date of October 1, 2019 is notable because it occurred after the three incidents referenced in the Notice of Denial.  MPD fully investigated these incidents and made a determination that Mr. Millard did not have a history of violent

behavior within the last five years.  D.C. Code 7-2502.03.  The fact the same agency now claims, with the same knowledge it had on October 1, 2019, that him possessing a CCP would create a danger to himself or others is further evidence that the decision is arbitrary, capricious, a total abuse of discretion, and not rationally connected to the conclusions reached.  At a minimum, these conflicting findings create a material fact in dispute.

CONCLUSION

Several material facts in dispute exist in this appeal, including (1) whether Mr. Millard has a propensity for violence or instability; (2) whether Mr. Millard has any "charges," or "serious criminal charges," (3) whether Mr. Millard holding a CCP would create a danger to himself or others; (4) whether Mr. Millard is the victim of domestic violence; (5) whether Mr. Millard has mental health issues making him unsuitable for a CCP; and (6) whether Mr. Millard improperly stored his firearm in a gun range locker.

The conclusions drawn from the factual record are clearly arbitrary, capricious, and an absolute abuse of discretion and are not supported by reliable, probative, and substantial evidence. Accordingly, DCMR 1210.3 compels a hearing so Mr. Millard, through counsel, may present oral argument.  To do otherwise, would be a clear violation of Mr. Millard's Second Amendment Rights under the Constitution of the United States, Heller, Palmer, and Wren."

**Appellant's Response to Notice, dated May 4, 2020:**

**8.  On June 10, 2020, the Panel received the Chief's Reply to appellant's response, which stated as follows:**

"The Chief of the Metropolitan Police Department (MPD), by and through his designee, and pursuant to D.C. Mun. Regs. tit. 1, § 1210.2, submits this response to the Concealed Pistol Licensing Review Board (CPLRB) Panel's Notice of Summary Disposition issued February 28, 2020, in the appeal of [appellant]. In this matter, [appellant] challenges the Chiefs revocation of his concealed pistol license (CPL) based on his disqualifying history of violent behavior under D.C. Code § 7-2502.03(a)(6A), and his propensity for violence or instability under D.C. Mun. Regs. tit. 24, § 2335.1 (d). As demonstrated by MPD's record submitted to the Panel, including [appellant]'s criminal history record, the Chiefs decision was supported by reliable, probative, and substantial evidence. Given the record evidence, and because [appellant] has not disputed any material fact, the Panel should sustain the Chiefs decision.

In this case, the Chief rendered a discretionary decision that Mr. Millard 18 unsuitable for a concealed carry license, finding that Mr. Millard poses a risk of violence or instability that would reasonably render his possession of a CPL a danger to himself or others pursuant to D.C. Mun. Regs. tit. 24, § 2335.1 (d). This regulation provides in pertinent part that a person is suitable to obtain a concealed carry license if he or she, in addition to meeting all other requirements, has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another. Id. Under the Chiefs interpretation of this regulation, conduct that is violent, criminal, or

demonstrating low self-control regardless of whether it results in a criminal conviction may be grounds for denial, revocation, or suspension of a CPL on the basis of unsuitability.

The Chief is charged with enforcing D.C. Code§ 7-2509.11(1)(C) and D.C. Mun. Regs. tit. 24, § 2335.1(d), and his interpretation is due deference. In implementing D.C. Mun. Regs. tit. 24, § 2335.1 (d), the Chiefs goal is to reduce the incidence of gun violence to an acceptable risk level. The Chief determined that it is in the interest of public safety and within his discretion to lower the level of acceptable risk in CPL decision-making. To those ends, risk factors, in particular, a person's history of domestic or intimate partner violence, acts of violence, threatened or actual use of weapons, drug or alcohol abuse, reckless driving, or other indicators of instability are given greater weight in propensity for violence or instability considerations.

I.      The Chief's Decision Should be Upheld Because it is Based on Reliable, Probative, and Substantial Evidence.

The Chiefs denial decision should be upheld because it is based on undisputed facts, which are supported by substantial evidence. In this case, Mr. Millard is 21 years old, which is the youngest an individual can be to obtain a CPL in the District. At this age, Mr. Millard requires parental consent for the prerequisite firearm registration. See D.C. Code §7-2509.02(a)(1 ); see also D.C. Code § 7-2502.03(a)(1 ). Mr. Millard's parents are divorced and both live in Northwest DC. Mr. Millard used to live with his father, Mr. Peter Millard, but when Mr. Millard turned 18 and wanted to register guns (the youngest an individual can be to register guns, with parental consent), his father refused to allow him to keep guns in the house. Mr. Millard subsequently moved in with his mother, Ms. Wanda Dyson, but for reasons that are unclear, Mr. Millard registered two firearms to his father's address. Ms. Dyson provided the requisite parental consent for him to register firearms.

