UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANU MILLARD<br>1400 Michigan Ave NE<br>Washington, DC 20017<br><br>and<br><br>Kenneth Hope,<br>2320 Chester Street, S.E.<br>Washington, DC 20020,<br><br>and<br><br>KEONTAE STEPTOE<br>5002 70th Ave.<br>Hyattsville, MD 20784.<br><br>On behalf of themselves and all others<br>similarly situated,<br><br>Plaintiffs,<br><br> v.<br><br>GOVERNMENT OF THE<br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Civil Action No.: **22-02672 (CKK)** |

**Deleted:** TONY KEY¶

**Deleted:** 1112 Thompson Ave

**Deleted:** ¶
Severn, MD 21144,

CLASS ACTION

SECOND AMENDED COMPLAINT AND JURY DEMAND

(§ 1983 Civil Rights Claims)

1

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

**INTRODUCTION**

1.      This is a class action against the Government of the District of Columbia (the "District" or the "District of Columbia") under 42 U.S.C. § 1983 brought by Sanu Millard, Kenneth Hope, and Keontae Steptoe (sometimes the "Named Plaintiffs" or "Plaintiffs") for injuries they and the other class members suffered during the Class Period because the District and the Chief of the Metropolitan Police Department, the District's final policymaker for implementing the District's gun control regime, violated their Second Amendment rights and the Second Amendment rights of the Class defined below by denying them registration certificates and licenses to carry a concealed pistol ("CPL" or "concealed carry license") based on the Chief's policy, the "new standard of suitability," and the Chief's registration regulations regulation (DCMR § 24-2309(f)) authorizing the use of arrest reports to determine whether a person has a "history of violence" in the previous five years.

2.      Each Named Plaintiff challenges under the Second Amendment the Chief's denial of their applications for, or revocation of, a "concealed carry" license to carry a handgun outside the home or place of business. The Chief made the denials or revocations pursuant to the Chief's policy statement setting forth the Chief's "new standard of suitability to carry a concealed pistol" for a CPL. But

**Deleted:** Tony Key

2

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

each Named Plaintiff has a right to carry a concealed pistol in public in the
District under the Second Amendment.

3.      Named Plaintiffs Millard, Hope, and Steptoe also challenge the

Deleted: Key

constitutionality under the Second Amendment of the Chief's "new standard of
suitability." The Chief's "new standard of suitability" violates the Second
Amendment because it gives the Chief unlimited discretion to rely on any
"available evidence that may reflect a propensity for violence or a propensity for
instability, unpredictability, or low self-control" even if the "evidence" is conduct
in an arrest report or other "incident" report that did not result in a conviction.

4.      Also, the Chief's "new standard of suitability" authorizes the Chief to
engage in the "appraisal of facts, the exercise of judgment, and the formation of an
opinion" to evaluate a person's eligibility to obtain or maintain a CPL, a standard
which the Supreme Court specifically identified as unconstitutional in *Bruen*'s
Footnote 9. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2138 n.9 (2022).

5.      The Chief's "new standard of suitability" is additionally and independently
unconstitutional because it does not have a carve-out for conduct undertaken in
lawful self-defense as the Second Amendment requires. In fact, under the Chief's
"new standard of suitability," the Chief may consider conduct constituting a lawful
use of violence in self-defense as "evidence that may reflect a [disqualifying]

3

propensity for violence or a propensity for instability, unpredictability, or low self-control" in evaluating a person's suitability to obtain or retain a CPL.

6.     On information and belief, the Chief has denied or revoked hundreds of CPLs since the Chief adopted the "new standard of suitability" in about August 2019 because of the criteria in the "new standard of suitability."

7.     There is no distinctly similar historical regulation addressing the problem.

8.     Alternatively, there is no historical analogue for the Chief's "new standard of suitability."

9.     The Chief's denial of Named Plaintiffs' applications for CPLs/ revocation of CPLs effectively amounts to a lifetime ban on their carrying a handgun outside the home or place of business in the District of Columbia because the Chief never stops considering the conduct which the Chief considered disqualifying conduct in evaluating "suitability" for a CPL under their "new standard of suitability" no matter how long ago it occurred.

10.     Named Plaintiffs Hope and Steptoe also challenge under the Second Amendment the Chief's decision to deny or revoke their certificates of registration for the handguns they were applying to carry concealed, because Named Plaintiffs Hope and Steptoe each has the right to register a handgun under the Second Amendment.

**Deleted:** Key

**Deleted:** Key

4

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

11.     Named Plaintiffs Hope and Steptoe also challenge the constitutionality

under the Second Amendment of the Chief's regulation (DCMR § 24-2309(f))

authorizing the Chief to rely on conduct contained in arrest reports -- even though

the conduct did not result in a conviction -- to deny or revoke their registration

certificates under the "history of violent behavior" within the immediately

preceding 5 years prong of the registration requirements, D.C. Code § 7-

2502.03(a)(6A).

12.     A registration certificate for the pistol that the person is applying to carry

concealed is a prerequisite for eligibility for a CPL under D.C. Code § 7-

2509.02(a)(2) ("has obtained a registration certificate for the pistol that the person

is applying to carry concealed") and 24 DCMR §§ 2332.1(b), (c), 2335.1(a).

13.     The Chief's regulation authorizing the Chief to rely on conduct contained

in arrest reports -- even though the conduct did not result in a conviction -- to

deny or revoke their registration certificates authorizes the Chief to engage in the

"appraisal of facts, the exercise of judgment, and the formation of an opinion" in

evaluating a person's eligibility to obtain or maintain a registration certificate in

violation of the Second Amendment.

*5*

**Deleted:** Key

14.     Neither the District's "history of violent behavior" statute (D.C. Code § 7-2502.03(a)(6A)) nor the Chief's regulation (DCMR § 24-2309(f)) has a carve-out for conduct undertaken in lawful self-defense as the Second Amendment requires.

15.     The Chief may even consider conduct constituting a lawful use of violence in self-defense as evidence "history of violent behavior" within the immediately preceding 5 years of the registration in evaluating a person's suitability to obtain or retain a registration certificate for a handgun, and thus to obtain or retain a CPL.

16.     There is no distinctly similar historical regulation addressing the problem.

17.     Alternatively, there is no historical analogue for the Chief's regulation authorizing the Chief to rely on conduct contained in arrest reports -- even though the conduct did not result in a conviction -- to deny or revoke registration certificates. DCMR § 24-2309(f).

18.     A registration certificate is required to obtain a CPL. Named Plaintiffs Hope and Steptoe's CPLs were denied or revoked, D.C. Code § 7-2502.09, and Steptoe's appeal to the Trial Board was dismissed, after the Chief denied or revoked their registration certificates, because they were not eligible for a license due to their lack of a registration certificate.

19.     The Chief denied or revoked their registration certificates under the "history of violent behavior" prong of the registration requirements, 7-

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

**Deleted:** Key

**Deleted:** their

**Deleted:** s

**Deleted:** were

2502.03(a)(6A), in reliance on conduct that was not reduced to a conviction by virtue of DCMR § 24-2309(f).

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over the Named Plaintiffs' § 1983 claims under 28 U.S.C.A. §1331 and 28 U.S.C.A. §1343(3)-(4).

21.    Venue is proper in this jurisdiction pursuant to 28 U.S.CA. §1391(b) because the events or omissions underlying the claims occurred in this judicial district.

## PARTIES

22.     Named Plaintiffs are adults and citizens of the United States and are part of "the People" protected by the Second Amendment.

23.     Defendant District of Columbia is a municipal corporation capable of being sued under D.C. Code § 1-102.

## FACTUAL ALLEGATIONS

**For years the District has maintained the most restrictive gun laws in the nation in violation of the Second Amendment.**

24.    For years the District has maintained the most restrictive gun laws in the nation in violation of the Second Amendment.

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

25.     From at least the 1970s the District maintained a total ban on ownership of handguns until 2008 when the Supreme Court in Heller invalidated the District's laws.

26.     Even after *Heller*, the D.C. Council doubled down, and the D.C. Council stripped the Chief of all power to issue CPLs. D.C. Code § 22-4504(a)(at that time, the statute enacted a flat prohibition on the carrying of pistols within the District of Columbia)(amended by Firearms Amendment Act of 2012, D.C. Law 19-170, § 3(d)) (effective Sept. 26. 2012).

27.     The District's Mayor, the Honorable Muriel Bowser, summed up the District government's position on handguns at a public event on January 9, 2015: "You have a mayor who hates guns," she said. "If it was up to me, we wouldn't have any handguns in the District of Columbia. I swear to protect the Constitution and what the courts say, but I will do it in the most restrictive way as possible."

28.     Muriel Bowser: 'You have a mayor who hates guns', Washington Post, January 9, 2015. https://www.washingtonpost.com/blogs/mike-debonis/wp/2015/01/09/muriel-bowser-you-have-a-mayor-who-hates-guns/

29.     Since then, the story of gun control regulations in the District has been a tug of war between the District government's desire to restrict the carriage of handguns in public to a narrow group of "suitable" people who could demonstrate a special

8

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

need for a handgun, and the Courts, which have (mainly) pushed the District towards the sort of "shall-issue" licensing regime under which "a general desire for self-defense is sufficient to obtain a [permit]," approved by the Supreme Court in *Bruen*'s Footnote 9. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2138 n.9 (2022).

### The License to Carry a Pistol Amendment Act of 2014

30.     In July 2014 this Court in *Palmer v. District of Columbia* invalidated the District's total ban on the carriage of handguns outside the home and business for self-defense. 59 F. Supp. 3d 173 (D.D.C. 2014).

31.     In October 2014, in response to this Court's decision in *Palmer*, the Council enacted a "may-issue" licensing regime which authorized the Chief to issue CPLs for public carriage of handguns. The License to Carry a Pistol Amendment Act of 2014 (the "2014 CPL Act"). D.C. Code § 22-4506; D.C. Code § 7-2509.11.

32.     The 2014 CPL Act provided a basic framework for registration of firearms and licensing of handguns outside of the home and place of business.

33.     The District's registration regime directly impacts the right to carry a handgun in public in the District because 2014 CPL Act requires each handgun lawfully possessed in the District to be separately registered. D.C. Code § 7-2502.01.

9

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

34.     As the District stated in its motion to dismiss the complaint, "People who want to carry a concealed pistol in the District must first obtain a registration certificate for that pistol and then a concealed carry license." [ECF No. 19], p. 7.

