## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SANU MILLARD, *et al.*,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-CV-02672-CKK** |
| **GOVERNMENT OF THE DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

## DEFENDANT'S MOTION TO STAY THE CASE OR, ALTERNATIVELY, DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

Defendant District of Columbia (District) moves to stay the case or, alternatively, under Federal Rules of Civil Procedure 12(b)(1) and (6) to dismiss Plaintiffs' Second Amended Complaint [30].  A memorandum of points and authorities as well as a proposed order are attached.  The District understands, based on the Court's March 10, 2023 Minute Order, that page limits are waived.  If that understanding is mistaken, the District can file a motion for leave to exceed page limits.  The District sought Plaintiffs' consent to the extent the Motion seeks a stay, but Plaintiffs do not consent.  *See* LCvR 7(m).

Date: August 30, 2023.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

STEPHANIE E. LITOS
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*

HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*

ADAM J. TUETKEN [242215]
RICHARD P. SOBIECKI [500163]
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendant*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SANU MILLARD,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-CV-02672-CKK** |
| **GOVERNMENT OF THE DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

**<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO STAY THE CASE OR, ALTERNATIVELY,
DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 2

    I.    Regulation of Gun Possession and Carrying in the District ................................. 2

        A.    Firearm Registration ................................................................................. 2

        B.    Licensing for Concealed Carry .................................................................. 4

    II.    Plaintiffs' Cases ................................................................................................. 6

        A.    Millard.................................................................................................... 6

        B.    Steptoe ................................................................................................... 7

        C.    Hope ...................................................................................................... 8

    III.    Procedural History ............................................................................................ 9

LEGAL STANDARDS .................................................................................................... 10

ARGUMENT .................................................................................................................. 11

    I.    The Court Should Stay the Case Pending the Supreme Court's Resolution of Threshold Second Amendment Issues................................................................ 11

    II.    The Court Should Dismiss Most of the Claims for Lack of Jurisdiction............. 14

    III.    Plaintiffs' Second Amendment Claims Fail. ....................................................... 19

        A.    Plaintiffs Fall Outside the Scope of the Second Amendment................... 20

            1.    The Second Amendment Covers Only Law-Abiding, Responsible Individuals, Not Dangerous Individuals.................. 20

            2.    *Bruen* Confirms That Licensing Laws with Dangerousness Standards Are Consistent With the Second Amendment. ........... 26

        B.    Alternatively, the District's Dangerousness Standards Are Consistent With the Nation's Historical Tradition of Firearm Regulation. ............................................................................................... 32

1.     The Historical Record Supports the Longstanding Public Acceptance of Laws Prohibiting Dangerous People From Possessing Firearms. ................................................................. 33

        a.     English Law ................................................................. 33

        b.     Affray Laws ................................................................. 34

        c.     Surety Laws ................................................................. 36

        d.     Laws Disarming "Dangerous" Classes of People ............. 38

        e.     Militia Laws ................................................................. 40

        f.     Reconstruction Laws and Commentary ........................... 41

        g.     Licensing Laws and Suitability Standards ...................... 42

2.     The District's Dangerousness Standards Are Relevantly Similar to Historical Laws Disarming Dangerous Individuals ....................................................................... 46

3.     The District's Dangerousness Standards Are Also Valid Because They Are Distinctly Similar to Licensing Laws Appearing in the 19th Century ....................................................................... 56

C.     Plaintiffs Do Not Otherwise Allege Any Constitutional Defect in the District's Dangerousness Standards. ................................................. 59

CONCLUSION ................................................................................................... 63

## INTRODUCTION

As then-Judge and now-Justice Barrett explained, "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting). The District prohibits dangerous people from possessing guns by authorizing the Metropolitan Police Department (MPD) to deny firearm registration and concealed carry licenses to individuals who are likely to be dangerous if allowed to possess a firearm or carry a pistol in public. Plaintiffs are three individuals who were, at one time, denied registration or licenses. Bypassing the review processes available under District law, Plaintiffs come to federal court claiming that the District's registration and licensing systems violate the Second Amendment.

But the Court should not take up their claims yet. The Supreme Court will soon decide whether, under its new test for Second Amendment challenges, governments may limit gun possession by individuals who are not law-abiding and responsible. Resolution of that issue will go far in resolving the issues here, so the Court should stay the case or hold the Motion to Dismiss in abeyance pending further guidance from the Supreme Court.

If the Court does not stay the case, it should dismiss the Second Amended Complaint [30]. At the threshold, Plaintiffs' claims suffer from serious jurisdictional problems, as each Plaintiff challenges aspects of the licensing and registration systems that have not caused him an injury, and two of the Plaintiffs have or will soon receive the licenses they seek. On the merits, Plaintiffs' Second Amendment claims fail because, in accord with the original meaning of the Second Amendment, a long history of regulation, and common sense, the District's system constitutionally prohibits dangerous persons from accessing guns.

## BACKGROUND

### I.  Regulation of Gun Possession and Carrying in the District

People who want to keep a gun at home or at a place of business in the District must obtain a registration certificate for that weapon, which requires them to satisfy certain standards, including, but not limited to, that they have no recent history of violent behavior that would indicate a likelihood of unlawful firearm use.  People who want to carry a concealed pistol in the District must first obtain a registration certificate for that pistol and then a concealed carry license, which requires them to satisfy additional standards, including, but not limited to, that they do not have a propensity for violence or instability that would render their carrying of a concealed pistol a danger to themselves or others.

### A.  Firearm Registration

Any person in the District who "possess[es] or control[s]" a firearm must register it, subject to several exceptions not relevant here.  D.C. Code § 7-2502.01(a).  A person seeking a concealed carry license also must register the pistol he intends to carry in the District, even if it is kept elsewhere.  *Id.* § 7-2509.02(a)(2).  Applicants often apply for a registration certificate and a concealed carry license at the same time.  *See* MPD, *Concealed Carry Pistol License Application* 2, https://tinyurl.com/5n953d76; MPD, *Instructions for Submitting an Application for a Concealed Carry Pistol License* 1, https://tinyurl.com/mr3fudd9.

The Chief of MPD issues registration certificates when certain requirements are met, including, for example, that the applicant "[h]as not been convicted of a weapons offense" "or a felony" and has not recently been "[c]ommitted to a mental institution."  D.C. Code § 7-2502.03(a)(2), (6)(A)(5).  This case involves only one of the several qualifications to receive a registration certificate:  that the applicant, "[w]ithin the 5 years immediately preceding the application, has not had a history of violent behavior," *id.* § 7-2502.03(a)(6A), which may be

determined by considering, among other things, facts contained in "[a]rrest records," 24 DCMR § 2309.01(f).  This includes, but is not limited to:  arrests for threats to do bodily harm under D.C. Code § 22-407; assaults or threatened assaults in a menacing manner under D.C. Code § 22-404; any "crime of violence" under D.C. Code § 23-1331(4)[1]; or "any similar provision of the law of any other jurisdiction so as to indicate a likelihood to make unlawful use of a firearm." 24 DCMR § 2309.1(f).

To begin the registration process, the applicant must provide certain information to the Chief, including any past revocations of a firearm license, D.C. Code § 7-2502.03(b)(6), and fingerprints, *id.* § 7-2502.04(a).  The Chief then uses that information to perform a background check, which may include "[i]nquiry and investigation of the applicant's criminal history," "[r]ecord checks," "[s]ubmission of fingerprints to the F.B.I.," and "interviews or other investigative techniques."  24 DCMR § 2314.2.

If the Chief determines there is no history of violence and the other eligibility factors are met, she approves the application and issues a registration certificate.  *Id.* § 2314.4.  If the Chief denies the application, she must notify the applicant of the proposed denial or revocation and explain her reasons.  D.C. Code § 7-2502.10(a).  If the applicant does not respond, the proposed denial or revocation becomes final.  *Id.*  If the applicant chooses to "submit further evidence in support of the application or qualifications," *id.*, the Chief must respond with a final decision, *id.* § 7-2502.10(b).  If the Chief has "not expressly approved or denied" a registration application within 60 days, the application is "deemed to be denied for the purpose of appealing."  24 DCMR § 2315.7.

---

[1]     D.C. Code § 23-1331(4) identifies several "crime[s] of violence" for purposes of the District's pre-trial detention statute, including, for example, "armed carjacking," "kidnapping," and "cruelty to children."

The applicant may appeal the Chief's final denial or revocation decision to the Office of Administrative Hearings (OAH), which must provide a de novo evidentiary hearing to resolve any disputed facts.  *See* D.C. Code §§ 7-2502.10(b), 2-1831.03(b-2); 1 DCMR §§ 2821, 2822.  If OAH denies the claim, the applicant may petition the D.C. Court of Appeals for judicial review. D.C. Code § 2-1831.16(e).

### B.  Licensing for Concealed Carry

District law allows the carrying of a concealed pistol with a license issued by the Chief. *See* D.C. Code §§ 22-4504(a), 22-4506.  To qualify, the applicant must meet several requirements.  For example, the applicant must register the pistol he intends to carry, complete a firearms training course, and be "a suitable person to be so licensed."  *Id.* §§ 7-2509.02(a)(2), (4), 22-4506(a).  Suitability is further defined by regulation, and this case involves only one of several criteria:  the applicant must demonstrate that he "[h]as not exhibited a propensity for violence or instability that may reasonably render [his] possession of a concealed pistol a danger to [himself] or another."  24 DCMR § 2335.1(d).  To enable the Chief to make this determination, the applicant provides certain information, *id.* § 2337(d), (e), which the Chief then uses to conduct an investigation, which may entail interviewing references and reviewing criminal records, *id.* §§ 2338.1, 2338.2(e)–(g).

If the Chief approves the application, a concealed carry license is issued to the applicant. *Id.* § 2340.1.  If the Chief denies the application, she must provide written notice to the applicant and include the reasons for the denial.  *Id.* § 2340.3.

A concealed carry license is valid for two years.  D.C. Code § 7-2509.03(a), (b)(1). During that time, the Chief may revoke the license if she finds that the licensee failed to comply with the duties for responsible carrying, 24 DCMR § 2341.1(2), or no longer meets licensing requirements, D.C. Code § 7-2509.05(a)(1).  To do so, the Chief must serve a "notice of intent"

explaining the reasons for revocation and informing the applicant that the revocation will take effect unless he or she timely appeals. *Id.* § 7-2509.05(a)(4); 24 DCMR § 2341.3.

A person who has had a license denied or revoked may appeal to the Concealed Pistol Licensing Review Board (the Board). D.C. Code §§ 7-2509.02(g), 7-2509.03(c), 7-2509.05(a)(4). The Board consists of 11 members (drawn from law enforcement, mental health professions, and members of the public with relevant experience) and typically hears appeals sitting in three-member panels. *See id.* § 7-2509.08; 1 DCMR § 1202. The Board may resolve the appeal through summary disposition if it "determines that the resolution of the appeal does not include a dispute concerning a material fact." 1 DCMR § 1210.1. When, however, the appeal requires the Board to resolve disputed material facts, the appeal proceeds to a de novo evidentiary hearing. *Id.* §§ 1208.1, 1218.2. At the hearing, the appellant must "prove disputed material facts by a preponderance of the evidence." *Id.* § 1218.2; *see* D.C. Code § 7-2509.08(d)(2) (placing the burdens of production and persuasion on the applicant). The Board defers to the Chief's exercise of discretion in applying the statutory and regulatory standards for licensure. 1 DCMR § 1218.3.[2]

A party aggrieved by the Board's decision may petition the D.C. Court of Appeals for judicial review. *See* D.C. Code § 7-2509.08(f).

---

[2]     Prior to June 2021, the Board's regulations did not require de novo review of disputed facts. *See* 1 DCMR § 1218.1 (2020) ("[T]he appellant has the burden of persuading the Board that the Chief's final action should be reversed or modified based on substantial evidence."). The Board amended the regulations in June 2021 to clarify that the Board conducts a de novo hearing and resolves disputed facts under a preponderance of the evidence standard. Notice of Emergency and Proposed Rulemaking, 68 D.C. Reg. 7,779, 7,779–81 (Aug. 6, 2021). Millard's appeal was denied by the Board under the prior regulations, but he does not contend that the differences between the two versions are relevant to his claims.

## II.    **Plaintiffs' Cases**

Plaintiffs are three individuals (Sanu Millard, Keontae Steptoe, and Kenneth Hope) who were denied concealed carry licenses or firearm registration certificates, or had them revoked, due to MPD's determination that they did not satisfy one of the District's dangerousness standards.

### A.    **Millard**

The Chief denied Millard a concealed carry license in 2019 because Millard "exhibited a propensity for violence or instability that may reasonably render [his] possession of a concealed pistol a danger to [himself] or another" under 24 DCMR § 2335.1(d).  2d Am. Compl. ¶ 121; Def.'s Ex. A, Final Order & Decision Den. Appeal of Sanu Millard (Millard Order) at 1–2.[3]  The notice of denial and an attached memorandum explained the Chief's reasoning in detail.  2d Am. Compl. ¶¶ 121–28; Millard Order at 1–2.

Millard appealed to the Board and argued that he did not have a propensity for violence or instability.  2d Am. Compl. ¶ 145; Millard Order at 3.  After a preliminary review, the Board notified the parties that the appeal did not appear to present any factual disputes, so summary disposition may be appropriate.  Millard Order at 4.  Each party then presented their arguments in writing to the Board.  *Id.* at 5–19.

---

[3]     The Court may consider, on a motion to dismiss, public records and filings before an administrative agency.  *Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017).  The Court may also consider "[p]ublic records . . . when referred to in the complaint and integral to the plaintiff's claim."  *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 273 (D.C. Cir. 2018).  The Second Amended Complaint refers to and quotes filings in each Plaintiff's case, and the claims depend on the Chief's and Board's decisions.  *E.g.*, 2d Am. Compl. ¶¶ 122, 154, 171.  To the extent any of Plaintiffs' allegations contradict the administrative record, the record controls.  *Owens*, 897 F.3d at 272–73.

The Board affirmed the Chief's denial of a concealed carry license in 2020.  *Id.* at 19–22. Millard did not petition the D.C. Court of Appeals for review.  *See* 2d Am. Compl. ¶ 150. Subsequently, MPD informed Millard that it would grant him a license once he completed firearms training and updated his outdated residency information.  Def.'s Ex. B, Millard Notice of Prelim. Approval (Millard Notice) at 1–2.

**B.    Steptoe**

The Chief revoked Steptoe's concealed carry license in 2021 because Steptoe violated his duty as a licensee to carry his pistol in a holster on his person under 24 DCMR § 2344.2.  2d Am. Compl. ¶ 171; Def.'s Ex. C, Steptoe Dec. 22, 2021 Notice of Revocation (Steptoe 2021 Notice) at 1.  The notice of revocation explained the Chief's reasoning.  2d Am. Compl. ¶¶ 171–72; Steptoe 2021 Notice at 1–2.

