UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SANU MILLARD, et al.,

    Plaintiffs,

v.

GOVERNMENT OF THE DISTRICT OF COLUMBIA,

    Defendant.

Civil Action No. 22-2672 (CKK)

**MEMORANDUM OPINION AND ORDER**
(February 29, 2024)

Plaintiffs Sanu Millard, Keontae Steptoe, and Kenneth Hope, on behalf of themselves and a putative class, sued the District of Columbia ("the District") for denying and/or revoking their firearm registration certificates and concealed carry licenses, in violation of their Second Amendment rights. *See generally* Second Am. Compl., ECF No. 30. Pending before the Court is the District's [31] Motion to Stay the Case or, Alternatively, Dismiss Plaintiffs' Second Amended Complaint ("Motion" or "Mot."). With respect to the former request, the District moves to stay this case pending the United States Supreme Court's decision in *United States v. Rahimi*, No. 22-915. *See* Mot. at 16–19. Plaintiffs oppose the District's motion in its entirety. *See* Pls.' Opp'n, ECF No. 35. Upon consideration of the briefing,[1] the relevant authorities, and the record as a whole, the Court shall **GRANT** the District's [31] Motion to Stay the Case or, Alternatively,

---

[1] The Court's consideration has focused on the following:
- Plaintiffs' Second Am. Compl., ECF No. 30;
- The District's Motion to Stay the Case or, Alternatively, Dismiss Plaintiffs' Second Amended Complaint, ECF No. 31;
- Plaintiffs' Opposition to Defendant's Motion to Stay the Case or, Alternatively, Dismiss Plaintiffs' Second Amended Complaint ("Pls.' Opp'n"), ECF No. 35; and
- The District's Reply in Further Support of its Motion to Stay the Case or, Alternatively, Dismiss Plaintiffs' Second Amended Complaint ("Reply"), ECF No. 39.

Dismiss Plaintiffs' Second Amended Complaint, and **STAY** proceedings in this case, pending further order from the Court.

## I. BACKGROUND

**A. Firearm Registration Certificate & Concealed Carry License**

Under D.C. law, any person who "possess[es] or control[s]" a firearm in the District must register it, with certain inapplicable exceptions. D.C. Code § 7-2502.01(a). Similarly, an individual seeking a concealed carry license must also register the pistol he intends to carry in the District, regardless if the firearm is kept elsewhere. *Id.* § 7-2509.02(a)(2). According to the District, individuals often apply for a registration certificate and a concealed carry license simultaneously. *See* Mot. at 7.

The Chief of the Metropolitan Police Department ("MPD") issues registration certificates when certain requirements are met. *See* D.C. Code § 7-2502.03(a). Of relevance here, applicants must not have "had a history of violent behavior" within the five years preceding their application. *Id.* § 7-2502.03(a)(6A). This determination can be made by considering, *inter alia*, certain information contained within arrest records, including, for instance, arrests for threats to do bodily harm (in violation of D.C. Code § 22-407) and "any crime of violence" as defined in D.C. Code § 23-1331(4). 24 DCMR § 2309.01(f). To obtain a firearm registration certificate, an applicant must provide information to the Chief, including any past denials or revocations of a registration certificate or firearm license, and fingerprints. D.C. Code § 7-2502.03(b)(6); *id.* § 7-2502.04(a). The Chief uses this information to perform a background check, which may involve an "[i]nquiry and investigation of the applicant's criminal history," record checks, "[s]ubmission of fingerprints to the [FBI]," and "interviews or other investigative techniques." 24 DCMR § 2314.2. If the Chief determines there is no "history of violent behavior" and the other eligibility factors are met, then

the Chief approves the application and issues a registration certificate. *Id.* § 2314.4. If the Chief denies the application, then notification and an explanation is provided to the applicant of the proposed denial or revocation. D.C. Code § 7-2502.10(a). The applicant may not respond, in which case the proposed denial/revocation becomes final, or the applicant may "submit further evidence in support of the application or qualifications," which in turn prompts the Chief to make a final decision. *Id.* § 7-2502.10(a)–(b). If an application is not expressly approved or denied within sixty days, then it is "deemed to be denied for the purpose of appealing." 24 DCMR § 2315.7. An applicant can appeal the Chief's final decision to the Office of Administrative Hearings ("OAH"). D.C. Code § 7-2502.10(b-1). If OAH denies the claim, then the applicant may petition the D.C. Court of Appeals for judicial review. *Id.* § 2-1831.16(e).

