**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SANU MILLARD,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **No. 1:22-cv-02672-CKK** |
| **GOVERNMENT OF THE DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

## DEFENDANT'S SUPPLEMENTAL MEMORANDUM

The Court offered the Parties an opportunity to address the effect, if any, of *United States v. Hemani*, 146 S. Ct. 1677 (2026), and *Wolford v. Lopez*, --- S. Ct. ----, No. 24-1046, 2026 WL 1825723 (June 25, 2026), on Defendant District of Columbia (the District)'s pending Renewed Motion to Dismiss Plaintiffs' Second Amended Complaint [46].  *See* June 18, 2026 Min. Order; June 26, 2026 Min. Order.  Neither *Hemani* nor *Wolford* supports Plaintiffs' claims.

## I.    *United States v. Hemani*

*Hemani* involved a prosecution under 18 U.S.C. § 922(g)(3), which, in relevant part, prohibits gun possession by anyone who is an "unlawful user of . . . any controlled substance." *See* 146 S. Ct. at 1684.  The United States prosecuted the defendant, Hemani, based on his admission that "he used marijuana 'about every other day,'" and Hemani raised a Second Amendment as-applied challenge.  *Id.* at 1685.  Under the framework announced in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the United States did not dispute that Hemani satisfied *Bruen*'s step one.  146 S. Ct. at 1686.  Instead, the United States argued that the prosecution satisfied step two of *Bruen* based on "one" "ambitious" and "expansive" "theory." *Id.* at 1693–94.  According to the United States, § 922(g)(3) can "automatically ban[ ] an individual from possessing a gun" because § 922(g)(3) is analogous to "historical drunkard laws, which included (1) vagrancy laws that allowed for the confinement or detention of vagrants, including habitual drunkards; (2) civil-commitment statutes that allowed courts to appoint guardians for various individuals, including habitual drunkards, or authorized their commitment; and (3) "good behavior" surety laws that allowed officials to compel habitual drunkards and others to post bond and forfeit the bond if they misbehaved.  *Id.* at 1686.[1]

---

[1]    The Supreme Court distinguished "good behavior" surety laws from the surety-of-the-peace laws that the Court relied upon in *United States v. Rahimi*, 602 U.S. 680, 695–96 (2024),

The Supreme Court found that these sources did not support the United States' theory because they "differ dramatically from" § 922(g)(3).  146 S. Ct. at 1687; *see also id.* at 1693–94. On the "why," the habitual drunkard laws applied to individuals whose drinking practically incapacitated them, not individuals who just regularly used intoxicants.  *Id.* at 1687–89.  Further, the habitual drunkard laws did not seek to prevent danger or firearm misuse but sought to protect habitual drunkards or their families from the drunkards' own actions and, in the case of sureties, protect the community from immorality.  *Id.* at 1689–91.  Regardless, § 922(g)(3) did not even appear aimed at "disarm[ing] individuals who are, as a category, violent and unusually dangerous" because controlled substances include drugs that are not categorically and unusually dangerous, and the United States has tolerated increasing use of marijuana.  *Id.* at 1692–93.  On the "how," the habitual drunkard laws "usually provided some form of process before an individual lost any of his liberties"—whether the process be a conviction or proceedings before a probate court, "something like it," a justice of the peace, or "a comparable officer"—while unlawful use of *any* controlled substance "automatically" makes someone ineligible for gun possession under § 922(g)(3).  *Id.* at 1691–92.  "[T]aken cumulatively," these "problems" doomed the United States' theory.  146 S. Ct. at 1687.

The Supreme Court stressed that "[i]n many respects, this case is a narrow one" because the Court only addressed the United States' specific theory.  *Id.* at 1693–94.  "The problem in this case is simply that the historical evidence the government presents does not support the

---

and that the District relies upon here.  *Hemani*, 146 S. Ct. at 1690–91; *see* Mem. of P. & A. in Supp. of Def.'s Renewed Mot. to Dismiss (Def.'s Mot.) [46] at 35–37.  Accordingly, *Hemani*'s discussion of "good behavior" surety laws is not applicable here.  More broadly, the governments in *Hemani* and *Wolford* did not rely on any of the historical sources that the District does here, so Plaintiffs are wrong to argue that "*Hemani* and *Wolford* rejected the historical analogues offered by the District."  Pls.' Supp. Mem. [79] at 4.

categorical restriction it urges." *Id.* at 1692 n.6.  Accordingly, the Court advised that its decision

"should not be taken to suggest 'that the Second Amendment prohibits the enactment of laws

banning the possession of guns by categories of persons thought by a legislature to present a

special danger of misuse.'" *Id.* (quoting *Rahimi*, 602 U.S. at 698); *see id.* at 1693–94.