According to Mr. Millard, he currently "splits his time" between his mother's and father's residences. His mother has also shared her apartment with her boyfriend, Mr. Desmar Becton, with whom Mr. Millard has had longstanding conflict. After Mr. Millard registered firearms to his mother's address, MPD has responded to multiple calls for service related to safety concerns over Mr. Millard's firearms and to intervene in altercations between Mr. Millard and Mr. Becton.

On August 31, 2019, Mr. Millard turned 21; and in mid-September, Mr. Millard submitted his application for a CPL. Later that month, Mr. Millard submitted paperwork to MPD to update his address of record for his two firearms registration cards, changing it from his father's address to his mother's address. For the reasons explained herein, Mr. Millard at least for the time being does not possess the stability or predictability with respect to his living situation, and there are indicators that he may present a risk of violence as well.

Five police reports give insight into Mr. Millard's unsuitability, summarized below. The first and last of these reported incidents were not identified in MPD's memorandum recommending the denial or the Notice of Denial, which relied on sufficient evidence from the three other incidents. However, in light of Mr. Millard's response to the Notice of

11

Summary Disposition, all five reports are included here to fully explain the determination on Mr. Millard's propensity for violence or instability.

•  (CCN 15001924) On January 4, 2015, an MPD officer responded to a call for a family disturbance in progress between Mr. Millard, who was then 16 years old, and his father, Mr. Peter Millard, at Mr. Millard's father's house. According to the police report, Mr. Millard and his father were engaged in a verbal altercation regarding "the appearance of the home." They both confirmed that no physical altercation had occurred, and they were advised to stay away from each other for the rest of the day. The call for service was documented as a family disturbance incident report.1

•  (CCN 18199823) On November 24, 2018, when Mr. Millard was 20 years old, MPD officers responded to a call for a family disturbance between Mr. Millard and Mr. Becton at Ms. Dyson's apartment. According to the police report, Mr. Becton had walked Ms. Dyson out of the apartment, and when he returned, he and Mr. Millard got into an argument about the television. Mr. Millard told the officers that he owned a firearm and presented his registration card. Mr. Becton advised the officers that he believed Mr. Millard had mental health issues. A Crisis Intervention Officer (CIO) was dispatched to the scene, and the CIO reported that Mr. Millard was not currently suffering from any issues.2 A family disturbance incident report was taken.

•  (CCN 19022600) The night of February 7, 2019, a special police officer (SPO) on duty at Mr. Millard's mother's apartment building requested MPD assistance to investigate a tip. The SPO reported that a young woman in tears told him there was a person in the building who was storing multiple firearms in a guitar case in the basement and "had beef" with someone else. The SPO and a property manager showed the MPD officer into the basement communal storage room. They could see into the caged storage units and identified one with a guitar case in it. The property management did not have a record of which apartment unit was assigned to the storage unit. Almost three hours later, after a K-9 unit had been dispatched and two firearms were located in the guitar case, the investigation led to Mr. Millard, who they found out was staying in his mother's apartment. Ms. Dyson and Mr. Becton were home, and they advised the officers that Mr. Millard was at his father's house close by. Ms. Dyson did not know which guns her son had registered or that he was keeping any guns in the basement. She called Mr. Millard to come home so he could show the officers his registration paperwork. While waiting for Mr. Millard, Ms. Dyson and Mr. Becton got into multiple arguments between themselves regarding Mr. Millard's gun ownership, his bad relationship with Mr. Becton, and the concerns that Mr. Becton and his father shared about Mr. Millard's strong interest in guns. Ms. Dyson and Mr. Becton advised that Mr. Becton had been in the military Special Forces, and despite his familiarity with guns, both he and Mr. Millard's father did not want to be around Mr. Millard's guns. Ms. Dyson reported that Mr. Millard's father refused to allow Mr. Millard to keep guns in his home, which led Mr. Millard to move in with her, despite his long-standing conflict with Mr. Becton. Mr. Becton also voiced concerns about Mr. Millard receiving packages in the mail with firearms accessories and tactical gear. Mr. Millard ultimately arrived at the apartment and showed registration cards for the two firearms that MPD found in the guitar case. He consented to having officers verify that he only had ammunition for those two guns