35.     The MPD "Instructions for Submitting an Application for a Concealed Carry Pistol License" encourage applicants to submit an application for a registration certificate and the application for a CPL at the same time, and the MPD waives the usual registration application fee for those who do so. Instructions for Submitting an Application for a Concealed Carry Pistol License 1, https://tinyurl.com/mr3fudd9.

36.     The registration and licensing requirements are linked and the application processes is usually combined.

37.     Obtaining a CPL depends on an applicant's being able to register the pistol the applicant wants a license for, so the registration and licensing requirements constitute a unitary system.

38.     The 2014 CPL Act confined eligibility for CPLs to those with a (1) special need for self-defense (the "good reason" requirement), (2) whom the Chief found "suitable to carry a concealed pistol," (3) who also met a set of non-discretionary requirements such as a minimum age of 21, and gun and safety training.

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

39.     The Committee Report states that the D.C. Council based the legislation

on the "models of states such as New York, New Jersey, and Maryland, which have

adopted a similar ["may issue"] licensing scheme." Report on Bill 20-930

("Committee Report"), p. 2.

40.     In the 2014 CPL Act the D.C. Council also made the Chief the final

policymaker for the registration and licensing function and delegated to the Chief

authority to issue rules to implement the provisions of the Act, including rules to

establish criteria: (1) for meeting the good or other proper reason for carrying a

concealed pistol requirement; and (2) for determining a person's "suitability to

carry a concealed pistol, which shall at a minimum include evidence that the

applicant meets the [non-discretionary] requirements of § 7-2509.02." D.C. Code §

7-2509.11(a)(1)(A) through (C).

41.     To enable the Chief to make determinations, the applicant must provide

certain information, id. § 2337(d), (e), which the Chief then uses to conduct an

investigation, which may entail interviewing references and reviewing criminal

records, id. §§ 2338.1, 2338.2(e)–(g).

42.     These rules also apply to holders of registration certificates and CPL holders

on an ongoing basis because of the revocation rules.

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

43.     A firearm registration certificate may be revoked when 1) the licensee no longer meets the criteria for registration, 2) the firearm has become an unregistrable firearm or a destructive device, or 3) information provided in the registration application "proves to be intentionally false." D.C. Code § 7-2502.09(a)(1)-(3).

44.     A CPL may be revoked upon a finding that 1) the licensee no longer meets the legal requirements for a CPL or 2) the licensee failed to comply with one or more of the legal requirements or duties imposed on licensees. D.C. Code § 7-2509.05(a); 24 DMCR § 2341.1.

**Court challenges to the special need/ good cause element of the 2014 CPL Act**

45.     Early legal challenges to the 2014 CPL Act focused on the "good reason"/"proper reason" requirement of the Act.

46.     The lawsuits did not challenge the "suitability requirement," or the "propensity for violence or instability" regulation, DCMR § 24-2335(d), or the D.C. Council's grant of discretion to the Chief to promulgate rules and to establish criteria for determining a person's "suitability to carry a concealed pistol". *See e.g.*, *Wrenn v. District of Columbia*, 167 F. Supp. 3d 86, 91 n.4 (D.D.C. 2016) ("Plaintiffs do

12

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

not challenge these requirements in this action") *vacated and remanded by Wrenn v. District of Columbia*, 864 F.3d 650 (2017).

47.     On May 18, 2015, (visiting) Judge Scullin, employing an intermediate level of scrutiny, enjoined the special need provisions of the 2014 CPL Act in *Wrenn v. District of Columbia*, 107 F. Supp. 3d 1 (D.D.C. May 18, 2015). That injunction was dissolved by the D.C. Circuit because Judge Scullin lacked jurisdiction to hear the case, because Judge Scullin, as a visiting judge, had not been designated and assigned by the Chief Justice to exercise jurisdiction over that case, even though he had been designated and assigned by the Chief Justice to exercise jurisdiction over another case, *Palmer v. District of Columbia*, and so the order entering the injunction was "null." *Wrenn v. District of Columbia*, 808 F.3d 81, 84 (2015).

48.     This Court in March 2016 denied the *Wrenn* plaintiffs' renewed motion for a preliminary injunction enjoining enforcement of the special need/ good cause because this Court held that "Plaintiffs have not shown that the licensing scheme is unlikely to survive intermediate scrutiny," and of the remaining three factors only the likelihood of irreparable harm weighed in Plaintiffs' favor. *Wrenn v. District of Columbia*, 167 F. Supp. 3d at 101.

49.     But, two months later, another district judge in this Court granted the *Grace* plaintiffs a preliminary injunction barring the District from enforcing the good-

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

reason law against anyone. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 152 (D.D.C. 2016).

**The Chief has promulgated several regulations both before and after enactment of the 2014 CPL Act that enlarged the Chief's discretion to deny registration certificates and CPLs.**

50.    Shortly after Judge Scullin's decision in *Wrenn*, the Chief promulgated a series of regulations establishing eligibility for a registration certificate and establishing standards for demonstrating "special need" and establishing a standard of "suitability" taking the "may issue" laws of Maryland, New Jersey, and New York City as his model. Notice of Final Rulemaking, July 17, 2015, 62 D.C. REG. 9781.

51.    Combined with the Chief's regulation promulgated in 2012, before the 2014 CPL Act, authorizing the Chief to rely on conduct contained in any arrest record even if the conduct were not reduced to a conviction, the Chief retains almost unfettered discretion to deny or revoke registration certificates, and thus CPLs.

14

**The Chief's regulation authorizing the Chief to rely on conduct in arrest reports that was not reduced to a conviction to show a "history of violent behavior".**

52.     For many years before the enactment of the 2014 CPL Act the District's registration scheme provided that certain categories of persons would be ineligible to obtain registration certificates for life, or for five-year periods. D.C. Code § 7-2502.03(a)(1) to (6).

53.     The bans included permanent categorical bans on the registration of firearms by felons and persons convicted of a weapons offense, and temporary (five-year) categorical bans on persons convicted of violent misdemeanors or adjudicated mental incompetents or chronic alcoholics within the five-year period preceding the application. D.C. Code § 7-2502.03(a): Section 7-2502.03(a)(2) (felonies and certain weapons offenses); Section 7-2502.03(a)(4)(B) (assaults and threats, or threats to do bodily harm); Section 7-2502.03(a)(4)(D)(domestic violence offenses); Section 7-2502.03(a)(5) (acquitted of any criminal charge by reason of insanity or adjudicated a chronic alcoholic by any court without recovery); Section 7-2502.03(a)(6)(commitment to mental health facility). There was even a ban for persons "under indictment for a crime of violence or a weapons offense." Section 7-2502.03(a)(3).

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

54.     Plaintiffs do not concede that each of these categorical bans was supported by an appropriately relevant historical analogue.

55.     But the Council cabined the Chief's discretion by defining the categories in objective terms which establish "narrow, objective, and definite standards" guiding licensing officials because the categories are defined in objective terms: for example, conviction of enumerated crimes, adjudication by a court as a mental defective, voluntarily admitted to a mental health facility.

56.     Determining whether a person falls into one or more of these categories does not require the Chief to engage in the "appraisal of facts, the exercise of judgment, and the formation of an opinion."

57.     These disqualifying offenses and statuses contain inherent due process protections because to be disqualified under these provisions a person must either be convicted of a crime or adjudicated by a court or, in the case of mental illness, be voluntarily admitted (which also satisfies due process because it is a voluntary choice not a deprivation by the government).

58.     In 2008 the D.C. Council added a new, "catch-all" or residual category, Subsection (a)(6A) which provides: "[w]ithin the 5 years immediately preceding the application, has not had a history of violent behavior." D.C. Code § 7-2502.03(a)(6A). D.C. Law 17-372. Firearms Control Amendment Act of 2008.

59.     The provision does not establish criteria to guide the Chief in determining whether a person has a "history of violent behavior." The provision gives extremely broad discretion to the Chief to determine whether a person has a "history of violent behavior" because it does not require conviction or adjudication by a court after due process as set forth in Section 7-2502.03(a)(2) through (a)(5), or a voluntary commitment as in Section 7-2502.03(a)(6). And so there is no due process protection built into Section 7-2502.03(a)(6A).

60.     In 2012 the Chief promulgated a regulation (DCMR § 24-2309(f)) providing that the term "history of violent behavior" in D.C. Code § 7-2502.03(a)(6A) is established by, "[a}rrest records within the five (5) years immediately preceding the application, showing that the applicant has had a history of violent behavior."

61.     The regulation expressly grants the Chief discretion to rely on any conduct contained in any arrest record, not just arrest records relating to crimes of violence such as assaults and threats, or a "crime of violence as defined" in D.C. Official Code § 23-1331(4).

62.     Allowing the Chief discretion to rely on conduct contained in any arrest record even if the conduct were not reduced to a conviction after a plea or a trial with due process protections is a radical departure from "this Nation's historical tradition of firearm regulation."

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

63.     Because there is no requirement of conviction, or adjudication by, a court of the conduct, no due process protection is built into the Chief's regulation, DCMR § 24-2309(f).

64.     Allowing the Chief to make the "history of violence" determination based on arrest reports, and similar arrest records which describe conduct that has not been reduced to a conviction, discriminates against African Americans because African Americans are disproportionately likely to have encounters with the criminal justice system.

65.     Each of the Named Plaintiffs is African American. The burden of the District's and the Chief's policies fall more heavily on African Americans than any other segment of applicants, resulting in more denials and revocations of registration certificates of CPLs for African Americans.

66.     As a matter of fact, every person whose registration certificate or CPL has been denied or revoked that Plaintiffs' counsel have learnt about is African American: Sanu Millard, Kenneth Hope, Tony Key, Keontae Steptoe, Linwood Allen, Allen Whitaker, plus other persons Plaintiffs' counsel have discovered.

67.     In May 2019, the American Civil Liberties Union published a study on D.C. that found "a pattern of disproportionate arrests of Black people persists across geographic areas and offense types." *See* Am. Civ. Liberties Union D.C.,

18

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

Racial Disparities in D.C. Policing: Descriptive Evidence from 2013-2017, (May 13, 2019), https://perma.cc/EL4C-BFNP (analyzing arrest data from 2013-2017). According to the study, Black people "were arrested at 10 times the rate of white people" between the period of 2013 and 2017. *Id.* "Black individuals composed 47% of D.C.'s population, but 86% of its arrestees." *Id.*

68.     African Americans are more likely to be wrongfully accused and convicted of crimes. "African Americans are only 13% of the American population but a majority of innocent defendants wrongfully convicted of crimes and later exonerated." *Samuel R. Gross et al., Race and Wrongful Convictions in the United States at ii, Nat'l Registry of Exonerations* (Mar. 7, 2017), https://perma.cc/3P2X-PT2Q. A recent nationwide study found "this racial disparity for all major crime categories." Relatedly, science shows high rates of misidentification of Black suspects when the eyewitness is of a different race. *See* Thomas D. Albright, *Why Eyewitnesses Fail*, 114(30) Proc. Nat'l Acad. Sci. USA 7758 (July 25, 2017), https://perma.cc/R8Y5-2G3F.