Steptoe appealed the revocation to the Board.  2d Am. Compl. ¶ 174.  He argued that a different regulation applied because he had been in his vehicle.  *Id.* ¶¶ 175–77; Def.'s Ex. D, Steptoe Order to Stay at 1.  The Board stayed the case and remanded the issue to the Chief to show cause why Steptoe's argument was incorrect.  2d Am. Compl. ¶ 179; Steptoe Order to Stay at 2.

On remand, the Chief determined that Steptoe was ineligible for a registration certificate because he had a history of violent behavior within the previous five years under D.C. Code § 7-2502.03(a)(6A), so the Chief revoked Steptoe's registration certificate.  2d Am. Compl. ¶ 180; Def.'s Ex. E, Steptoe Apr. 5, 2022 Notice of Revocation (Steptoe 2022 Notice) at 1. Because Steptoe lacked the prerequisite registration certificate, the Board dismissed his appeal without prejudice, advising him that he could pursue an appeal of his registration revocation through MPD and OAH.  2d Am. Compl. ¶ 182; Def.'s Ex. F, Steptoe Dismissal Without Prejudice (Steptoe Order) at 1–2.

Steptoe appealed the revocation of his registration certificate to MPD.  Def.'s Ex. G, Apr. 19, 2022 Appeal of Notice of Revocation of Firearms Registration.  Prior to the filing of the Second Amended Complaint, MPD "granted" Steptoe's appeal, and "rescind[ed] the proposed revocation of [his] firearm registration, as well as the proposed revocation of [his] concealed carry license."  Def.'s Ex. H, Ltr. from B. Greene to K. Steptoe (Steptoe Ltr.) at 1.

**C.** **Hope**

Hope applied for a registration certificate and concealed carry license in 2022.  2d Am. Compl. ¶ 151.  The Chief denied Hope a registration certificate after concluding that a background check revealed charges from less than three years prior for assaulting a police officer and unlawful entry.  Def.'s Ex. I, Ltr. from Firearms Registration Branch to K. Hope (Hope Ltr.) at 1.  The charges stemmed from an incident in which Hope became violent with several police officers—sending one to the hospital.  Affidavit, *United States v. Hope*, 2019 CMD 011751 (D.C. Super. Ct. Sept. 11, 2019).  The Chief concluded that these charges indicated "a history of violent behavior" under D.C. Code § 7-2502.03(a)(6A).  Hope Ltr. at 1.[4]  The Chief also denied Hope a concealed carry license because he was ineligible for the prerequisite registration certificate.  Def.'s Ex. J, Hope Notice of Denial (Hope Notice) at 1.  Hope never appealed the denial within MPD or to OAH.

---

[4]     It appears that the charge for assault on a police officer, a separately disqualifying offense for a registration certificate, D.C. Code § 7-2502.03(a)(4)(B), was dismissed for want of prosecution after the U.S. Attorney's Office was not ready for trial.  Event, *United States v. Hope*, 2019 CMD 011751 (D.C. Super. Ct. Mar. 9, 2020).  Prosecutions for assault are the responsibility of that office, not the Office of the Attorney General.  D.C. Code § 23-101.  Hope and the U.S. Attorney's Office entered a *nolle prosequi* for the unlawful entry charge.  Gov't's Notice of Nolle Prosequi, *United States v. Hope*, 2019 CMD 011751 (D.C. Super. Ct. Dec. 10, 2019).

### III.    Procedural History

Plaintiffs, on behalf of themselves and putative classes, sued the District to challenge their denials or revocation of concealed carry licenses or registration certificates.  *See* Compl. [1].[5]  The District moved to stay the case, or alternatively, dismiss the Complaint [19].

The Court ordered Plaintiffs to address in their opposition brief:  (1) "important founding-era legal scholars who interpreted the Second Amendment in published writings"; (2) "19th-century cases that interpreted the Second Amendment"; (3) "the discussion of the Second Amendment in Congress and in public discourse after the Civil War"; and (4) "how post-Civil War commentators understood the right to bear arms as to the conduct governed by the challenged regulations."  Mar. 10, 2023 Min. Order (internal quotation marks and citations omitted).  The Court also ordered the Parties to address "whether 1791 or 1868 is the more appropriate historical analogue for the challenged regulations" and "whether the challenged regulations are more akin to 'common-law offenses' (including that of affray), 'statutory prohibitions,' and/or 'surety statutes' that may or may not have been commonly accepted at the time of ratification."  *Id.* (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2146 (2022)).

Instead of filing an opposition brief, Plaintiffs amended their Complaint—twice.  Am. Compl. [27]; 2d Am. Compl.  In the operative Second Amended Complaint, Plaintiffs bring two claims:  (1) the regulation providing that licenses may be denied if a person has "exhibited a propensity for violence or instability that may reasonably render [his] possession of a concealed pistol a danger," 24 DCMR § 2335.1(d), violates the Second Amendment on its face and as

---

[5]    The original Complaint named Tony Key as a plaintiff instead of Hope.  Compl. ¶ 1.  The Second Amended Complaint swapped Key for Hope.  *Compare id.*, *with* 2d Am. Compl. ¶ 1.

applied to Plaintiffs; and (2) the statute and regulation providing that registration may be denied if a person has a "history of violent behavior," D.C. Code § 7-2502.03(a)(6A); 24 DCMR § 2309.01(f), violate the Second Amendment on their face and as applied to Plaintiffs.  2d Am. Compl. ¶¶ 231–270.  Plaintiffs seek a declaration that the challenged provisions are unconstitutional, an injunction enjoining their enforcement, and compensatory and nominal damages.  *Id.* ¶ 284.

## LEGAL STANDARDS

A complaint must be dismissed under Rule 12(b)(1) if the Court "lack[s] . . . subject-matter jurisdiction."  To survive a Rule 12(b)(1) motion, the plaintiff bears the burden of establishing jurisdiction.  *Bronner on Behalf of Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020).  Generally, the court accepts "well-pled factual allegations" while "disregard[ing] any legal conclusions, legal contentions couched as factual allegations, and unsupported factual allegations."  *Gulf Coast Mar. Supply, Inc. v. United States*, 867 F.3d 123, 128 (D.C. Cir. 2017).  If, however, the defendant disputes the complaint's factual allegations, "the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."  *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (internal quotation marks omitted) (quoting *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).

A complaint must also be dismissed under Rule 12(b)(6) if it "fail[s] to state a claim upon which relief can be granted."  To survive a Rule 12(b)(6) motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Courts need not accept as true conclusory "assertions devoid of further factual

enhancement," *id.* at 679 (internal quotation marks and citation omitted), or "legal conclusions,"

*Pueschel v. Chao*, 955 F.3d 163, 166 (D.C. Cir. 2020).

A plaintiff bears a "heavy burden" in bringing a facial challenge.  *United States v.*

*Salerno*, 481 U.S. 739, 745 (1987).  He cannot merely suggest that constitutional problems may

arise when the law is applied to some "conceivable set of circumstances."  *Id.*  Rather, the

complaint must affirmatively "establish that no set of circumstances exists under which the Act

would be valid."  *Id.*  Where a statute has a "plainly legitimate sweep," a facial challenge must

fail.  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (internal

quotation marks and citation omitted).

**ARGUMENT**

I.   **The Court Should Stay the Case Pending the Supreme Court's Resolution of**
     **Threshold Second Amendment Issues.**

The Court need not and should not decide the merits of this case just yet.  The Supreme

Court is poised to decide the core Second Amendment issues presented here in *United States v.*

*Rahimi*, No. 22-915, so this Court should briefly stay the case—or at least pause on issuing an

opinion—until the Court and Parties receive critical guidance from the Supreme Court.

A federal court enjoys the "inherent" power to stay proceedings due to "economy of time

and effort for itself, for counsel, and for litigants."  *Bledsoe v. Crowley*, 849 F.2d 639, 645 (D.C.

Cir. 1988) (internal quotation marks omitted) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254

(1936)).  This power is "appropriately exercised where a separate proceeding bearing upon the

case is pending."  *Hulley Enters. Ltd. v. Russian Fed'n*, 211 F. Supp. 3d 269, 276 (D.D.C. 2016);

*see also, e.g.*, *P.J.E.S. by & through Francisco v. Mayorkas*, No. 20-cv-2245, 2023 WL 387570,

at *5 (D.D.C. Jan. 25, 2023) (staying case pending appellate proceedings that would be binding);

*Fonville v. District of Columbia*, 766 F. Supp. 2d 171, 173 (D.D.C. 2011) (same).  In deciding

11

whether to stay a case, this Court considers:  "(i) What effect, if any, will the completion of the [Supreme Court's] proceedings have on the proceedings before this Court?; and (ii) How, if at all, will [Plaintiffs] be burdened if a stay is granted, and how, if at all, will Defendant[ ] be burdened if a stay is denied?"  *U.S. ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless, L.L.C.*, 288 F. Supp. 3d 28, 31 (D.D.C. 2017) (Kollar-Kotelly, J.).

On the first prong, the Supreme Court this coming Term will decide "[w]hether 18 U.S.C. 922(g)(8), which prohibits the possession of firearms by persons subject to domestic violence protective orders, violates the Second Amendment on its face."  Brief for the United States at i, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023).  The United States defends § 922(g)(8) on the ground that governments, consistent with the Second Amendment and historical tradition, have the power to disarm dangerous individuals.  *Id.* at 6–9.  The District defends its dangerousness standards on similar grounds here, relying on similar historical sources.  Argument § III, *infra*.  Therefore, the Supreme Court's resolution of the issue of whether governments can constitutionally disarm dangerous individuals will "narrow the issues" for this Court to decide.  *Landis*, 299 U.S. at 253.

Further, *Rahimi* will be the Supreme Court's first opportunity to clarify its new test for Second Amendment challenges, announced in *Bruen*.  That test has already engendered confusion in the Nation's courts, so the "need for . . . further guidance has become clear." *Atkinson v. Garland*, 70 F.4th 1018, 1036 (7th Cir. 2023) (Wood, J., dissenting).  Thus, at the least, *Rahimi* "will likely . . . 'assist in the determination of the questions of law involved'" here. *Hulley*, 211 F. Supp. 3d at 276 (quoting *Landis*, 299 U.S. at 253).  Indeed, this Court would not be the first to stay a Second Amendment challenge pending *Rahimi*.  *See Fooks v. State*, No. 24, 2023 WL 5211064 (Md. Aug. 15, 2023) (staying challenge to felon-in-possession ban).  Nor can

Plaintiffs contend that *Rahimi* will have little effect here—their Second Amended Complaint relies on the decision under review.  2d Am. Compl. ¶ 100.

On the second prong, the only burden Plaintiffs face is a slight delay—if any.  *Rahimi* will be decided, at the latest, by next June.  This Motion to Dismiss will take several weeks, at a minimum, and potentially several months, to fully brief.  *See* May 31, 2023 Min. Order (setting briefing schedule on Defendant's Motion to Dismiss the First Amended Complaint to include four weeks for Plaintiffs' opposition and three weeks for the District's reply).  Then, the Court will understandably need time to decide the myriad complex issues here.  *See* Mar. 10, 2023 Min. Order ("[P]ursuant to *Bruen*, a searching and detailed discussion of the historical record is necessary . . . .").  It is unlikely that the Court would be able to decide this Motion by much earlier than next June in any event.  *See Table N/A—U.S. District Courts–Combined Civil and Criminal Federal Court Management Statistics (June 30, 2023)* 2, https://tinyurl.com/5cap3656 (stating that the median time between filing and a disposition in a civil case is 4.7 months in this district).  Nor can Plaintiffs assert a pressing need to get past the pleadings stage more quickly because *they* have significantly delayed litigation by amending their Complaint—twice.

The District, however, faces potential burdens and prejudice if the Court gets out ahead of *Rahimi*.  For example, if the Court declines to dismiss the action, the Parties will begin discovery and class-certification litigation, which would be burdensome and costly—at the expense of the District taxpayer.  If, after that, the Supreme Court issues a decision confirming that Plaintiffs' claims are meritless, those limited public resources will have been wasted.  Moreover, the Court should not take up the pen on sensitive constitutional issues with public safety consequences when the Supreme Court will provide superseding guidance before the ink will even dry.  *See Landis*, 299 U.S. at 256 ("Especially in cases of extraordinary public moment,

the individual may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted.").  In short, this case should not start in earnest until the Supreme Court has clarified the applicable legal test.

A stay would have the added benefit of giving one Plaintiff, Hope, an opportunity to resolve his underlying District-law issues with District adjudicators.  Federal courts may pause on deciding cases where resolution of state-law issues will obviate the need to rule on a federal constitutional question.  *Quackenbush v. Allstate Ins.*, 517 U.S. 706, 716–17 (1996).  Here, Hope alleges that he should not be disqualified under the District's history of violence and suitability standards and that District agencies misapplied District law.  *E.g.*, 2d Am. Compl. ¶ 166.  No local court, however, has determined the scope of the terms "history of violent behavior" and "propensity for violence and instability"—let alone whether, on the facts, the District may bar Hope from obtaining a registration or a license under these standards.  Thus, Hope's case "concern[s] the applicability of [a] challenged statute to a certain person or a defined course of conduct, whose resolution in a particular manner would eliminate the constitutional issue and terminate the litigation."  *Baggett v. Bullitt*, 377 U.S. 360, 376–77 (1964).  In such circumstances, the Court should ask Hope to pursue the available District processes first—which he has never tried.  *See Osterweil v. Bartlett*, 706 F.3d 139, 145 (2d Cir. 2013) (O'Connor, J., sitting by designation) (abstaining in face of request to overturn handgun licensing law so state adjudicators could decide state-law issues); *Church v. Biden*, 573 F. Supp. 3d 118, 134 (D.D.C. 2021) (Kollar-Kotelly, J.) (finding that challenge to vaccination requirement was unripe when agencies had not been given opportunity to decide exemption requests).

## II.   <u>The Court Should Dismiss Most of the Claims for Lack of Jurisdiction.</u>

No Plaintiff has standing to pursue all of claims he raises and all of the relief he seeks.  Each of the three Plaintiffs raises facial and as-applied challenges to both the dangerousness

standard for registration certificates and the dangerousness standard for concealed carry licenses.

2d Am. Compl. ¶¶ 251, 269, 303.  But "[a] plaintiff has standing only if he can allege personal

injury fairly traceable to" the law he challenges and that this injury is "likely to be redressed by

the requested relief."  *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (internal quotation

marks and citation omitted).  And "standing is not dispensed in gross; rather, plaintiffs must

demonstrate standing for each claim that they press and for each form of relief that they seek (for

example, injunctive relief and damages)."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208

(2021).  And so, a plaintiff who has standing to challenge one aspect of a statutory scheme "does

not necessarily . . . also ha[ve] standing to challenge" another aspect.  *Davis v. FEC*, 554 U.S.