In addition to a firearm registration certificate, D.C. law permits an individual to carry a concealed pistol with a license issued by the Chief of MPD. D.C. Code §§ 22-4504(a), 22-4506. The applicant must meet various requirements to qualify for this license, such as registering the pistol, completing a firearms training course, and being "a suitable person to be so licensed." *Id.* §§ 7-2509.02(a)(2)&(4); *id.* § 22-4506(a). To be "suitable to obtain" a license, the applicant must, among other things, demonstrate that he "[h]as not exhibited a propensity for violence or instability that may reasonably render [his] possession of a concealed pistol a danger to [himself] or another." 24 DCMR § 2335.1(d). To make this determination, the Chief uses information provided by the applicant to conduct an investigation, which may entail interviewing references and reviewing criminal records. *Id.* §§ 2337(d)&(e); *id.* § 2338. If approved by the Chief, the applicant is issued a concealed carry license. *Id.* § 2340.1. If denied, the Chief provides written notice to the applicant and provides the reasons for the denial. *Id.* § 2340.3.

A concealed carry license is valid for two (2) years. *Id.* § 24-2340.5. During that period, the Chief may revoke the license if the individual failed to comply with the duties for carrying, *id.* § 2341.1(2), or no longer meets the requirements, D.C. Code § 7-2509.05(a)(1). In such circumstances, the Chief issues a notice of intent, explaining the reasoning for the revocation and informing the applicant that the revocation will take effect unless a timely appeal follows. *Id.* § 7-2509.05(a)(4). If a license has been revoked or denied, the individual can appeal this decision to the Concealed Pistol Licensing Review Board ("the Board"). *Id.* §§ 7-2509.02(g), 7-2509.03(c), 7-2509.05(a)(4). A party aggrieved by the Board's decision can petition the D.C. Court of Appeals for judicial review. *Id.* § 7-2509.08(f).

**B. Plaintiffs & Procedural History**

Plaintiffs are three individuals who were denied, or had revoked, concealed carry licenses or firearm registration certificates. *See generally* Second Am. Compl. ¶ 121 (Plaintiff Millard's denial for a concealed carry license); *id.* ¶ 152 (Plaintiff Hope's denial for a concealed carry license and firearm registration certificate); *id.* ¶¶ 170, 180 (Plaintiff Steptoe's revocation of his concealed carry license and registration certificate).

In September 2022, Plaintiffs, on behalf of themselves and a putative class, initiated this lawsuit against the District, alleging violations of their Second and Fifth Amendments rights. *See generally* Compl., ECF No. 1.[2] The District first moved to stay the case, or in the alternative, to dismiss the complaint, in February 2023. ECF No. 19. In light of the Supreme Court's instructions in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ("*Bruen*"), the Court ordered Plaintiffs to address, in their opposition, the following: (1) important founding-era legal

---

[2] Although Plaintiffs initially alleged that the District violated their Fifth Amendment rights, *see* Compl., ECF No. 1, ¶¶ 219–247, their Second Amended Complaint omits such allegations, *see generally* Second Am. Compl., ECF No. 30.

4

scholars who interpreted the Second Amendment in published writings; (2) 19th-century cases interpreting the Second Amendment; (3) the discussion of the Second Amendment in Congress and in public discourse after the Civil War; and (4) how post-Civil War commentators understood the right to bear arms as to the conduct governed by the challenged regulations. Minute Order (Mar. 10, 2023) (citations and internal quotation marks omitted). The Court further ordered the parties to address whether 1791 or 1868 is the more appropriate historical analogue for the challenged regulations, and whether the challenged regulations are more akin to "common-law offenses," "statutory prohibitions," and/or "surety statutes" that may or may not have been commonly accepted at the time of ramification. *Id.* (citations omitted).