As a "narrow" decision laser-focused on a different law, a different theory, and different

historical sources, *Hemani* is unhelpful to Plaintiffs.  The distinctions between the habitual

drunkard laws and § 922(g)(3) are not present here.  On the "why," the *Hemani* Court found that

the habitual drunkard laws "targeted different kinds of people" and "did so for different

purposes" from § 922(g)(3).  146 S. Ct. at 1687.  But here, the District marshalled historical laws

that targeted dangerous groups or individuals precisely because they were perceived as or found

to be dangerous.  *See* Def.'s Mot. at 33–43.  The District's dangerousness standards by their

plain terms target individuals found to pose a risk of danger, so there is not the type of

disconnect between regular users of any controlled substance and those subject to the habitual

drunkard laws, as in *Hemani*.  Likewise, there is no problem here of the government failing to

show that its prohibition applies to dangerous individuals, *see Hemani*, 146 S. Ct. at 1692–93,

because the District's standards require findings attuned to dangerousness, *see* D.C. Code

§ 7-2502.03(a)(6A); 24 DCMR § 2335.1(d) (current); 24 DCMR § 2335.1(d) (2019).

On the "how," the *Hemani* Court found that the habitual drunkard laws were not

relevantly similar because they provided some form of process, while § 922(g)(3) applies

automatically based on status.  146 S. Ct. at 1691.  This case is the opposite.  Many historical

laws automatically disarmed groups based on categorical judgments of dangerousness.  *See*

Def.'s Mot. at 34–35, 37–39.  But the District's dangerousness standards are applied through

individualized determinations by law enforcement based on parameters and delegations from the

D.C. Council. *See id.* at 3–5; Def.'s Reply [56] at 32. And those determinations provide more process and focus on potential misuse of a firearm than even the historical laws that relied on individual determinations, like surety laws. *See* Def.'s Mot. at 3–5, 52–53, 59; Def.'s Reply at 32, 42–43, 53–54.

Moreover, *Hemani* provides no support for the supposed Second Amendment rules that underly Plaintiffs' claims. *Hemani* did not address licensing laws, so there is no endorsement of Plaintiffs' proposed rule that license denials can only rely on convictions, not other evidence of dangerous conduct, like police reports. *See* 2d Am. Compl. [30] ¶ 100. If anything, *Hemani* is hard to square with Plaintiffs' "convictions only" or "judicial determinations only" rules, which Plaintiffs double down on. *See* Pls.' Supp. Mem. at 2. Nowhere in *Hemani* did the Court say that "the only way to dispossess someone" based on dangerousness is through "a hearing" "by a judge." *Id.* If such a rule existed, then § 922(g)(3) would seem facially invalid because it applies "automatically" if someone regularly uses a controlled substance. *Hemani*, 146 S. Ct. at 1693. Yet, the Supreme Court left open that the United States could bring § 922(g)(3) prosecutions if a defendant was an "addict[ ]," "a certain drug always renders its users dangerous," or the prosecutor provided "individualized proof" that the defendant's drug use "renders him a danger to himself or others." *Id.* The Court's narrow opinion in *Hemani* and incremental approach to the Second Amendment are contrary to Plaintiffs' reliance on supposed *per se* rules.

Plaintiffs nonetheless misinterpret *Hemani*'s discussion of the "how" to announce a rule that "removing Second Amendment rights requires 'some manner of pre-deprivation process,'" and "post-deprivation appeal process . . . is insufficient." Pls.' Supp. Mem. at 9 (quoting *Hemani*, 146 S. Ct. at 1692 n.6). Not so. Rather, the Court merely found that the specific

historical analogues relied on by the United States required some process, and that distinguished them from § 922(g)(3).  146 S. Ct. at 1691–92.  Had the Court announced a "pre-deprivation process" rule, it could not have left open possible constitutional applications of § 922(g)(3).  And such a rule would be incompatible with licensing in general and *Bruen*'s discussion of permissible licensing regimes.  *See* Def.'s Reply at 42 n.11; *Md. Shall Issue v. Moore*, 116 F.4th 211, 234–36 (4th Cir. 2024) (en banc) (Rushing, J., concurring in part).