12

in his bedroom. Mr. Millard packed some belongings to stay the night elsewhere before officers cleared the scene. This call for service was documented as a family disturbance incident report involving Ms. Dyson and Mr. Becton regarding Mr. Millard's storage of firearms.3

• (CCN 19022819) The next day, on February 8, 2019, Mr. Millard's mother called 911 because Mr. Millard and Mr. Becton were fighting in her apartment. According to the police report, Mr. Millard stated that he returned to the apartment to get his mother's computer, and Mr. Becton refused to let him have it, aggressively pulling the keyboard away from him. Mr. Becton stated that he was using the computer when Mr. Millard tried to take it from him, and that Mr. Millard began unhooking cords from it and pulling the keyboard out of Mr. Becton's hands. Mr. Becton reported that they were both pulling on the keyboard when Ms. Dyson got between them to stop things from escalating any further. Ms. Dyson stated that she asked Mr. Becton to leave earlier in the day because he and Mr. Millard were not getting along, and she had asked Mr. Millard to come pick up the computer. She allegedly witnessed the situation escalating after Mr. Millard began unplugging the computer cords. Ms. Dyson further alleged that she wanted Mr. Millard to leave the residence because the building management found out he was staying there and was not on the lease. She said that things had been "rocky" due to Mr. Becton "moving back into the residence." The police report noted that Mr. Millard's lip was bleeding, but no assault was reported by any of the parties. This call for service was documented as a family disturbance incident report.

• (CCN 19058866) On April 7, 2019, at approximately 9:30 pm, Mr. Becton called the police to report that Mr. Millard had removed his clothing from Ms. Dyson's apartment and put it in boxes out on the street without his approval. According to the police report, Mr. Becton had moved out of Ms. Dyson's apartment to get away from Mr. Millard, due to an ongoing disagreement. Mr. Millard allegedly told his mother that the boxes were out on the street in front of Mr. Becton's aunt's house. The report indicates that Mr. Becton and Ms. Dyson picked them up together; Mr. Becton and Mr. Millard were at separate locations when this occurred; and there was no physical contact between any of the parties. The call for service was documented as a family disturbance incident report. 4

In Mr. Millard's response to the Notice of Summary Disposition, Mr. Millard argued that MPD's Notice of Denial erroneously referred to November 2018 and February 2019 incidents as "charges," even though they involved no arrests, charges, or convictions. Mr. Millard noted that the District has a mandatory arrest law for intrafamily offenses, see D.C. Code§ 16-1031 et seq., and the fact that he was not arrested indicates that there was no probable cause that he had committed any offense. Without being arrested, Mr. Millard argued that these incidents provide insufficient evidence to support the Chiefs denial decision. This argument is misplaced. Probable cause is the legal standard used to determine whether a search or an arrest is reasonable under the Fourth Amendment. Probable cause does not apply to the Chiefs firearms licensing decisions, which do not implicate Fourth Amendment protections. Rather, firearms licensing decisions must be supported by substantial evidence, which the Supreme Court has defined as being "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citations omitted).

While Mr. Millard disagrees with the Chiefs determination based on the evidence in his case, the evidence is clearly adequate to support the Chiefs conclusion. Based on the totality of the circumstances from the November 2018 and February 2019 incidents, the Chief concluded that Mr. Millard has "exhibited a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another."5

II.     Summary Disposition Should Be Granted Based on the Undisputed Material Evidence

The Chiefs decision to deny Mr. Millard's CPL should be upheld as it is supported by undisputed substantial evidence. In his response to the Notice of Summary Disposition, Mr. Millard claimed to be raising factual disputes, but his arguments merely challenged whether the Chiefs determination was reasonable based on undisputed facts. While Mr. Millard would disagree, the Chiefs conclusion does rationally flow from the findings of fact. M r. Millard's arguments also raised new factual allegations, which are discussed below. Mr. Millard's arguments related to certain allegations are somewhat mitigating, but they do not outweigh the evidence supporting the Chiefs denial decision.

Regarding the February 7, 2019 incident, Mr. Millard argued that Mr. Becton manufactured the story about the "tip" given to the SPO, which led MPD to investigate his registered firearms stored in a guitar case locked in the basement of his mother's apartment building (CCN 19022600). Mr. Millard also alleged that his lip was bleeding when police returned the next day "because Mr. Millard was the victim of domestic violence perpetrated by his mother's boyfriend Desmar Becton-not the assailant" (CCN 19022819). Mr. Millard did not state in his response what Mr. Becton did to cause him the lip injury or explain why neither he nor his mother reported Mr. Becton to the police. However, in his signed declaration attached to his response, Mr. Millard averred that his mother started to dial 911 after Mr. Becton shoved him, and Mr. Becton then punched him in the mouth before he hid in his bedroom. In light of these allegations, Mr. Millard claimed that the family disturbance incidents should not be considered evidence that he has exhibited a propensity for violence or instability.