69.     Non-violent offenses, for which Black individuals are much more likely to be arrested than white individuals, "constituted a significant share of the overall arrest total for 2013-2017" and made up four of the top five offense categories by arrest during this period.  *See* Racial Disparities in D.C. Policing: Descriptive Evidence

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

from 2013-2017, Am. Civ. Liberties Union D.C. (May 13, 2019),

https://perma.cc/EL4C-BFNP. The nonviolent offense with the largest disparity

reported in the study was illegal gambling. *See Id.* From 2013-2017, of the 667

people arrested for gambling in D.C., ninety-nine percent were Black. *See Id.* In

that same time period in D.C., Black individuals accounted for 80% of the arrests

for possessing an open container and 80% of the arrests for public marijuana

consumption. *See Id.* Indeed, "[m]ore than one in four people arrested for drug law

violations in 2015 was black, although drug use rates do not differ substantially by

race and ethnicity and drug users generally purchase drugs from people of the

same race or ethnicity." The Sentencing Project, *Report to the United Nations on Racial*

*Disparities in the U.S. Criminal Justice System*, (Apr. 19, 2018),

https://perma.cc/Q79M-NZQ5. Black individuals are more likely to be stopped

or arrested by police, are more likely to be wrongfully convicted, and thus are more

likely to suffer any collateral consequences associated with having a criminal

record—even a record of unproven charges that the government itself decided not

to pursue. Against that backdrop, Defendants' actions violated Plaintiffs'

constitutional rights and statutory law.

70.    Moreover, as the Supreme Court's has observed, "[t]he mere fact that a

man has been arrested has very little, if any, probative value in showing that he

has engaged in any misconduct." *Schware v. Bd. of Bar Exam. of State of N.M.*, 353 U.S. 232, 241 (1957).

71.    "Actually," as the D.C. Circuit has explained, "a collection of dismissed, abandoned or withdrawn arrest records are no more than gutter rumors when measured against any standards of constitutional fairness to an individual and, along with records resulting in an acquittal are not entitled to any legitimate law enforcement credibility whatsoever." *Utz v. Cullinane*, 520 F.2d 467, 479 (D.C. Cir. 1975).

72.    In fact, the policy of the District of Columbia expressed in the "Duncan Ordinance" is to forbid the MPD from disseminating arrest reports that do not result in conviction or "post and forfeit" (pay a small fine) because arrest records and reports are too unreliable for employers to rely on for employment decisions. *Utz v. Cullinane*, 520 F.2d at 483-484.

**Regulation establishing standards for suitability to obtain a concealed carry license.**

73.    As part of the regulation establishing standards for suitability to obtain a concealed carry license the Chief promulgated a regulation disqualifying from obtaining a CPL any person the Chief determined had a "propensity for violence

or instability that could reasonably render the applicant's wearing, carrying, or transporting of a handgun a danger to the applicant or to others."

74.    There is no time limit in the regulation so a determination under this regulation amounts to a lifetime ban.

75.    There are no criteria limiting the sources of information the Chief may rely on to make the determination, such as convictions or adjudications by a court, so the provision has no inherent due process protections.

**The D.C. Circuit strikes down the "good reason/ special need for self-protection" standards for obtaining a CPL.**

76.    Then, on July 25, 2017, the D.C. Circuit struck down the "good reason/ special need for self-protection" standards for obtaining a CPL, reasoning that the restrictions amounted to a total ban on the carriage of handguns outside the home or office. *Wrenn v. District of Columbia*, 431 U.S. App. D.C. 62, 80, 864 F.3d 650, 668 (2017). The D.C. Circuit vacated both the orders in *Grace* and *Wrenn* and remanded with instructions to enter permanent injunctions against enforcement of the District's good-reason law.

**The District's registration and licensing regime after *Wrenn* remained a "may issue" system because there remained other areas where the Chief has broad discretion suitability and catch-all provision.**

77.     By striking down the "good reason/ special need for self-protection"

standards for obtaining/ maintaining a CPL, the D.C. Circuit eliminated a key

discretionary element from the District's CPL licensing system.

78.     But the District's system remained a "may issue" system which granted

enormous discretion to the Chief to deny registration certificates and CPLs. It was

by no means a "shall-issue" licensing regime, under which "a general desire for

self-defense is sufficient to obtain a [CPL]."

79.     The Chief – pursuant to the D.C. Council's delegation of authority - had

expanded their jurisdiction beyond historical limits to deny CPLs by promulgating:

(1) the regulation authorizing the Chief to deny registration certificates (required

for a CPL) based on conduct in police reports not reduced to a conviction, DCMR

§ 2309.1(f); and (2) the regulation authorizing the Chief to deny CPLs based on the

"propensity for violence or instability." DCMR § 2338.2(j).

80.     Although arguably permissible under an "intermediate review analysis,"

which takes the "substantial government interest in preventing crime and

protecting public safety" into consideration, no historical analogue supports the

Chief's exercise of such broad discretion.

23

81.     Another aspect of District of Columbia law which greatly expanded the Chief's discretion to deny CPLs was the allocation of the burdens of persuasion and production provisions in District of Columbia administrative law.

82.     The 2014 CPL Act provided for appeals of denials or revocations of CPLs to a Concealed Pistol Licensing Review Board [the "Board"] established by the Mayor pursuant to their rule making authority under the Act.

83.     District of Columbia administrative law provides that in any appeal from a denial of a CPL, the appellant, the applicant or person whose CPL had been revoked, bears the burden of persuasion. DCMR § 1218. Further, the appellant had the burden of producing evidence that (1) the appellant met all the non-discretionary requirements of the Act, and (2) having met all the non-discretionary requirements, the Chief's exercise of discretion was not supported by reliable, probative, and substantial evidence. DCMR § 1218.2.

84.     These provisions allowed the Chief to deny or revoke CPLs knowing that appellants faced an uphill battle to reverse their denials.

85.     So the Chief by promulgating regulations had gone a long way towards restoring a CPL "may issue" licensing system which authorized the Chief to engage in "the "appraisal of facts, the exercise of judgment, and the formation of an opinion," in evaluating the suitability of a person to carry a concealed pistol, a

24

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

standard held unconstitutional by the Supreme Court in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2138 n.9 (2022).

86.     The *Wrenn* decision and the injunctions also left in place the "suitability" requirement imposed by D.C. Code § 7-2509.11.

**The adoption and text of the Chief's "new standard of suitability."**

87.     In August 2019, just two years after the D.C. Circuit invalidated the District's "special need/ good cause" standards, the Chief adopted a "new standard of suitability" which gave the Chief unlimited discretion to deny CPLs based on "any evidence" including but not limited to conduct in arrest reports that was not reduced to a conviction or even a prosecutor's charge.

88.     The "new standard of suitability" is a policy statement of the Chief as the final policymaker on the subject setting forth criteria established by the Chief for determining a person's "suitability to carry a concealed pistol," including the "propensity for violence or instability" under 24 DCMR § 2335.1(d). D.C. Code § 7-2509.11(a)(1)(A) through (C).

89.     The Chief adopted the "new standard of suitability" after a license holder used their pistol to thwart an armed robbery of a business which had hired them to protect the business.

25

90.    The Chief has never promulgated the "new standard of suitability" as a
regulation subject to the notice and comment period requirements or even
published the "new standard of suitability" on the MPD website.

91.    The Chief has provided the following policy statement to applicants and
holders of CPL licenses whose licenses were denied or revoked describing the new
standard and the types of information the Chief uses in assessing a person's
suitability for carrying a concealed pistol outside the home or place of business:

> When determining whether a person meets this standard of suitability,
> **MPD assesses all available evidence that may reflect a
> propensity for violence or a propensity for instability,
> unpredictability, or low self-control**. This decision may be
> based on police or court records that have been sealed from the
> public; arrest records that may not have resulted in charges or
> convictions; and even records from incidents that may not have
> resulted in an arrest.

> **Behavior that is violent or criminal demonstrating
> instability, unpredictability, or low self-control may be
> grounds for denial under the standard of suitability**. This
> determination takes into account risk factors, such as any acts of
> violence, history of domestic or intimate partner violence or abuse,
> threatened or actual use of weapons, drug or alcohol abuse, and
> reckless or repetitious illegal behavior.

> MPD conducts an individualized assessment to determine whether an
> applicant has shown a propensity for violence or instability that my
> reasonably present a danger to the public.

> If you are being denied a renewal license application, please note that
> all licensees are being held to the new standard of suitability described
> above. This may explain a denial decision without any change in

circumstance that would affect your eligibility. As noted above, MPD's standard of suitability is primarily based on reducing risk to public safety in the District of Columbia. (emphasis added)

92.    An internal memorandum recommending denial of Mr. Key's (who is described below) application for a CPL Defendant's Ex. B [ECF No. 19-2], ECF p. 6 stated:

> Although all of these charges did not result in convictions, however the totality of charged offenses may be used when determining suitability to be licensed to carry a pistol. Under the Chief's interpretation of the regulation DCMR 2335. t(d), **conduct that is violent or criminal demonstrating low self-control, regardless of whether it results in a criminal conviction**, may be grounds for denial of a CPL on the basis of unsuitability. (emphasis added)

93.    The Chief's "new standard of suitability" affected all license holders, not just new applicants, because the Chief conducted an audit of all license holders and the Chief revoked or refused to renew holders of CPL licenses the Chief determined did not meet the "new standard of suitability."

94.    As part of the new standard of suitability, the Chief gives equal weight to incidents regardless of when they occurred, and greater weight to the total number of incidents in a person's background. The revision assesses suitability by giving the same weight to all criminal history incidents and greater weight to the number of incidents. Previously the Chief had given progressively less weight to an incident

Deleted: .

27

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

the older it became, similar to the five-year look-back rule applied to incidents in evaluating the "history of violence" element of the registration rules.

95.    This change of giving an incident the same weight over time no matter how long ago it occurred and giving greater weight to the total number of incidents in a person's background, ensures that any denial or revocation based on an incident or the total number of incidents in a person's background remains a lifetime ban.

96.    The Chief frequently allows persons to maintain a registration certificate even after finding the person has a "propensity for violence or a propensity for instability, unpredictability, or low self-control" which justifies denial or revocation of a CPL.