724, 733–34 (2008); *see also Hightower v. City of Boston*, 693 F.3d 61, 70 (1st Cir. 2012)

(plaintiff lacked standing to challenge aspects of concealed carry licensing regime that were not

applied to her).  The Court should thus begin by taking stock of which Plaintiff has standing to

challenge which law and demand which type of relief.

        To start, Millard only has standing to seek as-applied, retrospective relief for denial of a

concealed carry license.  He lacks standing to challenge any aspect of the registration system

because he was never denied a registration certificate.  Indeed, he currently possesses a

certificate.  2d Am. Compl. ¶¶ 109–13; *see California*, 141 S. Ct. at 2114 ("[O]ur cases have

consistently spoken of the need to assert an injury that is the result of a statute's actual or

threatened *enforcement* . . . .").  On Millard's challenge to the licensing system's dangerousness

standard, his claims for injunctive or declaratory relief are no longer live because MPD has

found him qualified under that standard—and he will be issued a license as soon he provides a

few forms and renews his firearm training.  Millard Notice at 1–2; *see Da Costa v. Immigr. Inv.*

*Program Off.*, --- F.4th ----, ----, No. 22-5313, 2023 WL 5313526, at *5 (D.C. Cir. Aug. 18,

2023) (holding that there was no live controversy challenging agency's adjudication of a government benefit once the agency granted the benefit); *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 122 (2d Cir. 2020) (affirming dismissal of Second Amendment challenge to licensing system after the plaintiff received a license), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.  Because Millard has no live claims for injunctive or declaratory relief, he cannot pursue his facial challenge to the licensing system's dangerousness standard.  *See Daskalea v. Wash. Humane Soc'y*, 710 F. Supp. 2d 32, 42–43 (D.D.C. 2010) (Kollar-Kotelly, J.) (explaining that monetary damages generally are not available for facial challenges so a facial challenge was mooted when injunctive and declaratory relief were no longer available); *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011) (explaining that the remedy for a facial Second Amendment challenge "*must* be injunctive and declaratory").

Conversely, Hope only has standing to challenge the dangerousness standard for firearm registration.  He was denied a registration certificate under that standard.  Hope Ltr. at 1.  He then was denied a concealed carry license, but only because he did not qualify for a registration certificate, which is a prerequisite to obtaining a concealed carry license.  Hope Notice at 1.  Generally, when "a separate action . . . independently causes the same alleged harm as the challenged action," plaintiffs are "unable to establish the 'necessary causal connection' between the [challenged action] and their purported injury."  *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1296–97 (D.C. Cir. 2015) (per curiam).  After all, an injury is not "redressable" if enjoining the challenged law would "have no real effect" because other laws cause the same injury.  *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 465 (D.C. Cir. 2018) (internal quotation marks omitted) (quoting *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 311 F. Supp. 3d 187, 219 (D.D.C.) (Kollar-Kotelly, J.)); *see also Von Aulock v. Smith*, 720 F.2d 176, 180 (D.C.

Cir. 1983) ("[T]he existence of one absolute barrier was sufficient injury only if its removal would mean that all other barriers to the ultimately sought relief were likely to fall.").  Applying these principles in the context of government benefits like a license, "a plaintiff who challenges the denial of a benefit on one ground, but who is shown to be ineligible for the benefit on some other ground" will lack standing.  13A Charles Alan Wright et al., *Fed. Prac. & Proc.* § 3531.5 (3d ed. Apr. 2023 update); *see also, e.g.*, *Midwest Media Prop., L.L.C. v. Symmes Township*, 503 F.3d 456, 461–62 (6th Cir. 2007) (collecting cases from six circuits applying this rule in the license or permit context).

Hope's asserted injury is his inability to exercise his Second Amendment right to keep and bear arms.  That injury was and is caused by his lack of a registration certificate.  If the Court were to invalidate the dangerousness standard for concealed carry licenses, that relief would "have no real effect" on Hope because he would still be unable to exercise his Second Amendment rights in the District due to the registration requirement.  *Kaspersky Lab*, 909 F.3d at 465.  He thus lacks standing to challenge the District's concealed carry licensing system on the ground that the dangerousness standard is unconstitutional because he is ineligible for a license on another ground:  the registration requirement.

Next, Steptoe only has standing to seek as-applied, retrospective relief for denial of a registration certificate.  Prior to the filing of the Second Amended Complaint, MPD rescinded its proposed revocation of Steptoe's registration certificate and license.  Steptoe Ltr. at 1.  So, when the operative pleading was filed, Steptoe *had* a registration certificate and license.  Accordingly, he lacks standing to obtain prospective relief regarding either system's dangerousness standards because they do not currently prevent him from possessing or carrying a firearm.  *See Da Costa*, 2023 WL 5313526, at *5; *Libertarian Party*, 970 F.3d at 122.  And his retrospective claim is

limited to challenging the registration system's standard as applied to him because his concealed carry license and registration were revoked because he was ineligible for a registration certificate which, as discussed, is a condition precedent to licensure.  2d Am. Compl. ¶ 180; *see also* Steptoe 2022 Notice at 1.  Like with Hope, the cause of Steptoe's Second Amendment injuries is therefore his ineligibility for registration, not the concealed carry license's dangerousness standard.

Finally, no Plaintiff has standing to challenge the asserted "new standard of suitability" as a separate policy from the licensing and registration schemes' dangerousness standard.  2d Am. Compl. ¶ 87.  The Second Amended Complaint alleges that the Chief has a policy—the "new standard of suitability"—under which she considers incidents in the applicant's past, "regardless of when they occurred," when deciding whether to grant a concealed carry license.  *Id.* ¶ 94. And Plaintiffs seek to invalidate that standard as something separate from the "propensity for violence or instability" standard.  *Id.*, Prayer (C)–(D).  But, as explained, neither Hope nor Steptoe has standing to challenge their denial of a concealed carry license, so they also lack standing to challenge any alleged "new standard of suitability" that applies to license applicants. Plus, their records do not even indicate that the Chief applied such a standard to them.  Hope Notice at 1; Steptoe 2022 Notice at 1.  Nor do Millard's records suggest that the Chief applied a special standard of suitability to him.  Rather, the Chief relied on arrest reports from the years immediately preceding Millard's application.  Millard Order at 12–13.  No Plaintiff, then, had the "new standard of suitability" applied adversely against him, so Plaintiffs lack standing to challenge it.  *See California*, 141 S. Ct. at 2114.

To sum up and for the Court's convenience, Table 1 immediately below captures whether the Court has jurisdiction (Yes or No) over the claims challenging the dangerousness standard

for firearm registration certificates (FRC) or the dangerousness standard for concealed carry licenses (CCL), for prospective relief (Prosp.) or retrospective relief (Retro.).

| Plaintiff | FRC – Prosp. | FRC – Retro. | CCL – Prosp. | CCL – Retro. |
|-----------|--------------|--------------|--------------|--------------|
| Millard | No | No | No | Yes |
| Hope | Yes | Yes | No | No |
| Steptoe | No | Yes | No | No |

The most important takeaway is this:  There is no jurisdictional basis for Plaintiffs to pursue an order enjoining the dangerousness standard for concealed carry licenses.

**III.**   **Plaintiffs' Second Amendment Claims Fail.**

If the Court reaches the merits, Plaintiffs' Second Amendment claims fail because the District may prevent individuals who pose a risk of danger from possessing or carrying guns.  A Second Amendment challenge requires a challenger to show that the law infringes on activity protected by "the Second Amendment's plain text," as originally understood.  *Bruen*, 142 S. Ct. at 2129–30.  If the challenger can show that his conduct is covered by the Second Amendment, a law restricting that conduct is "presumptively" unlawful.  *Id.* at 2130; *see also Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (instructing that "a plaintiff bears certain burdens to demonstrate an infringement of his rights" and that "[i]f the plaintiff carries these burdens, the focus then shifts to the defendant to show that its actions were nonetheless justified.").  Ultimately, the law must be upheld if the government can demonstrate that it "is consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130.

Here, Plaintiffs challenge the constitutionality of only one aspect of the District's registration and licensing schemes:  its dangerousness standards.  Specifically, Plaintiffs challenge:  (1) the prohibition on issuing registration certificates for people who, in the previous five years, have demonstrated a "history of violent behavior," 2d Am. Compl. ¶¶ 268–89 (citing D.C. Code § 7-2502.03(a)(6A) and DCMR § 24-2309(f)); and (2) the prohibition on issuing

concealed carry licenses to people whose conduct demonstrates a "propensity for violence or instability," *id.* ¶¶ 250–67 (citing 24 DCMR § 2335.1(d)).

Neither challenge states a claim on which relief can be granted.  Dangerous individuals fall outside the scope of the Second Amendment, which protects only the right of law-abiding, responsible citizens to possess or carry guns.  Alternatively, Plaintiffs' challenges should be dismissed because governments have long been empowered to prohibit dangerous people from possessing or carrying guns in public, and the District's laws follow in that historical tradition. And Plaintiffs' attempts to allege other constitutional flaws with the District's standards fail.

> **A.**     **Plaintiffs Fall Outside the Scope of the Second Amendment.**

Plaintiffs' claims fail at the threshold because the Second Amendment does not encompass a right of dangerous individuals to possess guns or carry them in public.  Indeed, *Bruen* itself signaled that licensing systems like the District's are a constitutional means of keeping guns only in the hands of law-abiding, responsible individuals.

> **1.**     **The Second Amendment Covers Only Law-Abiding, Responsible Individuals, Not Dangerous Individuals.**

The Second Amendment protects "the right of the people to keep and bear arms."  U.S. Const. amend. II.  In *Bruen*, the Supreme Court held that the conduct of those challengers was covered by this plain text because it was undisputed that they were "ordinary, law-abiding, adult citizens" and thus "part of 'the people' whom the Second Amendment protects."  142 S. Ct. at 2134 (citing *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008)).  In fact, the Court employed the term "law-abiding, responsible citizens" (or the like) more than a dozen times

when describing the Second Amendment's scope.[6]  Keeping with that understanding, the Court

has instructed that there are "longstanding," "presumptively lawful" prohibitions on possession

by individuals who cannot be trusted to responsibly use firearms for self-defense, *e.g.*,

restrictions on "felons and the mentally ill."  *Id.* at 626–27 & n.26; *see also Heller v. District of

Columbia* (*Heller II*), 670 F.3d 1244, 1255 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)

(explaining that the presumptively lawful prohibitions identified in *Heller* "were within the

historical understanding of the scope of the right").  Because dangerous individuals are not law-

abiding and responsible, Plaintiffs' claims fail at *Bruen*'s first step because they fall outside the

scope of the Second Amendment.  *See United States v. Sitladeen*, 64 F.4th 978, 985–87 (8th Cir.

2023) (rejecting Second Amendment challenge because the challenger fell outside the scope of

the right).[7]

Historical sources affirm that dangerous individuals have never been understood to

possess the right to keep and bear arms.  In examining historical sources "to determine the public

understanding of" the Second Amendment, *Heller*, 554 U.S. at 605, proposals from the

Pennsylvania, Massachusetts, and New Hampshire ratifying conventions reveal how the

Founders conceived of the right, *e.g.*, *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).  The

---

[6]      *Bruen*, 142 S. Ct. at 2125 ("law-abiding, adult citizens"); *id.* at 2131 ("law-abiding,
responsible citizens") (citation omitted)); *id.* at 2133 ("a law-abiding citizen's right to armed
self-defense" and "law-abiding citizens"); *id.* at 2134 ("ordinary, law-abiding, adult citizens");
*id.* at 2135 n.8 ("law-abiding citizens"); *id.* at 2138 ("law-abiding citizens"); *id.* at 2138 n.9
("'law-abiding, responsible citizens'" and "ordinary citizens" (citation omitted)); *id.* at 2149
("the responsible" (citation omitted)); *id.* at 2150 ("law-abiding citizens" and "responsible arms
carrying"); *id.* at 2156 ("law-abiding, responsible citizens" and "law-abiding citizens").

[7]      If it reaches the second step under *Bruen*, the Court should also consider the above
arguments and sources when deciding whether the regulation is "consistent with the Nation's
historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130; *see Kanter*, 919 F.3d at 452
(Barrett, J., dissenting) ("These approaches will typically yield the same result; one uses history
and tradition to identify the scope of the right, and the other uses that same body of evidence to
identify the scope of the legislature's power to take it away.").

"highly influential" Pennsylvania proposal from the dissenting minority in the ratification convention to amend the Constitution, *Heller*, 554 U.S. at 604, guaranteed the right to arms "unless for crimes committed, or real danger of public injury from individuals," *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (internal quotation marks and citation omitted).  Likewise, the Massachusetts proposal—drafted by Samuel Adams—"would have limited the right to 'peaceable citizens.'"  *Id.* at 455 (citation omitted).  "At the time, 'peaceable' was defined as '[f]ree from war; free from tumult'; '[q]uiet; undisturbed'; '[n]ot violent; not bloody'; '[n]ot quarrelsome; not turbulent.'"  *Id.* (quoting 1 Samuel Johnson, *A Dictionary of the English Language* (5th ed. 1773)).  Lastly, the New Hampshire proposal provided that Congress could disarm a citizen if he was "in actual rebellion."  *Id.* at 454 (emphasis, internal quotation marks, and citation omitted).  Because "[r]ebels posed a risk of insurrection and so were dangerous," this proposal too "focus[ed] on dangerousness."  *Folajtar v. Att'y Gen.*, 980 F.3d 897, 915 (3d Cir. 2020) (Bibas, J., dissenting).  "[T]aken together," each of these precursors to the Second Amendment reflect the Founders' understanding that individuals who "threatened violence" or posed a "risk of public injury" could be categorically excluded from keeping arms.  *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

Other sources from the Founding further establish that the Pennsylvania and Massachusetts ratifying conventions viewed the ultimate text of the Second Amendment as capturing their proposals' conception of the right.  A news article in Boston, reprinted in Philadelphia, described the proposed amendments for the Bill of Rights as containing "[e]very one of" the amendments "introduced to the convention of this commonwealth by . . . Samuel Adams."  *From the Bos. Indep. Chronicle, Phila. Indep. Gazetteer, Aug. 20, 1789*, at 2, *excerpted in* Stephen P. Halbrook, *A Right to Bear Arms: State and Federal Bills of Rights and*

*Constitutional Guarantees* 45 (1989).  In similar fashion, the Speaker of the Pennsylvania House expressed that the proposed amendments for the Bill of Rights "take[] in the principal Amendments which our Minority had so much at heart."  *Letter from Rep. Frederick A. Muhlenberg to Benjamin Rush* (Aug. 18, 1789), *reprinted in Creating the Bill of Rights: The Documentary Record from the First Federal Congress* 280 (Helen E. Veit et al. eds., 1991).