Plaintiffs then amended the complaint twice. *See* ECF No. 27 (Amended Complaint); ECF No. 31 (Second Amended Complaint). In their Second Amended Complaint, Plaintiffs raise two claims: (1) the D.C. regulation providing that concealed carry licenses can be denied if the applicant has "exhibited a propensity for violence or instability" violates the Second Amendment facially and as applied to Plaintiffs, Second Am. Compl. ¶¶ 250–267; and (2) the D.C. law and regulation providing that a firearm registration can be denied if the applicant has a "history of violent behavior" violates the Second Amendment facially and as applied to Plaintiffs, *id.* ¶¶ 268–289. Plaintiffs seek a declaration that the challenged provisions are unconstitutional (in violation of the Second Amendment), a permanent injunction enjoining their enforcement, and damages. *Id.* ¶ 303. Of relevance, Plaintiffs rely on the Supreme Court's *Bruen* decision for support that the challenged provisions are unconstitutional. *See id.* ¶¶ 4, 29, 85, 100.

C. **The Supreme Court &** ***United States v. Rahimi***

In November 2023, the Supreme Court heard oral arguments in *United States v. Rahimi*, with a decision expected to be issued by the end of the Supreme Court's term in June 2024. *See*

5

22-915, Supreme Court of the United States, https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/22-915.html (last accessed Feb. 27, 2024). On appeal is the Fifth Circuit's decision holding that an individual subject to a domestic violence restraining order, entered during a civil proceeding, remains within "the people" to whom the Second Amendment guarantees the right to bear arms. *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023). Although suspected of other criminal conduct, Rahimi was not a convicted felon or subject to another "longstanding prohibition[] on the possession of firearms." *Id.* (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008)). Therefore, "while hardly a model citizen," Rahimi was "nonetheless among the people entitled to the Second Amendment's guarantees[.]" *Id.* at 453. Applying the metrics articulated in *Bruen*, the Fifth Circuit found that the government failed to demonstrate that the challenged restriction on Rahimi's Second Amendment right "fits within our Nation's historical tradition of firearm regulation." *Id.* at 460.

In June 2023, the Supreme Court granted certiorari to determine whether the statute that barred Rahimi from possessing a firearm violates the Second Amendment on its face. Br. for U.S. at I, *Rahimi*, No. 22-915 (Aug. 14, 2023). That analysis would involve determining whether, and to what extent, governments may disarm individuals who are not law-abiding, responsible citizens. *See* Oral Arg. Tr. at 31:21–32:14, *Rahimi*, No. 22-915 (Nov. 7, 2023) (Chief Justice Roberts questioning Solicitor General Prelogar, stating: "[Y]our argument today is that it doesn't apply to people who present a threat of dangerousness? Whether you want to characterize them as responsible or irresponsible, whatever, the test that you're asking us to adopt turns on dangerousness?"); *id.* at 81:25–83:5 (Chief Justice Roberts questioning counsel for Rahimi: "I understand your answer to say that there will be circumstances where someone could be shown to

be sufficiently dangerous that the firearm can be taken from him. . . . And why isn't that the end of the case?"). The Supreme Court also stands to provide "useful guidance" about the "methodology that *Bruen* requires," considering the "fair bit of confusion about what *Bruen* means and what *Bruen* requires in the lower courts." *Id.* at 38:4–13.

## II. LEGAL STANDARD

The "power to stay proceedings" is "incidental to the power inherent in every court to control the disposition of the causes on its docket" with "economy of time and effort for itself, for counsel, and for litigants." *Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 879 n.6 (1998) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936)). The power to issue a stay is "appropriately exercised where a separate proceeding bearing upon the case is pending." *Hulley Enters. Ltd. v. Russian Fed'n*, 211 F. Supp. 3d 269, 276 (D.D.C. 2016) (BAH). A stay may be warranted "where the resolution of other litigation will likely narrow the issues in the pending cases and assist in the determination of the questions of law involved." *Id.* (quoting *Landis*, 299 U.S. at 253) (internal quotation marks omitted). The stay may still be warranted even when the "parallel proceedings 'may not settle every question of fact and law,' but would settle some outstanding issues and simplify others." *Bridgeport Hosp. v. Sebelius*, No. 09-cv-1344, 2011 WL 862250, at *1 (D.D.C. Mar. 10, 2011) (RWR) (quoting *Landis*, 299 U.S. at 256). To be lawful, the stay must have "reasonable limits." *Landis*, 299 U.S. at 257.