**II.**    ***Wolford v. Lopez***

*Wolford* involved a law even further afield, a Hawaii law prohibiting the carrying of guns onto private property without the property owner's express consent.  2026 WL 1825723, at *3, 7.  In a 6-3 decision, the Supreme Court held that Hawaii's law did not pass muster under *Bruen*.  At step one, the Court found that "Hawaii's law severely hampers the ability of a law-abiding citizen to exercise the right *Bruen* recognized."  *Id.* at *10.  At step two, the Court concluded that Hawaii's historical evidence was "vastly different from" the challenged law.  *Id.* at *12.  In short, Hawaii relied primarily on historical laws prohibiting gun carrying or hunting on certain lands without permission, but "these laws targeted unauthorized hunting and focused on land where game could be found," so their coverage, aim, and impact on Second Amendment rights "differed sharply."  *Id.*[2]  Hawaii also relied on an 1893 Oregon law that was not explicitly limited to hunting, but its terms did not extend nearly as far as Hawaii's law, and it was a "lone

---

[2]    Justice Barrett joined the majority opinion and wrote a concurrence explaining further that the challengers erred in discounting these laws simply because they targeted poaching while Hawaii's law "addresses something other than hunting."  2026 WL 1825723, at *17.  Instead, "[t]he antipoaching laws support the principle that when a State identifies specific places that are prone to particular abuses of the right, it can respond with focused regulations to address the threat."  *Id.* (citation modified).  The "problem" with Hawaii's law was that "rather than confining the rule to specific places where firearms are likely to be misused, Hawaii applies it to *all* private property."  *Id.*

statute." 2026 WL 1825723, at *13.  Finally, Hawaii relied on a part of Louisiana's Black Code prohibiting gun carrying on property without an owner's permission, but the statute was unique, and its purpose was specifically to "perpetuate the subjugation of" Black Americans.  *Id.* at *14.

*Wolford* provides no aid to Plaintiffs because it did not address a law anything like the laws challenged here or any of the historical evidence at issue here.  *Contra* Pls.' Supp. Mem. at 4.  Hawaii's law restricted *where* individuals could carry guns, not *who* could obtain a firearm license.  As a result, there is no overlap in the historical principles and sources at issue.  And the problem in *Wolford* was that Hawaii's proffered analogues were not just different from Hawaii's law—but "vastly different."  2026 WL 1825723, at *12.  Here, the historical analogues are relevantly similar in purpose and operation as the District's dangerousness standards: all kept or keep guns from individuals who pose a risk of danger if allowed to keep or carry a gun.

Moreover, the historical showing made by the District here is more than enough to satisfy *Wolford*.  *Wolford* explained that the ultimate question in *Bruen*'s step two is whether a court can say, "Because this historical law was understood to be compatible with the right codified by the Second Amendment, we can infer that the restriction imposed by the modern law is likewise consistent with that right."  *Id.* at *6; *see id.* at *13.  And so a court should consider "the number of jurisdictions in which [historical analogues] were adopted," "the extent to which they were well-accepted," and whether the analogues are "relevantly similar," *i.e.*, "whether [they] imposed a restriction similar to that imposed by the challenged law," and "whether [their] rationale was similar to that of the new law."  *Id.* at *6.[3]  And beyond historical analogues, "[a] variety of sources, including scholarship, may aid this inquiry," *Wolford*, 2026 WL 1825723, at *6,

---

[3]    Plaintiffs have argued that the District must show that historical analogues are "distinctly similar."  Pls.' Opp'n [51] at 138.  *Wolford* and *Hemani* make clear that the standard is "relevantly similar."  *Wolford*, 2026 WL 1825723, at *6; *Hemani*, 146 S. Ct. at 1686.

contrary to Plaintiffs' assertion that this Court should discount sources that were not

"implemented" as laws, Pls.' Supp. Mem. at 7.

Here, governments—through widespread and well-accepted laws—have long kept guns

out of the hands of those who pose a danger if armed and have done so to protect public safety.

*See* Def.'s Mot. at 33–43; Tr. of Oral. Arg. at 16, *Hemani*, No. 24-1234 (U.S. Mar. 2, 2026) (J.