Mr. Millard's new allegations are not material facts for purposes of the Chiefs decision, but even if they were, MPD does not need to dispute them. Assuming they are true, Mr. Millard's allegations do not change the Chiefs decision. If anything, they raise additional concerns. Importantly, Mr. Millard acknowledged in his response that he stored his two registered firearms in a guitar case in the basement of his mother's apartment building. Mr. Millard also acknowledged that he and his mother's live-in boyfriend had an ongoing conflict. If Mr. Millard was also the victim of his mother's boyfriend's domestic violence, unfortunately, his unstable and dangerous living situation is another risk factor weighing against his suitability.

The undisputed facts lead to the Chiefs very reasonable conclusion that Mr. Millard does not possess the stability, predictability, or self-control to be suitable for a CPL. For example, Mr. Millard decided to store his firearms in a guitar case in a communal storage room,

inside a caged storage unit secured only with a lock that could be broken with enough effort. Meanwhile, it was the basement of an apartment building where he was not an official tenant, and his guns were not legally registered there for home protection. This demonstrates Mr. Millard's lack of sound judgment, reliability, and predictability. Further, Mr. Millard did this while splitting his time between his mother's apartment, where he was not on the lease, and his father's home, where he was not allowed to keep his guns. The building management and apparently Mr. Millard's mother, to some extent, were unaware of Mr. Millard's self-made arrangement.

On one hand, Mr. Millard is adamant about his gun ownership, yet on the other, his conduct reflects a level of casualness and disturbing naivety towards what can be deadly consequences. That his firearms were kept in a guitar case in the basement raises many questions about Mr. Millard's reasoning. If the idea was to disguise his firearms from anyone who might see or know about them and want to steal them, then Mr. Millard should have known not to keep them there in the first place. If Mr. Millard did not want to store his firearms inside his mother's apartment, where they were also not registered, and his father refused to keep them in his house, it appears that Mr. Millard did not really have any fixed address to register firearms for home protection. Mr. Millard's actions created a public safety risk and were borderline illegal. Mr. Millard may have realized his actions were reckless and irresponsible which would explain the lack of transparency. Whatever the reason, the recklessness and irresponsibility he has shown towards the possession of lethal weapons is not acceptable for CPL holders.

Mr. Millard's remaining allegations regarding Mr. Becton provide further support for the finding that Mr. Millard, at least for now, does not possess the stability, predictability, or control over his living situation to be suitable for a CPL. Assuming Mr. Millard's allegations are true, and Mr. Becton was the aggressor and perpetrator of domestic violence against Mr. Millard, it raises additional concerns that domestic violence and a volatile relationship with his mother's boyfriend have been part of Mr. Millard's living situation. Despite all of this, and hopefully not because of it, with his mother's permission, Mr. Millard has added guns to the situation. In light of this information, it was reasonable for the Chief to conclude Mr. Millard has a propensity for violence as well as instability. For all of these reasons, the Chief made the correct decision to deny Mr. Millard's application for a CPL based on his exhibited propensity for violence and instability.

According to the police reports described above, police have been repeatedly called by Mr. Millard's parents and Mr. Becton to intervene in family disturbances. Every family disturbance that they have reported involves Mr. Millard. On February 8, 2019, Mr. Millard engaged in a verbal altercation with Mr. Becton that turned physical, when Mr. Millard physically attempted to take a computer keyboard away from Mr. Becton. Everyone involved stated that Ms. Dyson got between them to stop things from escalating further. Mr. Millard was observed with a bloody lip once police arrived. Given the previous verbal disputes involving Mr. Millard and Mr. Becton, as well as Mr. Millard's explanation for his bloody lip, the situation could have escalated very quickly.

15

MPD has serious concerns about the presence of domestic violence in Mr. Millard's living situation, at least at his mother's apartment where his firearms are now registered. The material facts are not in dispute. That Mr. Millard has engaged in a physical struggle with Mr. Becton at his mother's apartment at least once, and his mother physically inserted herself between the two of them to try to stop the situation from escalating further, supports the conclusion that Mr. Millard has a propensity for violence. Furthermore, the fact Mr. Millard did not report being assaulted by Mr. Becton to the police but alleged that Mr. Becton was the assailant for purposes of obtaining a CPL raises concerns that Mr. Millard failed to be forthcoming with law enforcement concerning a domestic violence incident. While certain circumstances may be beyond Mr. Millard's control and are somewhat mitigating, they do not sufficiently mitigate or outweigh the evidence in support of the Chiefs decision.