97.    As the District explained in a paper filed in Mr. Linwood Allen's case:

> MPD's decision to allow plaintiff to keep his firearm registration is entirely consistent with its decision to revoke his CPL. See Compl. ¶ 163. District law requires MPD to assess whether the applicant has a "history of violence" within the last five years in the context of firearm registrations. MPD concluded that plaintiff's background did not show a history of violence in the last five years. But the CPL suitability standard is not time limited and does not require a finding of an actual history of violence. It only asks whether the applicant has a "propensity" for "violence or instability" that "may reasonably" present a danger to others, and MPD found that plaintiff's arrest history demonstrated such a propensity. The distinction drawn by the District makes sense. Allowing an individual to carry a firearm in public presents a greater risk to public safety and does not involve the right to defend one's home. The District's regulations reflect that reality.

*Allen v. District of Columbia* et al 1:2020cv02453 [ECF No. 22], *31-32. (District's

motion to dismiss Linwood Allen complaint).

### The Constitutional defects in the Chief's "new standard of suitability."

98.    Recently, in *Allen v. Government of the District of Columbia, et al.*, Judge Chutkan

held that the Chief's "new standard of suitability" violates the Second Amendment

because Defendants did not marshal any evidence or adequately explain how

history and tradition support excluding someone from the Second Amendment's

scope because they were arrested but never convicted. *Allen v. District of Columbia*,

Civil Action No. 20-cv-2453 (TSC), 2023 U.S. Dist. LEXIS 60950, at *26 (D.D.C.

Mar. 31, 2023).

99.    Moreover, in combination with DCMR § 24-2309(f), which allows the Chief

to deny registration certificates based on conduct in arrest reports that was never

reduced to a conviction, the Chief's licensing system discriminates against African

Americans.

100.   The criteria in the Chief's "new standard of suitability" violate the Second

Amendment for four reasons: (1) there is no "distinctly similar historical regulation"

applicable to one of the "people" allowing for dispossession based on conduct that

is not reduced to a conviction (expect for chronic alcohol or drug addiction or

insanity which are not challenged here), *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2131 (2022); *Allen v. District of Columbia*, Civil Action No. 20-cv-2453 (TSC), 2023 U.S. Dist. LEXIS 60950, at *27 (D.D.C. Mar. 31, 2023)("As in *Rahimi*, the fact that Allen may have been suspected of criminal conduct in the past (but not charged) does not permit Defendants to restrict his Second Amendment rights"); *United States v. Rahimi*, 61 F.4th 443, 448, 461 (5th Cir. 2023) (holding unconstitutional a federal statute prohibiting possession of firearms by someone subject to a domestic violence restraining order because prohibition was inconsistent with historical tradition); and (2) the Chief makes their registration and licensing decisions on the basis of arrest reports, and similar arrest records and other sources, which are not reliable and are, in fact, discriminatory against African Americans; (3) the "new standard of suitability" does not expressly provide for the use of violence in self-defense, which is a core right under *District of Columbia v. Heller*, 554 U.S. 570, 628, 128 S. Ct. 2783, 2817 (2008) ("the inherent right of self-defense has been central to the Second Amendment right."); and (4) the "new standard of suitability" authorizes the Chief to engage in the "appraisal of facts, the exercise of judgment, and the formation of an opinion" to evaluate a person's eligibility to obtain or maintain a CPL, a standard which the Supreme Court specifically identified as unconstitutional in *Bruen*.

101.    On information and belief, the Chief has exercised this unlimited discretion to deny or revoke hundreds of CPLs since the Chief adopted the "new standard of suitability" in about August 2019.

## NAMED PLAINTIFFS' CASES

102.    Named Plaintiffs' cases illustrate how the Chief interprets and enforces the "history of violent behavior" registration regulation and the Chief's "new standard of suitability" including the "propensity for violence or instability" regulation to deny registration certificates and CPLs to law-abiding applicants.

### SANU MILLARD

103.    Sanu Millard is a 23-year-old African American lifetime resident of the District.

104.    He graduated from Woodrow Wilson Senior High School.

105.    He has no criminal convictions, and, in fact, he has never been arrested let alone charged with an offense.

106.    Mr. Millard's parents divorced when he was about 15 but they continued to live near each other in the District and during the few years before he applied for and was denied a license to carry a handgun, he split his time at his mother and father's homes.

31

107.    At the time of his application or thereafter he possessed special police officer

licenses issued by the District of Columbia, the State of Maryland, and the

Commonwealth of Virginia and he worked as a special police officer in those

jurisdictions.

108.    In addition, he holds a nonresident concealed carry permit issued by the

Commonwealth of Virginia, and the State of Maryland.

109.    At the time of his application, he held registration certificates issued by the

District of Columbia for two rifles and at least one pistol.

110.    At the time of his application, he held registration certificates or licenses

issued by the District of Columbia, the State of Maryland, the Commonwealth of

Virginia, and the State of Utah.

111.    Mr. Millard has met all the extensive qualifications to lawfully purchase and

register firearms in the District of Columbia — a jurisdiction with notoriously

difficult gun laws.

112.    Thus, the District and several State agencies have vetted Mr. Millard's

background and found him fit to (1) serve as a security guard; (2) act as a Special

Police Officer with arrest powers (D.C. Code § 23–582); and (3) lawfully carry a

concealed handgun.

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

113.   And, most importantly, the MPD has specifically found him fit to register

three separate firearms - two rifles and a handgun.

**Mr. Millard's application for a Concealed Carry License**

114.   On September 13, 2019, Mr. Millard applied for a CPL pursuant to

DCMR § 24-2332.

115.   Mr. Millard meets all the objective requirements set forth for eligibility.

116.   He has never been convicted under any of the disqualifying offenses in the

registration or licensing statutes.

117.   In fact, he has never even been arrested.

118.   Nor has he ever fallen into any of the statutory "statuses" such as mental

incompetence or drug addiction. *See* D.C. Code § 7-2502.03(a)(3) (mental illness or

condition); *see* D.C. Code § 22-4503 (unlawful possession of firearms).

119.   One of the criteria for registration of a firearm in the District is that

"[w]ithin the 5 years immediately preceding the application, has not had a history

of violent behavior." D.C. Code § 7-2502.03(a)(6A).

120.   Although the Chief denied Mr. Millard's application for a CPL the Chief

has never revoked the registration certificates for his rifles and handgun, so the

chief concedes implicitly that "[w]ithin the 5 years immediately preceding the

application, [Mr. Millard] has not had a history of violent behavior."

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

121.    Nonetheless, on December 21, 2019, the Metropolitan Police Department –
Gun Control Section issued a Notice of Denial in response to Mr. Millard's
application for a CPL based on the Chief's "propensity for violence or instability"
regulation and the Chief's "new standard of suitability" allowing the use of "any
evidence" including conduct in an arrest report not reduced to a conviction.

122.    The Notice of Denial cited D.C.M.R. 2335.1(d) as a basis for disqualifying
Mr. Millard from obtaining a CPL citing Mr. Millard's "propensity for violence or
instability that may reasonably render" his "possession of his concealed pistol a
danger" to himself or another.

123.    Specifically, the Notice of Denial erroneously stated that Mr. Millard has
"[e]xtensive criminal history" that is reflected in "serious criminal charges."

124.    In support of this erroneous conclusion, the Notice of Denial references two
incidents involving the MPD and which the Notice of Denial mischaracterizes as
"Extensive Criminal History."

125.    The Notice of Denial states: "(Extensive Criminal History)—Specifically
your criminal history reflected the following serious criminal charges; Family
Report 11/24/18 (DC) (No Arrest), Family Report 2/8/19 (DC) (No Arrest).
Although all of these charges may not have resulted in convictions, the totality of

34

charged offenses may be used when determining suitability to be licensed to carry a

pistol."

126.    An attachment to the denial contained an MPD memo listing these two

incidents and an additional incident where the police were called to the mother's

home because of problems with the boyfriend.

127.    The attachment also outlining the process by which the MPD arrived at the

decision to deny Mr. Millard's application for a CPL:

> The factors that were weighed during the consideration of this
> application were that he had been involved in three family domestic
> events in which police were needed to resolve the disturbance, it was
> alleged that he has mental health issue that could be a liability if he
> were to be issued a CCPL. Lastly, as documented he violated the
> firearm registration duties by not notifying the MPD that he had
> changed locations of his firearms, which directly demonstrates that he
> may not abide by the regulations governing CCPL.

128.    But, in an Orwellian inversion of logic, the "[e]xtensive criminal history"

that is reflected in "serious criminal charges" the Chief referenced in the Notice of

Denial and attachment refers to two interactions Mr. Millard had with police in

which he was not arrested or charged with a crime but was rather the victim of

domestic violence by his divorced mother's boyfriend.

129.    Mr. Millard disputed all of the facts the Chief relied on in his appeal of the

Chief's denial of his CPL application.

130.    The background to the events the Chief relied on stem from the fact that in

2014, when Mr. Millard was a teenager, his parents divorced. Although his parents

divorced, they continued to live near each other in Northwest Washington, D.C.

131.    First, he lived with his father and then when he was 18, he began splitting

his time between his mother and his father.

132.    After the divorce, Mr. Millard's mother began a relationship with a man

who ultimately became her boyfriend.

133.    The relationship was stormy and the boyfriend's behavior frequently led to

the police being called to the mother's home to calm the mother and especially the

boyfriend.

134.    In the first incident referenced by the Chief, police were called to the

mother's home because the boyfriend pushed Mr. Millard and bloodied his lip

after the mother had asked the boyfriend to leave her home.

135.    In the second incident, the boyfriend arranged for a false tip to the MPD

that someone was storing illegal firearms in the mother's basement in preparation

for a "beef."

136.    The reality is that Mr. Millard was legally storing two long guns lawfully

registered to him in a locked gun storage case disguised for safety's sake to look like

36

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

a guitar case in the locked storage area in the basement of the mother's apartment building.

137.    Mr. Millard was not "beefing" with anyone.

138.    In the third incident, on the same date as the second incident, the boyfriend grabbed Mr. Millard's mother's computer keyboard from Mr. Millard when Mr. Millard was attempting to retrieve Mr. Millard's mother's keyboard and computer at her request after she had asked the boyfriend to leave her home.

139.    Another factor the Chief relied on for the denial is that during the third incident where police came to the home the boyfriend told police that Mr. Millard had mental health issues and as a result MPD called a "Crisis Intervention Officer" to the scene. The "Crisis Intervention Officer" found that Mr. Millard was not in crisis.