The views of the Pennsylvania dissenters are also "relevant" because, "to quote Justice Scalia, 'their writings, like those of other intelligent and informed people of the time, display how the text of the Constitution was originally understood.'"  Amul R. Thapar & Joe Masterman, *Fidelity and Construction*, 129 Yale L.J. 774, 797 (2020) (quoting Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 38 (Amy Gutmann ed., 1997)).  Plus, their faction "did not exactly 'lose,' in the same way in which a party who settles a case but gets important concessions does not 'lose' the case."  *Id.* (quoting Scalia, *supra*, at 38).  They were, in fact, "the other Founders."  *See generally* Saul Cornell, *The Other Founders: Anti-Federalism and the Dissenting Tradition in America, 1788–1828* (1999).

Judicial precedent in the period following the Founding confirms that the scope of the right to keep and bear arms was never understood to extend to dangerous individuals.  *See Heller*, 554 U.S. at 605 (explaining that "a critical tool of constitutional interpretation" is "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification" (emphasis added)).  For example, the Supreme Court of Tennessee, when upholding the state's ban on concealed carry of certain weapons, explained that the scope of the right was not so broad as to deprive the legislature of the power to pass laws "by which to preserve the public peace, and protect . . . [citizens'] lives from being endangered by desperadoes with concealed arms."  *Aymette v. State*, 21 Tenn. 154,

159 (1840).  The court further explained that the right did not divest the legislature of the power

to determine which citizens could carry weapons.  *Id.* at 160.

Courts across the early United States agreed.  "[T]he majority of the 19th-century courts

to consider the question held that prohibitions on carrying concealed weapons were lawful under

the Second Amendment or state analogues."  *Heller*, 554 U.S. at 626; *see also, e.g.*, *State v.*

*Mitchell*, 3 Blackf. 229, 229 (Ind. 1833); *State v. Reid*, 1 Ala. 612, 614, 621 (1840); *State v.*

*Jumel*, 13 La. Ann. 399, 399–400 (1858).  Not only that, several states amended their state

constitutions to make plain that the right to bear arms did not prevent the government from

passing restrictions on concealed carriage or other regulations.  *See* Eugene Volokh, *State*

*Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 192, 210–14 (2006)

(collecting amendments).  Relevant here, a rationale for banning *concealed* carry was that "only

the criminal and unvirtuous elements within society," *i.e.*, dangerous individuals, "carried

concealed weapons."  Patrick J. Charles, *The Faces of the Second Amendment Outside the Home,*

*Take Two: How We Got Here and Why it Matters*, 64 Clev. St. L. Rev. 373 407 (2016); *see also,*

*e.g.*, *Concealed Carry Weapons*, The Daily Picayune, July 25, 1840, at 2 ("Concealed weapons

are the insignia of the foot pad, the burglar and the mercenary bravo; and by the man

unconscious of wrong and fearless of danger they should never be worn."); *Concealed Weapons*,

Balt. Sun, Jan. 29, 1839, at 2 (advocating for a concealed carry ban because "if rash, dissolute,

and revengeful persons were prevented from carrying weapons, we should hear of but few

instances of their wreaking their malice").

Public commentary was in accord and reflected the notion that the Second Amendment

only covered non-dangerous people.  One legal scholar interpreted the Second Amendment to

mean that a "free citizen, if he demeans himself peaceably, is not to be disarmed."  John Holmes,

*The Statesman, or Principles of Legislation and Law* 186 (1840).  This scholarship further explained that "[t]hus are the rights of self defence guarded and secured to every one who entitles himself by his demeanor to the protection of his country."  *Id.*  Similarly, a state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms."  *State Convention of the Suffrage Men of Rhode Island*, Vt. Gazette, Dec. 13, 1842, at 1.  And a mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why should not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?" Joseph Gales, *Prevention of Crime*, *in Early Indiana Trials and Sketches* 466–67 (O.H. Smith ed., 1858).

Based on this historic conception of the right, the D.C. Circuit, courts, and scholars have concluded that dangerous individuals can be ineligible for gun ownership.  *E.g.*, *Medina v. Whitaker*, 913 F.3d 152, 159–60 (D.C. Cir. 2019); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 713 (2009).  In *Medina*, the D.C. Circuit surveyed historical sources and *Heller* to conclude that individuals (there, felons) could fall outside of the class of law-abiding, responsible individuals that the Second Amendment protects. 913 F.3d at 160.  The Court further held that the class of excluded persons is *broader* than just dangerous individuals.  *Id.* at 159–60.

*Bruen* did not cast doubt on this principle.  *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm . . . ."); *id.* at 2162 (Kavanaugh, J., concurring) (emphasizing that the *Bruen* decision does not disturb *Heller*'s discussion of "presumptively lawful" prohibitions on possession by certain classes of individuals); *id.* at 2189 (Breyer, J., dissenting) (same).  Because *Medina* reached its conclusions

based on history and *Heller*, it is still binding today.  *See United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) ("[D]istrict judges . . . are obligated to follow controlling circuit precedent until either we, sitting en banc, or the Supreme Court, overrule it."); *Bruen*, 142 S. Ct. at 2127 (stating that courts' historical analysis under their former two-step approach "is broadly consistent with *Heller*"); *Sitladeen*, 64 F.4th at 985 (holding that *Bruen* did not abrogate circuit precedent holding that unlawfully present non-citizens fell outside the scope of the Second Amendment).  Thus, both precedent and history instruct that the Second Amendment does not protect a right of dangerous individuals to keep or bear arms.  The laws challenged here comport with that understanding of the Second Amendment because the District's dangerousness standards are reasonably crafted to prohibit only violent and other dangerous people from possessing firearms and carrying them in public.  *See Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017) (explaining that "traditional limits" on the Second Amendment right "include, for instance, licensing requirements"); *id.* at 659 ("[L]egal regulations of possession or carrying that are 'longstanding' . . . reflect limits to the preexisting right protected by the Amendment." (quoting *Heller*, 554 U.S. at 626)); *Heller II*, 670 F.3d at 1255 (stating that the background check requirement for firearm registration is "akin to licensing the gun owner").

### 2. *Bruen* Confirms That Licensing Laws with Dangerousness Standards Are Consistent With the Second Amendment.

The *Bruen* Court confirmed that licensing systems like the District's are a constitutional means of ensuring that only those within the scope of the Second Amendment's protections can exercise the right to keep and bear arms.  The Court took care to note that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of "licensing regimes," which are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"  142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635); *see also Berron*

*v. Ill. Concealed Carry Licensing Rev. Bd.*, 825 F.3d 843, 847 (7th Cir. 2016) (explaining that "[l]icensure is how states determine whether" someone is a law-abiding, responsible citizen with a right to bear arms). The Court further noted that these regimes "often require applicants to undergo a background check." 142 S. Ct. at 2138 n.9. And Justice Kavanaugh, joined by the Chief Justice, separately stressed that "the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun." *Id.* at 2161 (Kavanaugh, J., concurring); *see also Abed v. United States*, 278 A.3d 114, 129 n.27 (D.C. 2022) (affirming a conviction for unlicensed carry and explaining that *Bruen* "'does not prohibit States from imposing licensing requirements' for concealed-carry of a handgun" (quoting *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring))).

What is more, the *Bruen* Court favorably passed on several states' licensing statutes with dangerousness or suitability standards like the District's. *See* 142 S. Ct. at 2123 n.1 (majority op.) (listing 43 states' licensing systems), 2138 n.9. For example, the Court characterized Connecticut's scheme as permissible because its "suitable person standard precludes permits only to those individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon." *Id.* at 2123 n.1 (internal quotation marks and citations omitted). The Court then cited, with approval, licensing laws of more than a dozen states—compiled in the following Table 2—that allow the government to deny a concealed carry license if the applicant poses a danger or otherwise is unsuitable. *Id.*

| Statute | Dangerousness or Suitability Standard |
|---------|----------------------------------------|
| Ala. Code § 13A-11-75(c)(11) | Licensing authority shall deny the application if the applicant "[c]aused or causes justifiable concern for public safety" |
| Colo. Rev. Stat. § 18-12-203(2) | "[I]f the sheriff has a reasonable belief that documented previous behavior by the applicant makes it likely the applicant will present a danger to self or others if the applicant receives a permit to carry a concealed handgun, the sheriff may deny the permit." |

| Del. Code tit. 11, § 1441(a)(2) | Licensing authority requires a certificate from five citizens stating that the applicant "bears a good reputation for peace and good order in the community" |
|---|---|
| Ill. Comp. Stat., ch. 430, § 66/10(a)(4) | "The Illinois State Police shall issue a license to carry a concealed firearm . . . to an applicant who . . . does not pose a danger to himself, herself, or others, or a threat to public safety as determined by the Concealed Carry Licensing Review Board." |
| Iowa Code § 724.8(3) | Licensing authority shall deny license if "[p]robable cause exists to believe . . . that the person is likely to use a weapon unlawfully or in such other manner as would endanger the person's self or others" |
| Me. Rev. Stat. § 2003(1), (4)(C) | Licensing authority shall grant license if the applicant has "demonstrated good moral character," which requires considering whether "the applicant has engaged in reckless or negligent conduct" |
| Mo. Rev. Stat. § 571.101(c)(7) | Licensing authority may deny a license if the applicant has "engaged in a pattern of behavior . . . that causes the sheriff to have a reasonable belief that the applicant presents a danger to himself or others" |
| Minn. Stat. § 624.714(6)(a)(3) | Licensing authority may "deny the application on the grounds that there exists a substantial likelihood that the applicant is a danger to self or the public" |
| Mont. Code Ann. § 45-8-321(2) | "The sheriff may deny an applicant a permit to carry a concealed weapon if the sheriff has reasonable cause to believe that the applicant . . . may be a threat to the peace and good order of the community . . . ." |
| N.D. Cent. Code § 62.1-04-03(1)(e) | "The bureau may deny approval for a license if the bureau has reasonable cause to believe that the applicant or licenseholder has been or is a danger to self or others . . . ." |
| 18 Pa. Cons. Stat. § 6109(e)(1)(i) | "A license shall not be issued to . . . [a]n individual whose character and reputation is such that the individual would be likely to act in a manner dangerous to public safety." |
| R.I. Gen. Laws § 11-47-11(a) | License shall be granted "if it appears that . . . [the applicant] is a suitable person to be so licensed" |
| S.D. Codified Laws § 23-7-7.1(4), (5) | License shall be granted if the applicant "[h]as no history of violence" and "[h]as not been found in the previous ten years to be a danger" |
| Utah Code § 53-5-704(3)(a)(ii) | Licensing authority may deny or revoke license "if it has reasonable cause to believe that the applicant or permit holder has been or is a danger to self or others" |
| Va. Code Ann. § 18.2-308.09(13) | Licensing authority may deny license to "[a]n individual who the court finds . . . is likely to use a weapon unlawfully or negligently to endanger others" |

These standards are similar—and in some cases near-identical—to the District's

"propensity for violence or instability" and "history of violent behavior" standards. 24 DCMR

§ 2335.1(d); D.C. Code § 7-2502.03(a)(6A).  By citing these statutes with approval, the Court endorsed the "practice of disqualifying categories of persons based on a shared characteristics indicative of unsuitability to possess firearms (that is, dangerousness)."  *United States v. Rowson*, No. 22-cr-310, 2023 WL 431037, at *22 n.23 (S.D.N.Y. Jan. 26, 2023).  Even if considered only dictum, the Court's lengthy discussion of states' varying licensing schemes "must be treated as authoritative."  *Illinois v. Ferriero*, 60 F.4th 704, 718–19 (D.C. Cir. 2023) (internal quotation marks omitted) (quoting *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003)).  As such, courts have upheld suitability standards like those cited in *Bruen*—and like the District's.  *Matter of M.U.'s Application for a Handgun Purchase Permit*, 291 A.3d 827, 848 (N.J. App. Div. 2023); *Or. Firearms Fed'n v. Kotek Or. All. for Gun Safety*, No. 22-cv-1815, 2023 WL 4541027, at *47 (D. Or. July 14, 2023), *appeal docketed*, Nos. 23-35478 & 23-35479 (9th Cir. July 17, 2023).

What *Bruen* specifically condemned were licensing laws requiring ordinary, law-abiding applicants to show a special need for a gun.  142 S. Ct. at 2138, 2156.  That was because the Second Amendment codifies the right of *all* ordinary, law-abiding citizens to carry a gun for self-defense, so governments cannot require those citizens "to demonstrate a special need for self-protection distinguishable from that of the general community."  *Id.* at 2156 (internal quotation marks and citation omitted).  But, the Court clarified, requiring someone to demonstrate a special need is different from requiring someone to demonstrate that he or she is an ordinary, law-abiding citizen.  *Id.* at 2138 & n.9.  The latter is constitutional.  *See In re D.L.*, 310 Cal. Rptr. 3d 562, 581 (Cal. Ct. App. 2023) (holding that *Bruen* only invalidates California's "good cause" requirement, not its "may issue" scheme more generally or "good moral character" condition), *review filed* (Cal. Aug. 14, 2023); *Dimino v. McGinty*, 177 N.Y.S.3d 788, 789 n.1 (N.Y. App.

Div. 2022) (similar).  So, although the Court noted that the District had a requirement of proper

cause, that provision "has been permanently enjoined since 2017," *Wrenn*, 864 F.3d at 668, and

does not affect the issue here:  dangerousness standards.  *See Bruen*, 142 S. Ct. at 2124.

Still, Plaintiffs claim that the District's dangerousness standards permit too much

subjectivity and discretion in comparison to the licensing schemes approved in *Bruen*.  2d Am.

Compl. ¶ 4.  *Bruen*, however, described schemes that require dangerousness or suitability

determinations as providing "narrow, objective, and definite" standards.  142 S. Ct. at 2138 n.9

(internal quotation marks omitted) (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151

(1969)); *see* Table 2, *supra*.  Because the District's system mirrors those schemes, it cannot be

deemed too subjective or discretionary under *Bruen*.  Indeed, a federal court recently upheld a

standard like the District's as "the kind of narrow, objective criteria endorsed as constitutional in

*Bruen*."  *Or. Firearms Fed'n*, 2023 WL 4541027, at *49; *see id.* at *46 (addressing standard

allowing for permit denials if there are "reasonable grounds for a permit agent to conclude that

the applicant has been or is reasonably likely to be a danger to self or others, or to the community

at large, as a result of the applicant's mental or psychological state or as demonstrated by the

applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence"

(internal quotation marks and citation omitted)).

Moreover, Plaintiffs are wrong to suggest that *any* discretion is unconstitutional.  After

all, *Bruen* specifically noted that three states (Connecticut, Rhode Island, and Delaware) had

"discretionary criteria" like a "suitability requirement," yet the Court indicated that such schemes

were permissible.  142 S. Ct. at 2123 n.1.  So "the *Bruen* Court acknowledged that some limited

amount of discretion does not render a firearm permitting regime unconstitutional."  *Or.