In determining whether to issue a stay, the Court considers: (1) what effect, if any, "will the completion of the [Supreme Court's] proceedings have on the proceedings before this Court[]"; (2) how, if at all, "will [Plaintiffs] be burdened if a stay is granted"; and (3) how, if at all, "will [the District] be burdened if the stay is not granted." *U.S. ex rel. Vt. Nat'l Tele. Co. v. Northstar Wireless, L.L.C.*, 288 F. Supp. 3d 28, 31 (D.D.C. 2017) (CKK). In weighing the hardships of a

7

stay, a court considers the following factors: (1) the "harm to the nonmoving party if a stay does issue"; (2) "the moving party's need for a stay—that is, the harm to the moving party if a stay does not issue"; and (3) whether a stay "would promote efficient use of the court's resources." *Camp. Legal Ctr. v. Correct the Rec.*, No. 23-cv-75, 2023 WL 2838131, at *2 (D.D.C. Apr. 7, 2023) (JEB). If there is a "fair possibility" that the stay would "work damage to some one else," then the movant "must make out a clear case of hardship or inequity in being required to go forward." *Id.* (quoting *Landis*, 299 U.S. at 255–59). The Court's determination of whether a stay is warranted "is inextricably intertwined with the nature of the specific case." *Wrenn v. Dist. of Columbia*, 179 F. Supp. 3d 135, 137 (D.D.C. 2016) (CKK).

### III. DISCUSSION

In the pending Motion, the District first requests that the Court issue a stay in this case, pending the Supreme Court's resolution of *Rahimi*, No. 22-915. Mot. at 16. In the alternative, the District moves to dismiss Plaintiffs' Second Amended Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b). *Id.* at 19–68. For the reasons set forth below, the Court shall grant the District's first request and issue a stay of proceedings.

#### A. *Rahimi's* Effect on this Proceeding

The Court begins by addressing the likely effect the Supreme Court's decision in *Rahimi* will have on this case. There is no dispute that this case requires the Court to apply *Bruen*'s historical test, which directs lower courts to uphold gun restrictions only when there is a tradition of such regulation in the history of the United States. *Bruen*, 597 U.S. at 17 ("[T]he Government must demonstrate the regulation is consistent with this Nation's historical tradition of firearm regulation."); *see* Mot. at 17; Pls.' Opp'n at 20 (stating the Supreme Court "has already articulated the applicable test to decide this case [in *Bruen*]"). As Chief Judge James E. Boasberg put it,

*Bruen* "radically redrew the landscape" regarding Second Amendment challenges. *United States v. Shaw*, No. 22-cr-001, 2023 WL 3619416, at *1 (D.D.C. May 24, 2023) (JEB). Neither the Supreme Court nor the D.C. Circuit has since applied its standard. But, like this case, *Rahimi* also requires the deciding court—there, the Supreme Court no less—to apply *Bruen*'s historical test. *See Rahimi*, 61 4th at 461 (the Fifth Circuit concluding, in light of *Bruen*, that the challenged law is unconstitutional). Therefore, the Supreme Court's decision in *Rahimi*, applying—and clarifying—*Bruen*'s historical test for the first time since its inception will assist the Court in applying the test as well, especially given the lack of guidance from the D.C. Circuit. Furthermore, the District has stated that it intends to rely on "similar historical sources" that the United States raised in *Rahimi*. *See* Br. for U.S. at 6–9, *Rahimi*, No. 22-915 (Aug. 14, 2023); Mot. at 17 ("The District defends its dangerousness standards on similar grounds here, relying on similar historical sources."). The Supreme Court's analysis of these historical sources, and the weight given to those sources, will therefore inform the Court's own analysis of those same sources. *See Peled v. Netanyahu*, No. 17-cv-260, 2017 WL 7047931, at *2 (D.D.C. Oct. 16, 2017) (RBW).