Barrett: "[T]his is what *Rahimi* says, that legislatures can regulate to keep guns out of the hands

of dangerous people . . . ."). Historical laws were *more* restrictive of the right to keep and bear

arms than the District's dangerousness standards because they were not as tightly focused on

dangerousness and lacked the same procedures for making and reviewing individual

determinations. *See* Def.'s Mot. at 52–53, 59; Def.'s Reply at 42–43, 53–54. Because more

burdensome and less targeted laws were "understood to be compatible with the right," the Court

"can infer that the restriction[s] imposed by the [District's dangerousness standards are] likewise

consistent with that right." *Wolford*, 2026 WL 1825723, at *6.

Recent scholarship confirms as much and should aid the Court in applying *Wolford*.

Scholars created a database of 116 historical licensing laws and tagged them based on a variety

of metrics, including whether they contained a character standard and who issued licenses. Mark

Anthony Frassetto *et al.*, *An Interactive Database of Historical Public Carry Licensing Laws*,

Duke Ctr. for Firearms L. (Nov. 13, 2025), tinyurl.com/5n7esb2t. The data shows that licensing

laws were adopted in a "number of jurisdictions" and "were well-accepted." *Wolford*, 2026 WL

1825723, at *6. The data also shows that historical licensing laws were "relevantly similar," *id.*,

because "[c]onditioning licensing on an official's views of an applicant's character was very

common," Frassetto *et al.*, *supra*. Contrary to Plaintiffs' "judicial determinations only" rule,

most historical licensing laws were *not* administered by judges. *See* Mark Anthony Frassetto *et*

*al.*, *Interface: Historical Licensing Laws*, Airtable, tinyurl.com/3um9xjvs (last visited July 15, 2026) (scroll to "License Issuer Breakdown").  And because these laws required a license before carrying—and in some cases possessing—certain weapons, they refute Plaintiffs' rule that a person is entitled to carry or possess a gun *unless and until* a judge holds a hearing and makes dangerousness findings.  *See* Def.'s Reply at 42 n.11; *Md. Shall Issue*, 116 F.4th at 234–36 (Rushing, J., concurring in part).  These close historical analogues are enough to reject Plaintiffs' claims.  *See Wolford*, 2026 WL 1825723, at *6 (the government "may rely on a single analogue"); *Antonyuk v. James*, 120 F.4th 941, 987–91 (2d Cir. 2024) (relying solely on historical licensing laws to uphold New York's dangerousness standard); *Hanson v. District of Columbia*, 120 F.4th 223, 237 (D.C. Cir. 2024) (per curiam) (relying primarily on restrictions on Bowie knives, which also emerged in the mid-19th century, to uphold a firearms law).

Contrary to Plaintiffs' arguments, *Wolford*'s discussion of Louisiana's Black Code does not support Plaintiffs' request that this Court discard historical laws disarming categories of people perceived as dangerous.  *See* Pls.' Supp. Mem. at 7–8; Pls.' Opp'n at 122–27; Def.'s Reply at 60–61.  *Wolford* rejected Hawaii's reliance on the Black Codes because the purpose of the law was to "subjugate" newly freed Black Americans, which was contrary to the understanding of the framers of the Fourteenth Amendment that the right to bear arms was crucial to protecting Black Americans.  2026 WL 1825723, at *14.  So the "why" critically differed from Hawaii's law.  *See id.*; *id.* at *18–19 (Barrett, J., concurring).  In contrast, the class-based disarmament laws relied upon by the District and myriad courts were motivated by a perception that the disarmed groups were dangerous, as Justice Barrett herself previously explained.  *See, e.g.*, *Zherka v. Bondi*, 140 F.4th 68, 90 (2d Cir. 2025), *cert. denied,* 223 L. Ed. 2d 555 (2026); *Kanter v. Barr*, 919 F.3d 437, 457–58 (7th Cir. 2019) (Barrett, J., dissenting).

These laws at least stand for the principle that the state could disarm categories of people based on a perception that they were dangerous. *See, e.g.*, *id.* And if the state could historically disarm large groups of people based on a categorical perception of danger, then surely the District can temporarily prevent individuals from carrying or possessing guns based on an individualized assessment of their risk of firearm misuse.