Under these circumstances, MPD does not believe that denying Mr. Millard's CPL application will "set a dangerous precedent" regarding victims of domestic violence, as Mr. Millard has alleged. Studies have consistently shown significant risks associated with gun presence in abusive relationships. According to a multistate case control study in 2003 by the American Journal of Public Health, access to a firearm makes it five times more likely that an abusive partner will kill his female victim.6 Further, a study of intimate partner homicides published in the American Journal of Public Health in 2014 found that one in five victims were family members, friends, first responders, or other people who intervened in incidents of intimate partner violence.7 In roughly 70% of those deaths, the perpetrator used a firearm.

A.  There is No Material Fact in Dispute Regarding Mr. Millard's Background.

In his response, Mr. Millard stated that he is a 21-year-old African American male, he has attention deficit hyperactivity disorder (ADHD), he is a graduate of Woodrow Wilson Senior High School, and he is a licensed Security Guard in the State of Maryland. Mr. Millard also stated that he holds a nonresident concealed carry permit issued by the Commonwealth of Virginia and is a licensed special police officer (SPO) in the District. In addition, his divorced parents live near each other, and he splits his time living with them. Finally, Mr. Millard asserted that MPD "has specifically found him fit to register three separate firearms."

MPD has considered these allegations and finds that they do not sufficiently mitigate or outweigh the totality of the evidence for purposes of his suitability for a CPL. Mr. Millard's background information is not in dispute. With respect to his various licenses, in the District of Columbia, SPOs are subject to separate regulations and licensing requirements that do not impose the same eligibility or suitability standards used for concealed pistol licensing. See, e.g., D.C. Mun. Regs. tit. 6A, §§ 1100.7, 1100.8. In particular, different criminal history disqualifiers apply to the vetting of SPOs under D.C. Mun. Regs. tit. 6A, §  1102. An individual is not required to have a concealed carry license to be suitable for one-in order to be an SPO pursuant to D.C. Code§ 5-129.02(a) and D.C. Mun. Regs. tit. 6A, § 1100, et seq. Here, while Mr. Millard's background check may not prevent him from obtaining an SPO license, his employment as an SPO does not

fully mitigate concerns that he presents a propensity for violence or instability for purposes of CPL licensing. Likewise, whether Mr. Millard has obtained firearms licenses from Virginia or other states does not mitigate or outweigh the information presented in his background check for purposes of CPL licensing in the District of Columbia.

B. The Chief Would Have Made the Same Decision Regardless of Mr. Millard's "Mental Health Issues."

Mr. Millard also argued that his mental health is a material fact in dispute. In his response, he referred to the statement in MPD's memorandum recommending the denial decision: "it was alleged that he has mental health issue[s] that could be a liability if he were to be issued a CCPL."8 There is no dispute that this was included in MPD's memorandum. Nor does Mr. Millard dispute the relevance of mental health issues to a decision under D.C. Mun. Regs. tit. 24, § 2335.1(d). Instead, Mr. Millard argued that the statement in MPD's memorandum is a "triple hearsay allegation ... made by Mr. Becton who has abused Mr. Millard repeatedly." He asserted the record does not specify any particular mental health issue, and MPD's check of the Firearms Registration Mental Health Database found no mental health record. As such, he believes "no record of any law enforcement database supports th[e] unspecified allegation" that Mr. Millard has mental health issues.

These arguments are unavailing. First, the Chiefs decision does not hinge on whether Mr. Millard has mental health issues. Assuming no legitimate allegations had been made related to Mr. Millard's mental health, the Chief would have still found Mr. Millard unsuitable and denied his CPL application based on the remaining evidence. If Mr. Millard's mental health was dispositive of the Chiefs decision, Mr. Millard's CPL application would have been denied based on that alone. See D.C. Code § 7-2509.02(a)(3).