140.    Although it was the obviously biased spurned boyfriend who told MPD that Mr. Millard had mental health issues, and the MPD's own "Crisis Intervention Officer" found that Mr. Millard was not in crisis, the Chief nonetheless held that the fact that a "Crisis Intervention Officer" had been called to the scene at all was evidence of Mr. Millard's "instability."

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

141.    D.C. Code § 16-1031 requires mandatory arrest for intrafamily offenses when probable cause is present, but MPD never arrested Mr. Millard in connection with any of these incidents.

142.    The Chief contended that the Mr. Millard's being a victim of his mother's boyfriend's domestic violence renders his living situation unstable and dangerous and is a risk factor weighing against his suitability for a CPL.

143.    This denial sets a dangerous precedent of preventing victims of domestic violence from obtaining a Concealed Carry Pistol License and discouraging victims of domestic violence from calling the police for protection from violence.

144.    Finally, Mr. Millard did register a change of address with the MPD when he changed the storage location of his firearms.

**Mr. Millard submitted a timely appeal**

145.    On January 20, 2020, Mr. Millard timely filed an appeal from the denial of the CPL to the Concealed Pistol Licensing Review Board.

146.    In his response to Mr. Millard's appeal the Chief introduced additional incidents which were not listed as the basis of the denial of the application in the Notice of Denial which he claimed established a violation of the "propensity for violence or instability" regulation.

147.    Mr. Millard explained how each of the allegations was factually incorrect.

38

148.    The Concealed Pistol Licensing Review Board summarily denied Mr. Millard's appeal on April 23, 2020.

149.    Rather than granting Mr. Millard a CPL for self-defense it relied on evidence of the boyfriend's aggressive and assaultive conduct as a reason to deny the CPL, stating: "the Panel is deeply concerned about the introduction of a CPL into a home with such a recent and troubling pattern of domestic violence."

150.    Mr. Millard still does not have a CPL issued by the Chief.

## MR. KENNETH HOPE

151.    Mr. Hope is a resident of the District who applied for a registration certificate and a CPL in 2022.

152.    The Chief denied the application for a CPL by letter dated June 2, 2022, because, according to the Chief, Mr. Hope was not a "suitable" person to be licensed, because, according to the Chief, he had exhibited a "history of violent behavior" in the five years immediately preceding the application, so he was ineligible for a registration certificate for the handgun he intended to carry.

153.    The language in the denial letter indicates that the Chief used the "new standard of suitability" to evaluate his application.

154.    The denial letter states the basis for the finding of "history of violent behavor as: "Specifically, you were arrested on 09/10/2019 – "Unlawful Entry",

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

---

**Moved down [1]: TONY KEY**
Mr. Key is an upstanding member of the community, a Maryland resident for the last fifteen years, a business owner, a homeowner and licensed firearms instructor.
Tony Key's application for a Concealed Carry License
In 2021, Tony Key, age 45, of 5409 Chillum Place NE, Washington, DC, initiated the two-step process for a applying for a Concealed Carry Pistol License with the MPD Firearms Registration Branch: step one: apply to register a handgun; upon approval of the registration, apply for a CPL.
At the time of his application, he was a firearms instructor, and he has a license to carry firearms in several states including Maryland, Virginia, and Utah. He still retains those licenses in good standing.
The Chief denied Mr. Key's application for a CPL.
The Chief denied Mr. Key's application for a CPL by Notice of Denial dated June 3, 2021, because, the Chief found, Mr. Key was not "a suitable person to be so licensed" under DCMR § 2335.1(d) because of a "propensity for violence or instability" and the Chief's "new standard of suitability" allowing the use of "any evidence" including conduct in an arrest report not reduced to a conviction.
The Chief stated that he was relying on the following two arrests: (1) an ADW / CPWL arrest that occurred in the District of Columbia in September 5, 2020; and (2) an "Unlawful Discharge at a Crowd" arrest on May 27, 2019 in Maryland at Mr. Key's home.
The Chief's Notice did not provide the details of either incident or why he believed the arrests indicated a "propensity for violence or instability."
A few weeks later on June 24, 2021, the Chief issued a second Notice of Denial of the CPL Application.
The Chief relied on the same two incidents listed in the initial Notice of Denial: an alleged "unlawful discharge at crowd" charge in Maryland in 2019, and an alleged ADW/ CPWL charge by the MPD on September 5, 2020.
Again the Chief's denial did not provide any details or explanation of why he believed that the incidents made Mr. Key was "not suitable" for a CPL.
The Notice of Denial is unclear, but it appears that in the Notice dated June 24, 2021, the Chief denied Mr. Key's application for a CPL because Mr. Key did not qualify for

**Deleted: r.**
**Formatted:** Font: Bold
**Formatted:** Font: Bold
**Formatted:** Font: Bold
**Formatted:** Font: Bold
**Formatted:** Font: Bold
**Formatted:** Font: Bold
**Formatted:** Centered,  No bullets or numbering
**Deleted:** of
**Formatted:** Font: Baskerville, 14 pt, Font color: Text 1
**Formatted:** Indent: Left:  0", First line:  0", Tab stops: 0.56", List tab
**Formatted:** Font: Baskerville, 14 pt, Font color: Text 1

"Aggravated Assault on a Police Officer" and "Assault on a Police Officer" in D.C."

155.   Mr. Hope was arrested on 9/10/2019 which resulted in three charges of "Unlawful Entry", "Aggravated Assault on a Police Officer" and "Assault on a Police Officer.

156.   But Mr. Hope has always insisted that his arrest was unfounded.

157.   He did not commit the offenses he was charged with.

158.   The MPD's own publications concede that the APO statute was unfairly applied more often to African Americans.

159.   Mr. Hope brought no harm to any officer or anyone else on 9/10/2019.

160.   Moreover, Mr. Hope always maintained his innocence, he did not accept any plea agreements and the charges against Mr. Hope were subsequently dismissed.

161.   The arrests were sealed.

162.   Mr. Hope has never been convicted of any criminal offense.

163.   He is a 37-year-old, father of one child, and a law-abiding citizen and will remain so as a concealed carry licensed D.C. resident.

164.   His 13-year professional career in Information Technology relies on background checks and having a clear criminal record.

40

165.    His current contracting position with the Chief Administrator's office supports the 535 Member offices of Congress and requires the temperament of a patient and sensible person.

166.    Mr. Hope meets the standard for eligibility under Title 24, District of Columbia Municipal Regulations, § 2332.1(h) which states, "a person is eligible for issuance of a license to carry a concealed pistol (concealed carry license or license) only if the person is a suitable person to be so licensed."

167.    He has been properly trained in how to handle a firearm.

168.    He is a "suitable person", and he does not have any history of mental disorder, drug abuse, or violence.

## KEONTE STEPTOE

169.    Mr. Steptoe is a resident of the District who applied for and received a registration for a handgun in the District and a CPL May 3, 2021.

### Keonte Steptoe's Concealed Carry License revoked by the Chief

170.    On December 13, 2021, the Chief's designee issued a Notice of Revocation of Mr. Steptoe's CPL.

### Notice of Revocation of CPL

171.    The Notice revoked Mr. Steptoe's CPL pursuant to D.C. Code Sec. 7-2509.05(a)(1) and 24 D.C.M.R. § 2341.1 (no longer satisfies one or more of the

41

concealed carry license qualifications or failed to comply with one or more

requirements or duties imposed upon the licensee) and 24 D.C.M.R. § 2344.2(d)(a

licensee shall carry any pistol in a manner that it is entirely hidden from view of the

public when carried on or about a person, or when in a vehicle in such a way as it

is entirely hidden from view of the public, and Chief's "new standard of suitability"

allowing the use of "any evidence" including conduct in an arrest report not

reduced to a conviction.

172.     The Notice cited to the following violation as the basis to revoke:

> "Fail to carry a pistol in a holster on your person in a firmly secure
> manner that is reasonably designed to prevent loss, theft, or accidental
> discharge." During an investigative stop it was found that the pistol
> you were carrying was not secured on your person. The pistol was
> found inside your vehicle's glove box, loaded."

173.     The Chief did not indicate that Mr. Steptoe failed to meet any of the other

registration or licensing requirements and Mr. Steptoe in fact met and continues to

meet all these requirements.

174.     On January 28, 2022, Mr. Steptoe, through counsel, timely filed an appeal

with the Concealed Pistol Licensing Review Board because, since Mr. Steptoe was

in a vehicle at the time of the stop, the applicable regulations permitted him to

carry the handgun in the glovebox of his vehicle.

42

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

175.    In his appeal, Mr. Steptoe, through counsel, pointed out that 24 D.C.M.R. Sec. 2344 states that "A licensee shall carry any pistol in a manner that it is entirely hidden from view of the public when carried on or about a person, or when in a vehicle, in such a way as it is entirely hidden from view of the public."

176.    The regulation itself mandates against a CPL holder carrying a pistol on one's person when it should in fact be entirely hidden from view of the public. Mr. Steptoe's firearm was found **inside his locked glove box**, in such a way as it was entirely hidden from view of the public.

177.    Therefore, Mr. Steptoe did not violate D.C.M.R. 2344.2 because his conduct was not governed by that section of the Municipal Regulations as he was in a vehicle.

178.    Thus, the Board recognized that the Chief erred by applying D.C.M.R. 2344.2.

179.    On March 10, 2022, the Concealed Pistol Licensing Review Board issued an order staying the appeal and instructing the Chief to explain why explain why the Chief's reliance on 24 DCMR § 2344.2 as the basis for the revocation decision was not a legal error.

**The Chief revoked Mr. Steptoe's registration certificate instead of responding to the Board's Order.**

180.    But, rather than respond to the Board's order to justify his application of
D.C.M.R. 2344.2 to revoke Mr. Steptoe's CPL, the Chief on April 5, 2022 issued a
proposal to revoke Mr. Steptoe's registration certificate – a predicate of Mr.
Steptoe's holding a CPL – on the theory that "MPD has determined that Mr.
Steptoe does not meet the criteria for firearm registration based on the finding that
Mr. Steptoe has a disqualifying "history of violent behavior" within the past five
years. D.C. Code §§ 7-2502.03(a)(6A), 7- 2502.09(a)(1); Chief's "new standard of
suitability" allowing the use of "any evidence" including conduct in an arrest report
not reduced to a conviction.

181.    On April 5, 2022, the same day as the proposed notice of revocation of the
registration, the Chief filed a response asking the Board to uphold the revocation of
the CPL but on a different basis – "Mr. Beale (sic) does not meet the requirements
for a person registering a firearm."