Firearms Fed'n*, 2023 WL 4541027, at *48.  Plaintiffs further err in characterizing any discretion

in the District's system as "unfettered and unreviewable." 2d Am. Compl. ¶ 259.  To the

contrary, the Chief's decisions are subject to evidentiary standards and judicial review, which

cabin discretion.  Background § I, *supra*; *Or. Firearms Fed'n*, 2023 WL 4541027, at *48.

Accordingly, several other courts have applied *Bruen*'s teachings on licensing to reject

challenges to similar suitability standards.  *E.g.*, *People v. Velez*, 302 Cal. Rptr. 3d 88, 104–05

(Cal. Ct. App. 2022); *Dykes v. Broomfield*, No. 11-cv-4454, 2022 WL 4227241, at *4 (N.D. Cal.

Sept. 13, 2022); *People v. Williams*, 175 N.Y.S.3d 673, 675–76 (N.Y. Sup. Ct. 2022).

 *Bruen* also drew from First Amendment jurisprudence, and the District's dangerousness

standards are similar to permitting standards held to comply with the First Amendment.  For

example, the Supreme Court has upheld regulations allowing park officials to deny public-

assembly permits if they determine that "the intended use would present an unreasonable danger

to the health or safety of park users," explaining that these laws set "narrowly drawn, reasonable

and definite standards to guide the licensor's determination."  *Thomas v. Chi. Park Dist.*, 534

U.S. 316, 324 (2002) (internal quotation marks and citations omitted).  The D.C. Circuit has also

upheld a "danger" standard in the context of First Amendment permits in public parks,

explaining that "some measure of discretion" is "not fatal" because "[a]n official tasked with

forecasting whether a proposed event might endanger the health or safety of the public must

necessarily make a predictive judgment based on the facts as she knows them and her expertise

in the field."  *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 517 (D.C. Cir. 2010).  Plaintiffs'

attempt to cast the District's dangerousness standards as too subjective cannot be squared with

this line of cases either, to the extent these cases are relevant.

 All said then, the Court should dismiss Plaintiffs' Second Amendment claims because

they are legally deficient in light of the scope of the Second Amendment and *Bruen* itself.  *See*

*Medina*, 913 F.3d at 154 (affirming dismissal of challenge to federal felon-in-possession ban because the meaning and history of the Second Amendment supported disarming felons); *Or. Firearms Fed'n*, 2023 WL 4541027, at *49 (rejecting challenge to suitability standards without proceeding to *Bruen* step two); *Cusick v. U.S. Dep't of Just.*, No. 22-cv-1611, 2023 WL 5353170, at *5 (D. Md. Aug. 18, 2023) (dismissing complaint at *Bruen* step one); *DeWilde v. United States*, No. 23-cv-3, 2023 WL 4884582, at *8 (D. Wyo. July 17, 2023) (same), *appeal docketed*, No. 23-8054 (10th Cir. Aug. 1, 2023).

**B.**    **Alternatively, the District's Dangerousness Standards Are Consistent With the Nation's Historical Tradition of Firearm Regulation.**

Because the District's dangerousness standards do not run afoul of the original understanding of the Second Amendment, the Court's inquiry can end there.  Yet, even examining the "Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126, the historical record confirms that a "legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety," *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting).  This necessarily includes people who "either belong[] to a dangerous category or bear[] individual markers of risk."  *Id.* at 451.  The District's dangerousness standards follow in this "comparable tradition of regulation" and are thus constitutional.  *Bruen*, 142 S. Ct. at 2132.  In addition, licensing standards are not unconstitutional simply because they developed post-Founding, as Plaintiffs assert.  Rather, the rise of licensing is readily explained by social, technological, and legal changes of the 19th century, and *Bruen* instructs that more modern firearm regulations are valid if they can be so explained.

32

1.    **The Historical Record Supports the Longstanding Public Acceptance of Laws Prohibiting Dangerous People From Possessing Firearms.**

Historical sources—from proposals for and discussion around the Second Amendment, *see* Argument § III.A, *supra*, to English laws, affray laws, surety laws, laws disarming "dangerous" classes, Reconstruction Era laws and discourse, and, finally, licensing laws—establish historical traditions that support the District's dangerousness standards today.  Two traditions emerge from history:  The government has always been able to prohibit or limit firearm possession and carrying by those it considers dangerous; and the government has always been able to use discretionary means and a variety of indicators to determine whether an individual is sufficiently dangerous.

a.    **English Law**

Since the earliest English recognition of the right to bear arms, the government has prohibited or limited the exercise of that right by dangerous individuals.  *See Heller*, 554 U.S. at 599 (relying on English law because the Second Amendment "codified a right 'inherited from our English ancestors'" (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897))).  The English Bill of Rights—the first codification of the right to bear arms and the Second Amendment's predecessor, *id.*—provided that Protestants "may have arms for their defence suitable to their conditions and as allowed by law," An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown, 1 W. & M., Sess. 2, c. 2, § 7 (1689).  This "ensured that Parliament could define which persons could be armed—'suitable to their Condition'—and under what circumstances those arms could be borne—'as allowed by Law.'"  Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 61 (2018); *see also United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023).  Blackstone similarly observed that English law preserved the right of the people of "having arms for their

33

defence suitable to their condition and degree, and such as are allowed by law." 2 William Blackstone, *Commentaries* *132 (St. George Tucker ed., 1803) (1767). Blackstone also described the right as "a public allowance under due restrictions." *Id.*

As part of its power to define suitability, the English government possessed and exercised the authority to preclude dangerous individuals from possessing and carrying firearms. "In England, officers of the Crown had the power to disarm anyone they judged to be 'dangerous to the Peace of the Kingdom.'" *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (quoting Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662)). This power was exercised "on a massive scale" in the years *following* the adoption of the English Bill of Rights codifying a right to bear arms. Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in McDonald v. City of Chicago*, 57 Clev. St. L. Rev. 351, 382 (2009). What is more, English officials used this power to disarm dangerous individuals through 1757—that is, during the Founders' lifetime and while the Founders were still English subjects. Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405–06 (2019). Accordingly, English law shows that, even with a codified right to bear arms, the government had the power and discretion to determine who was sufficiently safe and law-abiding to exercise that right.

### b.     Affray Laws

The "same concern" in England over dangerous persons' access to guns crossed the Atlantic and animated "early American restrictions on arms possession," like the proposals for the Second Amendment discussed earlier and other American laws. *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting). To start, with affray laws, early American governments barred possession by individuals who used guns in a dangerous manner, as judged by government

officials.  Statutes from the colonial era through the early 19th century allowed government officials to disarm individuals who bore arms "in a way that spreads 'fear' or 'terror' among the people."  *Bruen*, 142 S. Ct. at 2145.

For example, colonial Massachusetts authorized justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride, or go armed offensively . . . elsewhere by night or by day in fear or affray of their majesties' liege people." Act of Nov. 1, 1692, ch. 18, § 6, *reprinted in* 1 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 52–53 (1869).  Breaches of the peace often entailed a threat or use of force.  *Kanter*, 919 F.3d at 455–56 (Barrett, J., dissenting).  "[U]pon view of such justice or justices, confession of the party or other legal conviction of any such offence," the justice could, among other things, "seize and take away his armour or weapons."  Act of Nov. 1, 1692, ch. 18, § 6.  This law remained in place through the Revolution and ratification of the Constitution, until its forfeiture provision was modified to a surety law (discussed further below). 1795 Mass. Laws 436, ch. 2.  New Hampshire, Virginia, and North Carolina all had similar laws throughout the Founding period and beyond.  *Acts and Laws of His Majesty's Province of New Hampshire*, *reprinted in New England; with Sundry Acts of Parliament* 2 (Daniel Fowle ed., 1761); 1786 Va. Laws 33, ch. 21; 1874 Va. Acts ch. 14, § 16 (repealing arms forfeiture provision); Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina* 60–61 (1792).

These affray laws indicate that "colonial-era legislatures still placed restrictions on uses of weapons that posed a present danger to others."  *State v. Weber*, 168 N.E.3d 468, 491 (Ohio 2020) (DeWine, J., concurring in judgment).  To be sure, in *Bruen*, the Court reasoned that these laws, the Statute of Northampton and its successors, did not provide historical support for New

York's broad prohibition on public carry because they were focused on dangerous uses.  142 S.

Ct. at 2142.  The laws nonetheless support the different notion that the government can prohibit

uses of weapons by dangerous people, as then-Judge Barrett (who joined *Bruen*) explained.

*Kanter*, 919 F.3d at 456–57 (Barrett, J., dissenting).

### c.  <u>Surety Laws</u>

Affray laws evolved into surety laws, which allowed ordinary citizens to ask a court to

take action—including orders burdening gun possession—against individuals who posed a risk

of harm.  These laws originated at English common law, 5 Blackstone, *supra*, at *251, but

carried over to the early United States, as nine states—plus the District—codified the surety

process in the early and mid-19th century, *Bruen*, 142 S. Ct. at 2148.  Under these laws, any

citizen could complain to a justice of the peace that he or she had "reasonable cause to fear an

injury" from another person, and the justice could require that person to "find sureties for

keeping the peace."  *Id.* (internal quotation marks omitted) (quoting Mass. Rev. Stat., ch. 134, §

16 (1836)).  These laws did not require criminal convictions—the justice could order sureties

based on his discretion because surety laws were "intended merely for prevention, without any

crime actually committed by the party, but arising only from a probable suspicion."  5

Blackstone, *supra*, at *252; *see also Rowson*, 2023 WL 431037, at *22; *United States v. Jackson*,

No. 22-cr-141, 2023 WL 2499856, at *18 (D. Md. Mar. 13, 2023).  The surety's terms were at

"the discretion of such justice" but would usually require the accused to find a community

member to post bond on the accused's behalf; then, if he or she committed an act of violence or

breached the peace, the bond would be forfeited and he or she would be imprisoned.  Marshall,

*supra*, at 718 (internal quotation marks omitted) (quoting William Hawkins, 1 *A Treatise of the*

*Pleas of the Crown: Or, a System of the Principal Matters Relating to that Subject, Digested*

*Under Their Proper Heads* ch. 60, § 15 (Leach ed., 1788) (1716)).

Importantly, surety laws could burden gun possession in several ways.  First, a prominent source on sureties, *Burn's Justice*, provided that a subject could forfeit sureties if he or she possessed "weapons."  *The Conductor Generalis: Or, the Office, Duty and Authority of Justices of the Peace* 337 (1801) [hereinafter "*Conductor Generalis*"]; *see* Mathew Carey, *Preface to Conductor Generalis* ("The present work was compiled from Burn's Justice . . . ."); *Bradstreet v. Furgeson*, 17 Wend. 181, 187 (N.Y. Sup. Ct. 1837) ("Most of the law upon the subject of '*surety for the peace*,' and for '*good behavior*,' will be found in *Burns's Justice*, a book of the highest authority in these matters . . . .").  In other words, some sureties could be forfeited if an accused person possessed weapons while under bond, so these laws "expressly limited some forms of weapons possession."  Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245, 295–96 (2021).  Second, a person acting as a surety could require that the subject, in exchange for the surety, forfeit his or her guns or pledge not to use them.  *Id.* at 295; *see also* Marshall, *supra*, at 718–19.  Indeed, surety laws acted as a "combination of both formal and informal sanction," in which community members could severely restrict a subject's behavior, including gun use and possession.  Donald Braman, *Punishment and Accountability: Understanding and Reforming Criminal Sanctions in America*, 53 UCLA L. Rev. 1143, 1169, n.93 (2006); *see also* Barondes, *supra*, at 295.  Third, the justice could, in his discretion, impose restrictions on the use of guns. Barondes, *supra*, at 295–96; Marshall, *supra*, at 718; Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U.L. Rev. 139, 168 (2021).  Finally, if no sureties could be secured, the person could be imprisoned, 5 Blackstone, *supra*, at *255, which necessarily "implies first disarming," *Tyler v.*

*Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 705 (6th Cir. 2016) (en banc) (Batchelder, J., concurring).

Surety laws thus served as "preventive justice," 5 Blackstone, *supra*, at *251, by "depriv[ing]" a dangerous person "of any power to do future mischief," *id.* at *255. As a surety law in place in the federal Northwest Territory stated, surety laws were aimed at "dangerous and disorderly persons." *Laws of the Territory of the United States North West of the River Ohio* 10 (Edmund Freeman ed., 1798).

### d.     Laws Disarming "Dangerous" Classes of People

Besides laws targeting dangerous individuals, American governments in the Founding Era imposed complete prohibitions on gun ownership by large classes of people the state found *per se* dangerous. *See Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). For example, "several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives* (*NRA*), 700 F.3d 185, 200 (5th Cir. 2012); *see, e.g.*, 1777 N.J. Laws 90, ch. 40, § 20 (empowering the government "to deprive and take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements, and Ammunition"). "American legislators had determined that permitting these persons to keep and bear arms posed a potential danger." *NRA*, 700 F.3d at 200. Indeed, such disarmament laws were recommended by the Continental Congress. 4 *Journals of the Continental Congress 1774–1789* 205 (1906). Yet, such laws were not seen as incompatible with a right to keep and bear arms. For example, Pennsylvania enacted such a disarmament law, which was "particularly notable as Pennsylvania's constitution at the time strongly protected an individual right to bear arms." Joseph Blocher & Caitlan Carberry, *Historical Gun Laws*

*Targeting "Dangerous" Groups and Outsiders* 9 (June 4, 2023), Duke L. Sch. Pub. L. & Legal Theory Series No. 2020-80, https://tinyurl.com/m5r2pefs.

Closely related to these laws disarming dangerous and disaffected individuals was disarmament legislation enacted after Shay's Rebellion.  In 1786, farmers mounted an armed rebellion in Massachusetts.  Charles, *Armed*, *supra*, at 86.  Once the rebellion was quelled, the Massachusetts legislature passed a law allowing the governor to grant pardons under the conditions that offenders "deliver their arms to, and take and subscribe the oath of allegiance." 1787 Mass. Acts 555, ch. VI.  The legislation was noteworthy because Massachusetts' constitution protected a right to keep and bear arms, yet "there was no vocal objection to the Shays rebels' disarmament" of individuals who had demonstrated their danger to the state. Charles, *Armed*, *supra*, at 88.