Moreover, certain issues presented in this case and in *Rahimi* are analogous. In both cases, the government argues that it may disarm individuals found to be "irresponsible" and/or dangerous. Br. for U.S. at 6–9, 42–43, *Rahimi*, No. 22-915 (Aug. 14, 2023); *see* Mot. at 17 ("The District defends its dangerousness standards on similar grounds here[.]"). As such, the Supreme Court's resolution of that issue—whether governments can constitutionally disarm certain "irresponsible" or dangerous individuals—will necessarily "narrow the issues" for the Court. *Landis*, 299 U.S. at 253.

Plaintiffs argument that there is "no need for this Court to wait for the Supreme Court's opinion in *Rahimi*" because this case presents "completely different issues" than those presented

in *Rahimi*, Pls.' Opp'n at 19, is unavailing. First, Plaintiffs concede that this case "raises the issue of whether [the District] can deny residents of the District their ability to own and carry firearms based upon conduct that did not lead to a conviction." *Id.* at 12. The United States, in *Rahimi*, is arguing that the government does have the power to do so in contexts that did not result in convictions. *See* Br. for U.S. at 42–43, *Rahimi*, No. 22-915 ("But legal sources from the 17th, 18th, and 19th centuries recognize the government's power to disarm irresponsible individuals regardless of their criminal records. States have long disarmed groups other than criminals[.]"). Second, Plaintiffs do not acknowledge that the Supreme Court in *Rahimi* will apply *Bruen*'s historical test and will further analyze "similar historical sources" that this Court must apply in its own analysis, despite acknowledging that *Bruen* is the applicable test here. *See* Mot. at 17; Pls.' Opp'n at 20. Finally, the District notes that proceeding in this case, assuming the Court does not grant the District's motion to dismiss in full, "would impose litigation costs, including engaging in discovery" that may later be obviated by a decision in *Rahimi*. Reply at 8 (quoting *Camp. Legal Ctr.*, 2023 WL 2838131, at *3). Therefore, a decision in *Rahimi* will, at a minimum, clarify *Bruen*'s historical test, which in turn will likely clarify the issues for discovery. *See* Reply at 8.

For the aforementioned reasons, the Court concludes that the Supreme Court's ruling in *Rahimi* will "narrow the issues" presented in this case and "assist [the Court] in the determination of the questions of law involved." *Hulley Enters. Ltd*, 211 F. Supp. 3d at 276; *see Bridgeport Hosp.*, 2011 WL 862250, at *1 (a stay can be warranted even if the other proceedings do not "settle every question of fact and law, but would settle some outstanding issues and simplify others.").

### B. The Burdens on the Parties

Next, the Court shall consider the burdens, if any, that a stay will impose on the parties, as well as the burdens, if any, if a stay is not issued.

Plaintiffs argue that they are "facing an ongoing deprivation of their Second Amendment rights and thus face irreparable harm." Pls.' Opp'n at 17. But at least two of the Plaintiffs (Plaintiffs Millard and Steptoe) have received concealed carry licenses and firearm registration certificates since this litigation began. *See* Mot. Ex. H, ECF No. 31-8 (MPD granting Plaintiff Steptoe's appeal and rescinding the proposed revocations of his firearm registration and concealed carry license); Reply, Ex. K, ECF No. 39-1 (MPD approving Plaintiff Millard's application for a concealed carry license). Moreover, the Court has not yet determined whether Plaintiffs have plausibly alleged a Second Amendment violation. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006) (explaining that movants "[must] do more than merely allege a [constitutional violation]" to show irreparable harm). Plaintiffs do not articulate any other hardship apart from the "irreparable harm" argument addressed above. Plaintiffs do not explain why an additional six months (at most) would significantly alter their current position. In fact, Plaintiffs themselves have "long delayed [their] day in court on [their] claim[s]." *Feld Enter., Inc. v. A.S.P.C.A.*, 523 F. Supp. 2d 1, 4 (D.D.C. 2007) (EGS). Plaintiffs initiated this lawsuit in September 2022, and amended their complaint first in May 2023 and then again in July 2023. *See* ECF No. 1; ECF No. 27; ECF No. 30. Plaintiffs have also sought six extensions of time in this matter. *See* Minute Order (Oct. 20, 2023). Without articulating a concrete reason of why a delay of approximately six months would impose a hardship, the Court cannot conclude that the balance of hardships weighs in favor of not issuing a stay.