Nor does *Wolford* (or *Hemani*) aid Plaintiffs at *Bruen*'s first step simply because they "are Americans" who want guns. Pls.' Opp'n at 70; *see* Pls.' Supp. Mem. at 3. The government parties in *Hemani* and *Wolford* did not contest that the challengers were protected by the Second Amendment. *Hemani*, 146 S. Ct. at 1686; *Wolford*, 2026 WL 1825723, at *9. And *Wolford*'s decision about "where" firearms may be carried does not abrogate binding circuit precedent about "who" may carry firearms. Most importantly, the Supreme Court did not address—let alone overrule—*Bruen*'s approval of licensing regimes that mirror the District's in relevant respects. *See* Def.'s Mot. at 20–24; *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (a case is not binding on an issue not "raised in briefs or argument nor discussed in the opinion of the Court"); *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (2023) (cautioning against "read[ing] too much into too little" in Supreme Court opinions because the Court's "opinions dispose of discrete cases and controversies and they must be read with a careful eye to context").

Nonetheless, this Court can avoid questions about the proper scope of step one by assuming without deciding that step one is satisfied and concluding that the District satisfies step two.[4] In doing so, the Court could and should consider all the District's step one arguments

---

[4]    However, the Court cannot assume that Plaintiffs satisfy step one but then find that the District has not satisfied step two. For Plaintiffs to prevail, they must actually satisfy step one despite the District's arguments to the contrary.

under the banner of step two.  For example, the Court can consider *Bruen*'s discussion of

permissible licensing regimes and the Supreme Court's and D.C. Circuit's prior pronouncements

on the scope of the Second Amendment as part of the step two analysis.  *See Md. Shall Issue*,

116 F.4th at 229–36 (Rushing, J., concurring in part).  And the Court can reject Plaintiffs'

supposed Second Amendment rules as unsupported by *Bruen* and history.  *See Antonyuk*, 120

F.4th at 994–98; Def.'s Mot. at 57–59.

* * *

In sum, *Hemani* and *Wolford* did not decide any of the issues here in Plaintiffs' favor.

Yet, other recent decisions are decidedly against Plaintiffs' theories.  Courts have continued to

uniformly uphold dangerousness standards for gun licensing,[5] explain that a dangerousness

standard or "may issue" language does not render a licensing scheme unconstitutional under

*Bruen*,[6] and affirm reliance on evidence other than convictions when making licensing

decisions.[7]  Nothing in *Hemani* or *Wolford* disturbs this consensus that dangerousness standards

for firearm licensing, like those challenged here, are constitutional.

---

[5]     *See People v. Santana*, 254 N.Y.S.3d 336, 339–41 (App. Div. 2026); *McGregor v. Suffolk Cnty.*, No. 23-cv-1130, 2025 WL 3704289, at *2–5 (E.D.N.Y. Dec. 22, 2025), *appeal docketed*, No. 26-141 (2d Cir. Jan. 22, 2026); *Commonwealth v. Mancevice*, No. 23-P-909, 2025 WL 250177, at *3–7 (Mass. Ct. App. July 21, 2025).

[6]     *See Hicks v. State*, --- A.3d ----, No. 634, 2026 WL 1601794, at *7 (Md. App. Ct. June 4, 2026) (en banc); *Santana*, 254 N.Y.S.3d at 339–40; *People v. Johnson*, --- N.E.3d ----, No. 86, 2025 WL 3259873, at *7 (N.Y. Nov. 24, 2025), *cert. denied*, No. 25-6940, 2026 WL 1780086 (U.S. June 22, 2026); *Mancevice*, 2025 WL 250177, at *5–6.

[7]     *See Matter of Gun Permit Appeal of A.A.R.*, No. A-3192-24, 2026 WL 1758290, at *1–3 (N.J. Super. Ct. App. Div. June 18, 2026); *Matter of Rodney Long Firearms Appeal*, No. A-1494-23, 2026 WL 453286, at *1 (N.J. Super. Ct. App. Div. Feb. 18, 2026); *People v. New*, No. B339342, 2026 WL 161273, at *2 (Cal. Ct. App. Jan. 21, 2026); *Matter of the Appeal of the Denial of an App. for a Permit to Carry a Handgun by Applicant, D.D.*, No. A-3536-23, 2026 WL 90692, at *4 (N.J. Super. Ct. App. Div. Jan. 13, 2026).

Date: July 15, 2026.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

/s/ Matthew R. Blecher
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

/s/ Honey Morton
HONEY MORTON [1019878]
Assistant Chief, Equity Section

/s/ Adam J. Tuetken
ADAM J. TUETKEN [242215]
Special Counsel for Firearm Safety
RICHARD P. SOBIECKI [500163]
Assistant Attorney General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendant*

11