Moreover, MPD has considered the remaining factors that Mr. Millard alleged, including that it was Mr. Becton who reported that Mr. Millard "has mental health issues" in November 2018, and that the police report did not specifically describe what Mr. Becton reported or what the officers observed with respect to Mr. Millard's mental health. Still, the officers determined a Crisis Intervention Officer (CIO) was needed. This indicates that the officers believed there was ongoing threat potential that Mr. Millard posed to himself or others, which might have necessitated transporting him to the Comprehensive Psychiatric Emergency Program (CPEP}. There is no dispute that a CIO was dispatched to the scene, or that the CIO found Mr. Millard was not experiencing a crisis at that time. Lastly, Mr. Millard cleared MPD's firearms licensing "mental health" check, however, Mr. Millard is still flagged on Cobalt with cautions that include "mental health condition" and "gun owner." While these facts are not dispositive of the Chiefs decision, this is evidence contradicting Mr. Millard's claim that there is no record of any law enforcement database raising liability concerns related to his mental health if he was issued a CPL.

C. The Chief's Decision Was Not Based on a Violation of Firearms Storage law but the Totality of the Circumstances, which Supported the Finding of Unsuitability.

Contrary to Mr. Millard's claim, there is no dispute that the Chiefs decision was not based on any violation by Mr. Millard of the legal duties of firearms registrants under D.C. Code § 7-2502.08.9 The Chiefs decision was based a finding of unsuitability under D.C. Mun. Regs. tit. 24, § 2335.1 ( d). As such, whether Mr. Millard violated the legal duties of firearms registrants is not a material fact in dispute. Despite all of this, in his response to the Notice of Summary Disposition, Mr. Millard argued that when he applied to register a firearm with MPD for home protection on July 19, 2018, he stated on his application that his firearm would be generally kept in a "gun range locker." Mr. Millard also stated in the declaration attached to his response that "[t]he storage locker is where I mentioned my firearms will generally be kept on my registration application." See Sanu Millard Decl. ¶ 18. He did not offer any explanation to rectify the significant difference between a locker for a gun range and a caged storage unit with a common padlock inside the communal storage room of his mother's apartment building.

In addition, Mr. Millard's response alleges that "Mr. Millard moved the firearms at the request of [MPD] officers in full cooperation with their lawful authority," and he "clearly notified MPD of the movement of the firearms because he did so at their request and command." Mr. Millard's response did not specify when this movement occurred, but presumably he is referring to the night of February 7, 2019. He also alleged that his mother "insisted" he put his rifles in the storage unit two weeks prior, and Mr. Millard, his mother, and her "romantic partner" (i.e., Mr. Becton) were the only people who knew the location of his rifles. See id. Decl. ¶ ¶   19-20. Mr. Millard's response, prepared by counsel, conceded that the "gun case" was in fact a guitar case, yet Mr. Millard still referred to it as a "locked hard side gun case" in his declaration. The inconsistencies in Mr. Millard's allegations are not material facts in dispute, but circumstances indicate that Mr. Millard remains defensive about his choices and has not identified responsible solutions to resolve MPD's various concerns.

III     The Chiefs Decision is Not Arbitrary or Capricious.

Lastly, Mr. Millard's response acknowledged that "great deference" should be given "to the agency's finding supporting the decision," and on review, the inquiry is limited to a determination of "whether the findings and conclusions were arbitrary, capricious or an abuse of discretion, or not supported by substantial evidence." Importantly, however, Mr. Millard has the burden of "persuading the Board that the Chiefs final action should be reversed or modified based on substantial evidence." D.C. Mun. Regs. tit. 1, § 1218.1. As previously stated, the Supreme Court has defined substantial evidence as being "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citations omitted).

Mr. Millard has not proffered substantial evidence to support a reversal or modification of the Chiefs decision. Mr. Millard averred that he would not be a danger to himself or others if MPD granted him a CPL, but his allegations do not alleviate the Chiefs concerns that his recent conduct exhibits a propensity for violence or instability, exceeding the acceptable level of risk for CPL licensing decisions. Mr. Millard also argued that he was permitted to

keep his firearms registration certificates which requires a finding that he has not had a history of violent behavior within the past five years. See D.C. Code § 7-2502.03(a)(6A). This argument is unavailing, because under D.C. Mun. Regs. tit. 24, § 2335.1(d), the Chief is not required to find that he has previously engaged in violent behavior to conclude that he has exhibited a propensity for violence or instability. These standards reflect important differences between the risks associated with registering firearms for home protection and authorizing concealed carrying in the District of Columbia. That Mr. Millard has been able to maintain firearms registration certificates does not render the Chiefs decision on his CPL application "clearly arbitrary."

Lastly, there are no evidentiary issues with the Chiefs reliance on police reports. The Chief is entitled to rely on police reports and other criminal history records containing hearsay in determining whether a person is suitable to carry a concealed firearm. The police reports were prepared and signed by police officers sworn to uphold the law. Indeed, "hearsay evidence is admissible in administrative proceedings unless it is irrelevant, immaterial, or unduly repetitious." James v. D.C. Dep't of Employment Servs., 632 A.2d 395, 398 {D.C. 1993) (internal quotation marks and citation omitted). In sum, Mr. Millard's assertions do not weigh against the Chiefs use of police reports, which are both reliable and probative of his unsuitability for a CPL.