182.    On April 7, the Board dismissed the appeal of the revocation of the CPL for
lack of a registration certificate.

**Notice of Revocation of Registration Certificate**

183.    The Chief proposed revoking Mr. Steptoe's registration based on the
D.C. Code § 7-2502.03(a)(6A) which prohibits firearm registration for individuals
who have had a history of violent behavior within the past five years using Chief's

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

"new standard of suitability" allowing the use of "any evidence" including conduct in an arrest report not reduced to a conviction.

184.    The statute, as enacted by the D.C. Council, does not provide "objective, and definite standards" guiding licensing officials in evaluating applications for and revocations of registration certificates.

185.    Therefore, the provision invites the Chief to engage in the "appraisal of facts, the exercise of judgment, and the formation of an opinion" in deciding when the provision applies.

186.    The Chief issued a DCMR regulation establishing that the term "history of violent behavior" in D.C. Code § 7-2502.03(a)(6A) is satisfied by, among other things, "[a]rrest records within the five (5) years immediately preceding the application" for offenses including but not limited to threats, assault, and any crime of violence as defined in D.C. Official Code § 23-1331(4), or any similar offense in any other jurisdiction, regardless of whether a conviction resulted from the arrest. *See also* DCMR § 24-2309(f).

187.    Therefore, the Chief's regulations invite the Chief's delegates in the Firearms Registration Branch to engage in the "appraisal of facts, the exercise of judgment, and the formation of an opinion" in deciding when the provision applies.

45

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

188.    In Mr. Steptoe's case the Chief relied on the following incidents to revoke the registration:

189.    • On April 5, 2017, Mr. Steptoe threatened to shoot someone before fleeing the scene in a vehicle. (CCN: 17-055-197)

190.    • On April 29, 2020 there was a Sound of Gunshots call in the 1300 block of Fairmont Street, NW. Officers were dispatched and, upon arrival, they located multiple spent shell casings and a crime scene. Shortly thereafter, Mr. Steptoe delivered the shooting victim to an area hospital. (CCN: 20-065-194)

• On November 28, 2021 in the 1300 block of Fairmont Street, NW you attempted to interfere with a. police investigation by assaulting a police officer and resisting arrest. You were additionally found to be in possession of a quantity of marijuana, the amount of which was more consistent with the intent to distribute the drug.

• On December 13, 2021 [Mr. Steptoe was] arrested for Possession with Intent to Distribute Marijuana while Armed. The officers recovered various forms of leafy green substance that tested positive for Marijuana, and located [Mr. Steptoe's] registered firearm loaded and improperly stored in the glove box of your vehicle.

191.    But **the Chief's version of the facts was wrong**.

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

192.    In the April 5, 2017, incident, Mr. Steptoe never threatened to shoot someone and he never fled the scene in a vehicle. (CCN: 17-055-197). Mr. Steptoe was not arrested in this incident. The stepfather was arrested; Mr. Steptoe was a witness.

193.    In the April 29, 2020 incident, Mr. Steptoe acted as a Good Samaritan and carried a wounded person to the hospital. Mr. Steptoe was not arrested in this incident.

194.    In the November 28, 2021 incident, Mr. Steptoe did not assault or interfere with a police officer. The encounter resulted in an arrest but the U.S. Attorney no-papered the MPD arrest charges.

195.    In the December 13, 2021 incident, Mr. Steptoe was arrested but the prosecutor no papered the arrest and personal use marijuana is legal in the District and carrying a gun in the glovebox of the vehicle is the correct mode of transporting a handgun in a vehicle. 24 D.C.M.R. Sec. 2344.

196.    Mr. Steptoe has never been charged with a crime by a prosecutor.

**Mr. Steptoe "appealed" the revocation of his registration certificate by asking the Chief to reconsider the revocation in light of facts presented by Mr. Steptoe but the Chief refused to do so.**

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

197.    On April 19, 2022, Mr. Steptoe through counsel timely submitted further evidence in support of the qualifications to continue to hold a registration certificate to the Chief as the statute provides. D.C. Code § 7-2502.10(a).

198.    The statute requires the Chief or their designee to respond to the submission within 10 days of the date of receipt with a final decision on the proposed registration revocation.

199.    The Chief provided a decision after the original complaint in this case was filed.

200.    Counsel for Mr. Steptoe has emailed (the usual method of communication) the designees numerous times about the decision but Counsel has never received a response from the designees.

201.    Once in a phone call on an unrelated related matter with the Chief's designee, Counsel raised the Steptoe "appeal" on the call. The Chief's designee said he would "get back to me" but he never did.

202.    Mr. Steptoe applied for a registration certificate in September of 2020. At the time of his application, the Chief had available Mr. Steptoe's existing law enforcement contacts, which included the 2017 and 2020 incidents now cited as reasons for revoking his firearm registration certificate. In other words, at the time of the application, the Chief considered Mr. Steptoe's criminal history in the

48

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

preceding five years and approved the application and issued a firearm registration certificate on January 7, 2021. This sequence of events shows that the Notice to Revoke Mr. Steptoe's registration is based on pretext or the appraisal of facts, the exercise of judgment, and the formation of an opinion authorized by the Chief's "new standard of suitability" allowing the use of "any evidence" including conduct in an arrest report not reduced to a conviction, and the use of conduct in an arrest report not reduced to a conviction – not in fact based on Mr. Steptoe's conduct or history.

### OTHER PERSONS WHOSE REGISTRATION/ CPL APPLICATIONS WERE DENIED

#### Tony Key

203.    Mr. Key is no longer a Named Plaintiff but he remains a member of the damages class. The allegations of his application and denials remain relevant to allegations supporting the Named Plaintiffs' claims.

204.    At the time of his application Mr. Key was an upstanding member of the community, a Maryland resident for the last fifteen years, a business owner, a homeowner and licensed firearms instructor.

#### Tony Key's application for a Concealed Carry License

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

205.     In 2021, Tony Key, age 45, of 5409 Chillum Place NE, Washington, DC, initiated the two-step process for a applying for a Concealed Carry Pistol License with the MPD Firearms Registration Branch: step one: apply to register a handgun; upon approval of the registration, apply for a CPL.

206.     At the time of his application, he was a firearms instructor, and he had a license to carry firearms in several states including Maryland, Virginia, and Utah.

**The Chief denied Mr. Key's application for a CPL.**

207.     The Chief denied Mr. Key's application for a CPL by Notice of Denial dated June 3, 2021, because, the Chief found, Mr. Key was not "a suitable person to be so licensed" under DCMR § 2335.1(d) because of a "propensity for violence or instability" and the Chief's "new standard of suitability" allowing the use of "any evidence" including conduct in an arrest report not reduced to a conviction.

208.     The Chief stated that he was relying on the following two arrests: (1) an ADW/ CPWL arrest that occurred in the District of Columbia in September 5, 2020; and (2) an "Unlawful Discharge at a Crowd" arrest on May 27, 2019 in Maryland at Mr. Key's home.

209.     The Chief's Notice did not provide the details of either incident or why he believed the arrests indicated a "propensity for violence or instability."

50

Deleted: s

Deleted: ¶
He still retains those licenses in good standing.

210. A few weeks later, on June 24, 2021, the Chief issued a second Notice of Denial of the CPL Application.

211. The Chief relied on the same two incidents listed in the initial Notice of Denial: an alleged "unlawful discharge at crowd" charge in Maryland in 2019, and an alleged ADW/ CPWL charge by the MPD on September 5, 2020.

212. Again, the Chief's denial did not provide any details or explanation of why he believed that the incidents made Mr. Key was "not suitable" for a CPL.

213. The Notice of Denial is unclear, but it appears that in the Notice dated June 24, 2021, the Chief denied Mr. Key's application for a CPL because Mr. Key did not qualify for a registration certificate because he had a "history of violent behavior." But the Chief did provide a Notice of Denial of the registration certificate at this time.

214. It is unclear when the June 24, 2021, Notice of Denial was in fact mailed.

215. On June 29, 2021, Mr. Key through counsel filed an appeal from the June 3, 2021, Notice of Denial of CPL Application.

216. By the time the June 24, 2021, Notice of Denial reached Mr. Key or his counsel, Mr. Key had already through counsel filed an appeal from the June 3, 2021, Notice of Denial of CPL Application.

217.    The alleged "unlawful discharge at crowd" charge and arrest (referred to as a "disorderly conduct" by the Maryland authorities, was, based on the Maryland police reports, a constitutional exercise by Mr. Key of his Second Amendment right to self-defense and protection of his daughter and his home using a lawful handgun Mr. Key was licensed to carry.

218.    The following account tracks the version of events the Chief relied on in making his revocation decision.

219.    Mr. Key and his daughter were being menaced by a crowd in front of his Maryland home, one of whom had yelled, "I'm going to shoot the house up."

220.    Mr. Key fired a shot from a lawful handgun into the ground in front of the crowd to disperse the crowd and it worked – the crowd menacing Mr. Key ran to their cars and left peacefully.

221.    The prosecutor accepted Mr. Key's explanation that he acted in self-defense and the prosecutor declined to prosecute the charge ("no papered" the case in Superior Court parlance) the arrest charge.

222.    The arrest was expunged.

223.    Implicit in the Second Amendment right to carry a handgun outside the home for self-defense is the right to fire the handgun.

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

**Deleted:** "

224.    The Chief's reliance on this incident as evidence of "a history of violent behavior" effectively excludes from carriage of handguns in public for self-defense people who have actually exercised the Second Amendment right to use a handgun for self-defense.

225.    The second incident was an arrest by the MPD for ADW (assault with a deadly weapon) and CPWL (carrying a pistol without a license) in the District on September 5, 2020.

226.    The arrest report on which the Chief based his version of the incident begins with the report-writing officer's disclaimer, "[t]his statement off acts is based on my best recollection without having the legal authorization to review any associated body worn camera footage to assist in writing this statement."

227.    The MPD's ADW narrative is based on third-party hearsay.

228.    According to the MPD ADW narrative, officers were flagged down by two people who falsely alleged that Mr. Key, also on the scene, and whom they knew, had pointed a gun at them.

229.    The sworn *Gerstein* affidavit states that in response to a call MPD officers approached Mr. Key in his truck and asked him to identify himself and whether there was a firearm in the truck without any mention of an ADW.

*53*

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

230.    Mr. Key truthfully identified himself to the officers and truthfully reported that there was a pistol in his glovebox and that he had permits to conceal carry from outside the District but not a District-issued CPL.

231.    As to the alleged ADW the *Gerstein* states merely that, "[o]fficers were investigating an allegation of an assault with a deadly weapon." (emphasis added).