In addition, Founding Era governments disarmed Native Americans, law-abiding enslaved persons, free Black people, and religious minorities.  *Jackson*, 69 F.4th at 502–03; *NRA*, 700 F.3d at 200.  These status-based disarmament laws reflect then-contemporary judgments that certain groups were dangerous and should be disarmed.  *NRA*, 700 F.3d at 200; *Koons v. Platkin*, No. 22-cv-7464, 2023 WL 3478604, at *21–22 (D.N.J. May 16, 2023), *appeal docketed*, No. 23-2043 (3d Cir. June 9, 2023); *see Waters v. State*, 1 Gill 302, 309 (Md. 1843) (stating that, because free Black persons were treated as a "dangerous population," "laws have been passed to . . . make it unlawful for them to bear arms").  For other classes that Founding Era governments considered dangerous, there were greater restrictions on liberty than disarmament. The mentally ill were put in prison.  Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial* Ipse Dixit, 60 Hastings L.J. 1371, 1377 (2009).  And felons were put to death.  *Medina*, 913 F.3d at 158.

Of course, all these status-based prohibitions would be unconstitutional today under other constitutional provisions—not to mention abhorrent. *See Kanter*, 919 F.3d at 458 n.7 (Barrett, J., dissenting). But these laws nonetheless show that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Id.* at 458; *see also Jackson*, 69 F.4th at 503.

### e. Militia Laws

Concerns over arming dangerous individuals also played a role in Founding Era statutes governing the militia, which prohibited possession by those who demonstrated unfitness to bear arms. Mustering laws authorized officers to determine who in their militia could bear arms. *See, e.g.*, 1779 N.Y. Laws, ch. 55 ("That if any dispute shall arise with respect to the age or ability to bear arms of any person, it shall be determined by the colonel or commanding officer of the regiment whose determination in the case shall be final."). Laws likewise provided that if a militia member appeared drunk, used abusive language, quarreled, or instigated argument, "he shall be disarmed . . . until the company is dismissed." 1806 N.J. Laws 536, 563; *see also* 1822 Penn. Laws 316, 340. Again, the historical record shows legislatures authorizing government officials to use their discretion to prohibit dangerous or unstable individuals from possessing or using arms.

General Washington himself advocated for the power to disarm those militia members he found unsuitable to bear arms. In a letter to the Pennsylvania Council of Safety (which had authority over Pennsylvania's militia during the Revolutionary War), the General expressed concerns over the attitudes and conduct of Pennsylvania militia men and "beg[ged] leave to submit to your Consideration whether such people are to be intrusted [*sic*] with Arms in their Hands?" *From George Washington to the Pennsylvania Council of Safety*, Founders Online, Nat'l Archives (Dec. 15, 1775), https://tinyurl.com/much7kd3. He wrote that "in my Opinion we

ought not to hesitate a Moment in taking their Arms," and so he asked the Council to "empower" him to disarm militia members. *Id.* Thus, even the Father of the Nation harbored a belief that an individual's right to bear arms depended on whether he could be trusted with such weapons.

### f.      Reconstruction Laws and Commentary

"This Nation's tradition of disarming dangerous individuals or those who would endanger the public continued during Reconstruction." *Koons*, 2023 WL 3478604, at *23; *see Bruen*, 142 S. Ct. at 2150 (describing "a short review of the public discourse surrounding Reconstruction" as "useful"); *Heller*, 554 U.S. at 614 (calling Reconstruction sources "instructive"). Much of this discussion concerned whether newly freed Black people could exercise the right to keep and bear arms. *Heller*, 554 U.S. at 614–15. A joint congressional report explained that the right should extend to freedmen because they "have shown by their peaceful and orderly conduct that they can safely be trusted with fire-arms." *Id.* at 615 (quoting Joint Comm. on Reconstruction, H.R. Rep. No. 30, 39th Cong., 1st Sess., pt. 2, p. 229 (1866) (Proposed Circular of Brigadier General R. Saxton)). Similarly conditioned, an 1866 decree by a Union general preempting South Carolina's prohibition on gun possession by Black people declared: "The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed . . . . And no disorderly person, vagrant, or disturber of the peace shall be allowed to bear arms." *Bruen*, 142 S. Ct. at 2152 (internal quotation marks omitted) (quoting Cong. Globe, 39th Cong., 1st Sess., at 908–09). Still further, circulars and newspapers advised freedmen who sought to exercise their Second Amendment right that "[a]ny person, white or black, may be disarmed if convicted of making an improper or dangerous use of weapons." *Id.* (quoting *The Loyal Georgian*, Feb. 3, 1866, p. 3, col. 4). Thus, in the era when the Second Amendment was extended to a new segment of the American population, most people

understood that the right did not extend to dangerous persons as determined by government officials.

### g.     Licensing Laws and Suitability Standards

Starting in the mid-19th century, governments turned to licensing schemes and suitability standards as the means of keeping guns away from dangerous individuals.  Charles, *Armed*, *supra*, at 156, 407–408 n.219; Saul Cornell, *Early American Gun Regulation and the Second Amendment: A Closer Look at the Evidence*, 25 Law & Hist. Rev. 197, 199 (2007).  Such laws are thus closer to the Founding than they are to the present.  To further put things in perspective, the sons of Founding Fathers Alexander Hamilton and Aaron Burr lived in New York when New York jurisdictions began adopting licensing laws.  *See Obituary: Philip Hamilton*, N.Y. Herald, July 10, 1884, at 10; *Obituary: Aaron C. Burr*, N.Y. Times, July 8, 1882, at 5; note 8, *infra* (listing licensing ordinances for New York City and Brooklyn).

The shift to licensing as the primary method for regulating unsuitable individuals' access to guns is explained by several historical factors.  Licensing gained prominence as a few things grew:  population, cities, local government, and crime; while one thing shrank:  the size of firearms.  The result was that the carriage of easily fired and concealed firearms presented a greater risk to Americans' safety as the 19th century wore on, thus prompting lawmakers to turn to licensing schemes to restrict carriage, especially by dangerous individuals.

Over the course of the 19th century, the United States' population exploded, from 4 million in 1790, to 31 million in 1860, to 76 million in 1900.  U.S. Census Bureau, *Decennial Census by Decade*, https://tinyurl.com/2byh2ee9 (select 1790, 1860, and 1900).  The population not only grew but became increasingly concentrated in urban areas.  Alexander von Hoffman & John Felkner, *The Historical Origins and Causes of Urban Decentralization in the United States* 6–7, Joint Ctr. for Housing Studies, Harvard Univ. (Jan. 2002), https://tinyurl.com/bdzzn4kv.  As

cities swelled, they developed municipal governments and administrative apparatuses to provide governance.  *See generally Bringing the State Back In* (Peter B. Evans, Dietrich Rueschmeyer, & Theda Skocpol eds., 1985); Richard Franklin Bensel, *Yankee Leviathan: The Origins of Central State Authority in America, 1859–1877* (1991); Stephen Skowronek, *Building a New American State: The Expansion of National Administrative Capacities, 1877–1920* (1982).  While the early United States, with its small and rural population, primarily relied on common law and community enforcement mechanisms (*e.g.*, surety laws) for law and order, the 19th century United States needed more statutory law, carried out by an administrative state and police force. Patrick J. Charles, *The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It*, 71 Clev. State L. Rev. 623, 652 (2023); *see Bruen*, 142 S. Ct. at 2161 (Alito, J., concurring) ("In 1791, . . . there were no police departments, and many families lived alone on isolated farms or on the frontiers.").

As cities grew, crime rose—particularly, homicides, and more particularly, homicides committed with firearms.  Randolph Roth, *American Homicide* 297–300 (2009); Randolph Roth, *Why Guns Aren't the Problem: The Relationship Between Guns and Homicide*, *in American History*, *in Firearms and the Common Law: History and Memory* 116–17 (Jennifer Tucker, Barton C. Hacker, & Margaret Vining eds., 2019).  In this same period, firearms (especially revolvers) advanced technologically such that they became more available, more concealable, more usable, and more transportable—a deadly combination.  Roth, *Why Guns*, *supra*, at 124–26; *see also Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, No. 22-cv-951, 2023 WL 2655150, at *11 (D. Del. Mar. 27, 2023).  Thus, over the 19th century, Americans faced an increasing problem of living more closely with more strangers, who could easily conceal and fire a gun on them.  Joseph Blocher & Eric Ruben, *Originalism-by-Analogy*

*and Second Amendment Adjudication* 51–55 (May 20, 2023), Duke L. Sch. Pub. L. & Legal Theory Series No. 2023-26, https://ssrn.com/abstract=4408228.

In response, the public clamored for carriage restrictions and licensing schemes.  Charles, *Armed*, *supra*, at 156–63.  To sample a few prominent voices, *The New York Times* opined—just after the Fourteenth Amendment was adopted—that "pistols cannot safely be committed to every irresponsible hand."  *The Sale of Deadly Weapons*, N.Y. Times, May 19, 1873, at 4.  To ensure that guns "fall as nearly as possible only into proper hands," the *Times* implored, gun purchasers must receive "a permit from the police authorities."  *Id.*  On the Nation's other coast, a San Francisco newspaper in 1869 similarly suggested a "licensing scheme that 'granted to the County or District judges' the power to grant annual permits to 'persons to carry deadly weapons on proof of good character,' and the power to 'revoke the license whenever it should appear that the privilege granted was misused or abused.'"  Charles, *Armed*, *supra*, at 409 n.220 (quoting *Concealed Weapons—Should the Present Law Be Modified*, Daily Evening Bulletin, Dec. 29, 1869, at 2).  Likewise, in a seminal 1875 book defending the use of the pistol for self-defense, the author "urge[d] that no man has a right to carry such a terribly efficient instrument of destruction unless he is perfectly assured of his power of self control, and of his ability to use the weapon without incurring the danger of injuring friends and innocent persons."  *Id.* at 162 (internal quotation marks omitted) (quoting *The Pistol as a Weapon of Defence: In the House and on the Road* 9 (1875)).  These are just a few examples of the "[b]road public support for armed carriage laws" that included licensing laws with suitability standards.  *Id.* at 162.  And this national conversation around licensing schemes and suitability standards reflects that the American public thought of such policies as the preferred way to protect the right of law-abiding, responsible citizens to bear arms.  *Id.* at 156–63.

Heeding the call, lawmakers responded with either bans on concealed carry or, as a more limited measure, licensing schemes.  Charles, *Fugazi*, *supra*, at 652–53 & nn. 209–10, 660–65; Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 63–64 (2017).  Cities were the first to adopt licensing schemes, as dozens of cities across the Nation passed ordinances requiring a permit to carry firearms, many subject to a suitability determination by a government official.  Charles, *Fugazi*, *supra*, at 652–53 & nn. 209–10, 660–65.[8]  These ordinances were enacted by some of the largest cities, like New York and San Francisco, thus placing a significant portion of the American population under licensing schemes.  *See id.*  The states picked up the trend in the early 20th century, enacting their own licensing schemes with suitability standards that mirror those in use today.  *E.g.*, 1917 Cal. Sess. Laws 221–25, § 6 ("good moral character"); 1923 N.H. Laws 138, § 6 ("suitable person to be licensed"); 1925 Mich. Pub. Acts 473, 473–74, No. 313, §§ 5–6 (same).

The District's own licensing law was first enacted in the 19th century, after Congress passed and the President signed legislation requiring people to obtain a permit to carry "any

---

[8]      *See also, e.g.*, Jersey City, N.J., Rev. Ordinances ch. 21 (1873) ("[N]or shall any such [carry] permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control."), *reprinted in Revised Ordinances of Jersey City* 121 (Howard C. Griffiths ed., 1899); Order No. 1,226: Prohibiting the Carrying of Concealed Deadly Weapons (1875), *reprinted in San Francisco Municipal Reports* 886 (1875) (San Francisco ordinance allowing carry with a permit from the police to "any peaceable person"); Ordinance No. 84: Prohibiting the Carrying of Concealed Deadly Weapons (1876), *reprinted in Charter and Ordinances of the City of Sacramento* 173 (R.M. Clarken, ed., 1896) (same); Pistols—Carrying Of:  Ordinance to Regulate the Carrying of Pistols (1880), *reprinted in The Brooklyn Daily Eagle*, Oct. 26, 1880, at 1 (Brooklyn ordinance allowing carry with a permit from the police to a "proper and law abiding person"); Article XXVII: Carrying of Pistols, *reprinted in Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881*, 214–16 (Elliott F. Shepard & Ebenezer B. Shafer eds., 1881) (similar New York ordinance).  Because records of local ordinances are often "lost to time," historians can infer that the already substantial number of licensing ordinances available represents "only a tiny fragment of the whole."  Charles, *Fugazi*, *supra*, at 664.

deadly or dangerous weapons," such as "pistols," in the District.  Act of July 13, 1892, Pub. L. No. 52-159, § 2, 27 Stat. 116, 116–17.  The legislation gave "judge[s] of the police court" power "to grant such a permit . . . upon satisfactory proof to him of the necessity for the granting thereof."  *Id.*  The licensing scheme introduced an explicit suitability requirement a few decades later.  Act of July 8, 1932, § 6, 47 Stat. 650, 651.  That requirement has endured, in some form, for nearly 100 years as a cornerstone of the District's effort to keep its community safe.  The District is not alone.  After their early adoption in the 19th century, licensing laws gained popularity such that, today, most states require a license for concealed carry and allow government officials to deny a license to "people who pose a serious risk to the community."  Everytown for Gun Safety, *Permitless Carry* (last updated Mar. 23, 2022), https://tinyurl.com/vtubskv2.

### 2.   The District's Dangerousness Standards Are Relevantly Similar to Historical Laws Disarming Dangerous Individuals.

Laws from before, during, and just after the Founding restricting dangerous individuals' access to guns are "relevantly similar" to the District's dangerousness standards challenged by Plaintiffs.  *Bruen*, 142 S. Ct. at 2132 (internal quotation marks omitted) (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).  The *Bruen* Court explained that two "metrics" for similarity are "why" and "how" "the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.*  The historical sources and the District's laws share the same "why" and "how."

On the "why," all the laws and sources discussed above were aimed at regulating the possession and carrying of firearms by individuals who posed a potential danger to others.  *See Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) ("The concern common to all three [proposals for the Second Amendment] . . . is about threatened violence and the risk of public

injury . . . . This is the same concern that animated English and early American restrictions on arms possession."). That is precisely what the District's dangerousness standards aim to do. *See Koons*, 2023 WL 3478604, at *23 ("The historical laws and [New Jersey's suitability standards] all burden arms bearers to protect the public from a person who will misuse a firearm.").

And dangerous standards achieve their aim, as evidence shows. Licensing systems with standards like the District's saw 11% lower homicide rates compared to other states. Michael Siegel & Claire Boine, *What Are the Most Effective Policies in Reducing Gun Homicides?* 9, Rockefeller Inst. of Gov't (Mar. 29, 2019), https://tinyurl.com/ydxcb4s9. Conversely, states where law enforcement cannot assess an applicant's characteristics "were significantly associated with 6.5% higher total homicide rates, 8.6% higher firearm-related homicide rates, and 10.6% higher handgun-specific homicide rates." Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 Am. J. of Pub. Health 1923 (2017), https://tinyurl.com/2p6neksf. Likewise, states that loosened licensing standards saw "increases in violent crime of 13–15 percent after ten years." John J. Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis* 3, Nat'l Bureau of Econ. Rsch. (Nov. 2018), https://tinyurl.com/26tckw92.