The District, on the other hand, has explained that if the stay is not issued, and the Court does not grant its motion to dismiss, then the parties will begin discovery and class-certification litigation—a costly endeavor. Mot. at 18. If, once discovery begins, the Supreme Court issues a decision "confirming that Plaintiffs' claims are meritless," then the resources devoted to discovery

and litigation would indeed be wasted. *See id.* The District also correctly notes that judicial economy weighs in favor of a stay. Reply at 7. The Court's limited resources are not well spent adjudicating a complex motion to dismiss, and possibly discovery disputes, all of which may be obviated post-*Rahimi* and without the Supreme Court's guidance on *Bruen*'s historical test. But a brief stay of approximately six months would provide the parties and the Court the benefit of the Supreme Court's ruling, clarifying the issues and the law in this case, and would likely take less time than the alternative. *See Novenergia II – Energy & Env't (SCA) v. Kingdom of Spain*, No. 18-CV-1148, 2020 WL 417794, at *4 (D.D.C. Jan. 17, 2020) (TSC) ("[W]hile a stay may well "delay the resolution" of the dispute, in the long run, a stay will 'still likely be shorter than the possible delay that would occur" in its absence).

Lastly, the Court notes that Plaintiffs' objections to the stay primarily rest on the belief that the District "did not ask for a stay in an almost identical case which is farther along the litigation track than this case." Pls.' Opp'n at 1. As a threshold matter, the determination to issue a stay "is inextricably intertwined with the nature of the specific case." *Wrenn*, 179 F. at 137. As such, Plaintiffs' "lengthy discussion" of another case does "not facilitate the resolution of the essential question before this Court:" whether a "stay is proper in this case, at the present time[.]" *Id.* In any event, the District has sought a stay in the case raised by Plaintiffs—*Allen v. District of Columbia*, No. 20-cv-2453. *See* ECF No. 41, No. 20-cv-2453.[3] And a review of that docket reveals that Judge Tanya S. Chutkan granted the District's motion to stay proceedings. *See* ECF No. 52, No. 20-cv-2453. Accordingly, Plaintiffs' objections on this ground are unavailing. *See* Pls.' Opp'n at 15 ("There is no reason to stay this case while *Allen* is steaming full speed ahead.");

---

[3] The Court is not suggesting that Plaintiffs made false representations to the Court. A review of the docket in *Allen v. District of Columbia*, No. 20-cv-2453, reveals that the District moved to stay the proceedings in November 2023, ECF No. 41, No. 20-cv-2453, whereas Plaintiffs filed their opposition in this case in October 2023, *see* Pls.' Opp'n, ECF No. 35.

12

*id.* at 18 ("If the District can defend *Allen* without a stay pending the Supreme Court's decision in *Rahimi*, it can defend this case without a stay.").

## IV. CONCLUSION AND ORDER

For the foregoing reasons, the Court shall **GRANT** the District's [31] Motion to Stay the Case or, Alternatively, Dismiss Plaintiffs' Second Amended Complaint. This matter shall remain **STAYED** pending further order of the Court. The parties are directed to meet and confer and file a joint status report **within thirty days** of the Supreme Court's decision in *United States v. Rahimi*, No. 22-915. Therein, the parties shall propose how to proceed in this case.

Date:   February 29, 2024                                    /s/
                                                                      COLLEEN KOLLAR-KOTELLY
                                                                      United States District Judge