For these reasons, the undisputed factual record provides substantial evidence in support of the Chiefs decision. Given the substantial evidence supporting the Chiefs decision, and because Mr. Millard has not met his burden, the Chiefs decision should be upheld."

**Chief's Memorandum, dated June 22, 2020 ("Chief's Reply") (served on June 24, 2020 appellant's attorney via email) (footnotes omitted and attaching cited police reports).**

9. **On July 9, 2020, the Panel met and voted to sustain the Chief's denial.**
**During the meeting the Panel made the following conclusions based upon the above facts.**

1. In this case, the Chief denied revoked application for a CPL after determining that appellant was unsuitable to obtain a license based on his propensity for violence or instability that may render his possession of a concealed pistol a danger to himself or another.  *See* D.C. Official Code § 7-2509.11(1)(C); 24 DCMR §§ 2332.1(h), 2335.1(d).

2. As an initial matter, and as indicated by the Chief in his filings, the Panel takes judicial notice of the fact that different legal requirements apply in the District for obtaining a firearms registration, a special police officer license, and a concealed pistol permit.  In fact, District law generally imposes more stringent requirements for obtaining CPLs, to include the CPL disqualifier at issue in this appeal of a finding of propensity for violence or instability. Thus, the fact that appellant may possess a firearms registration – which is a prerequisite to a CPL – or an SPO, is not dispositive of whether appellant is eligible for a CPL.  In addition, the District does not grant reciprocity, so the fact that appellant may have CPLs in other jurisdictions is irrelevant to this appeal.

3. The record reviewed by the Panel contained no disputes as to material facts.  Appellant alleges the following material facts in dispute:

19

"…(1) whether Mr. Millard has a propensity for violence or instability;
(2) whether Mr. Millard has any "charges," or "serious criminal charges,"
(3) whether Mr. Millard holding a CCP [sic] would create a danger to himself or others;
(4) whether Mr. Millard is the victim of domestic violence;
(5) whether Mr. Millard has mental health issues making him unsuitable for a CCP [sic]; and,
(6) whether Mr. Millard improperly stored his firearm in a gun range locker."

*See* Appellant's Response.  The Panel finds that Paragraphs (1)-(6) fail to sufficiently allege any material facts in dispute:

- The Panel finds that Paragraphs (1) and (3) are not facts in dispute but rather legal conclusions at issue in this case, as described in greater detail below.

- Paragraph (2) objects to the Chief's description of appellant's criminal history records as "charges" or "serious criminal charges:" appellant claims he was never "arrested" for the offenses at issue and therefore the incidents were not "charges."  The Panel agrees that appellant's criminal history records are not charges but rather incidents, and finds that the Chief clearly acknowledges as such in both his Memorandum and Response.  The Chief's acknowledgment cures this potential defect and thus the term "charges" in the Notice is not a material fact in dispute.

- Paragraph (4), addressing whether appellant was the victim in this case, also is not a material fact in dispute. While appellant may dispute the facts which underlie the domestic violent incidents at issue, the Panel finds that appellant does not dispute the fact of the domestic violence criminal history records. Thus, as explained in greater detail below, the Panel concludes that there are no material facts in dispute.

- Lastly, the Panel finds that Paragraphs (5) and (6) are not material facts in dispute, as neither basis were grounds for the Chief's denial. While D.C. Code § 7-2409.02(a)(3) prohibits issuance of a CPL to a person with specified mental illnesses or conditions, that basis was not grounds for the denial in this case. As the Chief explains in his reply, he considered appellant's mental health issues, but that consideration was not in the context of a mental health illness or condition triggering a disqualification. Rather, appellant's mental health issues were considered in the context of appellant's propensity for violence or instability. Similarly, the Panel finds that the CPL was not denied for improper firearms storage, but rather, that appellant's record of storing his firearms, as documented by the Chief in his filings, was a factor in considering his propensity for violence or instability.