232.    Based on third-party hearsay – the two people who flagged down the MPD - MPD also arrested and charged Mr. Key with ADW (DV)/ CPWL (D.C. Code § 22-4504, carrying a pistol without a license) and referred the prosecution to the US Attorney.

233.    Mr. Key did not assault anyone in connection with the incident.

234.    Mr. Key was licensed to carry the handgun in three other states.

235.    The U.S. attorney initiated a prosecution for CPWL in Superior Court but not for the MPD ADW arrest charge.

236.    The Denial stated that:

> When determining whether a person meets this standard of eligibility, MPD assesses all available evidence that may reveal your criminal history. This decision may be based on police or court records that have been sealed from the public; arrest records that may not have resulted in charges or convictions; and even records from incidents that may not have resulted in an arrest. Behavior that is violent or criminal demonstrating instability, unpredictability, or low self-control may be grounds for denial under the standard of eligibility. This determination takes into account risk factors, such as any acts of

54

violence, history of domestic or intimate partner violence or abuse, threatened or actual use of weapons, drug or alcohol abuse, and reckless or repetitious illegal behavior. MPD conducts an individualized assessment to determine whether an applicant's history has shown instability, low self control, that may reasonably present a danger to the public.

**The Chief erroneously alleged Mr. Key "had been convicted by guilty plea to "attempted carrying a pistol without a license" growing out of the arrest for CPWL (carry a pistol without a license).**

237.   In the Notice of Revocation, the Chief erroneously allegedly that Mr. Key "had been ***convicted*** by guilty plea to "attempted carrying a pistol without a license" growing out of the arrest for CPWL. (emphasis added).

238.   Admittedly, "conviction of a weapons offense (but not an infraction or misdemeanor violation under § 7- 2502.08, § 7-2507.02, § 7-2507.06, or § 7-2508.07) or a felony in [the District] or any other jurisdiction" is a disqualifying conviction under D.C. Code § 7-2502.03(a)(2).

239.   But, as the Chief knows, and as the docket of the Superior Court proves, Mr. Key has never been convicted of a weapons offense under Section 7-2502.03(a)(2). Docket entry, *U.S. v. Key*, 2020 CF2 006853 (November 20 and 23, 2020).

240.   Mr. Key was arrested and prosecuted for carrying a pistol without a license in the District on September 5, 2020.

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

241.   But, about a month after the prosecution began, Mr. Key accepted responsibility and entered a guilty plea in a Deferred Sentencing Agreement to a charge of Attempted Carrying a Pistol without a License.

242.   The Deferred Sentencing Agreement provided that, upon successful completion of community service and the other terms of the agreement, the U.S. Attorney would not oppose withdrawal of the plea, and the U.S. Attorney would nolle the case. Docket entry, *U.S. v. Key*, 2020 CF2 006853 (October 20, 2020).

243.   Judge Erik Christian approved the Deferred Sentencing Agreement, and he accepted the plea.

244.   Mr. Key successfully completed the terms of the Deferred Sentencing Agreement and on November 20, 2020, two months after the arrest, Mr. Key withdrew the guilty plea and the U.S. Attorney *nolle*'d the prosecution. Docket entry, *U.S. v. Key*, 2020 CF2 006853 (November 20 and 23, 2020).

245.   Therefore, Mr. Key was never convicted of Attempted Carrying a Pistol without a License because he withdrew the plea before the Judge entered sentence, and the U.S. Attorney *nolle*'d the charge.

246.   Mr. Key appealed the denial of the CPL to the Concealed Pistol Licensing Review Board:

56

247.   The Board dismissed the appeal rather than remanding for supplementing the record because it assumed that the Chief had refused to issue the registration certificate for a valid reason:

> The record in this case does not reflect that the issuing authority, the Chief of the Metropolitan Police Department ("Chief"), has granted Anthony Key ("appellant") a registration certificate, **likely due to a finding of appellant's ineligibility pursuant to D.C. Official Code § 7-2502.03(a) (setting forth provision disqualifying persons from firearms registration certificates)**. In any event, because District law is clear that the Chief must issue a registration certificate as a prerequisite to considering a CPL application, this appeal hereby is DISMISSED WITHOUT PREJUDICE. (emphasis added)

248.   The Chief's refusal to issue a denial of a registration certificate denies Mr. Key the statutory right under D.C. Code § 7-2502.10(a) to submit further evidence in support of the qualifications to hold a registration certificate to the Chief as the statute provides, and to ask the Chief to reconsider the denial.

249.   The Chief's refusal to issue a denial of a registration certificate also denies Mr. Key the right to appeal any denial or refusal to reconsider.

### SUBSTANTIVE ALLEGATIONS FOR CLAIMS

### Claim 1

### Second Amendment CPL Claim

250.   The preceding paragraphs are incorporated as though fully stated herein.

251.    Each Named Plaintiff <u>(the "Second Amendment License Class Named Plaintiffs")</u> challenges under the Second Amendment the Chief's denial of their applications for, or revocation of, a "concealed carry" license to carry a handgun outside the home or place of business.

252.    The Chief made the denials or revocations pursuant to the Chief's policy statement setting forth the Chief's "new standard of suitability" for a CPL allowing the use of "any evidence" including conduct in an arrest report not reduced to a conviction.

**Deleted:**

253.    The Chief's "new standard of suitability" violates the Second Amendment because it gives the Chief unlimited discretion to rely on any "available evidence that may reflect a propensity for violence or a propensity for instability, unpredictability, or low self-control" even if the "evidence" is conduct in an arrest report or other "incident" report that did not result in a conviction.

254.    This discretion is unconstitutional because the standard of suitability does not contain narrow, objective, and definite standards. Rather it requires the Chief to engage in the appraisal of facts, the exercise of judgment, and the formation of an opinion to determine who is issued a CPL.

255.    The Chief routinely relies on D.C.M.R.2335.1(d), the "propensity for violence or instability" regulation, as a basis for denying or revoking CPLs from

*58*

<u>Second</u> Amended Class Action Complaint • Millard v. Gov't of D.C.

law-abiding applicants or licensees whom the Chief classifies as having a "propensity for violence or instability that may reasonably render" their "possession of his concealed pistol a danger" to himself or another.

256.    The regulation is not consistent with this Nation's historical tradition of firearm regulation. Nor is there a historical analogue for the regulation.

257.    The regulation and the standard are independently unconstitutional because they do not make any exceptions for the Second Amendment right to self-defense by providing a carve-out for conduct undertaken in lawful self-defense as the Second Amendment requires.

258.    The propensity for violence/instability regulation and the Chief's "new standard of suitability" allows the Chief to indulge in the "appraisal of facts, the exercise of judgment, and the formation of an opinion" in making CPL decisions instead of being guided by "narrow, objective, and definite standards" in licensing decisions.

259.    This system allows the Chief practically unfettered and unreviewable discretion to deny a CPL to an applicant or revoke the CPL of a licensee who satisfies all the objective criteria in the regulatory framework including an applicant or licensee who has not been convicted of any of the disqualifying offenses or status enumerated in the statutes enacted by the D.C. Council.

*59*

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

260.    The regulation and Chief's "new standard of suitability" as promulgated and as applied by the Chief impermissibly shifts the Chief's burden of establishing that an applicant for or a license is not qualified as a basis for denial or revocation to the applicant or licensee to show that they are qualified for a CPL in addition to meeting the objective criteria.

261.    The "propensity for violence or instability" regulation as promulgated and as applied by the Chief and the Chief's "new standard of suitability" violated Named Plaintiffs' Second Amendment rights.

262.    The "propensity for violence or instability" regulation as promulgated and as applied by the Chief and the Chief's "new standard of suitability" discriminate against African Americans.

263.    The District is liable for the Plaintiffs' and the putative class members' injuries because the statutes and regulations and the Chief's "new standard of suitability to carry a concealed pistol" are policies of the District of Columbia.

264.    Alternatively, the District is liable for the Plaintiffs and putative class members' injuries because: (1) the statutes enacted by the D.C. Council are policies of the District of Columbia, and (1) the regulations promulgated by the Chief and the Chief's "new standard of suitability to carry a concealed pistol" are acts or policies of a final policymaker of the District.

265.    The moving force of the constitutional violations was the statutes enacted by the D.C. Council and Chief's promulgation and enforcement of the "propensity for violence or instability" regulation and the Chief's "new standard of suitability to carry a concealed pistol".

266.    The Second Amendment License Class Named Plaintiffs and the other members of the Second Amendment License Class suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses and loss of the constitutional right to carry handguns in self-defense outside the home that resulted from denial of their CPLs because of the District's enactment and enforcement of its "propensity for violence or instability" to deny or revoke or refuse to renew their CPLs.

267.    The Second Amendment Named Plaintiffs and the other class members are therefore entitled to monetary compensation and the other relief described herein.

### Claim 2

### Second Amendment Registration Certificate Claim

268.    The preceding paragraphs are incorporated as though fully stated herein.

269.    Both Named Plaintiffs Hope, and Steptoe (the "Second Amendment Registration Class Named Plaintiffs") had their registration revoked by the Chief pursuant to the "history of violent behavior" prong of the registration

**Deleted:** Key

61

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

requirements, 7-2502.03(a)(6A), in reliance on conduct that was not reduced to a conviction by virtue of DCMR § 24-2309(f).

270.    Named Plaintiffs Hope and Steptoe also challenge the constitutionality under the Second Amendment of the Chief's regulation (DCMR § 24-2309(f)) authorizing the Chief to rely on conduct contained in arrest reports -- even though the conduct did not result in a conviction -- to deny or revoke their registration certificates under the "history of violent behavior" within the immediately preceding 5 years prong of the registration requirements, D.C. Code § 7-2502.03(a)(6A).

*Deleted: Key*

271.    A registration certificate for the pistol that the person is applying to carry concealed is a prerequisite for eligibility for a CPL under D.C. Code § 7-2509.02(a)(2) ("has obtained a registration certificate for the pistol that the person is applying to carry concealed") and 24 DCMR §§ 2332.1(b), (c), 2335.1(a).

272.    The Chief has issued a regulation establishing that the term "history of violent behavior" in D.C. Code § 7-2502.03(a)(6A) is satisfied by, among other things, "[a]rrest records within the five (5) years immediately preceding the application" for offenses including but not limited to threats, assault, and any crime of violence as defined in D.C. Official Code § 23-1331(4), or any similar offense in

62

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

any other jurisdiction, regardless of whether a conviction resulted from the arrest. *See also* DCMR § 24-2309(f).