On the "how," the historical laws relied on the legislature's or government officials' assessment of a person's previous conduct to determine who was dangerous. The District's laws are at least comparable to, if not less burdensome than, those historical laws. *See Bruen*, 142 S. Ct. at 2133 (describing as a "central" consideration "whether modern and historical regulations impose a comparable burden"). Many of the historical sources did not define their conception of dangerousness (*e.g.*, Pennsylvania and Massachusetts proposals) or used inexact proxies for

dangerousness (*e.g.*, status-based disarmament laws).  Unlike these amorphous, categorical approaches, the District's scheme uses textually cabined standards for dangerousness along with careful procedures to make individualized, evidence-based determinations.  *See* 24 DCMR § 2335.1(d) (providing that an individual will be denied a concealed carry license if he has "exhibited a propensity for violence or instability that may reasonably render [his] possession of a concealed pistol a danger to [himself] or another."); D.C. Code § 7-2502.03(a)(6A) (providing that an individual will be denied a registration certificate if "[w]ithin the 5 years immediately preceding the application, has [ ] had a history of violent behavior"); *White v. Ill. State Police*, 15 F.4th 801, 813 (7th Cir. 2021) (concluding that Illinois's similar "individualized approach to concealed carry licenses reflects better, not worse, tailoring than the blanket prohibitions we have previously upheld").  If the government historically could preclude possession by dangerous individuals based on status-based judgments, the District should be able to preclude possession after making an individualized assessment of dangerousness.  *See Jackson*, 69 F.4th at 504 ("[H]istory demonstrates that there is no requirement for an individualized determination of dangerousness . . . ."); *Medina*, 913 F.3d at 159–60 (same).

Nonetheless, Plaintiffs make two main arguments why the District's dangerousness standards are not sufficiently analogous to historical firearm restrictions.  First, Plaintiffs argue that the challenged laws lack a historical analogue because no licensing laws existed at the Founding.  2d Am. Compl. ¶¶ 8, 100.  Plaintiffs misunderstand the inquiry.  The *Bruen* Court emphasized that current laws only need a "historical *analogue*, not a historical *twin*."  142 S. Ct. at 2133.  Even "a distinctly modern firearm regulation," "unimaginable at the founding," could be constitutional if it is "relevantly similar" to historical laws.  *Id.* at 2132 (internal quotation marks and citation omitted).  As then-Judge Barrett explained, contemporary restrictions on the

use of guns by dangerous individuals, like a ban on gun possession by those convicted of dangerous crimes, "are 'lineal descendants' of historical laws banning dangerous people from possessing guns." *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting) (quoting Tr. of Oral Arg. 77, *Heller*, 554 U.S. 570 (No. 07290)). As such, they "need not mirror limits that were on the books in 1791." *Id.* (internal quotation marks omitted) (quoting *United States v. Skoien*, 614 F.3d 638, 634 (7th Cir. 2010) (en banc)).

Plaintiffs' demand, then, for a mirror statute from the Founding applies the wrong test. Instead, if history established that the government could categorically disarm a class of people, any modern prohibition on gun ownership by members of that class should be constitutional, even if the formulation of such a law is new. In other words, "[t]he relevant inquiry is whether a particular *type* of regulation has been a 'longstanding' exception to the right to bear arms," not whether the particular regulation *itself* is longstanding. *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019). One longstanding type of firearm regulation, according to a chorus of courts and jurists, is a law aimed at disarming dangerous individuals.[9] Licensing suitability standards are such a law, so courts have upheld them. *Koons*, 2023 WL 3478604, at *24; *M.U.*, 291 A.3d at 849–54. Indeed, *no* court, to the District's knowledge, has invalidated suitability standards since *Bruen* was decided more than a year ago. Notably, the only court that preliminarily enjoined a licensing scheme post-*Bruen* had that decision quickly stayed by the Second Circuit, and the Supreme Court denied a request to lift the stay—without any noted dissents. *Antonyuk v.*

---

[9]   *E.g.*, *Rowson*, 2023 WL 431037, at *21; *United States v. Harper*, No. 21-cr-4085, 2022 WL 4595060, at *2, *4 (N.D. Iowa Sept. 30, 2022) (collecting post-*Bruen* cases); *United States v. Williams*, 24 F.4th 1209, 1212 (8th Cir. 2022) (Stras, J., concurring in part and concurring in the judgment); *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting); *Weber*, 168 N.E.3d at 490 (DeWine, J., concurring in the judgment only); *Binderup v. Att'y Gen.*, 836 F.3d 336, 367 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments).

*Hochul*, No. 22-cv-986, 2022 WL 16744700, at *42 (N.D.N.Y. Nov. 7, 2022), *stay granted*, No. 22-2908, 2022 WL 18228317 (2d Cir. Dec. 7, 2022), *application to vacate stay denied sub nom. Antonyuk v. Nigrelli*, 143 S. Ct. 481 (2023).

Relatedly, this Court directed the Parties to address "whether the challenged regulations are more akin to 'common-law offenses' (including that of affray), 'statutory prohibitions,' and/or 'surety statutes.'" Mar. 10, 2023 Min. Order (quoting *Bruen*, 142 S. Ct. at 2146). To be clear, *Bruen* does not require a one-to-one comparison of a historical law to a modern law. *See Bruen*, 142 S. Ct. 2132 (explaining that the historical inquiry "will *often* involve reasoning by analogy" (emphasis added)). The bottom-line question is whether the challenged law is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. *Bruen* thus instructs courts to examine the historical record as a whole, determine what relevant traditions it establishes, and then decide whether the challenged regulation follows in that tradition. Here, the historical record establishes that governments can disarm dangerous individuals, and the District's dangerousness standards follow in that tradition. But to directly answer the Court's question: Of the Founding Era laws, the District's dangerousness standards are most akin to surety laws because both (1) seek to prevent violence or harm, (2) are aimed at dangerous individuals, (3) rely on an individualized determination of dangerousness by a government official, (4) use a prescribed process, and (5) restrict a person's access to arms. And of all historical laws, the dangerousness standards are most akin to licensing laws gaining prominence beginning in the mid-19th century—indeed, they are near-identical.

To be sure, the *Bruen* Court found that surety laws did not provide historical support for New York's requirement that individuals establish a special need to carry firearms for self-defense because surety laws did not amount to a "ban on public carry" for all individuals absent

a good reason.  142 S. Ct. at 2148 (emphasis omitted).  That determination is inapposite to the separate and distinct question of whether surety laws provide historical support for restrictions on dangerous individuals possessing or carrying firearms.  *E.g.*, *Rowson*, 2023 WL 431037, at *23–24.  In fact, in distinguishing New York's law from surety laws, the *Bruen* Court pointed to ways in which surety laws mirror the dangerousness standards challenged here:  (1) "they typically targeted only those threatening to do harm," 142 S. Ct. at 2148; (2) the "right to public carry . . . could be burdened only if another person could make out a specific showing of 'reasonable cause to fear an injury,'" *id.* (quoting Mass. Rev. Stat., ch. 134, § 16); and (3) surety laws were used "for prevention," *id.* at 2149 (quoting Blackstone, *supra*, at *249).

Second, Plaintiffs allege that the dangerousness standards are too dissimilar to historical restrictions because they allow licensing officials to consider violent or dangerous conduct that does not result in a conviction.  2d Am. Compl. ¶ 100.  Assuming a Plaintiff has standing to assert this argument, *see* Argument § II, *supra*, it suffers from several flaws.  To start, it is demonstrably false that historically the government could only disarm individuals if they had been convicted of a crime.  *None* of the historical disarmament laws discussed above, Argument § III.B, *supra*, required convictions.  A closer look at a few key sources reveals that the concern was dangerousness, rather than criminality alone, and governments used evidence or proxies other than convictions to determine if someone was dangerous.

Consider, for example, how the Founders conceived of the right to bear arms.  The Pennsylvania proposal guaranteed the right "unless for crimes committed, *or* real danger of public injury from individuals."  *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (emphasis added) (internal quotation marks and citation omitted).  The use of "or" in this influential source indicates that "crimes committed" were not the only factors that could disqualify someone from

keeping and bearing arms.  *See Medina*, 913 F.3d at 158–59.  Rather, anyone who posed "real danger" was likewise unsuitable.  *See id.*  Similarly, the Massachusetts proposal "limited the right to 'peaceable citizens.'"  *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (citation omitted).  "Peaceable" referred to a disposition that did not rise and fall with prior convictions.  *See id.*

Or consider the status-based laws.  These laws did not disarm people based on convictions or even "individualized determination[s] of dangerousness"; rather, "[l]egislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed."  *Jackson*, 69 F.4th at 504.  A conviction requirement, then, is ahistorical when considered against the various categorical disarmament laws present at the Founding that "disarmed persons on bases other than a felony (or other) conviction."  *Rowson*, 2023 WL 431037, at *21.

Even when governments historically relied on individualized determinations of dangerousness, they did not rely solely on convictions.  The affray laws allowed a justice of the peace to disarm a person "upon view of such justice or justices, confession of the party *or* other legal conviction."  Act of Nov. 1, 1692, ch. 18, § 6 (emphasis added).  These laws allowed disarmament based on government officials' "views" or a person's "confession," and a "legal conviction" was only one mechanism for determining dangerousness.  *Id.*  Similarly, surety laws operated to disarm individuals based on a justice's discretion and were triggered by a fellow community member's accusation alone.  Mass. Rev. Stat., ch. 134, § 16 (1836).  Indeed, Plaintiffs' argument cannot be squared with Blackstone, who wrote authoritatively that surety laws applied "without any crime actually committed by the party, but arising only from a probable suspicion."  5 Blackstone, *supra*, at *252.  Based on these sources, courts applying *Bruen* have rejected the notion that historically a conviction was a prerequisite to disarming

dangerous individuals.  *E.g.*, *Rowson*, 2023 WL 431037, at *22; *Jackson*, 2023 WL 2499856, at

*18; *United States v. Bartucci*, No. 19-cr-244, 2023 WL 2189530, at *8 (E.D. Cal. Feb. 23,

2023); *see Koons*, 2023 WL 3478604, at *29 ("[H]istorical disarmament laws appear both

reputation- and opinion-based.").

    History aside, *Heller* and *Bruen* belie Plaintiffs' argument that a determination of

dangerousness can only be based on conduct resulting in a criminal conviction.  *Heller* explained

that laws disarming "felons and the mentally ill" were part of a "*[non]-exhaustive*" list of

"presumptively lawful" restrictions.  554 U.S. at 626–27 & n.26 (emphasis added).  Because the

list is non-exhaustive, the Court indicated that a felony conviction or mental illness are not the

exclusive criteria by which an individual would be considered outside of the class of "law-

abiding, responsible" citizens the Second Amendment protects.  *Jackson*, 2023 WL 2499856, at

*6.

    Moreover, while Plaintiffs take issue with the Chief's consideration of arrest reports,

among other indicia of dangerousness, even an individual's physical liberty can be restricted

under a probable cause standard.  Under the Fourth Amendment, arrests require probable cause.

U.S. amend. IV; *McGovern v. Brown*, 891 F.3d 402, 405 (D.C. Cir. 2018).  An arrest is, of

course, a restraint on someone's physical liberty.  *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021).

And "[t]he freedom of a person to conduct his life physically unconfined by the government is

among the most fundamental of constitutional liberty interests."  *Hurd v. District of Columbia*,

864 F.3d 671, 683 (D.C. Cir. 2017).  If probable cause has historically supported deprivation of

one of the most fundamental constitutional liberties, then it should also support limitations on the

right to keep and bear arms.  *See Jackson*, 2023 WL 2499856, at *7–8 (upholding federal ban on

gun possession while under indictment because "probable cause that a person committed a serious crime is sufficient to trigger a range of liberty restrictions").

To argue otherwise, the Second Amended Complaint cites two non-binding cases, but Plaintiffs' reliance is misplaced. 2d Am. Compl. ¶ 100. Plaintiffs cite *Allen v. District of Columbia*, No. 20-cv-2453, 2023 U.S. Dist. LEXIS 60950 (D.D.C. Mar. 31, 2023), in which a court denied a motion to dismiss an as-applied challenge to the revocation of a plaintiff's concealed carry license. *Allen* was briefed prior to *Bruen*, and the court did not order supplemental briefing. *Id.* at *25. Instead, because there was no historical evidence yet presented to rebut the plaintiff's claim, the court denied the motion. *Id.* at *26. But the court did not suggest that the plaintiff was likely to prevail, noting that "*Bruen* does not directly address whether someone with a history of arrests but no convictions has a right to a CPL under the Second Amendment." *Id.* at *30.

Even if it had precedential value, *Allen* would not require a similar result here. *Bruen* instructs courts applying its "text-and-history test" to "decide a case based on the historical record compiled by the parties." 142 S. Ct. at 2130 n.6; *see also Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *9 (D. Minn. Mar. 31, 2023) (observing that *Bruen* may lead to differing conclusions on the same issue based on different historical records presented), *appeal docketed*, No. 23-2248 (8th Cir. May 22, 2023). The *Allen* court did not have the extensive historical record and analysis presented in this case. This Court should therefore decide this case on the record before it, which is more than sufficient to defeat Plaintiffs' claims. *See Koons*, 2023 WL 3478604, at *24 (relying on similar sources to those presented here to reject challenge to New Jersey's suitability standards); *M.U.*, 291 A.3d at 849–54 (same).

Plaintiffs also cite *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688, in which a Fifth Circuit panel departed from the well-accepted approach to analyzing historical analogues above and struck down the longstanding federal law prohibiting the possession of firearms by someone subject to a domestic violence restraining order (18 U.S.C. § 922(g)(8)). The panel reasoned that historical laws disarming dangerous individuals were too dissimilar from the federal law because the former operated broadly against disfavored classes rather than narrowly neutralizing risks posed by specific dangerous individuals. *Id.* at 457.