In sum, appellant does not dispute the criminal history records cited by the Chief as the grounds for denial.  The Panel finds that, as a matter of law, appellant's undisputed criminal history records may be a factor in denying his application for a CPL.  See 24 DCMR § 2335.1(d) (stating that a person is not suitable for a CPL if he has exhibited "a propensity for violence or instability that may reasonably render the person's possession of a concealed

pistol a danger to the person or another);" *see also* D.C. Official Code § 7-2509.11(1)(C); 1 DCMR § 2332.1(h).  The law provides the Chief with discretion to determine what events may constitute a propensity for violence or instability, which may include appellant's criminal histories which did not result in convictions.  In addition, the law does not require that the Chief find that appellant has a history of violent behavior.[3]  To the contrary, the Chief is required only to find that appellant is *not suitable* for a CPL based on his *propensity* for violence or instability.  *See id.*  While suitability and propensity for violence or instability are undefined in District law, these types of findings are implicit in several states' CPL schemes where licensing authorities may deny CPL applicants where there is reason to believe applicants are unsuitable or dangerous.[4]

The Panel acknowledges that appellant may not have been convicted of, or even arrested for, the incidents in his criminal history record.  However, the standards in criminal cases and the instant civil proceedings are different.  In criminal cases, the government would be required to show that defendant was guilty of the offenses beyond a reasonable doubt.  Likewise, and as appellant describes in his filings, the government would have to demonstrate probable cause to initiate an arrest.  In this case, however, the burden is on appellant to demonstrate that the Chief failed to establish by substantial evidence appellant's unsuitability.  *See* 1 DCMR § 1218.  In addressing the 'substantial evidence' standard in the context of similar administrative proceedings, the Supreme Court ruled that substantial evidence means "more than a mere scintilla... It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted).

Here, the Panel concludes that appellant did not meet his burden to establish that there was not substantial evidence upon which the Chief could base the denial of this application, nor that the denial was arbitrary or capricious.  Rather, the Panel finds that the record reflects the undisputed fact that appellant's criminal history includes several incidents of domestic violence in 2018 and 2019.  For the reasons in the record, highlighted by the Chief in his Reply, the Panel is deeply concerned about the introduction of a CPL into a home with such a recent and troubling pattern of domestic violence, in addition to appellant's irresponsible and careless manner of firearms storage.  The Panel concludes that appellant's criminal history, as well as the record in its totality, provide sufficient evidence to support the Chief's finding

---

[3]In fact, a finding of a history of violent behavior within the past five years automatically would disqualify appellant from obtaining a CPL, and indeed, in this case, resulted in the revocation of appellant's firearms registration.  *See* D.C. Official Code §§ 7-2502.03(a)(6A), 7-2509.02(a)(2).  Contrary to appellant's assertions, however, in this case the Chief's adverse action is based not on a history of violence but rather on a propensity for violence or instability.

[4] *See* https://lawcenter.giffords.org/gun-laws/policy-areas/guns-in-public/concealed-carry/ (identifying 11 states and the District of Columbia which require applicants to be of good character or a suitable person, and 15 other states which authorize denials based on reason to believe the person is dangerous).

that appellant's propensity for violence and instability reasonably may render the issuance of a CPL a danger to himself or others.

4. The Panel concludes that, based upon the record before the Chief and the materials submitted to the Panel during this appeal, the Panel independently would have reached the same conclusion as the Chief.

5. As the Panel finds that there are no material facts in dispute, there is no basis to conduct an evidentiary hearing to resolve a fact in dispute in this appeal.

6. The Panel finds that the fact that appellant may have other permits in the District is not dispositive; as indicated by the Chief in his Reply, different laws govern CPLs.  Additionally, the fact that appellant may have concealed carry licenses outside the District similarly is not dispositive as the District does not grant reciprocity.

7. The Panel has no authority to address appellant's constitutional issues.

   **THEREFORE**, by unanimous vote of the Panel members present, **IT IS ORDERED** that this appeal is **DENIED**.

   Pursuant to 1 DCMR § 1221.6 the appellant is instructed that judicial review of this Order may be pursued as provided in section 908 of the Firearms Regulations Control Act of 1975, (D.C. Official Code § 7-2509.08).  So ordered this ____ day of July, 2020.

   _____

   Presiding Member

   Cc: Betsy Cavendish, Mayor's Office of General Counsel

## <u>CERTIFICATE OF SERVICE</u>

19I hereby certify that on this 19  day in July 2020, a copy of the Final Decision was emailed to the Supervisor, Firearms Registration Unit, authorized by the Chief of Police to act as his designee in this capacity (pursuant to the Firearms Regulations Control Act of 1975, effective January 6, 2015 (D.C. Act 20-564), and 24 DCMR § 2399); and, emailed to the appellant's a at sanumill55@gmail.com.

ADMINISTRATOR SIGNATURE:

*Michelle Vanneman*