273.    The Chief denied or revoked their registration certificates under the "history of violent behavior" prong of the registration requirements, 7-2502.03(a)(6A), in reliance on conduct that was not reduced to a conviction by virtue of DCMR § 24-2309(f).

274.    The Chief routinely relies on D.C. Code § 7-2502.03(a)(6A) ("history of violent behavior" provision) and his regulation implementing it, DCMR § 24-2309(f) ("history of violent behavior" regulation), as a basis for denying registration certificates from law-abiding applicants or holders of registration certificates whom the Chief classifies as having a "history of violent behavior."

275.    The "history of violent behavior" provision and regulation are overbroad on their faces and as applied.

276.    The "history of violent behavior" provision and regulation discriminate against African Americans.

277.    The Chief may even consider conduct constituting a lawful use of violence in self-defense as evidence "history of violent behavior" within the immediately preceding 5 years of the registration in evaluating a person's suitability to obtain or retain a registration certificate for a handgun, and thus to obtain or retain a CPL.

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

278.    The "history of violent behavior" provision and regulation is not consistent with this Nation's historical tradition of firearm regulation. Neither is there an historical analogue for this provision.

279.    In fact, requiring registration of all handguns is not consistent with this Nation's historical tradition of firearm regulation.

280.    The Second Amendment's core right is to self-defense.

281.    The regulation does not make any exceptions for the Second Amendment right to self-defense.

282.    The "history of violent behavior" provision and regulation allows the Chief to evade the "narrow, objective, and definite standards" components of the District's registration system and to indulge in the "appraisal of facts, the exercise of judgment, and the formation of an opinion" in making registration decisions instead of being guided by "narrow, objective, and definite standards" in registration decisions.

283.    This system allows the Chief practically unfettered and unreviewable discretion to deny a registration certificate to an applicant or revoke the registration certificate of a licensee who satisfies all the objective criteria in the regulatory framework including an applicant or licensee who has not been

64

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

convicted of any of the disqualifying offenses or status enumerated in the statutes enacted by the D.C. Council.

284.    The "history of violent behavior" statute and the regulation as promulgated and as applied by the Chief impermissibly shifts the Chief's burden of establishing that an applicant for or registration certificate is not qualified as a basis for denial or revocation to the applicant or registration certificate holder to show that they are qualified for a registration certificate in addition to meeting the objective criteria.

285.    The District is liable for Mr. Hope, Mr. Steptoe, and the putative class members' injuries because the "history of violent behavior" statute and the Chief's "history of violent behavior" regulation allowing the Chief to deny registration certificates based on unconverted conduct in arrest reports are policies of the District of Columbia.

286.    Alternatively, the District is liable for Mr. Hope, Mr. Steptoe, and the putative class members' injuries because: (1) the "history of violent behavior" statute and enacted by the D.C. Council are policies of the District of Columbia, and (1) the Chief's "history of violent behavior" regulation allowing the Chief to deny registration certificates based on unconverted conduct in arrest reports are acts or policies of a final policymaker of the District.

65

287.    The moving force of the constitutional violations was the enactment of the "history of violent behavior" statute and the Chief's enforcement of the provision and the Chief's promulgation and enforcement of the regulation.

288.    The Second Amendment Registration Class Named Plaintiffs and the other members of the Second Amendment Registration Class suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses and loss of the constitutional right to own handguns including the right to own handguns and to carry handguns in self-defense outside the home that resulted from denial or revocation of their registration certificates.

289.    The Second Amendment Registration Class Named Plaintiffs and the other class members are therefore entitled to monetary compensation and the other relief described herein.

## RULE 23 ALLEGATIONS

290.    Named Plaintiffs on behalf of themselves and the classes defined below bring this action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following two classes consisting of each person who:

291.    **Second Amendment License Class**: (i) in the period beginning three years before the date of filing of the original complaint in this case and going forward up to the case is terminated; (ii) whose application for a CPL was denied or

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

whose CPL was revoked or not renewed; (iii) by the Chief; (iv) because of the Chief's "new standard of suitability" including the "propensity for violence or instability" regulation.

292.    **Second Amendment Registration Class**: (i) in the period beginning three years before the date of filing of the original complaint in this case and going forward up to the case is terminated; (ii) whose registration certificate was denied or revoked or not renewed; (iii) by the Chief; (iv) because of the "history of violent behavior" statutory provision and the Chief's regulation allowing denials or revocations or non-renewals in reliance on conduct that was not reduced to a conviction under DCMR § 24-2309(f).

293.    Certification of these classes under Federal Rule of Civil Procedure 23(b)(2) is appropriate, because the District of Columbia has a policy, pattern, and practice for each claim that has uniformly affected all members the class, and injunctive relief and declaratory judgment and a judgment against the District will benefit each Named Plaintiff and class member.

294.    The classes are entitled to injunctive relief including issuance of, or restoration of, registration certificates and CPLs.

295.    Certification of the classes under Federal Rule of Civil Procedure 23(b)(3) is also appropriate, in that common questions of law and fact predominate over any

individual questions, and class action treatment is superior for the fair and efficient adjudication of these class claims as detailed below.

296.    The classes are entitled to monetary relief.

297.    Regarding Named Plaintiffs and the other members of the classes defined above, there are no individual questions on the issue of liability, because all members of each of the classes were injured by the same policy and practices.

298.    Among the questions of law and fact common to the classes are:

a.  whether the Chief's "new standard of suitability" policy statement or any part of it during the Class Period violated the Second Amendment facially or as applied;

b.  whether the Chief's "propensity for violence or instability" regulation or any part of it during the Class Period violated the Second Amendment facially or as applied;

c.  whether the District's "history of violent behavior" regulation or any part of it or the Chief's implementing regulation or any part of it during the Class Period violated the Second Amendment facially or as applied;

d.  whether during the Class Period requiring separate registration of all handguns violated the Second Amendment;

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

e.  whether Named Plaintiffs and the members of the classes are entitled to
equitable relief, and, if so, what is the nature of that relief; and

f.  whether a jury can determine the general damages for an entire class
using a damages matrix based on a trial using a sample of the class
members.

299.  Each of the classes is both so numerous that joinder of all members is
impracticable. The exact number of the classes members is unknown to plaintiffs at
this time, but discussions with lawyers, instructors, and applicants/ holders
indicates that each class numbers in the hundreds.

300.  Sanu Millard, Kenneth Hope, and Keontae Steptoe's claims are typical of
the claims of the other members of the they are members of and the classes were
injured by exactly the same means, that is, by District's Chief's unconstitutional
policies and enforcement of their unconstitutional policies.

301.  Sanu Millard, Kenneth Hope, and Keontae Steptoe on behalf of themselves
and the classes will fairly and adequately protect the interests of the members of the
classes and have retained counsel who are competent and experienced in complex
federal civil rights class action litigation and criminal defense law including the
District's unconstitutional gun control regime.

69

**Deleted:** Tony Key

**Deleted:** Tony Key,

302.   Sanu Millard, Kenneth Hope, and Keontae Steptoe on behalf of themselves

and each of the classes of which they are members have no interests that are

contrary to or in conflict with those of the members of each of the classes of which

they are members.

**Deleted:** Tony Key,

## CLASS RELIEF DEMANDS

303.   Sanu Millard, Kenneth Hope, and Keontae Steptoe as Named Plaintiffs on

behalf of themselves and all other members of the classes of which they are

members respectfully request that this Court grant the following relief:

**Deleted:** Tony Key,

**A.**        Enter judgment in their favor on all of their claims;

**B.**        Grant a jury trial on all claims so triable;

**C.**        Declare that the Chief's "new standard of suitability" policy

statement on its face or as applied to them and other class members violates the

Second Amendment and grant them nominal damages;

**D.**        Declare that the Chief's "propensity for violence or instability"

regulation on its face or as applied to them and other class members violates the

Second Amendment and grant them nominal damages;

**E.**        Declare that the District's "history of violent behavior" statutory

provision and the Chief's implementing regulation on their face or as applied to

70

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

them and other class members violates the Second Amendment and grant them nominal damages.

**F.**        An injunction permanently enjoining the District and the Chief from enforcing the portions of the statute, the regulations, and the Chief's new standard of suitability which are reproduced above in strikeout mode.

**G.**        Declare that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) and certifying the classes defined above, and designating Sanu Millard, Kenneth Hope, and Keontae Steptoe as the proper representative of each of the classes of which they are a member and appointing William Claiborne as class counsel.

**H.**        Award Sanu Millard, Kenneth Hope, and Keontae Steptoe and all other members of the classes defined above injunctive relief in the form of enjoining application of the "propensity for violence or instability" regulation ordering the Chief to process their applications for CPL based on the objective criteria in the CPL statutes and regulations;

**I.**        Award Sanu Millard, Kenneth Hope, and Keontae Steptoe and all other members of the classes defined above injunctive relief in the form of enjoining enforcement of the statutes and regulations requiring separate registration of all handguns.

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

**Deleted:** Tony Key,

**Deleted:** Tony Key,

**Deleted:** Tony Key,

**J.**          Award all Named Plaintiffs and class members compensatory and

consequential damages in an amount to be determined at trial;

**K.**          Award Plaintiffs attorney's fees and costs incurred in bringing this

action under 42 U.S.C. § 1988 or as determined under the "common fund" rule;

and

**L.**          Grant such other relief as this Court deems just and proper.

| | |
|---|---|
| Respectfully submitted,<br><br>/s/ William Claiborne<br>WILLIAM CLAIBORNE<br>D.C. Bar # 446579<br><br><br>717 D Street, N.W<br>Suite 300<br>Washington, DC 20006<br>Phone 202/824-0700<br>Email claibornelaw@gmail.com<br><br><br>Counsel for Sanu Millard, Kenneth Hope, and Keontae Steptoe on behalf of themselves and the putative class members | Respectfully submitted,<br><br>/s/ Alan Alexander Beck<br>_ALAN ALEXANDER BECK<br>D.C. Bar # HI001<br><br><br>2692 Harcourt Drive<br>San Diego, CA 92123<br><br><br>Email alan.alexander.beck@gmail.com<br><br><br>Counsel for Sanu Millard, Kenneth Hope, and Keontae Steptoe on behalf of themselves and the putative class members |

72

Second Amended Class Action Complaint • Millard v. Gov't of D.C.

**Deleted:** Tony

**Deleted:** Key

**Deleted:** Tony Key

### JURY DEMAND

Plaintiffs demand a jury of six as to all claims so triable.

/s/William Claiborne
WILLIAM CLAIBORNE
D.C. Bar # 446579
Counsel for Plaintiffs and the classes

Second Amended Class Action Complaint • Millard v. Gov't of D.C.