Plaintiffs are wrong to rely on *Rahimi*. For starters, the Supreme Court has granted *certiorari*, so the Fifth Circuit's opinion will not be the last or authoritative word. In any event, the panel's reasoning makes no sense because it faults the federal law for being *less* burdensome on Second Amendment rights than historical laws. To boot, the panel's discussion of historical sources is against the weight of other courts of appeals' and Justice Barrett's views, which conclude that § 922(g)(8) and similar modern laws, like the federal felon-in-possession ban, are supported by the historical record. *Compare id.* at 456–60, *with United States v. Boyd*, 999 F.3d 171, 186 (3d Cir. 2021), *and United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011), *and Kanter*, 919 F.3d at 465 (Barrett, J., dissenting). Unsurprisingly, the panel's decision has already engendered sharp criticism. *Range v. Att'y Gen.*, 69 F.4th 96, 118 (3d Cir. 2023) (en banc) (Krause, J., dissenting) ("deeply disturbing"); Michael L. Smith, *Historical Tradition: A Vague, Overconfident, and Malleable Approach to Constitutional Law*, 88 Brook. L. Rev. 797, 833 (2023) ("ill conceived and nonsensical"); Samantha L. Fawcett, *Upholding the Domestic Violence Firearm Prohibitors Under* Bruen*'s Second Amendment*, 18 Duke J. Const. L. & Pub. Pol'y Sidebar 405, 438 (2023) ("a facially absurd result"). And, for other reasons explained in

greater depth by the United States, the Fifth Circuit's decision is "profoundly wrong."  Brief for the United States at 10, *Rahimi*; *see also id.* at 41–46.[10]  Accordingly, the Court should hold that the government could historically regulate access to firearms by dangerous individuals, and the licensing and registration laws challenged here are relevantly similar to that historical practice.

### 3. The District's Dangerousness Standards Are Also Valid Because They Are Distinctly Similar to Licensing Laws Appearing in the 19th Century.

While the District's dangerousness standards are lineal descendants of Founding Era laws disarming dangerous individuals, they are also heirs apparent to licensing laws emerging in the 19th century.  The bare fact that licensing laws only took the throne of gun regulation in the 19th century does not disinherit them of constitutional validity.  Rather, for three reasons, the 19th and 20th century licensing laws are proper historical analogues under *Bruen* and support the District's ability to implement its current licensing regime.

First, *Bruen* instructs that late 19th and early 20th century evidence is not relevant "when it *contradicts* earlier evidence."  142 S. Ct. at 2154 (emphasis added).  But reliance on such evidence is permissible when it comports with an understanding "open, widespread, and unchallenged since the early days of the Republic."  *Id.* at 2137.  Here, 19th and early 20th century suitability standards are *consistent* with earlier evidence.  Governments have been keeping guns out of the hands of dangerous or unsuitable individuals since the right to bear arms was first codified in England.  Licensing schemes with suitability standards were just another method of doing what governments have always done.  The present case is different from *Bruen*, which addressed a proper cause standard, because no historical law reviewed by the Court had

---

[10]      The *Allen* court relied on *Rahimi*.  2023 U.S. Dist. LEXIS 60950, at *23–24.  Thus, the court's reliance on such a misguided case is another reason *Allen* should not control here.

"operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." 142 S. Ct. at 2150. By contrast, historical laws have long operated to prevent dangerous individuals from carrying or possessing guns, so early licensing laws provide historical support for the standards challenged here. *See Smith v. United States*, 143 S. Ct. 1594, 1608 n.16 (2023) (relying on mid-19th century sources to construe the Constitution "[b]ecause the evidence is uniformly consistent" with earlier sources); *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) (holding that the government had established a "historical tradition" by relying on laws passed at the Founding and similar "laws throughout the 1800s"); *Del. State Sportsmen's Ass'n*, 2023 WL 2655150, at *12 (relying on "analogous twentieth-century regulations" because they were consistent with a historical "pattern").

Second, the *Bruen* Court explained that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." 142 S. Ct. at 2132. Accordingly, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* That is, gun regulation not present at the Founding may still be constitutional if it appeared later due to changing conditions. *Id.*; *see also Alaniz*, 69 F.4th at 1129 (rejecting challenger's arguments that there was no similar historical regulation to a sentencing enhancement for possession of a dangerous weapon during a drug offense because "[i]llegal drug trafficking is a largely modern crime"); *Hanson v. District of Columbia*, No. 22-cv-2256, 2023 WL 3019777, at *12–17 (D.D.C. Apr. 20, 2023) (upholding the District's ban on large-capacity magazines as analogous to similar bans that emerged in the Prohibition Era due to social and technological changes), *appeal docketed*, No. 23-7061 (D.C. Cir. May 17, 2023).

As detailed above, the post-Founding shift to licensing laws and suitability standards is readily explainable.  Argument § III.B.1.g, *supra*.  Licensing laws respond to a "societal problem" not present at the Founding, *Bruen*, 142 S. Ct. at 2131:  Americans living in numbers the Founders never could have forecasted, at a density they never could have predicted, with technologically advanced guns they never could have imagined.   Nor could the Founding generation have even considered licensing schemes as a policy solution because they lived in a time with only fledgling state and federal governments—in many cases, without any municipal government presence, let alone the strong municipal governments of today.  As a result, society did not yet have the administrative or police apparatus capable of administering and enforcing a licensing scheme.  Accordingly, historians and scholars have concluded that concealed carry restrictions, licensing laws, and suitability standards emerged in the mid- to late-19th century due to social, technological, and legal changes in American society.  *E.g.*, Charles, *Fugazi*, *supra*, at 652; Spitzer, *supra*, at 63–64; *Nat'l Ass'n for Gun Rts. v. Lamont*, No. 22-cv-1118, 2023 WL 4975979, at *32 (D. Conn. Aug. 3, 2023); *Or. Firearms Fed'n*, 2023 WL 4541027, at *43–44.  And so licensing laws' post-Founding vintage reflects not a constitutional flaw, but a historical reality.  *See McCullen v. Coakley*, 573 U.S. 464, 481–82 (2014) (observing that "States adopt laws to address problems that confront them" at the moment).

Third, licensing laws with suitability standards, and public support for them, show up in the period around the Fourteenth Amendment, which is a highly relevant period to a *Bruen* analysis.  The Supreme Court has considered history from this era and after as "a critical tool of constitutional interpretation."  *See Heller*, 554 U.S. at 605; *see also id.* at 614–19; *McDonald v. City of Chicago*, 561 U.S. 742, 776 (2010) (plurality op.) (examining "[e]vidence from the period immediately following the ratification of the Fourteenth Amendment" to "confirm[] that

the right to keep and bear arms was considered fundamental").  Moreover, the Supreme Court

has "made clear that individual rights enumerated in the Bill of Rights and made applicable

against the States through the Fourteenth Amendment have the same scope as against the Federal

Government," *Bruen*, 142 S. Ct. at 2137, which principle necessarily extends to the District.

That scope inevitably includes "how the right was understood when the Fourteenth Amendment

was ratified." *Ezell*, 651 F.3d at 702.  In fact, leading legal scholars have rightly posited that, to

the extent it is different, the 1868 understanding alone must govern, because the States'

then-contemporary understanding of incorporated rights also served to "readopt[ ] the original

Bill of Rights  . . .  in a manner that invested those original 1791 texts with new 1868 meanings."

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439

(2022).

### C.      Plaintiffs Do Not Otherwise Allege Any Constitutional Defect in the District's Dangerousness Standards.

Based on both the text and history of the Second Amendment, Plaintiffs' marquee claim

(that the Second Amendment broadly prohibits the District's dangerousness standards) fails.

Plaintiffs also allege a smattering of "defects" with the District's standards.  2d Am. Comp.

¶ 100.  None, however, renders the standards unconstitutional.

First, Plaintiffs argue that, to comport with the Second Amendment, the District's

dangerousness standards must make exceptions for self-defense.  *Id.*  This misunderstands the

point of the Supreme Court's "self-defense" analysis.  Self-defense was at the heart of the

analysis in *Heller* because the Court recognized, for the first time, that the Second Amendment

guarantees "the individual right to possess and carry weapons in case of confrontation."  554

U.S. at 592; *see id.* at 599 ("[S]elf-defense . . . was the *central component* of the right itself.").

*Heller* did not, however, suggest that the Second Amendment covers every individual with self-

defense needs.  On the contrary, *Heller* envisioned that some categories of dangerous people (such as felons and the mentally ill) could be prohibited altogether from possessing firearms regardless of an individualized right to self-defense.  *Id.* at 626; *see id.* at 635 ("Assuming that Heller is not *disqualified from the exercise of Second Amendment rights*, the District must permit him to register his handgun and must issue him a license to carry it in the home." (emphasis added)).  The Court thus recognized that, although the Second Amendment protects the right to bear arms for self-defense, that right is held only by "ordinary, law-abiding, adult citizens." *Bruen*, 142 S. Ct. at 2134.  Because dangerous individuals fall outside of that category, they cannot assert a right to arm themselves for self-defense.  *See id.* at 2134–35 (explaining that, because the petitioners were "two ordinary, law-abiding, adult citizens," they could assert the Second Amendment right to keep arms for self-defense); *United States v. Barnes*, No. 22-cr-43, 2023 WL 2268129, at *1 (S.D.N.Y. Feb. 28, 2023) (rejecting argument similar to Plaintiffs').

Second, Plaintiffs argue that the registration and licensing systems are unconstitutional because they shift the burden of establishing suitability to the individual.  2d Am. Compl. ¶¶ 81, 241, 256.  Plaintiffs are wrong both factually and legally.  As a factual matter, under both schemes, the Chief bears the initial burden of identifying and explaining reasons for denial or revocation.  D.C. Code §§ 7-2502.10(a), 7-2509.05(a)(4); 24 DCMR §§ 2341.3, 2340.1, 2340.3. As a legal matter, "[o]utside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment."  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 58 (2005) (internal quotation marks omitted) (quoting *Lavine v. Milne*, 424 U.S. 577, 585 (1976)).  So "a state may assign applicants that burden [of demonstrating suitability] without transgressing the Constitution."  *Berron*, 825 F.3d at 848.

Indeed, in noting with approval states' licensing laws that employ dangerousness standards, *Bruen* made no remark about those schemes' locus of the burden.  142 S. Ct. at 2138 n.9.

Third, Plaintiffs allege that the District's dangerousness standards are overbroad.  2d Am. Compl. ¶ 256.  But the Supreme Court has "discouraged" courts from recognizing overbreadth claims outside "relatively few settings"—and the Second Amendment is not one of them.  *Sabri v. United States*, 541 U.S. 600, 609 (2004).  Following this guidance, courts have rejected Second Amendment overbreadth claims both before and after *Bruen*.  *E.g.*, *Hightower*, 693 F.3d at 82 (collecting cases); *Cal. Rifle & Pistol Ass'n, Inc. v. City of Glendale*, No. 22-cv-7346, 2022 WL 18142541, at *7 (C.D. Cal. Dec. 5, 2022).  For good reason:  such claims would "invite judgments on fact-poor records" and "allow a determination that the law would be unconstitutionally applied to different parties and different circumstances from those at hand." *Sabri*, 541 U.S. at 609.  That is especially true when it comes to challenges to licensing laws, which would require courts to imagine hypothetical applicants.  To avoid "a further departure from the norms of adjudication," the Court should reject any overbreadth claim.  *Id.*

Fourth, each Plaintiff alleges that the District applied its dangerousness standards to him in a manner that violates Second Amendment rights.  *E.g.*, 2d Am. Compl. ¶¶ 241–43, 265. Plaintiffs' disagreements with the decisionmakers' rationales do not rise to a Second Amendment violation.  At the outset, Plaintiffs seek to collaterally attack the Chief's determinations, but ordinarily "litigants must overcome a 'stron[g]' 'presumption of validity' when 'otherwise final decisions . . . are collaterally attacked.'"  *George v. McDonough*, 142 S. Ct. 1953, 1962 (2022) (quoting *Fugo v. Brown*, 6 Vet. App. 40, 44 (1993)).  Further, "respect for the review mechanism[s] that [the District] has established, along with broader concerns of comity and federalism, counsel against a searching federal review" of the Chief's and Board's decisions.

*White*, 15 F.4th at 810; *see also id.* at 813–14 (deferring to state licensing authority's individualized determination of dangerousness); *Kuck v. Danaher*, 600 F.3d 159, 165 (2d Cir. 2010) (explaining that it is "not [the federal court's] province" to resolve whether the licensing authority correctly denied an application under state law).

In each case here, the Chief and/or the Board relied on a history of recent charges, arrests, or incidents to reach their conclusions. Although these are not all convictions, the Second Amendment allows states to consider arrests "in assessing dangerousness." *White*, 15 F.4th at 813. While Plaintiffs may disagree with the conclusions drawn from their records, the Second Amendment allows the determination of dangerousness to be left to licensing authorities. Argument § III.B, *supra*. If Plaintiffs disagreed with the Chief's or Board's decisions, then they should have exercised their ability to appeal their individual cases to the District's courts. Thus far, none has.

Finally, the Second Amended Complaint repeatedly accuses the District of "discriminat[ing]" against Black people. 2d Am. Compl. ¶¶ 64–69, 99–100, 243, 257. Plaintiffs do not bring any claims under the Equal Protection Clause or any anti-discrimination statute, so their accusations are irrelevant. Indeed, these allegations only got tacked on with Plaintiffs' recent amendments—so they cannot be necessary to Plaintiffs' claims or else they would have been alleged in the original Complaint. *See* Compl.

The accusations are also unsupported by factual allegations that the District's licensing and registration system treats applicants differently based on race. All the Second Amended Complaint alleges is that Black people "are more likely to be . . . arrested," 2d Am. Compl. ¶ 69, "resulting in more denials and revocations of registration certificates [or] CPLs for African Americans," 2d Am. Compl. ¶ 65. This leap of logic suffers from two flaws of reasoning:

(1) arrests do not automatically disqualify an applicant, rather, the Chief may use the *facts* contained in arrest records to determine whether they "show[ ]"—along with other evidence— "that the applicant has had a history of violent behavior," 24 DCMR § 2309.1(f); and (2) there is zero evidence cited indicating that Black applicants face more denials than applicants of other races.  And there is no way Plaintiffs can allege that there is a disparity in application denials based on race because they have no access to that data.  The pleading thus violates the Rule that, by signing it, counsel represents that "to the best of [their] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," "the factual contentions have evidentiary support."  Fed. R. Civ. P. 11(b)(3).

Charges of racial discrimination are serious.  Especially where, as here, they are lobbed at the Government without factual support, they run the risk of unfairly affecting public perception of the District's gun safety measures.  The potential for prejudice against the District is obvious and substantial.  Because Plaintiffs' threadbare accusations of racial animus have no relevance to the Second Amendment analysis and serve only to distract from the issues and inflame emotions, the Court should strike them as "immaterial, impertinent, or scandalous."  Fed. R. Civ. P. 12(f); *see also, e.g.*, *Pigford v. Veneman*, 215 F.R.D. 2, 4 (D.D.C. 2003) (striking "accusations of racism").

## CONCLUSION

The Court should stay the case or dismiss the Second Amended Complaint.

Date: August 30, 2023.                        Respectfully submitted,

                                             BRIAN L. SCHWALB
                                             Attorney General for the District of Columbia

                                             STEPHANIE E. LITOS
                                             Deputy Attorney General
                                             Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
RICHARD P. SOBIECKI [500163]
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendant*